IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA – TAMPA DIVISION

| | | |
|---|---|---|
| RAYMOND H. PIERSON, III, M.D., | § | |
| Plaintiff, | § | Civil Action No. 8:08-CV-183-T 17 MAP |
| | § | |
| v. | § | |
| | § | **JURY TRIAL DEMANDED** |
| ORLANDO REGIONAL HEALTHCARE | § | |
| SYSTEM, INC., *et al.* | § | |
| Defendants. | § | |

---

## PLAINTIFF'S FIRST AMENDED ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

---

RAYMOND H. PIERSON, III, M.D. ("Dr. Pierson") files this First Amended Original Complaint and Demand for Jury Trial against Defendants ORHS d/b/a ORMC and also d/b/a Dr. P. Phillips Hospital (formerly known Sand Lake Hospital), Spiegel, Murbach, Appleblatt, Bone, Bott, Csencsitz, Cole, Hillenmeyer, Moser, Diebel, Evans, Galceran, Rivero, Wolfram, Sanders, Estate of John Connolly, M.D., deceased (by and through Co-Personal Representatives Gregory A. Rief and Linda G.T. Parks), FOI, Wolverine, the United States of America, National Practitioner Data Bank, Michael O. Leavitt, Secretary of the United States Department of Health & Human Services, Region IV of the Department of Health & Human Services, State of Florida, Florida Department of Health and Florida Board of Medicine (collectively referred to as "Defendants") as follows:

### I.    NATURE OF ACTION

1.    This complex, multi-faceted lawsuit arises from a sham, malicious medical peer review that lasted more than seven years.  The peer review began with a wrongful

summary suspension of Dr. Pierson's emergency and trauma call privileges and ended with a hospital board resolution affirming that wrongful suspension, which has now been reported to various federal and state entities. As a result, Dr. Pierson is labeled incompetent and a "dangerous" doctor for the rest of his career. The peer review decision was communicated to Dr. Pierson on or after February 3, 2004. Therefore, the statute of limitations for many of the claims asserted herein may expire as early as February 3, 2008.

## II.   PARTIES

2.      Plaintiff Raymond H. Pierson, III, M.D. ("Plaintiff" or "Dr. Pierson"), is an individual who is licensed to practice medicine. Presently, Dr. Pierson resides and practices medicine in Jackson, California. At all times relevant, Dr. Pierson was licensed to practice medicine and was practicing medicine in the State of Florida.[1]

3.      Defendant Orlando Regional Healthcare System, Inc. ("ORHS") is a private healthcare network serving Central Florida. ORHS is a non-profit corporation organized under the laws of the State of Florida. ORHS is comprised of and does business, through its location in Central Florida, as seven healthcare facilities including Orlando Regional Medical Center ("ORMC") and Dr. P. Phillips Hospital (formerly known as, and referred to herein as, "Sand Lake Hospital"). At all times relevant herein, Dr. Pierson held privileges at ORMC and Sand Lake. ORHS can be served by delivering a copy of this Complaint to its registered agent, John Hillenmeyer.

---

[1] Dr. Pierson practiced in Florida through a Professional Association ("P.A.") that he alone owned and controlled. That P.A., which suffered damages as a result of the wrongful events described herein, has since ceased to exist and is defunct. Dr. Pierson sues to recover in his own right, individually, and on behalf of his former P.A.

4.      Defendant Phillip G. Spiegel, M.D. ("Spiegel") is a medical doctor licensed to practice in the State of Florida.  Spiegel resides in Englewood, Florida, and his principal place of business is located in Tampa, Florida.  Spiegel can be served by delivering a copy of this Complaint to his residence, or to his business, or wherever he may be found.  At all relevant times herein, Spiegel was associated with, employed by and/or acted as an agent of Defendant Musculoskeletal Institute, Chartered d/b/a Florida Orthopedic Institute ("FOI") and therefore FOI is liable for his actions in Dr. Pierson's peer review.

5.      Defendant Roger Murbach, M.D. ("Murbach") is a medical doctor licensed to practice in the State of Florida.  Murbach's specialty is anesthesiology.  Murbach was at all times alleged herein a member of the medical staff of ORHS and an agent of ORHS.  Murbach resides in Windermere, Florida, and his principal place of business is located in Orlando, Florida.  Murbach may be served by delivering a copy of this Complaint to his place of business or to his residence, or wherever he may be found.  At all relevant times herein, Murbach was associated with, employed by and/or acted as an agent of Defendant Wolverine Anesthesia Consultants M.D., P.A. ("Wolverine") and therefore Wolverine is liable for his actions in Dr. Pierson's peer review.

6.      Defendant Steven Appleblatt, M.D. ("Appleblatt") is a medical doctor licensed to practice in the State of Florida.  Appleblatt's specialty is anesthesiology.  At all times alleged herein, Appleblatt was a member of the medical staff of ORHS and an agent of ORHS.  Appleblatt resides in and his principal place of business is located in Orlando, Florida.  Appleblatt may be served by delivering a copy of this Complaint to his place of business or to his residence, or wherever he may be found.  At all relevant times herein,

Appleblatt was associated with, employed by and/or acted as an agent of Wolverine and therefore Wolverine is liable for his actions in Dr. Pierson's peer review.

7.    Defendant Frank Bone, M.D. ("Bone") is a medical doctor licensed to practice in the State of Florida.  Bone specializes in gastroenterology and palliative care.  Bone was at all times alleged herein a member of the medical staff of ORHS and an agent of ORHS. Bone resides in and his principal place of business is located in Orlando, Florida.  Bone may be served by delivering a copy of this Complaint to his place of business, or his residence, or wherever he may be found.

8.    Defendant William Bott, M.D. ("Bott") is a medical doctor licensed to practice in the State of Florida.  Bott's specialty is orthopedics.  Bott was at all times alleged herein a member of the medical staff, and an agent of ORHS, while maintaining an orthopedic practice offering orthopedic services in the same geographic area and with the same referral base as Dr. Pierson.  Bott resides in Orlando, Florida, and his principal place of business is located in Ocoee, Florida.  Bott may be served by delivering a copy of this Complaint to his place of business, or to his residence, or wherever he may be found.

9.    Defendant Thomas Csencsitz, M.D. ("Csencsitz") is a medical doctor licensed to practice in the State of Florida.  Csencsitz specializes in orthopedics.  Csencsitz was at all times alleged herein a member of the medical staff of ORHS and an agent of ORHS while maintaining an orthopedic practice offering orthopedic services in the same geographic area and with the same referral base as Dr. Pierson.  Csencsitz resides in and his principal place of business is located in Orlando, Florida.  Csencsitz may be served by delivering a copy of this Complaint to his place of business, or to his residence, or wherever he may be found.

10.     Defendant J. Dean Cole, M.D. ("Cole") is a medical doctor licensed to practice in the State of Florida. Cole specializes in orthopedics. Cole was at all times alleged herein a member of the medical staff of ORHS and an agent of ORHS while maintaining an orthopedic practice offering orthopedic services in the same geographic area and with the same referral base as Dr. Pierson. Cole resides in and his principal place of business is in Orlando, Florida. Cole may be served by delivering a copy of this Complaint to his place of business, or his residence, or wherever he may be found.

11.     Defendant John Hillenmeyer ("Hillenmeyer") is the President and Chief Executive Officer of ORHS. At all times alleged herein, Hillenmeyer was ORHS President and CEO and an agent and employee of ORHS. Hillenmeyer resides in and his principal place of business is located in Orlando, Florida. Hillenmeyer may be served by delivering a copy of this Complaint to his place of business, or his residence, or wherever he may be found.

12.     Defendant J. David Moser, M.D. ("Moser") is a medical doctor licensed to practice in the State of Florida. Moser specializes in pediatric otolaryngology. Moser was at all times alleged herein a member of the medical staff and an agent of ORHS. Moser resides in and his principal place of business is located in Orlando, Florida. Moser may be served by delivering a copy of this Complaint to his place of business, or to his, or wherever he may be found.

13.     Defendant N. Donald Diebel, M.D. ("Diebel") is a medical doctor licensed to practice in the State of Florida. Diebel was at all times alleged herein a member of the medical staff of ORHS and an agent of ORHS. Diebel resides in and his principal place of

business is located in Winter Park, Florida.  Diebel may be served by delivering a copy of this Complaint to his place of business, or to his residence, or wherever he may be found.

14.      Defendant Rory Evans, M.D. ("Evans") is a medical doctor licensed to practice in the State of Florida.  Evans specializes in orthopedics.  Evans was at all times alleged herein a member of the medical staff of ORHS and an agent of ORHS while maintaining an orthopedic practice offering orthopedic services in the same geographic area and with the same referral base as Dr. Pierson.  Evans resides in Winter Springs, Florida, and his principal place of business is located in Orlando, Florida.  Evans may be served by delivering a copy of this Complaint to his place of business, or to his residence, or wherever he may be found.

15.      Defendant Manuel J. Galceran, M.D. ("Galceran") is a medical doctor licensed to practice in the State of Florida. Galceran specializes in internal medicine. Galceran was at all times alleged herein a member of the medical staff of ORHS and an agent of ORHS.  Galceran resides in and his principal place of business is located in Orlando, Florida.  Galceran may be served by delivering a copy of this Complaint to his place of business, or to his residence, or wherever he may be found.

16.      Defendant Hedrick J. Rivero, M.D. ("Rivero") is a medical doctor licensed to practice in the State of Florida. Rivero is a radiologist.  Rivero was at all times alleged herein a member of the medical staff of ORHS and an agent of ORHS.  Rivero resides in Boynton Beach, Florida, and his principal place of business is located in Orlando, Florida.  Rivero may be served by delivering a copy of this Complaint to his place of business, or to his residence, or wherever he may be found.

17.    Defendant C. Gordon Wolfram, M.D. ("Wolfram") is a medical doctor licensed to practice in the State of Florida. Wolfram is a cardiologist. Wolfram was at all times alleged herein a member of the medical staff of ORHS and an agent and employee of ORHS.    Wolfram resides in and his principal place of business is located in Orlando, Florida.  Wolfram may be served by delivering a copy of this Complaint to his place of business, or to his residence, or wherever he may be found.

18.    Defendant Roy W. Sanders, M.D. ("Sanders") is a medical doctor licensed to practice in the State of Florida. Sanders specializes in orthopedics. Sanders was at all times alleged herein a member of the medical staff of Defendant FOI, an officer and/or director of FOI, and an agent of FOI while maintaining an orthopedic practice offering orthopedic services in the same region and with the same Level One orthopedic trauma referral base as Dr. Pierson. Sanders resides in Tampa, Florida, and his principal place of business is located in Temple Terrace, Florida.   At all relevant times herein, Sanders was associated with, employed by and/or acted as an agent of Defendant FOI and therefore FOI is liable for his actions. Sanders may be served by delivering a copy of this Complaint to his place of business, or to his residence, or wherever he may be found.

19.    Gregory A. Rief and Linda G.T. Parks are the Co-Personal Representatives of the Estate of John Connolly, M.D. ("Connolly"), deceased. Prior to his death, Connolly was a medical doctor licensed to practice in the State of Florida.   Connolly specialized in orthopedic surgery. Connolly was at all times alleged herein a member of the medical staff of ORHS and an agent of ORHS while maintaining an orthopedic practice offering orthopedic services in the same geographic area and with the same referral base as Dr.

Pierson. The Estate of John Connolly, M.D., deceased, may be joined as a party to this lawsuit by naming Co-Personal Representatives of the Estate, Gregory A. Rief and Linda G.T. Parks, as parties and by delivering a copy of this Complaint to either of them.

20.     Defendant Musculoskeletal Institute, Chartered d/b/a Florida Orthopaedic Institute ("FOI"), a corporation organized under the laws of the State of Florida, is comprised of a group of physicians and surgeons with claimed expertise in every orthopaedic subspecialty.   Through its relationship (agency, employment, and/or association) with Spiegel, FOI participated in the wrongful peer review of Dr. Pierson and is vicariously liable therefore. FOI does business in this district through its main campus in Tampa, Florida, and six satellite offices located in the Tampa Bay area.  FOI can be served by delivering a copy of this Complaint to its registered agent, Joyce B. Anderson.

21.     Defendant Wolverine is a professional association doing business in the State of Florida.  At all times alleged herein, Wolverine acted through its agents Murbach and Appleblatt, who, upon information and belief, are members and/or principals with ownership interests in Wolverine.  At all times alleged herein, Wolverine had an exclusive medical provider contract with ORHS to provide anesthesiology services to ORMC and Sand Lake. Wolverine does business through its facilities located in Orlando, Florida.  Wolverine can be served by delivering a copy of this Complaint to its registered agent, Roger S. Murbach, M.D.

22.     Defendant United States of America is a federal government of those limited enumerated powers specified in and restrained by the Constitution of the United States. The United States of America can be served by delivering a copy of the Complaint to Robert E.

O'Neill, US Attorney for the Middle District of Florida, and by delivering a copy of the Complaint to the US Attorney General, via registered mail.

23.     Defendant National Practitioner Data Bank ("NPDB") was established through Title IV of Public Law 99-660, the Health Care Quality Improvement Act of 1986, and is a mandatory reporting and alert system for the comprehensive review of the professional credentials of physicians and other health care practitioners in the United States. NPDB can be served by delivering a copy of the Complaint to Robert E. O'Neill, US Attorney for the Middle District of Florida, and by delivering a copy of the Complaint to Michael O. Leavitt, Secretary of the United States Department of Health & Human Services, via registered mail.

24.     Defendant Michael O. Leavitt is Secretary of the United States Department of Health & Human Services ("HHS").  HHS, which includes the Bureau of Health Professions, Health Resources and Services Administration, is the entity responsible for the maintenance and administration of the NPDB.  Defendant Leavitt can be served by delivering a copy of the Complaint to Robert E. O'Neill, US Attorney for the Middle District of Florida, by delivering a copy of the Complaint to the US Attorney General, and by delivering a copy of the Complaint to Michael O. Leavitt, Secretary of the United States Department of Health & Human Services, via registered mail.

25.     Defendant Region IV of the Department of Health and Human Services ("Region IV") is the regional office responsible for coordination of the Department of Health and Human Services' policies in the region.  Region IV may be served by delivering a copy of the Complaint to Region IV director, Christopher Downing.

26.     Defendant State of Florida is a state of the United States of America.  The State of Florida may be served by delivering a copy of the Complaint to Mark Ober, State Attorney, and by sending two copies of the Complaint to the Florida State Attorney General Bill McCullom, via registered mail.

27.     The Florida Department of Health is the agency responsible for the creation and oversight of the Florida Board of Medicine.  The Florida Department of Health may be served by delivering a copy of the Complaint to the State Surgeon General, Ana M. Viamonte Ros M.D.

28.     The Florida Board of Medicine is the state agency responsible for the licensing of physicians in the State of Florida.  The Florida Board of Medicine can be served by delivering a copy of the Complaint to the Chair of the Florida Board of Medicine, Robert Cline, M.D.

### III.     JURISDICTION AND VENUE

29.     This action arises under the laws of the United States.  The jurisdiction of the Court is based, in part, upon its authority under 28 U.S.C. §1337 to hear "any civil action or proceeding arising under any Act of Congress regulating Commerce or protecting trade and commerce against restraints and monopolies."  Dr. Pierson brings this action under Section 4 of the Clayton Act (15 U.S.C. § 4) to recover damages incurred as a result of violations by ORHS and the Peer Review Defendants[2] of Section 1 of the Sherman Anti-Trust Act (15

---

[2] Defined in Paragraph 35, *infra.*

U.S.C. § 1) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 4 and 16) to secure equitable relief against a continuation of those violations.[3]

30.     In addition, jurisdiction is also founded upon the Federal Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. §11111 *et seq.*, due to ORHS's and the Peer Review Defendants' conducting a wrongful and fraudulent peer review, and due to Dr. Pierson's request for declaratory and injunctive relief allowed by HCQIA.

31.     Jurisdiction exists under the U.S. Constitution because state and federal immunity laws applicable to peer review violate Dr. Pierson's constitutional rights.

32.     Because of proper federal question jurisdiction, this Court has pendent jurisdiction to hear Plaintiff's state law claims under 28 U.S.C. § 1367. All administrative proceedings and rights have been exhausted.

33.     Diversity jurisdiction under 28 U.S.C. §1332(a) also exists. Dr. Pierson is a California citizen. None of the named defendants are California citizens. Accordingly, complete diversity exists. *See* 28 U.S.C. §1332(a). Further, the amount in controversy as alleged and more fully described herein far exceeds $75,000, excluding interest and costs.

34.     This Court also has ancillary jurisdiction over all state law claims asserted herein. Each of Dr. Pierson's claims for relief are derived from a common nucleus of

---

[3] At all times relevant to this Complaint, Dr. Pierson and the Peer Review Defendants transacted business at ORHS, further affecting interstate commerce by treating a substantial number of out-of-state patients, and receiving monies from Medicare, Medicaid, Champus, the Federal Office of Personal Management (OPM), Health Care programs, Blue Cross/Blue Shield, Workers' Compensation and various private third-party insurance programs. Furthermore, Dr. Pierson and the Peer Review Defendants purchased, used and sold products and services while engaged in the practice of medicine, including but not limited to, the purchase of malpractice insurance, equipment and other materials that affect the flow of interstate commerce and which form an integral part of the interstate distribution of such services and products that are manufactured, sold and flow in a continuous and uninterrupted stream of interstate commerce.

operative facts involving substantially identical issues of fact and law such that one would ordinarily be expected to try them in one judicial proceeding. Consequently, the entire action constitutes a single case wherein all claims should be combined and tried together in the interests of judicial economy, convenience, fairness and in order to avoid unnecessary duplication and multiplicity of actions.

35.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) because diversity jurisdiction is not the only ground of jurisdiction and no separate statute provides a specific venue, and because Spiegel, Sanders and FOI reside in this judicial district.

36.    Venue is also proper pursuant to 15 U.S.C. § 22 because Defendant FOI is an inhabitant of this judicial district, is found in this judicial district, and transacts business in this judicial district, wherein interstate trade and commerce are conducted. Pendent venue is established as to all other claims brought in this suit because the claims pleaded arise out of the same transaction or occurrence as the federal anti-trust claims against Defendants Spiegel and Sanders (residents of this judicial district) and FOI (a resident in this judicial district that also inhabits, is found in and transacts business in this judicial district), and are based on a common nucleus of operative facts.

## IV.    FACTS COMMON TO ALL COUNTS

37.    As pleaded herein, the actions of those Defendants who participated in and conducted the peer review at issue (Spiegel, Murbach, Appleblatt, Bone, Bott, Csencsitz, Cole, Hillenmeyer, J. David Moser, Diebel, Evans, Galceran, Rivero, Wolfram, Sanders, Gregory A. Rief and Linda G.T. Parks as Co-Personal Representatives of the Estate of John Connolly, M.D., deceased, FOI and Wolverine, sometimes referred to herein collectively as

the "Peer Review Defendants"), and ORHS's conduct surrounding such actions, cause ORHS to be vicariously liable for such actions and the resulting damages.

38.     At all relevant times, the Peer Review Defendants were agents/employees of ORHS, and acted in the course of their respective agency/employment with ORHS in furtherance of ORHS's business (that is, they carried out the purpose of ORHS).

39.     At all relevant times, the Peer Review Defendants were acting on behalf of ORHS with apparent or implied authority and ORHS, through the acts of these individuals, secured a benefit. ORHS ratified their actions described herein as they relate to Dr. Pierson's medical peer review and the reporting and other ramifications of such medical peer review.

40.     Further, at all relevant times, the Peer Review Defendants were all acting pursuant to the instructions and directions of ORHS in carrying out the peer review against Dr. Pierson and ORHS was directing and/or exerting sufficient control over these individuals to show that they were employees and/or agents of ORHS, or, to the extent that they were independent contractors, to negate such status and render them agents of ORHS.

41.     At all relevant times, each of the Peer Review Defendants also acted pursuant to their respective individual interests and, therefore, each is also individually liable.

42.     Dr. Pierson graduated from Temple University School of Medicine in May 1980. He then interned at the Harbor-UCLA Medical Center in Los Angeles, California, which internship was followed by one year as an emergency room physician at Phoenixville Hospital in suburban Philadelphia. In July 1982, Dr. Pierson entered a four-year orthopedic surgery residency program in New York City at the Hospital for Special Surgery – Cornell University Medical Center, which he completed on June 30, 1986. Dr. Pierson's residency

program was followed by an Adult Reconstruction Fellowship (Total Joint Replacement Surgery Fellowship), and then a limited traveling fellowship in sports medicine at the Cincinnati Sports Medicine Center.   Dr. Pierson then became a member of University Orthopedics and the academic teaching staff at Rush Medical College.  Dr. Pierson remained in this academic medical practice for six and a half years post-fellowship, achieving the rank of assistant professor.

43.     In November 1993, Dr. Pierson left his practice and his teaching position in Chicago for Orlando, Florida, where his wife, Dr. Joanne Werntz, had a solo private practice.

44.     Following a rigorous application and credentialing process, in early 1995 Dr. Pierson was granted privileges as a member of the ORHS medical staff.  As part of his privileges, Dr. Pierson was included on the trauma and emergency call schedules at both ORMC and Sand Lake.  Inclusion in the emergency and trauma call rotation was a critical component in Dr. Pierson's development of his orthopedic surgery practice in Orlando.

45.     Simultaneous with setting up private practice in Florida, Dr. Pierson began to implement plans for establishment of a physician-patient centered management services organization/independent provider association ("MSO/IPA)" called The Physician Patient Alliance.™ Dr. Pierson invested significant time, effort and expense in The Physician Patient Alliance,™ with the expectation that it would provide the best environment for physicians and the best healthcare alternative for patients.

46.     In the two-years before the onset of the peer review at issue in this Complaint, Dr. Pierson extensively marketed The Physician Patient Alliance™ to physicians throughout

Central Florida – including physicians who practiced at ORHS, and/or were effectively employed by ORHS, as well as those in senior leadership positions with ORHS.

47.     When Dr. Pierson joined ORHS, Dr. Werntz had been practicing in Central Florida since late 1987. From late 1987 until June 1992, Dr. Werntz practiced in a large group practice – Matthew's Orthopedic Clinic.

48.     However, when Dr. Pierson joined ORHS, Dr. Werntz was not on favorable terms with the fifteen or so members of Matthew's Orthopedic Clinic (including Cole) who were also members of the ORHS staff.

49.     Matthew's Orthopedic, in parting ways with Dr. Werntz, attempted to restrict the financial package that she was entitled, by the terms of her partnership contract, to receive. These circumstances resulted in strained relationships among Dr. Werntz, Dr. Pierson and the members of Matthew's Orthopedic (including Cole). These strained relationships and attendant resentments persisted throughout Dr. Pierson's time at ORHS.

50.     Additionally, Dr. Werntz's patient treatment philosophy resulted in several disputes with the anesthesiologists at ORMC – including Murbach, Appleblatt and the other physicians at Wolverine.   The adversarial history between Dr. Werntz and the anesthesiologists also resulted in strained relationships among Dr. Werntz, the anesthesiologists and Dr. Pierson.

51.     In June 1992, Dr. Werntz sought formal recognition as Director of the Hand Surgery Section of the Orthopedic Surgery Residency Training Program at ORMC. Although Connolly had previously informally designated and recognized Dr. Werntz as such, he refused to endorse her with this title. Connolly then began to marginalize Dr. Werntz.

52.     In 2001, Connolly formally removed Dr. Wertnz from the teaching staff and completely stopped her work with the orthopedic surgery residents.

53.     Connolly's treatment of and actions toward Dr. Werntz severely strained the relationship between Connolly and Dr. Pierson.

54.     Due to the history of disputes between Dr. Werntz and other physicians at ORMC, it becomes obvious that the environment at ORHS was not warmly disposed to her or toward Dr. Pierson when he joined the medical staff.

55.     Dr. Pierson's efficiency in providing early surgical intervention for acute surgical orthopedic cases using the most current techniques significantly reduced hospital length of stay, thereby lowering potential revenues for ORHS.

56.     The increasing volume of patient referrals and on-call coverage provided by Dr. Pierson also significantly lowered revenues for the orthopedic medicine Defendants who were his economic competitors in Central Florida.

57.     ORMC is the only Level One Trauma Center in Central Florida, and Sand Lake advertises the latest technology in orthopedics. Both hospitals were able to handle cases 24 hours a day, and fully able to treat acutely injured patients immediately.

58.     Providing early, humane surgical care often means an urgent/emergent surgery must be performed in the late evening or early morning hours. This treatment approach by Dr. Pierson was resisted by the operating room staff and the anesthesiologists at ORMC and Sand Lake – including Murbach, Appleblatt and other Wolverine physicians.

59. However, at no point did any of the anesthesiologists suggest to Dr. Pierson that his timing of surgical care was inappropriate. Further, they did not resist Dr. Pierson's efforts to proceed with surgeries at night or early in the morning.

60. Instead, and in spite of documented evidence of optimal outcomes in Dr. Pierson's patient care, the anesthesiologists covertly contacted the Chief of Staff and other physicians in authority positions complaining about late night, early morning surgery and the duration of the operative cases.

61. Unbeknownst to Dr. Pierson, in May 1996 Chief of Staff Diebel received two letters alleging concerns with Dr. Pierson's surgical management of trauma cases. One letter was from Bott and one from Csencsitz. Both letters raised concerns over Dr. Pierson's treatment of emergency patients – complaining of late night/early morning surgery times and that Dr. Pierson's surgeries took too long.

62. The second letter from Csencsitz also noted that the anesthesiologists (including those with Wolverine) had raised complaints to Csencsitz questioning Dr. Pierson's ability to surgically manage trauma cases.

63. As a result of these letters, the Peer Review Defendants, surreptitiously and behind Dr. Pierson's back, began building a case for suspension of his trauma and emergency call and consultation privileges.

64. On May 21, 1996, an Investigation Committee ("IC") consisting of Defendants Bone, Galceran, and Rivero was formed to conduct an in-house focused review.

65. The IC selected three physicians to review cases conducted by Dr. Pierson from January 1, 1995, forward. The physicians selected – Defendants Connolly, Bott, and

Evans – had inherent conflicts as economic competitors of Dr. Pierson, which should have prevented their participation in the peer review.

66.    Further, before Evans was asked to review Dr. Pierson's charts as part of the peer review at issue, Dr. Pierson and Evans had a significant difference of opinion with respect to ORMC trauma call practice, which was one of the issues in the peer review.

67.    At the time that Evans reviewed Dr. Pierson's cases, Evans was not participating in the ORMC trauma call rotation and had not done so for some time. As a consequence of his limited trauma and emergency practice, Evans lacked exposure to the types of severely injured patients whose care by Dr. Pierson he was being asked to review.

68.    On October 21, 1996, the IC met for the third time and was presented with a summary of patients whose cases were performed by Dr. Pierson at ORMC and Sand Lake between January 1, 1995 and June 30, 1996. This summary was prepared by Ms. Lynn Burcham, who essentially "cut and pasted" a random selection of comments from the review forms completed by Bott, Evans and Connolly.

69.    The in-house reviewers were not appropriately knowledgeable of evolving concepts in modern orthopedic trauma management, nor were they knowledgeable of the relevant standard of care documented in the orthopedic literature at the time of their reviews.

70.    In many of the cases rated by the in-house reviewers, there was significant disparity in the ratings given by the three reviewers who, due to their lack of trauma surgery experience, often misstated the procedure being reviewed.

71.    The "facts" alleged by the reviewers in their assessments of Dr. Pierson's patients were frequently erroneous and contrary to the facts recorded on the patient charts.

These erroneous facts then became the basis of faulty conclusions drawn by the reviewers. These faulty conclusions are inconsistent with and contrary to the techniques and procedures described by the applicable medical literature as reasonable and within the standard of care.

72.     Faced with vastly different ratings on the same cases in a number of instances, the IC was unable to determine whether it had a basis to declare Dr. Pierson incompetent and suspend his trauma and emergency call privileges. Accordingly, the IC asked for an outside review of the cases.

73.     In the interim, the IC recommended that Dr. Pierson be summarily suspended and removed from the emergency and trauma call schedule "due to the increased number of trauma patients who have had an extended operating time." There is nothing in the IC recommendation for suspension of privileges that points to any concern about immediate patient care or safety in the hospital necessitating a summary suspension. The IC report and recommendation did not raise any concern about an impediment to the effective operation of the hospital or to patient care and safety if Dr. Pierson's privileges were not suspended.

74.     Notably, in spite of the vastly different ratings and the mischaracterization of the facts recorded on the patient charts reviewed by the ORMC in-house reviewers, Galceran admitted during the peer review proceeding that the IC did not independently review any patient charts in connection with their investigation of Dr. Pierson. Clearly, the IC did not perform its assigned task to investigate Dr. Pierson's clinical competence.

75.     The IC recommended on October 21, 1996, that Dr. Pierson be removed from emergency and trauma call and consulting. However, such action was not taken for another

month. This time lapse indicates that a summary suspension was absolutely unnecessary, unjustified, and unrelated to any immediate patient care or hospital operation concern.

76.    Dr. Pierson was never notified during the five-month course of the initial investigation that there were concerns about operative duration and late scheduling of surgeries related to his patients. To the extent that anyone at ORHS, was truly concerned about Dr. Pierson's "clinical competence," not one person at ORHS, ORMC or Sand Lake ever approached him with those concerns before he was removed from trauma and emergency call and consulting.

77.    On November 25, 1996, Dr. Pierson met with Moser and Bott who formally told him for the first time that he was under investigation and that his trauma and emergency call privileges would be summarily suspended while the hospital did a peer review.

78.    On or about December 3, 1996, Dr. Pierson received a notice letter from Hillenmeyer stating that Hillenmeyer, as President of ORHS and with the concurrence of the Chief of Staff, had removed Dr. Pierson from the trauma call and emergency department call schedule and also from consulting on trauma and emergency patients, pending the completion of the current investigation. Nothing in Hillenmeyer's letter informed Dr. Pierson of what patient care interest was being served or protected by suspending his privileges and his ability to consult on trauma and emergency patients.

79.    The suspension of Dr. Pierson's ability to take trauma and emergency call effectively prevented his ability to develop an orthopedic practice in Central Florida.

80. The summary suspension of these privileges also severely compromised Dr. Pierson's efforts to develop the Physician Patient Alliance™ because it effectively eliminated Dr. Pierson as a funding source for development of the Physician Patient Alliance.™

81. Upon receiving notice of the suspension of his privileges, Dr. Pierson immediately requested a hearing under the Bylaws. ORHS denied his request, taking the position that the IC had not yet made a final report and recommendation. This procedure was clearly in violation of the Bylaws, which provided the right to a hearing upon the reduction of a staff member's privileges.

82. Had ORHS followed its own Bylaws, it is unlikely that Dr. Pierson would have waited three years for the IC to makes its "final" report and recommendation and another four years to have a hearing on the suspension of his privileges. The collective impact of this seven-year wait for a hearing, which should have been provided within 90 days of Dr. Pierson's request, was debilitating to Dr. Pierson's very livelihood and ability to support his family.

83. In response to the IC's request for an unbiased outside review of Dr. Pierson's cases, Moser sought out and retained Spiegel in December 1996. Although Spiegel was not on staff at ORMC or Sand Lake, his review of Dr. Pierson's cases was not the unbiased assessment the IC requested.

84. On information and belief, Defendant Cole suggested to Moser that Spiegel be retained by ORHS to provide the "outside" review of Dr. Pierson's cases. Cole had trained in orthopedics under Spiegel and knew that Spiegel would provide a review of Dr. Pierson's

cases, if ORHS so desired, that would give ORHS grounds to take action against Dr. Pierson's privileges.

85.    Before the investigation against Dr. Pierson, and at least into the year 1994, Spiegel was employed with Defendant FOI. Following the end of his direct employment with FOI, Spiegel continued to participate in FOI sponsored seminars and lectures and maintained contact with FOI and its physicians. Through his connections with FOI, Spiegel was aware of Dr. Pierson's open criticism of FOI's plans for a state-wide orthopedic surgery independent provider association.

86.    On information and belief, Cole, Sanders and Spiegel were aware of the impact Dr. Pierson's comments had on FOI's attempts at creating a state-wide orthopedic surgery independent provider association. Further, Cole and Sanders were present when Dr. Pierson spoke out against FOI's proposed independent provider association and were both noticeably impacted by the effect of Dr. Pierson's words on the group of orthopedists to whom FOI presented its proposal.

87.    On February 6, 1997, Spiegel submitted a 91 page report titled "ORHS Peer Review January 8/9, 1997" (the "Spiegel Report)." The Spiegel Report focused on Dr. Pierson's admissions/surgeries at ORMC during the years 1995 and 1996.

88.    The Spiegel Report alleged that there was cause for concern about Dr. Pierson's technical abilities and judgment to perform the procedures for which he was privileged at ORHS. Although the outcomes in each of the reviewed cases were consistently positive for the patients, Spiegel stated that Dr. Pierson's performance was not consistent and that the protracted length of procedures performed by Dr. Pierson was placing his patients at

Case 6:08-cv-00466-JA-GJK   Document 3   Filed 02/01/08   Page 23 of 73 PageID 165

increased risk. Spiegel also speculated that problems with Dr. Pierson's surgical technique and judgment were due to the limited focus of his practice.

89.     Spiegel falsely characterized Dr. Pierson's approach to emergency and trauma surgical cases as "now or never," noting that Dr. Pierson did all Emergency Room cases on an urgent or emergent basis. This erroneous stereotyping of Dr. Pierson's practice neglected to consider the factors Dr. Pierson weighed to determine when and how to perform a necessary surgery on a patient. This erroneous stereotyping also failed to consider choices offered by Dr. Pierson and made by patients for their care as well as the success rate for Dr. Pierson's surgeries, decreased hospital stay times, and extremely favorable results experienced by patients whose surgical treatment by Dr. Pierson was severely criticized.

90.     A copy of the Spiegel Report was provided to Dr. Pierson, and he was invited to meet with the IC to discuss his practice pattern before the IC made their next report and recommendation to the MEC. Dr. Pierson informed the IC of his desire to make a written response to the Spiegel Report's analysis and condemnation of his practice methods.

91.     Between July 1997 and January 13, 1998, Dr. Pierson progressively provided the IC with a detailed report focused on drawing out and explaining the gross mischaracterizations and factual inaccuracies that were stated in the initial ORHS in-house review and the Spiegel Report, and which formed the basis for the ORHS in-house reviewers' and Spiegel's faulty conclusions that Dr. Pierson was not clinically competent to participate in emergency and trauma call and consulting. Dr. Pierson's report was replete with explanations for his treatment approach and surgical technique, which demonstrated that his orthopedic trauma care of patients was reasonable and fully supported.

Plaintiff's First Amended Original Complaint and Demand for Jury Trial – Page 23 of 72

92.     On January 13, 1998, Dr. Pierson met with the IC to discuss his response to the investigation and resulting allegations of incompetence and substandard surgical technique made by Connolly, Evans, Bott and Spiegel.

93.     Following the meeting, the IC requested a second, "unbiased" review by an academic medical reviewer, noting that, while it could address administrative concerns, clinical areas of concern were outside its field of knowledge.

94.     Dr. Pierson immediately requested that he be permitted to assist in choosing the second outside reviewer. His request went unanswered.

95.     Unbeknownst to Dr. Pierson, Moser denied the IC's request for a second academic review by an "unbiased" medical school instructor and again enlisted Spiegel to rebut the evidence and medical literature Dr. Pierson provided to the IC in support of his practice methods, surgical judgment, technique and management of trauma cases.

96.     In July 1998, ORHS's attorney finally informed Dr. Pierson and his counsel that Spiegel would be reviewing the materials submitted to the IC by Dr. Pierson. Eleven months later, the Spiegel Rebuttal was provided to Dr. Pierson on November 30, 1998.

97.     Notably, at least two of the case examples on which Spiegel relied in his rebuttal to mischaracterize the treatment provided by Dr. Pierson in similar cases were cases that appear to have been performed by FOI orthopedic surgeons (and, on information and belief, at least one of which was under Defendant Sanders's supervision).

98.     The Spiegel Rebuttal was four volumes of hundreds of pages that further significantly misrepresented the facts as to Dr. Pierson's treatment of patients and misrepresented the applicable medical literature. The Spiegel Rebuttal was undoubtedly

intended to overwhelm Dr. Pierson in his efforts to put the facts of his patient care and treatment, facts which plainly showed him competent as an orthopedic trauma surgeon, and the relevant medical literature before the IC.

99.     The efforts required of Dr. Pierson to address each of the factual inconsistencies and faulty conclusions drawn in the Spiegel Rebuttal exhausted Dr. Pierson's personal and financial resources.

100.    Dr. Pierson met with Defendant Wolfram in December 1998.  During the meeting, Wolfram told Dr. Pierson that he had briefly reviewed some peer review materials. Wolfram stated his conclusion that Dr. Pierson had done nothing wrong in his treatment of patients, and that he believed no patient suffered adversely from Dr. Pierson's care.

101.    Wolfram further intimated that Defendant Csencsitz had expressed the opinion to the Credentials Committee that Dr. Pierson had done nothing wrong and was a good orthopedic surgeon.  Wolfram noted that Csencsitz opined that the opinions presented in Spiegel's Report were incorrect in some areas and controversial in others.

102.    While Wolfram freely expressed to Dr. Pierson his opinions that the peer review was unfounded and that Dr. Pierson had done nothing wrong, Wolfram, who was in an authority position with ORHS did nothing to call the peer review into question or raise with ORHS issues about the wrongful conclusions being drawn in the peer review, or relay to the peer reviewers or ORHS that Dr. Pierson had not adversely affected any patient and that Dr. Pierson was a good orthopedic surgeon.

103.    On July 1, 1999 – more than 3 years after the investigation was initiated – the IC made another report and recommendation to the Credentials Committee.

104.    The IC recommended that Dr. Pierson's emergency and trauma call and consulting privileges remain suspended, with an on-going mentoring relationship and peer review put into place to review Dr. Pierson's surgical technique and judgment, surgical scheduling time, length of surgery and prompt dictation of operative notes.

105.    The Credentials Committee seconded the IC's recommendation in its report to the Medical Executive Committee ("MEC"), and on August 30, 1999, the MEC recommended that Dr. Pierson should be excluded from trauma call and emergency department call, and also that peer review or monitoring for surgical scheduling time, length of surgery, and prompt dictation of operative notes be conducted on an ongoing basis. The MEC supported its recommendation by pointing to the investigation results identifying (1) excessive length of surgery time, (2) inappropriate scheduling of surgical time, (3) delay in dictating operative notes, and (4) elective cases being performed as urgent or semi-urgent.

106.    The MEC also noted an unsubstantiated "concern" that Dr. Pierson's response to the peer review proceeding demonstrated "an attitude toward the hospital, the hospital staff, and peers, which could interfere with collegial and professional relationships and the ability to work with peers and ancillary staff in a collegial and professional manner."

107.    While the medical literature Dr. Pierson cited clearly shows a difference in professional opinion as to case management and technique as well as support for Dr. Pierson's surgical judgment, management and technique, the IC, CC and MEC maliciously disregarded that literature in favor of adopting the ORHS reviewers' disparate findings and Spiegel's Report and Rebuttal as the standard of care for Dr. Pierson's cases.    This

misrepresented "standard of care" became the basis by which Dr. Pierson's competence was judged and the foundation for the adverse action taken by the Peer Review Defendants.

108.    In response to the MEC recommendation, Dr. Pierson renewed his request for a hearing under the Bylaws.

109.    On April 23, 2003, the Hearing Panel commenced a hearing -- some <u>five years after</u> the commencement of the action against Dr. Pierson.

110.    Rather than utilize the 1996 Bylaws (in place at the time the peer review was initiated), the Hearing Panel and Presiding Officer adopted and proceeded under ORHS's 2003 Fair Hearings and Appeals Policies and Procedures.  This is significant and is additional evidence of the malicious intent underlying Dr. Pierson's peer review because the burden of proof was changed so that the MEC recommendation was initially presumed to be reasonable, and it was entirely up to Dr. Pierson to prove that the MEC's recommendation was unreasonable, not sustained by the evidence, or otherwise unfounded.

111.    The Presiding Officer rejected and overruled Dr. Pierson's objection to use of the revised procedure's order of presentation and the new burden of proof for his peer review.

112.    The Presiding Officer also rejected and overruled Dr. Pierson's objection to one of the members of the Hearing Panel on the grounds that (1) Dr. Pierson had been critical of a model of medicine proposed by that doctor; and (2) that doctor was a former partner of one of the ORHS in-house reviewers (Evans) who participated in the initial investigation.

113.    During the course of the hearing, the Presiding Officer repeatedly rejected and overruled Dr. Pierson's running objection to Spiegel's presence throughout the hearing to assist the MEC's counsel.  The Presiding Officer permitted Spiegel to remain at the hearing

as a designated representative of ORHS and recognized that Spiegel was there to defend his criticism of Dr. Pierson and his related recommendations about Dr. Pierson's privileges.

114.    As an outside reviewer, Spiegel was ostensibly to be neutral, have no allegiance either to Dr. Pierson or ORHS, and give a completely objective, unbiased opinion about Dr. Pierson's clinical competence as an orthopedic surgeon. Spiegel's overt association with ORHS and his assistance in development and presentation of the MEC's case against Dr. Pierson further demonstrates the intentional fraud and malice prevalent throughout Dr. Pierson's peer review.

115.    At the hearing, the malicious, false statements made by Defendants Spiegel, Connolly, Evans and Bott in their reviews and assessments of Dr. Pierson's cases were presented as support for the MEC's recommendation to exclude Dr. Pierson from trauma call and emergency department call. However, Evans and Bott would not appear at the hearing. Thus, Dr. Pierson was not afforded an opportunity to cross-examine them on their opinions or the erroneous judgments that were made about his clinical competence.

116.    Dr. Pierson's peer review was rife with violations of the Bylaws as well as utter disregard for fundamental fairness in the peer review itself, as described herein.

117.    For example, although the initial request for an investigation of Dr. Pierson made no mention of any alleged deficiencies in his timely submitting operative reports and medical records, such allegations were made and subsequently relied on as a basis for action against Dr. Pierson's privileges.

118.   As further example, the Peer Review Defendants showed significant, intentional prejudice against Dr. Pierson by the inconsistent manner in which the Bylaws were applied to him as opposed to other ORHS physicians.

119.   In spite of the Peer Review Defendants' obvious efforts to secure approval for their sham peer review, the Hearing Panel found that, while Dr. Pierson was slower than his peers, his surgical time was not excessive and no harm to his patients was demonstrated.

120.   The Panel found further that Dr. Pierson had a different philosophy than his reviewers as to the necessity for urgent surgical intervention for some types of injuries, but that both views were supported by the medical literature.

121.   The Panel noted that Dr. Pierson's attitude during the peer review did not reflect the collegial, professional attitude that should mark peer review, and that Dr. Pierson was passionate and uncompromising in his views on best practices. The Panel observed this resulted from the manner in which the peer review was conducted and that no effort was made by Dr. Pierson's peers to raise concerns or counsel him before starting an investigation.

122.   The Panel further noted that the process employed by ORHS was deficient. The Panel expressed surprise that Dr. Pierson was not counseled by his peers or given an opportunity to correct perceived deficiencies before the IC was appointed. The Panel also expressed difficulty understanding why an investigation was conducted without Dr. Pierson's involvement or knowledge -- until the day before his privileges were summarily suspended. Importantly, the Panel noted that such conduct violated the spirit if not the letter of the Bylaws, and polarized the positions of Dr. Pierson and the MEC from the beginning making it impossible to conduct the peer review with professionalism and collegiality.

123.    The Hearing Panel recommended that Dr. Pierson be given the opportunity to demonstrate his willingness and ability to correct deficiencies in scheduling, in completing medical records, and in his attitude toward fellow physicians and hospital personnel. The Hearing Panel also recommended that Dr. Pierson's privileges be temporarily restored so that his trauma and emergency call practices could be reviewed through retrospective proctoring by an experienced trauma surgeon, who could evaluate whether Dr. Pierson's surgeries were appropriately scheduled and completed in a justifiable timeframe.

124.    Both Dr. Pierson and the MEC appealed the Hearing Panel's recommendation.

125.    On December 12, 2003, Dr. Pierson was notified of the Appeal Panel recommendation that (1) Dr. Pierson not be placed on emergency call until the MEC determines he is ready, willing and able to work within institutional guidelines, standards, protocols, resources and systems; (2) MEC verify and analyze Dr. Pierson's surgical procedures, type of procedures and outcomes of those procedures during the preceding 12 months; (3) Dr. Pierson not be placed on emergency or trauma call unless and until the MEC determines he has current clinical competency to handle emergency surgical procedures; and (4) Dr. Pierson perform non-emergent elective cases before attempting emergency or trauma cases as appropriate in the best interest of patient care.

126.    On January 26, 2004 – almost seven years after the peer review was initiated – the ORHS Board passed a resolution affirming the recommendation to indefinitely maintain a suspension of Dr. Pierson's emergency and trauma call and consulting privileges.

127.    The Board resolution stated that Dr. Pierson failed to comply with the rules and regulations of the Medical Staff, and that his practice of performing surgeries during late

night and early morning hours unnecessarily increased risk to his patients and to other patients who came to the hospital with true emergencies.

128.    Notifice of the resolution was not received by Dr. Pierson or his counsel until on or after February 3, 2004.[4]

129.    Following the Board's resolution, ORHS immediately filed a complaint with the Florida Department of Health, citing the disciplinary action taken against Dr. Pierson. The Department of Health then initiated an investigation of Dr. Pierson's medical license.

130.    ORHS also immediately filed an Adverse Action Report with the NPDB, which report provided a false, unflattering, misleading misstatement of the facts of Dr. Pierson's peer review and the resulting decision.

131.    Dr. Pierson requested that ORHS correct the erroneous and false Adverse Action Report to reflect the true nature of the peer review and the reason for the resulting action against Dr. Pierson.  ORHS refused and failed to make any such correction.

132.    On information and belief, ORHS and Hillenmeyer, acting on behalf of ORHS, have made other similar reports to third parties.

133.    The reports made by ORHS and Hillenmeyer communicate that Dr. Pierson is incompetent, lacking in surgical judgment and skill, and a danger to patients. The reported statements are based on the unfounded, unreasonable adverse action taken against Dr. Pierson as a result of ORHS's and the Peer Review Defendants' sham, biased peer review.

---

[4] The resolution was sent to Dr. Pierson and his attorney by certified mail with an enclosure letter dated February 2, 2004, which was postmarked February 3, 2004.

134.   ORHS knew that the statements contained in its reports to the NPDB, the Florida Department of Health and the Florida Board of Medicine were erroneous and false at the time the reports were made, but ORHS made the reported statements anyway.

135.   Further, ORHS was aware that the charges against Dr. Pierson were no basis for a suspension of privileges and that the decision to suspend Dr. Pierson's emergency and trauma call and consulting privileges was the result of a sham, biased peer review action undertaken to oust Dr. Pierson from practicing orthopedic medicine in Central Florida.

136.   ORHS and Hillenmeyer, who directed or caused the reports at issue to be made, made these erroneous reports with malice and with intentional fraud.  ORHS and Hillenmeyer knew that the reported statements were false, erroneous and based on the outcome of a sham, biased peer review process or acted with reckless disregard as to the truth or falsity of the reported statements.

137.   The statements reported by ORHS and Hillenmeyer impugn Dr. Pierson's competency as an orthopedic surgeon and disparage his abilities to discharge his duties as an orthopedic medicine practitioner.  The reported statements would be understood to have such meaning by both the general public and by those within the medical community.

138.   For Dr. Pierson, a physician who has dedicated his life to the humane treatment of his patients in the most efficient manner and with the highest quality of care, no other accusation could be more heinous than to be labeled incompetent, lacking in surgical judgment and dangerous.  The reported statements are unfounded, erroneous accusations that have caused Dr. Pierson to be ostracized from the medical community.

139.    When ORHS and Hillenmeyer made the reported statements at issue, they were aware that, from time to time, indefinitely into the future (and for as long as Dr. Pierson's medical career lasts), various persons and organizations would query NPDB and receive a copy of the reported statements, or otherwise discover the reported statements. As a result, any entity that queries NPDB (be it a hospital, surgical center, other healthcare facility or provider, HMO or insurer) concerning Dr. Pierson will be informed that Dr. Pierson's privileges were suspended because he was incompetent, lacking in surgical judgment, and a danger to patients. This casts strong doubt on his professional credentials and severely impairs his ability to obtain or continue privileges at other hospitals or to establish relationships with other healthcare entities.

140.    When ORHS and the Peer Review Defendants conducted and participated in the sham, biased peer review against Dr. Pierson, they were aware that Dr. Pierson would be required to self-report any adverse action taken against him as a result of the peer review in response to questions and queries posed by other hospitals, surgical centers, healthcare organizations, insurers, licensing bodies and other third parties, which in fact has happened.

141.    Further, when ORHS and the Peer Review Defendants conducted and participated in the sham, biased peer review against Dr. Pierson, they were aware or should have known that the suspension of Dr. Pierson's privileges would be reported to other hospitals, surgical centers, healthcare organizations, insurers, licensing bodies and other third parties, which in fact has happened.

142.    The peer review was not secret. The fact that Dr. Pierson's privileges were in jeopardy before and throughout the peer review process was quickly "leaked" to the medical communities at ORMC and Sand Lake. Immediately, Dr. Pierson's referral sources dried up.

143.    Even before the peer review action was brought to Dr. Pierson's attention in November 1996, there was a progressive reduction in his on-call related patient work as well as physician referrals from the ORHS system.

144.    As soon as Dr. Pierson was taken off the trauma and emergency call rotations at ORMC and Sand Lake, the economic effects were felt immediately. These economic effects included direct losses related to lost revenue from Dr. Pierson's inability to take call as well as the indirect losses related to the progressive loss of referrals from physicians practicing at ORHS, who lost confidence in Dr. Pierson's abilities because of the peer review.

145.    Additionally, the extreme amount of time and employee efforts to create the necessary responses to the Spiegel and ORMC in-house reviews resulted in significant further economic costs borne by Dr. Pierson.

146.    There were also lost opportunities to see patients while Dr. Pierson was working on the reports and reviews required to counter all aspects of the Spiegel Report and Rebuttal as well as the ORMC in-house reviews.

147.    The peer review action severely compromised Dr. Pierson's personal financial condition, brought Dr. Pierson and Dr. Werntz to the brink of corporate and personal bankruptcy and saddled both with significant corporate and personal debt.

148.    Dr. Pierson had to quit practicing in Central Florida and re-establish himself in California in an underserved community that had no practicing orthopedic surgeon.

149.    All efforts expended in the development of The Physician Patient Alliance[TM] were lost. The entire project had to be abandoned once the peer review became known to Dr. Pierson in November 1996, due to the significant adverse financial effects of the peer review.

150.    Dr. Pierson had limited opportunity to contribute to retirement plans from 1996 to the present.   Dr. Pierson's ability to make retirement contributions continues to be forestalled due to the costs of servicing and paying off loans taken out in Florida, and to subsidize the effects of the peer review on his ability to earn income from his medical practice as well as the ongoing legal costs.

151.    A future increase option for Dr. Pierson's disability plan provided for automatic increases in coverage as long as income levels met appropriate thresholds.  Due to the adverse effects on his income in Florida, resulting from the peer review action, Dr. Pierson was never able to exercise this option.

152.    Dr. Pierson has patented a number of medical devices and techniques.  Dr. Pierson has not been able to further develop actual patents he holds, with respect to bringing actual products to market, due to lack of funding capital, which is a result of the requirement to satisfy accumulated debt that directly resulted from the peer review at issue in this Complaint.   Further, Dr. Pierson was unable to pursue many other patentable ideas to completion during this time period due to the financial effects of the peer review action.

153.    Emotional and financial strains caused by the peer review destroyed Dr. Pierson's and Dr. Werntz's marriage and family life.   Dr. Pierson continues to incur significant divorce related costs that are a result of the marital dissolution that was brought about in large measure by the economic and emotional impact of the peer review.

154.   Dr. Pierson has incurred and continues to incur significant legal costs related to his efforts to preserve and restore his reputation as well as his ability to be able to continue to practice and earn a living in orthopedic surgery. Those costs are significant and ongoing from the time the peer review was initiated to the present, related to efforts to bring this matter before the courts in order to obtain relief from the damage that has been done. These costs to date exceed $500,000.00.

155.   Between 2002 and 2003, Dr. Pierson and Dr. Werntz were forced to sell or liquidate stocks from their joint brokerage account to pay legal fees and costs related to preparation for and then participation in the hearing process.

156.   Investment opportunities were lost as a direct result of the peer review action because all of Dr. Pierson's financial resources were committed to addressing the peer review. The estimated loss in this regard exceeds $500,000.

157.   During the peer review time period, Dr. Pierson was absent from the family home for long periods related to preparations of his reports and preparations for the Hearing. This resulted in loss of companionship with Dr. Werntz as well as the loss of valuable family time with Dr. Pierson's children.

158.   Also, while the peer review action was ongoing, Dr. Pierson did not leave the Orlando area even to visit extended family in the Northeast for period of over five years. This led to his inability to maintain the expected family relationships with close relatives such as his paternal grandmother with whom he had always been close and visited often prior to the peer review. Unfortunately, she became ill with cancer and died during this time.

159.    Further, Dr. Pierson harbored an intense sense of shame and experienced overwhelming frustration related to the nature of the comments and criticisms about his medical practice and judgment, which were untruthful and completely misrepresented in the in-house reviews by ORHS and the Spiegel Report and Rebuttal.   The Peer Review Defendants' comments and criticisms were personally devastating and never ending despite all Dr. Pierson's efforts to exonerate himself and to disprove this false information.

## V.    CAUSES OF ACTION

**COUNT 1 – COMBINATION AND CONSPIRACY IN VIOLATION OF FEDERAL AND STATE LAW IN MARKET FOR ORTHOPEDIC SERVICES AND IN MARKET FOR HEALTHCARE SERVICES (ORHS, Peer Review Defendants)**

160.    The allegations contained in Paragraphs 37-159 are incorporated by reference.

161.    Beginning at least as early as May 1996, the exact date being unknown to Dr. Pierson, and continuing thereafter, ORHS and the Peer Review Defendants conspired to inhibit trade and competition in violation of § 1 of the Sherman Act (15 U.S.C. § 1) and in violation of the Florida Antitrust Act of 1980 (*see* F.S.A. §542.15, *et seq.*), by engaging in an unlawful combination and conspiracy to (1) blacklist and boycott Dr. Pierson and to exclude him from practicing medicine at ORHS facilities and in Central Florida by summarily suspending his privileges at both ORMC and Sand Lake without cause; and/or (2) intentionally destroy and derail Dr. Pierson's development of The Physician Patient Alliance.[TM]  ORHS and its medical staff are separate entities for antitrust purposes only and each acted in this unlawful combination and conspiracy.

162.    Dr. Pierson has suffered the type of injury the antitrust laws were intended to prevent, and flows from that which makes ORHS and the Peer Review Defendants' conduct

unlawful. The injury reflects the anti-competitive effect either of the violation of law or of the anti-competitive acts made possible by the violation.

163.    Dr. Pierson's injury and damages coincide with the public detriment resulting from ORHS's and the Peer Review Defendants' conspiracy and violations of the law, which diminish competition in (1) the field of specialized emergency and trauma orthopedic surgery in the ORMC and Sand Lake markets, and/or (2) the field of healthcare services to be provided by The Physician Patient Alliance™ in the Central Florida market.

164.    This is particularly true in light of the fact that managed care contracts, which require patients to see only certain doctors, exist and often limit a patient's choice to a select hospital. Thus, the consuming public that is part of a managed plan may not be able to use Dr. Pierson because their plan would not allow them to do so except at ORMC or Sand Lake.

165.    Further, the restraint of Dr. Pierson's ability to make high quality services readily and fully available to the public through The Physician Patient Alliance™ is detrimental to the public need for such healthcare services.

166.    Dr. Pierson was deprived of access to the care and treatment of emergency and trauma patients, which denied those patients, many of whom were beneficiaries and recipients of Medicare, Medicaid, insurance contracts, and other third-party reimbursement, the opportunity to seek or benefit from Dr. Pierson's services or from The Physician Patient Alliance.™

167.    Further, the suspension of privileges is a black mark on Dr. Pierson's career, which has been reported to state and federal licensing authorities and data banks and other third parties to his severe detriment, which he will always be required to disclose, and which

will inhibit or prevent him from obtaining privileges in other hospitals, surgical centers or healthcare practice groups.

168.     The competitive significance of Dr. Pierson's exclusion from ORMC and Sand Lake must be measured, not just by the particularized evaluation of his own practice, but also by a general evaluation of the impact of the restraint on other participants and potential participants at ORHS.   Those orthopedic medicine practitioners in the Central Florida area involved in Dr. Pierson's peer review, which resulted in the summary suspension of his privileges, were competing orthopedic surgeons in the ORHS system.

169.     Elimination of Dr. Pierson from the emergency and trauma call schedule resulted in increased patient load to the Peer Review Defendants who specialized in orthopedic medicine.   This was especially beneficial to Defendant Cole whose call rotation frequency increased significantly with the exclusion of Dr. Pierson from the trauma and emergency call rotations at ORMC.

170.     Likewise, elimination of the proposed The Physician Patient Alliance™ resulted in increased patient load to ORHS and the Peer Review Defendants.

171.     The proper focus under these circumstances is on the potential harm that would ensue if ORHS's and the Peer Review Defendants' conspiracy was successful, rather than on the actual consequences.   The essence of any violation of §1 of the Sherman Act and/or Florida Antitrust Act of 1980 is the illegal agreement itself, rather than the overt acts performed in furtherance of the agreement.

172.    Because the conspiracy was actually successful, Dr. Pierson was summarily suspended from participating in emergency and trauma call and consulting cases, which represented over 60% of his practice, and which effectively put him out of business.

173.    Further, the summary suspension of Dr. Pierson's privileges destroyed and derailed The Physician Patient Alliance.™

174.    As a matter of practical economies, there was a reduction in the provision of (1) specialized orthopedic surgical services; and/or (2) healthcare services in the Central Florida market.

175.    ORHS and the Peer Review Defendants conspired with one another and with others to abuse the peer review process and thereby (1) deny Dr. Pierson access to the market for orthopedic services provided by ORHS at its facilities, including ORMC and Sand Lake and/or (2) deny Dr. Pierson access to the market for healthcare services that the Physician Patient Alliance™ would have provided.  The peer review process was the gateway that controlled access to the market for services.

176.    Further, as alleged and pleaded herein, ORHS and the Peer Review Defendants conspired with one another to monopolize or attempt to monopolize the orthopedic services in the relevant market in Central Florida in violation of 15 U.S.C.A. §§ 1 and 2 and/or Florida Antitrust Act of 1980 (see F.S.A § 542.19).  ORHS and the Peer Review Defendants conspired to restrain competition and inhibit trade, including denial of competitive advantages or opportunities, in violation of 15 U.S.C.A. § 15 and § 26 and/or the Florida Antitrust Act of 1980 (F.S.A § 542.15, et seq.).

177.   As a direct and proximate result of the aforesaid combination and conspiracy, Dr. Pierson expended all necessary financial, personal and intangible resources required to remain in business and to compete in spite of the pressures resulting from the goals and desired effects of Defendants' conspiracy, and to overcome the illegal attempts by ORHS and the Peer Review Defendants to deny Dr. Pierson his right to develop and implement The Physician Patient Alliance.™   ORHS and the Peer Review Defendants have, therefore, completely depleted Dr. Pierson's resources.

178.   ORHS and the Peer Review Defendants continuously delayed and ultimately denied Dr. Pierson his due process rights, privileges and review so as to severely damage Dr. Pierson's ability to compete or remain in business in Central Florida.   Any "process" provided to Dr. Pierson was a sham and a cover for ORHS's and the Peer Review Defendants' intended conspiracy to remove Dr. Pierson from competing with them for orthopedic emergency and trauma cases.

179.   The effect of the combination and conspiracy was, among other things, to prevent and restrain competition in the provision of high quality, efficient, cost-effective (1) orthopedic medicine and/or (2) healthcare services that The Physician Patient Alliance™ would provide the public, which violates federal and state antitrust laws.

180.   As a result of ORHS's and the Peer Review Defendants' combination and conspiracy to restrain trade and competition, Dr. Pierson has been caused to suffer and will continue to suffer substantial damages to his reputation and to his practice – all to his severe and continuing detriment.

181. The concerted efforts of ORHS and the Peer Review Defendants who participated in and conducted the peer review to eliminate Dr. Pierson as a competitor constitutes a group boycott in violation of Section 1 of the Sherman Act and/or the Florida Antitrust Act of 1980 (*see* F.S.A. §542.19) . By eliminating Dr. Pierson and The Physician Patient Alliance™ as competitors, the boycott successfully reduced competition for ORHS and the Peer Review Defendants.

182. Dr. Pierson would show that, but for the illegal combination and conspiracy of ORHS and the Peer Review Defendants as alleged herein, as of the date of the filing of this lawsuit, he has suffered damages in an amount in excess of $1,000,000. Dr. Pierson is further entitled to three times the damages determined to have been sustained, simple interest on actual damages as allowed by law, costs of suit and attorneys' fees for the trial or hearing in this Court, an additional amount in the event an appeal is taken to the Court of Appeals, and an additional amount for an appeal to the United States Supreme Court.

183. ORHS and the Peer Review Defendants conspired with one another to perform a false and malicious sham peer review against Dr. Pierson in order to cause the loss of his emergency and trauma call and consulting privileges at ORMC and Sand Lake. They did so by instigating, using and performing reviews by persons who were unqualified and/or who were biased competitors, all of whom were motivated by anti-competitive intent.

184. ORHS and the Peer Review Defendants knowingly, willingly, and maliciously sought to destroy Dr. Pierson's reputation and medical practice in order to inhibit or restrain competition from Dr. Pierson. This is a pattern of conduct that can be established by the testimony of other doctors, other competitors, and staff at ORMC and Sand Lake.

185.   Pursuant to Section 4 of the Clayton Act (15 U.S.C.A. § 15) and/or Florida Statutes Annotated §542.22, Dr. Pierson is entitled to recover threefold the damages he sustained and his costs of suit, including attorneys' fees. In addition, pursuant to Section 16 of the Clayton Act (15 U.S.C.A. § 26) and/or Florida Statutes Annotated §542.23, Dr. Pierson seeks declaratory and injunctive relief as prayed for herein.

### COUNT 2 – BREACH OF CONTRACT (DEFENDANT ORHS)

186.   The allegations contained in Paragraphs 37-159 are incorporated by reference.

187.   The Bylaws set out a series of rights afforded to members of the Medical Staff, including Dr. Pierson, which constitute a contract between ORHS (including ORMC and Sand Lake) and the respective medical staffs, and are legally enforceable as a contract, pursuant to Florida Law.  Dr. Pierson, as a member of the Medical Staff, was a party to this contract and/or a third-party beneficiary of the contract.

188.   As alleged and pleaded herein, Defendant ORHS breached the Bylaws and Dr. Pierson's contractual right to due process in a number of ways.

189.   As a direct result of ORHS's actions that were in breach and violation of the Bylaws, Dr. Pierson has sustained substantial economic damages, including but not limited to (a) the loss of his emergency and trauma call and consulting privileges, resulting in substantial loss of past earnings; (b) the loss of referrals and patients as a result of being removed from the emergency and trauma call schedule, resulting in substantial loss of past earnings; (c) substantial economic losses in defending against ORHS's and the Peer Review Defendants' actions and the sham peer review, including payment of reasonable attorneys'

fees and costs; and (d) other consequential damages (such as those described throughout the complaint) resulting from ORHS's breach and violation of the Bylaws.

### COUNT 3 – JUDICIAL REVIEW OF REASONABLENESS AND/OR FAIRNESS IN PEER REVIEW (ORHS, Peer Review Defendants)

190.   The allegations contained in Paragraphs 37-159 are incorporated by reference.

191.   The peer review employed by ORHS and the Peer Review Defendants to summarily suspend Dr. Pierson's privileges was committed in bad faith, in violation and in breach of the Bylaws, and in violation of Dr. Pierson's fundamental right to due process and fairness. Further, the peer review was unfair, unreasonable, arbitrary, and capricious, and was rife with violations of the notions of fundamental fairness.

192.   ORHS and the Peer Review Defendants intentionally misapplied the Bylaws and/or intentionally conducted the peer review in violation of the Bylaws in order to achieve a desired result – elimination of Dr. Pierson from practicing orthopedic surgery and orthopedic medicine at ORHS and in Central Florida.

193.   Dr. Pierson requests that this Court judicially review and determine the validity, reasonableness and fairness of ORHS's and the Peer Review Defendants' actions, and that he be awarded injunctive relief, declaratory judgment, and damages as described herein and as proven at trial, together with his court costs and interest as allowed by law.

### COUNT 4 – DEFAMATION: LIBEL AND SLANDER (ORHS, Peer Review Defendants)

194.   The allegations contained in Paragraphs 37-159 are incorporated by reference.

195.   ORHS and the Peer Review Defendants made and published false and defamatory written and spoken statements about Dr. Pierson during and after the peer review, including statements that Dr. Pierson was justifiably summarily suspended.

196.   Further, Defendants ORHS and Hillenmeyer provided false, erroneous and defamatory information about Dr. Pierson to the NPDB, to the Florida Department of Health and to other third parties.   These entities and third parties have published and republished these defamatory statements, which Dr. Pierson has also been required to self-publish.

197.   Throughout the peer review process, ORHS and the Peer Review Defendants made defamatory statements about Dr. Pierson's surgical technique, surgical judgment, methods and practice, operative durations, operating times and surgical decisions.

198.   These defamatory statements, both written and spoken, were made with knowledge of their falsity or with reckless disregard of their truth or falsity.   Further, the defamatory statements are defamatory per se or per quod.

199.   As a direct and proximate result of ORHS's and the Peer Review Defendants' defamatory statements, both written and spoken, Dr. Pierson has suffered and continues to suffer actual and special damages, including but not limited to harm to his reputation, economic loss, extreme embarrassment, humiliation, outrage and indignity.

200.   Dr. Pierson is entitled to recover damages suffered as a direct and proximate result of all of these defamatory statements, including but not limited to (a) economic losses, past and future, resulting from the loss of his staff privileges and his medical practice; (b) loss of goodwill and permanent harm to his professional reputation; (c) extreme

embarrassment, humiliation, inconvenience, mental anguish, outrage and indignity; (d)

exemplary damages; and (e) all other damages allowed by law to make Dr. Pierson whole.

### COUNT 5 – INTENTIONAL AND UNJUSTIFIABLE INTERFERENCE WITH EXISTING CONTRACTUAL RELATIONS (ORHS, Peer Review Defendants)

201.    The allegations contained in Paragraphs 37-159 are incorporated by reference.

202.    ORHS's and the Peer Review Defendants' actions and the resulting reports to

NPDB and other federal and state licensing authorities and data banks, and other publications

(whether by third parties or self-published) as described herein, constitute an intentional and

unjustifiable interference with Dr. Pierson's existing business relationships – particularly

relationships with hospitals, physicians, patients, insurers, and other healthcare organizations.

203.    ORHS and the Peer Review Defendants knew or at the very least should have

known of Dr. Pierson's existing contractual relationships.

204.    ORHS and the Peer Review Defendants intended that the summary suspension

of privileges interfere with Dr. Pierson's existing business, particularly existing contractual

relationships with hospitals, physicians, patients, insurers and other healthcare organization.

205.    ORHS's and the Peer Review Defendants' actions protected no legitimate

business interest, were not justified, and were not privileged.

206.    The summary suspension of Dr. Pierson's privileges and related publications

of such facts, brought about by ORHS and the Peer Review Defendants, improperly

influenced other hospitals, physicians, patients, insurers and other healthcare organizations

not to deal with or conduct business with Dr. Pierson.

207.    In the absence of ORHS's and the Peer Review Defendants' unjustified and

unreasonable interference, Dr. Pierson's business would not have been lost and Dr. Pierson

would have obtained substantially greater business.  As a direct and proximate result of ORHS's and the Peer Review Defendants' actions, Dr. Pierson has suffered and continues to suffer actual damages as described herein including damages for lost profits and loss of past and future earnings and/or earning capacity, in an amount to be determined by a jury.  In addition, Dr. Pierson suffered non-economic damages (e.g., past and future mental anguish, emotional distress, injury to reputation, and physical pain) all to his damage and detriment, in an amount to be determined by a jury.

208.   ORHS's and the Peer Review Defendants' actions as described herein were consciously and deliberately undertaken with oppression, fraud, wantonness, and malice with regard to Dr. Pierson, and with the intention of breaching or preventing Dr. Pierson's contractual relationships, particularly his relationships with other hospitals, physicians, patients, insurers, and other healthcare organizations.  Further, their actions were without good faith, and outside HCQIA standards and with specific intent to cause injury to Dr. Pierson.  He is entitled to recover punitive damages, in an amount to be determined by a jury.

### COUNT 6 – INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIP (ORHS, Peer Review Defendants)

209.   The allegations contained in Paragraphs 37-159 are incorporated by reference.

210.   ORHS's and the Peer Review Defendants' actions and the resulting reports to NPDB and other federal and state licensing authorities and data banks, and other publications (whether by third parties or self-published) as described herein, constitute an intentional and unjustifiable interference with Dr. Pierson's prospective advantageous business relationships with hospitals, physicians, patients, insurers, and healthcare organizations.

211.   ORHS and the Peer Review Defendants knew or at the very least should have known of these relationships, and intended that the summary suspension of privileges interfere with these prospective advantageous business relationships.

212.   ORHS's and the Peer Review Defendants' actions protected no legitimate business interest, were not justified, and were not privileged.

213.   The summary suspension of Dr. Pierson's privileges and related publications of such facts, brought about by ORHS and the Peer Review Defendants, improperly influenced other hospitals, physicians, patients, insurers and other healthcare organizations not to deal with or conduct business with Dr. Pierson.

214.   In the absence of ORHS's and the Peer Review Defendants' unjustified and unreasonable interference, Dr. Pierson's prospective advantageous business relationships would not have been lost and Dr. Pierson would have obtained substantially greater business. As a direct and proximate result of ORHS's and the Peer Review Defendants' actions, Dr. Pierson has suffered and continues to suffer actual damages as described herein including damages for lost profits and loss of past and future earnings and/or earning capacity, in an amount to be determined by a jury.  In addition, Dr. Pierson suffered non-economic damages (e.g., past and future mental anguish, emotional distress, injury to reputation, and physical pain) all to his damage and detriment, in an amount to be determined by a jury.

215.   ORHS's and the Peer Review Defendants's actions as described herein were consciously and deliberately undertaken with oppression, fraud, wantonness, and malice with regard to Dr. Pierson, and with the intention of breaching or preventing Dr. Pierson's prospective business relationships, particularly his relationships with other hospitals,

physicians, patients, insurers, and other healthcare organizations. Further, their actions were without good faith, outside HCQIA standards and with specific intent to cause injury to Dr. Pierson. He is entitled to recover punitive damages, in an amount to be determined by a jury.

### COUNT 7 – FALSE LIGHT (ORHS, Peer Review Defendants)

216.    The allegations contained in Paragraphs 37-159 are incorporated by reference.

217.    Dr. Pierson was placed in a false light before the public. ORHS's and the Peer Review Defendants' communications (whether directly by them to federal and state agencies, to the NPDB, to third parties, or through reported communications that Dr. Pierson must self-report) place Dr. Pierson in a false light that is highly offensive to a reasonable person. This false light has held and continues to hold Dr. Pierson up to shame, contempt and ridicule, and has caused him personal and professional embarrassment and humiliation.

218.    The avowed grounds on which Dr. Pierson's trauma and emergency call and consulting privileges were summarily suspended are entirely, patently false, which makes the substance of ORHS's and the Peer Review Defendants' reports to the NPDB, the Florida Health Department, and to other third parties entirely false and improper as well.

219.    ORHS's and the Peer Review Defendants' actions that place Dr. Pierson in a false light are without privilege, legal justification or excuse.

220.    ORHS's and the Peer Review Defendants' statements regarding Dr. Pierson's suspension (including that his surgical techniques were not competent and that his attitude towards fellow practitioners and staff was not collegial) were spoken or written maliciously by these Defendants for the reason that they were made with the knowledge that they were false or with reckless disregard for whether they were true or false, and also with knowledge

of or reckless disregard to the false light in which the materials would place Dr. Pierson, so as to indicate a conscious indifference to Dr. Pierson's rights. This is also true for statements that ORHS and the Peer Review Defendants have forced Dr. Pierson to self-report, which self-publication was reasonably foreseeable by these Defendants.

221. As a direct result of ORHS's and the Peer Review Defendants' actions, Dr. Pierson has suffered and continues to suffer actual damages as described herein including damages for lost profits and loss of past and future earnings and/or earning capacity, in an amount to be determined by a jury. In addition, he has suffered non-economic damages (e.g., past and future mental anguish, emotional distress, injury to reputation and physical pain) as described herein to his detriment and damage, in an amount to be determined by a jury.

222. Further, the acts, statements, determinations and recommendations made and acts reported by ORHS and the Peer Review Defendants, were made with malice, without good faith, and outside HCQIA standards and with specific intent to cause injury to Dr. Pierson. These Defendants consciously and deliberately engaged in oppression, fraud, wantonness, and malice with regard to Dr. Pierson. He is entitled to recover punitive damages, in an amount to be determined by a jury.

## COUNT 8 – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (ORHS, Peer Review Defendants)

223. The allegations contained in Paragraphs 37-159 are incorporated by reference.

224. The suspension and termination of Dr. Pierson's privileges at ORHS caused by the actions of ORHS and the Peer Review Defendants and the publications of such incidents as set forth above constitute the tort of intentional infliction of emotional distress.

236. By their conduct, ORHS and the Peer Review Defendants intentionally and recklessly labeled Dr. Pierson "incompetent" and a "dangerous" doctor and excluded him from performing orthopedic trauma and emergency surgeries with the intended purpose of denying him the opportunity to perform the professional services for which he trained.

237. ORHS and the Peer Review Defendants also intentionally and recklessly harmed Dr. Pierson through the use and abuse of the peer review process at ORHS.

238. ORHS's and the Peer Review Defendants' conduct was not privileged, legally justified, or excused. Further, their conduct was so extreme, unreasonable and outrageous in character and degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

239. By engaging in such conduct, these Defendants intentionally and recklessly ignored and/or disregarded the foreseeable risk that Dr. Pierson would suffer extreme emotional distress as a result of ORHS's and the Peer Review Defendants' conduct.

240. These Defendants' conduct proximately caused Dr. Pierson emotional distress.

241. As a result of their conduct, Dr. Pierson was required to defend his surgical techniques in a sham peer review proceeding that utterly ignored the applicable medical standards of care at issue in Dr. Pierson's reviewed cases, Dr. Pierson was required to dispute an erroneous, false characterization of his practices filed by ORHS with the National Practitioner's Data Bank, Dr. Pierson was also required to defend his medical license in response to a complaint filed by ORHS with the Florida Department of Health, which complaint was based on the sham peer review conducted against Dr. Pierson, and he has been subjected to other investigations at other hospitals and healthcare organizations.

242.   Due to ORHS's and the Peer Review Defendants' conduct, Dr. Pierson has been labeled an "incompetent" and "dangerous" doctor, which is the most heinous label a physician can bear. Dr. Pierson was ostracized from the Central Florida medical community and his ability to earn a livelihood for himself and his family was jeopardized and then destroyed. Dr. Pierson suffered the dissolution of his marriage as a result of the tensions in familial and marital relationships that resulted from these Defendants' intentional and reckless abuse of the peer review procedures at ORHS.

243.   ORHS and the Peer Review Defendants are either a part of the medical community in Central Florida or have knowledge of the healthcare industry and knew the serious and permanent ramifications to a physician and to his practice if the physician were labeled an "incompetent" and "dangerous" doctor. These Defendants knew that their abuse of the peer review proceedings (and subsequent reporting) at ORHS would devastate Dr. Pierson personally and professionally. ORHS and the Peer Review Defendants intended that their actions inflict emotional distress on Dr. Pierson or knew there was at least a high probability that their actions would cause the severe emotional distress that he has suffered.

244.   As a direct and proximate result of ORHS's and the Peer Review Defendants' conduct, Dr. Pierson has suffered and continues to suffer actual damages as described herein including damages for lost profits and loss of past and future earnings and/or earning capacity, in an amount to be determined by a jury. In addition, he has suffered non-economic damages (e.g., past and future mental anguish, emotional distress, injury to reputation and physical pain) described herein to his detriment, in an amount to be determined by a jury.

245.    Further, the acts, statements, determinations and recommendations made and acts reported by ORHS and the Peer Review Defendants as more fully set forth above, were made with malice, without good faith, and outside the HCQIA standards and with specific intent to cause injury to Dr. Pierson. These Defendants consciously and deliberately engaged in oppression, fraud, wantonness, and malice with regard to Dr. Pierson. Dr. Pierson is entitled to recover punitive damages, in an amount to be determined by a jury.

### COUNT 9 – NEGLIGENT HIRING AND SUPERVISION OF THOSE CONDUCTING PEER REVIEW (Defendant ORHS)

246.    The allegations contained in Paragraphs 37-159 are incorporated by reference.

247.    The actions of Defendants Murbach, Csencsitz, Bone, Spiegel, Moser, Diebel, Bott, Evans, Connolly, Galceran, Rivero, and Wolfram who were each agents and/or employees of ORHS, were taken maliciously with intent to harm Dr. Pierson as pleaded.

248.    The wrongful, illegal and malicious actions of these Defendants against Dr. Pierson were reasonably foreseeable by Defendant ORHS, because it became aware or should have become aware of problems, biases and wrongful motives of each of these Defendants that indicated their unfitness to participate in the peer review proceeding at any level and failed to take any action to investigate, discharge or reassign these Defendants in relation to their participation in Dr. Pierson's peer review. Such action would have revealed each of these Defendants unsuited as a participant in Dr. Pierson's peer review.

249.    ORHS is answerable in damages to Dr. Pierson for the negligent hiring and supervision of these Defendants. ORHS negligently failed to make an investigation to ascertain the propensities of these Defendants for wrongful, illegal, destructive, vengeful and malicious action, bias, or wrongful motive before placing them in positions at ORHS from

which these Defendants were able to orchestrate and perpetrate the aforesaid malicious acts and sham peer review proceeding against Dr. Pierson. Such action would have revealed the unsuitability of each of these Defendants as a participant in Dr. Pierson's peer review.

250.    Thereafter, Defendant ORHS negligently failed to supervise these Defendants to prevent them from maliciously conducting a sham peer review against Dr. Pierson and from acting wrongfully and illegally in the manner described herein as to Dr. Pierson.

251.    Defendant ORHS was also negligent in placing Drs. Shea and Neder on the peer review hearing and appeals panels, and in its failure to remove them from those panels on Dr. Pierson's well-founded objections to their participation in the peer review.

252.    As a direct and proximate result of Defendant ORHS's negligence, Dr. Pierson suffered and continues to suffer actual damages as described herein including damages for lost profits and loss of past and future earnings and/or earning capacity, in an amount to be determined by a jury.

253.    In addition, Dr. Pierson has suffered non-economic damages (e.g., past and future mental anguish, emotional distress, injury to reputation and physical pain) as described herein to his detriment and damage, in an amount to be determined by a jury.

254.    Further, the acts, statements, determinations and recommendations made and acts reported by Defendants as more fully set forth above, were made with malice, without good faith, and outside the HCQIA standards and with specific intent to cause injury to Dr. Pierson. Defendants consciously and deliberately engaged in oppression, fraud, wantonness, and malice with regard to Dr. Pierson. Dr. Pierson is entitled to recover punitive damages, in an amount to be determined by a jury.

## COUNT 10 – FRAUD (ORHS, Peer Review Defendants)

255.    The allegations contained in Paragraphs 37-159 are incorporated by reference.

256.    ORHS and members of its medical staff (which include the Peer Review Defendants) made certain material representations to Dr. Pierson about and through ORHS's Bylaws and otherwise, including representations regarding ORHS's methods and means for governance of its medical staff, privileges, interests and rights held by members of the ORHS medical staff, and the grounds, bases and procedures for investigative actions, peer review actions, and any other actions regarding a medical staff member's privileges.

257.    These material representations were made by ORHS and the Peer Review Defendants with the knowledge that the representations made to the medical staff, including Dr. Pierson, about and through the Bylaws were false and misleading in that ORHS and the Peer Review Defendants did not intend to honor the Bylaws when conducting a peer review.

258.    Further, these material representations were made by ORHS and the Peer Review Defendants with the intention that the medical staff, including Dr. Pierson, rely on the representations made by ORHS and the Peer Review Defendants in reaching a decision to become a member of the medical staff.

259.    In deciding to join the ORHS medical staff, Dr. Pierson relied on these false representations to his severe and continuing detriment.

260.    As a direct and proximate result of his reliance on the false representations made by ORHS and the Peer Review Defendants, Dr. Pierson has suffered and continues to suffer actual damages as described herein including damages for lost profits and loss of past and future earnings and/or earning capacity, in an amount to be determined by a jury.    In

addition, Dr. Pierson has suffered non-economic damages (e.g., past and future mental anguish, emotional distress, injury to reputation and physical pain) as described herein to his detriment and damage, in an amount to be determined by a jury.

261.    Further, the false representations made by ORHS and the Peer Review Defendants were made with intentional fraud, with malice, without good faith, outside HCQIA standards and with specific intent to cause injury to Dr. Pierson. ORHS and the Peer Review Defendants consciously and deliberately engaged in oppression, fraud, wantonness, and malice with regard to Dr. Pierson. Dr. Pierson is entitled to recover punitive damages, in an amount to be determined by a jury.

## COUNT 11 - APPLICATION FOR PERMANENT INJUNCTION (All Defendants)

262.    The allegations contained in Paragraphs 37-159 are incorporated by reference.

263.    The Bylaws set forth a series of rights afforded to members of the ORHS Medical Staff, including Dr. Pierson. The Bylaws are legally enforceable as a contract.

264.    Pursuant to the Bylaws, Dr. Pierson has a legal right to have ORHS comply with the Bylaws by rescinding and vacating the wrongful suspension of his privileges and expunging these events from his record at ORHS.

265.    Dr. Pierson also has a legal right to have ORHS rescind, correct, and expunge the reports made to the NPDB, the Florida Department of Health and any other third parties to whom a false or wrongful report concerning Dr. Pierson was made.

266.    In addition, to the extent that any other Defendant has made or published these reports, Dr. Pierson has the legal right to have those parties rescind, correct, and expunge such reports.

267.    Dr. Pierson has been denied these rights.  Such denial is causing Dr. Pierson immediate harm and irreparable injury for which there is no adequate legal remedy.  Dr. Pierson has a probable right to recovery in this matter.

268.    As a result, Dr. Pierson seeks injunctive relief ordering ORHS to comply in all respects with the Bylaws by lifting and vacating his wrongful suspension of privileges, rescinding and vacating his wrongful suspension of privileges, and expunging these events from Dr. Pierson's record at ORHS and to expunge the reports made to the National Practitioners' Data Bank, the Florida Department of Health, Consumer Unit, and any other third parties to whom a false or wrongful report concerning Dr. Pierson was made.  Dr. Pierson also seeks injunctive relief ordering the expungement of these events from Dr. Pierson's record at ORHS and expungement of reports made any third parties.

## COUNT 12 – REQUEST FOR DECLARATORY RELIEF – COMPLIANCE WITH BYLAWS, RESCISSION, AND EXPUNGEMENT (ORHS, Peer Review Defendants)

269.    The allegations contained in Paragraphs 37-159 are incorporated by reference.

270.    An actual controversy has arisen between Dr. Pierson and Defendants in that Dr. Pierson contends that he has a legal right to have ORHS and the Peer Review Defendants comply with the Bylaws by rescinding and vacating his wrongful suspension of privileges and expunging these events from his record at ORHS so that such events may not be used against him in the future at ORHS and these Defendants contend that he does not.

271.    Further, an actual controversy has arisen between Dr. Pierson and the Defendants in that Dr. Pierson contends that he has a legal right to have these Defendants rescind, correct, and expunge the reports made to any third party, including the National Practitioners' Data Bank and the Florida Department of Health.

272.   Dr. Pierson brings this complaint for declaratory relief to settle and afford relief from uncertainty with respect to rights, status and other legal relations.  Dr. Pierson's claim that a bona fide, actual, present practical need exists for such declaration is sufficient to invoke the Court's jurisdiction to enter the declaratory relief requested.

273.   As a result, Dr. Pierson seeks a declaration of his rights asserting that he is entitled to the above-stated rights, and seeks his court costs and interest as allowed by law. The relief sought by Dr. Pierson is not merely the giving of legal advice by the courts or the answer to a question propounded from curiosity.

### COUNT 13 - REQUEST FOR DECLARATORY RELIEF – DENIAL OF IMMUNITY (ORHS, Peer Review Defendants)

274.   The allegations contained in Paragraphs 37-159 are incorporated by reference.

275.   320.   An actual controversy has arisen between Dr. Pierson and the Peer Review Defendants and ORHS in that Dr. Pierson contends that the Peer Review Defendants and ORHS are not entitled to the immunity from civil suit presumably conferred by HCQIA and similar Florida statutory and common law.

276.   Dr. Pierson brings this complaint for declaratory relief to settle and afford relief from uncertainty with respect to rights, status and other legal relations.  Dr. Pierson's claim that a bona fide, actual, present practical need exists for such declaration is sufficient to invoke the Court's jurisdiction to enter the declaratory relief requested.

277.   HCQIA permits immunity to attach to peer review participants for activities undertaken in connection with peer review, provided the review meets certain procedural requirements.  In order to be entitled to presumptive immunity under HCQIA, ORHS and the Peer Review Defendants must meet the following four requirements of the Act:  the review at

issue (1) must be taken in the reasonable belief that the action was in furtherance of quality health care; (2) after reasonable efforts to obtain facts of the matter; (3) after adequate notice and hearing procedures were afforded to the physician or after such other procedures as were fair to the physician under the circumstances; and (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after such adequate procedures.  42 U.S.C. §§ 11111(a)1, 11112(a).  For the reasons pleaded, ORHS and the Peer Review Defendants are not entitled to a presumption of immunity.

278.    Florida laws that provide civil immunity for peer review committee members and participants expressly do not extend immunity to acts done in bad faith, with malicious intent or with intentional fraud. F.S.A.  § 766.101 and § 766.1015(1), (2).  Monetary liability for conduct undertaken in peer review attaches when there is intentional fraud. F.S.A. § 395.0193(5).  For the reasons pleaded, ORHS and the Peer Review Defendants are not entitled to immunity under Florida law.

279.    As a result, Dr. Pierson seeks a declaration of his rights asserting that the Peer Review Defendants' actions and ORHS's actions in connection with and related to the peer review were taken and made with intentional fraud and, therefore, the Peer Review Defendants are not entitled to a presumption of immunity under HCQIA and are not entitled to immunity under either Florida Law.

280.    Dr. Pierson seeks a declaration of his rights asserting that he is entitled to the above-stated rights, and seeks his court costs and interests as allowed by law.  The relief sought by Dr. Pierson is not merely the giving of legal advice by the courts or the answer to a question propounded from curiosity.

**COUNT 14 – REQUEST FOR DECLARATORY RELIEF**
**UNCONSTITUTIONALITY OF HCQIA AND FLORIDA IMMUNITY STATUTES**
**(F.S.A. § 766.101, § 766.1015 AND §395.0193) AS VIOLATIONS OF THE 5TH AND**
**14TH AMENDMENTS' DUE PROCESS PROTECTIONS AND SIMILAR DUE**
**PROCESS GUARANTEES UNDER THE FLORIDA CONSTITUTION**
**(Defendants United States of America, NPDB, HHS, Region IV, State of Florida,**
**Florida Health Department and Florida Board of Medicine)**

281.     The allegations contained in Paragraphs 37-159 are incorporated by reference.

282.     Dr. Pierson has a fundamental liberty and due process right in his livelihood, work and reputation under both the United States and Florida Constitutions. ORHS and the Peer Review Defendants conducted peer review proceedings under the encouragement and statutory powers granted by Congress. In doing so, and for multiple reasons not limited to the peer review and immunity provisions in the federal and Florida statutes, ORHS and the Peer Review Defendants acted as state actors, with all of the constitutional limitations that apply to the state and federal government.

283.     ORHS and the Peer Review Defendants, acting under color of state law, conducted and participated in a peer review process that failed to meet ordinary standards of due process, thereby undermining Dr. Pierson's fundamental rights. The fraudulent, sham peer review process conducted and participated in by these Defendants suffered from numerous procedural flaws, including but not limited to the complete lack of rights afforded to Dr. Pierson. The peer review participants, reviewers, committee and panel members, and decision makers were not neutral but were biased and prejudiced against Dr. Pierson. As described herein, multiple procedural defects were legion throughout both the investigation of Dr. Pierson and the peer review.

284.   ORHS and the Peer Review Defendants used Dr. Pierson's defense in the peer review as a key reason to take adverse action against him, asserting that the vigorousness of his defense proved his non-collegiality.  Using a person's choice of defense against him in a proceeding is a hallmark of arbitrary and deficient process.

285.   ORHS and the Peer Review Defendants took these wrongful actions against Dr. Pierson without compelling or sufficient justification, depriving Dr. Pierson due process.

286.   Acting as peer reviewers at the direction of the federal and state governments, ORHS and the Peer Review Defendants administered HCQIA and similar Florida peer review statutes, which (through its provision of qualified immunity) purports to insulate participants in peer review proceedings from federal and state causes of action – even when the peer review proceedings do not comport with due process.

287.   ORHS and the Peer Review Defendants' administration of HCQIA and the Florida peer review statutes is an unconstitutional deprivation of due process because it interferes with plaintiff's ability to secure redress of his rights in a court of law.

288.   Dr. Pierson therefore respectfully requests that this Court issue a declaratory judgment that the HCQIA and the Florida immunity statutes (F.S.A. §766.101, § 766.1015 and §395.0193) violate the Due Process protections provided by the United States Constitution and the Florida Constitution. Dr. Pierson is entitled to all damages permitted by law, including, without limitation, declaratory relief, simple interest on actual damages, interest as allowed by law, cost of suit and attorneys' fees, all pursuant to applicable law – including, without limitation, Florida law.

**COUNT 15 - REQUEST FOR DECLARATORY RELIEF**
UNCONSTITUTIONALITY OF HCQIA AND FLORIDA IMMUNITY STATUTES
(F.S.A. § 766.101, § 766.1015 AND §395.0193) AS VIOLATIONS OF THE 5TH AND
14TH AMENDMENTS' EQUAL PROTECTION GUARANTEES AND SIMILAR
STATE PROHIBITIONS AGAINST UNEQUAL TREATMENT UNDER THE
FLORIDA CONSTITUTION (Defendants United States of America, NPDB, HHS,
Region IV, State of Florida, Florida Health Department and Florida Board of
Medicine)

289.    The allegations contained in Paragraphs 37-159 are incorporated by reference.

290.    Dr. Pierson, has a right to equal protection of the law under the Fifth and

Fourteenth Amendments to the Constitution. He possesses a right to equal protection of the

law under the Constitution of Florida. In particular, Dr. Pierson has the right to be treated the

same as other similarly situated individuals, and possesses a separate, fundamental right of

access to the courts. Dr. Pierson also possesses a fundamental liberty right in his livelihood,

work, and reputation.

291.    ORHS and the Peer Review Defendants conducted peer review proceedings

under the encouragement and statutory powers granted to them by the United States

Congress and the Florida Congress. In doing so, and for multiple reasons not limited to the

peer review and immunity provisions in the federal and Florida statutes, these Defendants

acted under color of state law, with all of the constitutional limitations that apply to the state

and federal government.

292.    ORHS and the Peer Review Defendants administered HCQIA and the Florida

peer review statutes, which (through their provision of qualified immunity) purport to

insulate participants in peer review proceedings from federal and state causes of action.

Further, the Florida peer review privilege laws, although not applicable in this federal

question case, also purport to insulate from discovery documents and materials utilized in peer review by deeming those documents and materials privileged.

293.   HCQIA and the Florida peer review statutes treat similarly situated doctors in different ways, both by design and in effect.  For example, doctors from small practice groups and solo-practitioners such as Dr. Pierson are treated differently from those in large practice groups, and doctors in some specialties are treated differently than those in others. HCQIA and the Florida peer review statutes cause doctors who should be treated similarly to be treated in ways that lack a rational basis; and even in ways that can be arbitrary, fraudulent, oppressive, wanton, malicious, and/or motivated by animus, bias and prejudice.

294.   Further, the Florida peer review privilege laws, although not applicable in this federal question case, inhibit a doctor's ability to discover evidence of the wrongful methods, means and motives against him in peer review and use that evidence to support and prove statutory and common law causes of action that would redress any injury to that doctor from a wrongful peer review.

295.   HCQIA's immunity presumption and the Florida peer review immunity statutes and privilege statutes (but only to the extent applicable, which Dr. Pierson denies) create arbitrary classifications that deprive physicians of their traditional state-based common law and statutory causes of action including breach of contract, interference with contractual relations and defamation as well as statutory clauses under anti-trust laws, while not denying all healthcare providers and all non-health care professionals their rights to bring such claims.

296.   Neither HCQIA nor the Florida peer review immunity or privilege statutes are justified by a compelling government interest, nor are these laws narrowly tailored to redress

the problem they purport to solve. Separately, neither HCQIA nor the Florida immunity and privilege statutes are justified by a rational basis.

297.   Dr. Pierson therefore respectfully requests that this Court issue a declaratory judgment that HCQIA violates the Equal Protection guarantees of the United States Constitution. Dr. Pierson further respectfully requests that this Court issue a declaratory judgment that the Florida immunity and privilege statutes violate the Equal Protection guarantees of the Florida Constitution. Dr. Pierson is entitled to all damages permitted by law, including, without limitation, declaratory relief, simple interest on actual damages, interest as allowed by law, cost of suit and attorneys' fees, all pursuant to all applicable law.

**COUNT 16 – REQUEST FOR DECLARATORY RELIEF**
**UNCONSTITUTIONALITY OF HCQIA AS A VIOLATION OF ARTICLE 1, SECTION 8 – THE COMMERCE CLAUSE OF THE UNITED STATES CONSTITUTION (Defendants United States of America, NPDB, HHS, Region IV, State of Florida, Florida Health Department and Florida Board of Medicine)**

298.   The allegations contained in Paragraphs 37-159 are incorporated by reference.

299.   ORHS and the Peer Review Defendants administered HCQIA, which purports to regulate the practice of medicine through peer review of physicians conducted by physicians. HCQIA, through various provisions including but not limited to its qualified immunity provision, attempts to sweep away state policy – including virtually all state causes of action for money damages that a physician would have based on a peer review process.

300.   While Congress undoubtedly has the power to regulate interstate commerce under Artice I, Section 8 of the Constitution, it lacks the ability to wholly intervene into state processes involving medical care and local employment decisions. The generic ability of Congress to regulate certain aspects of the practice of medicine does not give it the wholesale

power to displace state law entirely in this area.  With the enactment of HCQIA, Congress exceeded its powers under the Commerce Clause to regulate peer review among physicians since this is a matter traditionally regulated by the states.

301.    The actual peer review of Dr. Pierson by ORHS and the Peer Review Defendants did not substantially affect interstate commerce.

302.    Congress lacks Constitutional authority to regulate Dr. Pierson's peer review process and alter, either directly or indirectly, the peer review process, which is a process traditionally reserved to the states.

303.    Dr. Pierson therefore respectfully requests that this Court issue a declaratory judgment that HCQIA violates the Commerce Clause of the United States Constitution.  Dr. Pierson is entitled to all damages permitted by law, including, without limitation, declaratory relief, simple interest on actual damages, interest as allowed by law, cost of suit and attorneys' fees, all pursuant to applicable law – including, without limitation, Florida law.

**COUNT 17 – REQUEST FOR DECLARATORY RELIEF**
**UNCONSTITUTIONALITY OF HCQIA AS A VIOLATION OF THE 10TH AMENDMENT AND FEDERALISM PRINCIPLES (Defendants United States of America, NPDB, HHS, Region IV, State of Florida, Florida Health Department, Florida Board of Medicine, ORHS and the Peer Review Defendants)**

304.    The allegations contained in Paragraphs 37-159 are incorporated by reference.

305.    ORHS and the Peer Review Defendants administered HCQIA, which requires hospitals to report adverse actions against doctors to the applicable state medical board.  *See* 42 U.S.C. §§11131-33.  Under HCQIA, the applicable state medical board, in turn, is to report those adverse actions to a national database – the NPDB. *See* 42 U.S.C. §11134.

306.     Defendants ORHS and Hillenmeyer reported and/or caused to be reported the adverse action against Dr. Pierson to the Florida Board of Medicine on or about Feb. 9, 2004. Thereafter, Defendant Florida Board of Medicine reported the adverse action to the NPDB.

307.     Defendants NPDB, HHS and/or Region IV administer NPDB and placed the adverse action report about Dr. Pierson in this database.

308.     Defendants' placement of Dr. Pierson's name and adverse action in this database harmed Dr. Pierson's ability to practice medicine, his livelihood, and his reputation.

309.     The Constitution of the United States forbids Congress from commandeering state processes and requiring state officials to take certain actions.   This prohibition is particularly strong in the spheres of databases and privacy, as well as in medical employment.   As such, HCQIA violates the 10th Amendment and federalism principles provided under the laws of the United States.

310.     Dr. Pierson therefore respectfully requests that this Court issue a declaratory judgment that the HCQIA violates the 10th Amendment and federalism guarantees in the United States Constitution.   Dr. Pierson is entitled to all damages permitted by law, including, without limitation, declaratory relief, simple interest on actual damages, interest as allowed by law, cost of suit and attorneys' fees, all pursuant to applicable law.

**COUNT 18 – REQUEST FOR DECLARATORY RELIEF UNCONSTITUTIONALITY OF HCQIA AS A VIOLATION OF THE UNITED STATES CONSTITUTION'S PROHIBITION, AND SIMILAR FLORIDA STATE PROHIBITION, AGAINST DELEGATION OF GOVERNMENT FUNCTIONS TO PRIVATE ENTITIES (Defendants United States of America, NPDB, HHS, Region IV, State of Florida, Florida Health Department, Florida Board of Medicine, ORHS and the Peer Review Defendants)**

311.     The allegations contained in Paragraphs 37-159 are incorporated by reference.

312.    Dr. Pierson has a fundamental right of access to courts to redress wrongs. Judicial decision-making is contemplated by the structure of the U.S. Constitution, and in particular by Article III, as well as by state constitutional guarantees.

313.    ORHS and the Peer Review Defendants administered HCQIA, which purports (through its qualified immunity provision) to insulate participants in peer review from federal and state causes of action for damages. HCQIA therefore deprives Dr. Pierson of his ability to have his case heard in a neutral court. Instead, it provides him, and doctors like him, with a peer review that can be woefully deficient, fraudulent, malicious, wanton, and oppressive, and without effective ability to remedy that deficient, wrongful process in court.

314.    While the government may delegate minor functions to private entities, wholesale delegation of judicial power to a private body, such as a hospital, its MEC, medical staff, governing board, peer review panel or other committee, is unconstitutional.

315.    HCQIA essentially displaces the public function of adjudication -- transferring what was previously a judicial decision to a private enclave in the peer review process.

316.    Dr. Pierson therefore respectfully requests that this Court issue a declaratory judgment that HCQIA violates the prohibition against delegating government functions in the United States and Florida Constitutions. Dr. Pierson is entitled to all damages permitted by law, including, without limitation, declaratory relief, simple interest on actual damages, interest as allowed by law, cost of suit and attorneys' fees, all pursuant to applicable law.

### COUNT 19 – CIVIL CONSPIRACY (ORHS and the Peer Review Defendants)

317.    The allegations contained in Paragraphs 37-159 are incorporated by reference.

318.   ORHS and the Peer Review Defendants conspired against Dr. Pierson in his peer review in order to accomplish their respective personal, professional, political and economic agendas and to assure the current power structure of ORHS.  Accordingly, each of these Defendants was a member of a combination and/or conspiracy of two or more persons.

319.   The object of the conspiracy was to accomplish an unlawful purpose or a lawful purpose by unlawful means, i.e. the removal of Dr. Pierson's privileges at ORMC and Sand Lake through a sham, malicious peer review, the placement of a permanent stigma on his reputation, and the destruction of his career through various false reports to third parties.

320.   ORHS and the Peer Review Defendants had a meeting of the minds on the object or course of action of the conspiracy and at least one of these Defendants committed an unlawful, overt act to further the object or course of action of the conspiracy.  Acts in furtherance of the conspiracy occurred when ORHS and the Peer Review Defendants held various meetings and reached certain secret basic understandings concerning their scheme to harass, intimidate, and embarrass Dr. Pierson and force him from ORHS.  In committing these acts, these Defendants acted oppressively, maliciously, fraudulently, and outrageously, with malice and conscious disregard for Dr. Pierson's rights and with intent to injure him.

321.   Dr. Pierson was injured as a proximate result of the wrongful acts for which, by virtue of the conspiracy, ORHS and the Peer Review Defendants are liable.

322.   As a result of ORHS's and the Peer Review Defendants' actions pursuant to the conspiracy, Dr. Pierson suffered and continues to suffer actual damages as described herein including damages for lost profits and loss of past and future earnings and/or earning capacity, in an amount to be determined by a jury.  In addition, he has suffered non-economic

damages (e.g., past and future mental anguish, emotional distress, injury to reputation and physical pain) to his detriment, in an amount to be determined by a jury.

323.   Further, the acts, statements, determinations and recommendations made and acts reported by ORHS and the Peer Review Defendants were made with malice, without good faith, outside HCQIA standards and with specific intent to injure Dr. Pierson. These Defendants consciously and deliberately engaged in oppression, fraud, wantonness, and malice for which Dr. Pierson is entitled to recover punitive damages, in an amount to be determined by a jury.

## VI.   CONDITIONS PRECEDENT

324.   All conditions precedent have been performed or have occurred.

## VII.   DEMAND FOR JURY

325.   Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury.

## VIII.   PRAYER FOR RELIEF

Wherefore, premises considered, Dr. Pierson prays that Defendants be cited to appear and answer herein, and that upon final trial or hearing, Dr. Pierson recover judgment against the Defendants, jointly and severally, ordering as follows:

A.   That the Court adjudge and decree that ORHS and the Peer Review Defendants engaged in an unlawful conspiracy to monopolize the orthopedic medicine and healthcare services markets and to inhibit competition, in violation of federal law;

B.   That the Court adjudge and decree that ORHS and the Peer Review Defendants engaged in an unlawful conspiracy to monopolize the orthopedic medicine and healthcare services markets and to inhibit competition, in violation of Florida law;

C.    That the Court award Dr. Pierson his actual damages as proved at trial;

D.    That the court award Dr. Pierson statutory damages as allowed by law;

E.    That ORHS and the Peer Review Defendants and their respective officers, directors, agents and employees, and all other persons acting or planning to act on behalf thereof, or in concert therewith, be perpetually enjoined and restrained from in any manner, directly or indirectly, continuing, maintaining or renewing the aforesaid conspiracy, and from adopting or following any practice, plan, program or design, having a similar purpose or effect;

F.    That the Court grant an injunction against further enforcing, taking or reporting any professional review action which adversely affects Dr. Pierson without justification;

G.    That the Court declare that ORHS and the Peer Review Defendants are not entitled to immunity under the federal HCQIA or the Florida statutes;

H.    That the Court declare the federal HCQIA provisions, which confer immunity on persons involved in peer review, unconstitutional;

I.    That the Court declare the Florida statutes, which confer immunity on persons involved in peer review, unconstitutional;

J.    That the Court declare the Florida statutes, which provide a privilege for documents and information related to peer review, unconstitutional;

K.    That the Court declare the NPDB unconstitutional and award such other Constitutional relief as specifically pleaded;

L.    That the Court award punitive damages as allowed by law;

M.    That the Court award pre-judgment and post-judgment interest as provided by law;

N.    That the Court award Dr. Pierson reasonable and necessary attorneys' fees as pleaded;

O.    That the Court award Dr. Pierson his taxable costs of Court; and

P.    That the Court grant such other and further relief to which Dr. Pierson has pleaded and/or shown himself justly entitled.

Respectfully submitted:

s/ John F. Romano
John Romano
Florida Bar No. 175700
Romano Law Group
PO Box 21349
West Palm Beach, Florida 33416
Telephone:    561.533.6700
Facsimile:    561.533.1285
john@romanolawgroup.com
Trial Counsel

Of Counsel:

KANE RUSSELL COLEMAN & LOGAN, P.C.
Michael A. Logan
Texas Bar No. 12497500
Karin M. Zaner
Texas Bar No. 00791183
Jennifer S. Brownell
Texas Bar No. 24031775

3700 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75202

Telephone:    214.777.4200
Facsimile:    214.777.4299
mlogan@krcl.com
kzaner@krcl.com
jbrownell@krcl.com

**ATTORNEYS FOR PLAINTIFF**

## VERIFICATION

STATE OF CALIFORNIA §

COUNTY OF Amador §
§

On this day, Raymond H. Pierson, III, M.D., appeared before me, the undersigned notary public. After I administered an oath to him, upon his oath, he said that he read the foregoing Plaintiff's First Amended Original Complaint and Demand for Jury Trial – Injunctive Relief Sought and that the facts stated in it are within his personal knowledge and are true and correct.

_____
Raymond H. Pierson, III, M.D.

SWORN TO AND SUBSCRIBED before me by Raymond H. Pierson, III, M.D., on this 30 day of January 2008.

_____
Notary Public in and for the State of California
Printed Name: Debra Shomler
My Commission Expires: 7-16-08

DEBRA SHOMLER
COMM. #1601210
Notary Public-California
AMADOR COUNTY
My Comm. Exp. July 16, 2008

# ACKNOWLEDGMENT

State of California
County of _____ Amador _____ )

On January 30, 2008 _____ before me, Debra Shomler, Notary Public
(insert name and title of the officer)

personally appeared Raymond H. Pierson III
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Debra Shomler_         (Seal)

DEBRA SHOMLER
COMM. #1501210
Notary Public-California
AMADOR COUNTY
My Comm. Exp. July 16, 2008