# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

RAYMOND H. PIERSON, III,

                              **Plaintiff,**

**and**

JOANNE R. WERNTZ,

                              **Intervenor-Plaintiff,**

**-vs-**                                    Case No.  **6:08-cv-466-Orl-28GJK**

ORLANDO REGIONAL HEALTHCARE SYSTEMS,
INC.; ERIK LIEBERMAN, as personal
representative of the Estate of Phillip G. Spiegel;
ROGER MURBACH; STEVEN APPLEBLATT;
FRANK BONE; WILLIAM BOTT; THOMAS
CSENCSITZ; J. DEAN COLE; JOHN
HILLENMEYER; J. DAVID MOSER; N. DONALD
DIEBEL; RORY EVANS; MANUEL J. GALCERAN;
HEDRICK J. RIVERO; C. GORDON WOLFRAM;
ROY W. SANDERS; GREGORY A. RIEF, as co-
personal representative of the Estate of John
Connolly; LINDA G.T. PARKS, as co-personal
representative of the Estate of John Connolly;
MUSCULOSKELETAL INSTITUTE, CHARTERED;
WOLVERINE ANESTHESIA CONSULTANTS, M.D.,
P.A.; UNITED STATES OF AMERICA; NATIONAL
PRACTITIONER DATA BANK; MICHAEL O.
LEAVITT, Secretary of the United States
Department of Health & Human Services;
REGION IV OF THE DEPARTMENT OF HEALTH
AND HUMAN SERVICES; STATE OF FLORIDA;
FLORIDA HEALTH DEPARTMENT; and FLORIDA
BOARD OF MEDICINE;
                              **Defendants.**

_____

# ORDER

This case arises from what Plaintiff, Raymond H. Pierson, III, characterizes as "a

sham, malicious medical peer review." (Am. Compl., Doc. 3, ¶ 1).  Plaintiff is an orthopedic surgeon who formerly practiced in Orlando, Florida, and was on the trauma and emergency call schedules at two hospitals operated by Defendant Orlando Regional Healthcare System, Inc. ("ORHS")—Orlando Regional Medical Center ("ORMC") and Sand Lake Hospital ("Sand Lake").[1]  In the 73-page, 325-paragraph Amended Complaint, Plaintiff recounts events occurring from 1996 to 2004 that culminated in the passage of a resolution by the ORHS Board indefinitely suspending his emergency and trauma call and consulting privileges.

The nineteen-count Amended Complaint names twenty-six Defendants—ORHS, ORHS's CEO, fifteen individual physicians, two physician groups, and seven governmental entities[2]—and includes claims ranging from antitrust violations to breach of contract to allegations of unconstitutionality of federal and state statutory provisions.[3]  Now pending

---

[1]According to the Amended Complaint, Sand Lake Hospital is now known as Dr. P. Phillips Hospital. (Am. Compl. ¶ 3).  However, the parties refer to it by its former name, Sand Lake, and the Court will do so as well.

[2]The State of Florida is named as a Defendant, and a Return of Service (Doc. 101) on the State of Florida has been filed.  No appearance has been made on behalf of the State of Florida apart from the appearance of the state Attorney General (Doc. 94) on behalf of two other named Defendants, the Florida Department of Health and the Florida Board of Medicine.  All counts in which the State of Florida is named as a Defendant are dismissed with prejudice by this Order, however.

[3]Plaintiff's counsel has repeatedly tried to present this case as a complicated one.  (See, e.g., Am. Compl. ¶ 1 (referring to "[t]his complex, multi-faceted lawsuit"); Hr'g Tr. 06/13/2005, Doc. 155, at 28 ("This is a medical peer review case.  The law is difficult.  The facts are complex.  And there are important policy issues that are interwoven in this whole case."); id. at 32 ("We understand that these cases are complex ones . . . ."); id. at 44 ("[G]iven this very long peer review process, the very complex factual, the facts that interweave the defendants and their actions that created this ability for peer review to suspend him, it's a very complicated case."); id. at 48 ("The intent was to tell the story to understand because it's a complicated story . . . .")).  While cases involving antitrust claims

before the Court[4] are the six motions to dismiss (Docs. 107, 108, 109, 121, 131, & 142) filed

by the Defendants.[5]  The Court heard argument on these motions on June 13, 2008 (see

Mins., Doc. 150; Hr'g Tr., Doc. 155) and August 5, 2008 (see Mins., Doc. 167; Hr'g Tr., Doc.

199) and now issues the following rulings.

## I.  Background[6]

The chain of events leading to the suspension of Plaintiff's privileges is described at

---

and allegations of unconstitutionality are often "heavier" than some of this Court's other fare, in working on the instant motions the Court has come to realize that this case has been made unnecessarily more complicated and time-consuming by the poor pleading of claims, the assertion of claims that are not viable on the facts alleged, and the confusing nature of some of counsel's arguments—not by the underlying nature of the case itself.

[4]The Court has subject matter jurisdiction over this case under both 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1332 (diversity of citizenship).  As noted in the text, Plaintiff brings some claims "arising under the Constitution [or] laws . . . of the United States," 28 U.S.C. § 1331, and there is complete diversity of citizenship because Plaintiff is a citizen of California and none of the Defendants is a citizen of that state.  Plaintiff seeks well in excess of the $75,000 jurisdictional threshold for diversity cases.

[5]These motions are:  ORHS's Motion to Dismiss Counts 1, 3-10, and 17-19 (Doc. 107); Motion to Dismiss Counts 1, 3-8, 10-12, and 17-19, or for More Definite Statement, by Defendants Wolfram, Spiegel, Rief, Parks, Csencsitz, and Hillenmeyer (Doc. 108); Motion to Dismiss or, Alternatively, for More Definite Statement, by Defendants Murbach, Appelblatt, Bone, Cole, Moser, Diebel, Evans, Galceran, Rivero, and Wolverine Anesthesia Consultants, M.D., P.A. (Doc. 109); Motion to Dismiss by Defendants Florida Department of Health and Florida Board of Medicine (Doc. 121); Motion to Dismiss Counts 1, 3-8, 10-12 and 17-19, or in the Alternative to Strike or for More Definite Statement by Defendants Sanders and Musculoskeletal Institute, Chartered d/b/a Florida Orthopedic Institute (Doc. 131); and Motion to Dismiss by Defendants United States of America, National Practitioner Data Bank, Region IV of the Department of Health and Human Services, and Michael O. Leavitt (Doc. 142). Additionally, Defendant Bott has joined in the first three of these motions.  (See Notice of Joinder, Doc. 124).

[6]The statements in the Background section are taken from the Amended Complaint (Doc. 3), the allegations of which must be taken as true at the motion-to-dismiss stage. Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007).

great length in the Amended Complaint but can be more succinctly summarized as follows. In May 1996, Defendant Diebel, the Chief of Staff,[7] received two letters—one from Defendant Bott and one from Defendant Csencsitz—expressing concerns over Plaintiff's surgical practices; the letters complained of Plaintiff's late night/early morning surgeries and the length of the surgeries. (Am. Compl. ¶ 61). On May 21, 1996, an Investigation Committee ("IC") comprised of Defendants Bone, Galceran, and Rivero was formed to conduct an in-house review. (Id. ¶ 64). The IC selected three doctors—Defendants Connolly,[8] Bott, and Evans—to review cases that Plaintiff had conducted from January 1, 1995 on. (Id. ¶ 65).

On October 21, 1996, the IC met and "was presented with a summary of patients whose cases were performed by [Plaintiff] at ORMC and Sand Lake between January 1, 1995 and June 30, 1996." (Id. ¶ 68). "[T]he IC was unable to determine whether it had a basis to . . . suspend [Plaintiff's] trauma and emergency call privileges," so it "asked for an outside review of the cases." (Id. ¶ 72). "In the interim, the IC recommended that [Plaintiff] be summarily suspended and removed from the emergency and trauma call schedule 'due to the increased number of trauma patients who have had an extended operating time.'" (Id. ¶ 73). During the five months (May to October) of this initial investigation, Plaintiff was not notified that there was concern about his surgical practices. (Id. ¶ 76).

---

[7]The Amended Complaint does not specify the entity of which Defendant Diebel was the Chief of Staff. The original Complaint stated that "at one point during the underlying peer review [Diebel] served as ORMC Chief of Staff." (Doc. 1 ¶ 16).

[8]Dr. John Connolly died prior to the filing of the Amended Complaint. The co-personal representatives of his estate, Gregory A. Rief and Linda G.T. Parks, have been named as Defendants in his stead, but in describing the allegations pertaining to Dr. Connolly the Court refers to "Defendant Connolly."

On November 25, 1996, Defendants Moser and Bott informed Plaintiff in a meeting that he was being investigated and that his trauma and emergency call privileges would be summarily suspended while the hospital conducted a peer review.  (Id. ¶ 77).  On December 3, 1996, Plaintiff received a letter from the President and CEO of ORHS, Defendant Hillenmeyer, informing him that he had been removed from the trauma and emergency call schedule and from consulting on trauma and emergency patients, pending completion of the investigation.  (Id. ¶ 78).  Pursuant to the ORHS Bylaws, Plaintiff immediately requested a hearing, but ORHS denied the request on the basis that the IC had not yet made a final report and recommendation.  (Id. ¶ 81).

The IC requested an outside review of Plaintiff's cases, and in December 1996 Defendant Moser retained Defendant Spiegel,[9] who was not on the staff of ORMC or Sand Lake, to conduct that review.  (Id. ¶ 83).  On February 6, 1997, Defendant Spiegel submitted a 91-page report ("the Spiegel Report"), stating, inter alia, that Plaintiff's performance was not consistent and that the length of Plaintiff's procedures placed patients at increased risk.  (Id. ¶¶ 87-88).  The Spiegel Report also noted that Plaintiff performed all Emergency Room cases on an urgent or emergent basis.  (Id. ¶ 89).  Plaintiff was provided with a copy of the Spiegel Report and was invited to meet with the IC before the IC made its next report and recommendation to the Medical Executive Committee ("MEC").  (Id. ¶ 90; see also id. ¶ 105

---

[9]Dr. Phillip G. Spiegel—originally named as a Defendant herein—died on June 26, 2008.  (See Suggestion of Death, Doc. 170).  His estate, through its personal representative, Erik Lieberman, has been substituted as a Defendant.  (See Docs. 179 & 180).  In this Order, however, the Court refers to "Defendant Spiegel" when describing the allegations pertaining to him.

(defining "MEC")).

Between July 1997 and January 1998, Plaintiff provided the IC with a response to the Spiegel Report, explaining his approach and technique.  (Id. ¶ 91).  On January 13, 1998, Plaintiff met with the IC to discuss his response.  (Id. ¶ 92).  After that meeting, the IC "requested a second, 'unbiased' review by an academic medical reviewer."  (Id. ¶ 93). Plaintiff asked to be permitted to assist in choosing the outside reviewer, but that request went unanswered.  (Id. ¶ 94).

Defendant Moser denied the IC's request for a review by an academic reviewer and instead enlisted Defendant Spiegel to review the materials that Plaintiff had submitted to the IC.  (Id. ¶¶ 95-96).  On November 30, 1998, the four-volume "Spiegel Rebuttal" was provided to Plaintiff.  (Id. ¶¶ 96, 98).  In December 1998, Plaintiff met with Defendant Wolfram, and Wolfram told Plaintiff that Plaintiff had done nothing wrong in treating patients and that Wolfram "believed no patient suffered adversely" from Plaintiff's care.  (Id. ¶ 100). Additionally, Wolfram "intimated that Defendant Csencsitz had expressed the opinion to the Credentials Committee that [Plaintiff] had done nothing wrong and was a good orthopedic surgeon."  (Id. ¶ 101).  However, "Wolfram, who was in an authority position with ORHS[,] did nothing to call the peer review into question."  (Id. ¶ 102).

On July 1, 1999, the IC made another report and recommendation to the Credentials Committee, recommending the continued suspension of Plaintiff's emergency and trauma call and consulting privileges and an ongoing mentoring and peer review.  (Id. ¶¶ 103-04). The Credentials Committee seconded this recommendation in a report to the MEC, and on August 30, 1999, the MEC recommended exclusion of Plaintiff from trauma call and

emergency department call and that peer review or mentoring of Plaintiff be conducted on an ongoing basis.  (Id. ¶ 105).  "In response to the MEC recommendation, [Plaintiff] renewed his request for a hearing under the Bylaws."  (Id. ¶ 108).

The Hearing Panel commenced a hearing on April 23, 2003[10] and found that Plaintiff was slower than his peers but that his surgical time was not excessive and no harm to patients had been demonstrated.  (Id. ¶¶ 109, 119).  Additionally, the Hearing Panel found that Plaintiff had a different philosophy than the reviewers regarding the necessity of urgent surgical intervention for some types of injuries but that medical literature supported both views.  (Id. ¶ 120).  Further, the Hearing Panel expressed surprise that Plaintiff was not counseled or given an opportunity to correct perceived deficiencies before the IC was appointed.  (Id. ¶ 122).  The Hearing Panel recommended that Plaintiff's privileges be temporarily restored so that his practices could be reviewed by an experienced trauma surgeon.  (Id. ¶ 123).

Both Plaintiff and the MEC appealed the Hearing Panel's recommendation.  (Id. ¶ 124).  On December 12, 2003, Plaintiff was notified that the Appeal Panel recommended that Plaintiff not be placed on emergency call until the MEC determined he was able to work within guidelines; that the MEC verify Plaintiff's surgical procedures during the prior twelve months; that Plaintiff not be placed on emergency or trauma call unless and until the MEC determined he had current clinical competency to handle emergency surgical procedures;

_____

[10]As noted by Plaintiff, this hearing was commenced more than five years—indeed, nearly seven years—after the investigation of Plaintiff's practices began.  (Am. Compl. ¶ 109).

and that Plaintiff perform non-emergent elective cases before attempting emergency or trauma cases as appropriate in the best interest of patient care.  (Id. ¶ 125).

On January 26, 2004, "the ORHS Board passed a resolution affirming the recommendation to indefinitely maintain a suspension of [Plaintiff's] emergency and trauma call and consulting privileges."  (Id. ¶ 126).  Plaintiff received notice of the resolution on or after February 3, 2004.  (Id. ¶ 128).  Once the resolution was passed, ORHS filed a complaint with Defendant Florida Department of Health ("FDH"), which initiated an investigation of Plaintiff's medical license.  (Id. ¶ 129).  ORHS also filed an Adverse Action Report with Defendant National Practitioner Data Bank ("NPDB"), "a mandatory reporting and alert system for the comprehensive review of the professional credentials of physicians and other health care professionals in the United States" that was established as part of the Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. § 11101 et seq.  (Id. ¶¶ 130, 23).  The report allegedly was false and misleading, but Plaintiff's request that ORHS correct the report was refused.  (Id. ¶¶ 130-31).

On January 25, 2008, Plaintiff filed this lawsuit in the Tampa Division of this court (Compl., Doc. 1).  The initial Complaint—138 pages long and containing twenty-two counts—was dismissed without prejudice by the previously-assigned judge as a "shotgun pleading."  (Order, Doc. 2).  Three days later, on February 1, 2008, Plaintiff filed his Amended Complaint (Doc. 3).[11]  The case was transferred to the Orlando division of the

_____

[11]The district judge in Tampa gave Plaintiff twenty days to amend the complaint. (See Order, Doc. 2).  Nevertheless, Plaintiff filed the Amended Complaint in only three days. Plaintiff's counsel referred during oral argument to having been "in a pretty tight time period" with regard to amending the complaint because of "statute of limitations situations." (See

court in March 2008, (see Doc. 58), and was reassigned to the undersigned.

Plaintiff alleges that as a result of the peer review and the reporting of its outcome to state and federal entities, he "is labeled incompetent and a 'dangerous' doctor for the rest of his career." (Am. Compl. ¶ 1). He seeks damages and declaratory relief.[12] The Amended Complaint contains nineteen counts:  Combination and Conspiracy in Violation of Federal and State Law (Count I); Breach of Contract (Count II); "Judicial Review of Reasonableness and/or Fairness in Peer Review" (Count III); Defamation:  Libel and Slander (Count IV); Intentional and Unjustifiable Interference with Existing Contractual Relations (Count V); Interference with Advantageous Business Relationship (Count VI); False Light (Count VII); Intentional Infliction of Emotional Distress (Count VIII); Negligent Hiring And Supervision (Count IX); Fraud (Count X); Application for Permanent Injunction (Count XI); Request for Declaratory Relief–Compliance with Bylaws, Rescission, and Expungement (Count XII); Request for Declaratory Relief–Denial of Immunity (Count XIII); Request for Declaratory Relief–Unconstitutionality of HCQIA and Florida Immunity Statutes (Due Process) (Count XIV); Request for Declaratory Relief–Unconstitutionality of HCQIA and Florida Immunity Statutes (Equal Protection) (Count XV); Request for Declaratory Relief–Unconstitutionality of HCQIA (Commerce Clause) (Count XVI); Request for Declaratory

---

Doc. 155 at 50).  In light of the provisions of Federal Rule of Civil Procedure 15(c), the Court does not readily discern the "statute of limitations situations" to which counsel was referring. The Court can only hope that had counsel spent closer to the twenty days allowed instead of only three refining the complaint, much time and effort by all parties and the Court could have been spared in dissecting the resulting document now at issue.

[12]Plaintiff's wife, Joanne Werntz, has intervened in this case as an additional Plaintiff. (See Docs. 181 & 182).  Her claims are not discussed in this Order.

Relief–Unconstitutionality of HCQIA (Tenth Amendment and Federalism Principles) (Count XVII); Request for Declaratory Relief–Unconstitutionality of HCQIA (Delegation of Governmental Function) (Count XVIII); and Civil Conspiracy (Count XIX).

Plaintiff is no longer pursuing Count XVI, having conceded in a memorandum "that the HCQIA is adequately supported under the commerce clause." (Doc. 161 at 20). Additionally, the sufficiency of the pleading of Count II (Breach of Contract) and Count XIII (Declaratory Relief—Denial of Immunity) has not been challenged by any of the Defendants against whom those counts are brought.[13] The sufficiency of the pleading of all of the other counts, however, has been challenged in one or more of the pending motions to dismiss (Docs. 107, 108, 109, 121, 131, & 142).

## II.  Legal Standards

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007).  Generally, "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'  Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Id. (quoting Fed. R. Civ. P. 8(a)(2) and Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007)).  However, "[t]o survive dismissal, the complaint's allegations must plausibly suggest that the plaintiff has a right to relief, raising

---

[13]Count II is brought against ORHS only, while Count XIII is brought against ORHS and all of the other nongovernmental Defendants.

that possibility above a speculative level; if they do not, the plaintiff's complaint should be dismissed." James River Ins. Co. v. Ground Down Eng'g, Inc., 540 F.3d 1270, 1274 (11th Cir. 2008) (internal quotation omitted).

## III.  Discussion

There are six motions to dismiss pending before the court, filed by subsets of the twenty-six Defendants.  After addressing one overarching issue made by some of the Defendants, the claims in the Amended Complaint will be discussed on a count-by-count basis.

### A.  "Group Pleading" of Allegations Against the "Peer Review Defendants"

The individual Defendants and two physician groups—referred to by Plaintiff throughout the Amended Complaint as "the Peer Review Defendants"—complain that the Amended Complaint improperly groups them together and does not describe what action each of them allegedly took against Plaintiff.  Although Plaintiff maintains that he has appropriately stated claims against these Defendants by referring to them as a group, the Court disagrees.

The first, introductory, unnumbered paragraph of the Amended Complaint lists all of the Defendants by name.  (Am. Compl. at 1).  Each of paragraphs 4 through 19 then describes an individual Defendant separately, in most instances setting forth the residence and medical specialty of each.[14]  (Id. at 3-8).  Paragraphs 20 and 21 describe Defendants

---

[14]Defendants Spiegel and Diebel are described as "medical doctors," with no specialty given, (Am. Compl. ¶¶ 4 & 13); Defendants Murbach and Appelblatt are anesthesiologists, (id. ¶¶ 5-6); Defendants Bott, Csenscitz, Cole, Connolly, Evans, and Sanders are

Musculoskeletal Institute and Wolverine, respectively.  (Id. ¶¶ 20-21).  Musculoskeletal

Institute, Chartered, d/b/a Florida Orthopaedic Institute "(FOI") is alleged to be a Florida

corporation that is vicariously liable for the actions of Defendant Spiegel, who allegedly acted

as FOI's agent.  (Id. ¶ 20).  Wolverine[15] is described as a professional association that acted

through Defendants Murbach and Appleblatt[16] and which had an exclusive contract with

Defendant ORHS to provide anesthesiology services at ORMC and Sand Lake.  (Id. ¶ 21).

All of these Defendants—the individual doctors and the two business entities with

which some of them are associated—are then collectively referred to at Paragraph 37 as the

"Peer Review Defendants":

> 37.   As pleaded herein, the actions of those Defendants
> who participated in and conducted the peer review at issue
> (Spiegel, Murbach, Appleblatt [sic], Bone, Bott, Csencsitz, Cole,
> Hillenmeyer, [] Moser, Diebel, Evans, Galceran, Rivero,
> Wolfram, Sanders, [Connolly], FOI and Wolverine, sometimes
> referred to herein collectively as the "Peer Review Defendants"),
> and ORHS's conduct surrounding such actions, cause ORHS to
> be vicariously liable for such actions and the resulting damages.

(Id. ¶ 37).  The term "Peer Review Defendants" is then used throughout the Amended

Complaint.

_____

orthopedists, (id. ¶¶ 8-10, 14, & 18-19); Defendant Bone specializes in gastroenterology and palliative care, (id. ¶ 7); Defendant Moser is a pediatric otolaryngologist, (id. ¶ 12); Defendant Galceran specializes in internal medicine, (id. ¶ 15); Defendant Rivero is a radiologist, (id. ¶ 16); Defendant Wolfram is a cardiologist, (id. ¶ 17); and Defendant Hillenmeyer is the President and CEO of ORHS, (id. ¶ 11).

[15]The full name of this business entity is not given in the Amended Complaint.  In the initial Complaint, it is listed as Wolverine Anesthesia Consultants M.D., P.A. (Doc. 1).

[16]The spelling of this Defendant's name varies in the filings between Appleblatt and Appelblatt.  The Court is unsure which is the correct spelling.

Because of Plaintiff's extensive reliance on the term "Peer Review Defendants" without differentiation among individual Defendants, some of these Defendants are mentioned by name only two or three times in the entire Amended Complaint.  For example, Defendant Appleblatt is mentioned only: in a descriptive paragraph (¶ 6) stating that he is an anesthesiologist who resides in Orlando and was a member of ORHS's medical staff; in paragraph 50, which states that the treatment philosophy of Plaintiff's wife resulted in disputes with anesthesiologists including Appleblatt; and in paragraph 58, which alleges that Plaintiff's treatment approach was resisted by anesthesiologists including Appleblatt. Everywhere else in the Amended Complaint, Plaintiff relies on the label "Peer Review Defendants" in support of his claims against Appleblatt.[17]

The Amended Complaint in places breaks down the peer review process, but in others the reader is left to wonder about the identities of the parties involved.  For instance, Plaintiff describes an Investigation Committee ("IC")—made up of Defendants Bone, Galceran, and Rivero—that was formed to conduct an in-house focused review.  (Id. ¶ 64). However, the Amended Complaint later refers to an "MEC" in paragraph 90—defined fifteen paragraphs later as "Medical Executive Committee," (see id. ¶ 105)—without defining who the members of the MEC are; it is not clear whether some of the named Defendants served on this MEC or whether the MEC consisted of individuals whom Plaintiff has not sued.  Also mentioned is a "Credentials Committee" ("CC"), (see, e.g., id. ¶¶ 103 & 105), but no

---

[17]Several of the other "Peer Review Defendants" are also mentioned by name only a few times; the description of the scant allegations against Appleblatt is merely an example of the Amended Complaint making only a few specific references to these Defendants individually.

description of who served on this committee is given, even though Plaintiff alleges that "the IC, CC and MEC maliciously disregarded [medical] literature," (id. ¶ 107).  As with the MEC, it is far from clear whether the CC is made up of some of the named Defendants or if there are other parties who allegedly acted maliciously but have not been sued.

Continuing this theme, a "Hearing Panel" and its "Presiding Officer" are mentioned, (see, e.g., id. ¶¶ 109-13), but the membership of this panel[18] and the identity of this Presiding Officer are not given.  Again, the Court cannot tell whether any of the named individual Defendants were allegedly on the Hearing Panel or served as its Presiding Officer; absent such clarification, the allegations regarding this entity and person are impossible to put into context.  An "Appeal Panel" and the ORHS Board are also mentioned, but their membership is undefined as well.[19]  (See, e.g., id. ¶¶ 125-26).[20]

"Although [Rule 8] does not demand that a complaint be a model of clarity or exhaustively present the facts alleged, it requires, at a minimum, that a complaint give each defendant 'fair notice of what the plaintiff's claim is and the ground upon which it rests.'" Atuahene v. City of Hartford, 10 F. App'x 33, 34 (2d Cir. 2001) (quoting Ferro v. Ry. Express

---

[18]There is a reference to "placing Drs. Shea and Neder on the peer review hearing and appeals panels" within Count IX.  (Am. Compl. ¶ 251).  These doctors are not otherwise mentioned, however, nor is the membership on these panels otherwise defined.

[19]See note 18 supra.

[20]While Plaintiff's counsel has professed to have attempted to shorten the Amended Complaint to comply with the Order of the first-assigned judge in the Tampa division dismissing the initial complaint as a shotgun pleading, many of the allegations of the Amended Complaint are superfluous and add nothing to the stating of the claims, especially given the lack of meaningful descriptions of the actors at issue.

Agency, 296 F.2d 847, 851 (2d Cir. 1961)).  In Atuahene, the court held that "[b]y lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, [the plaintiff's] complaint failed to satisfy this minimum standard."  Id.  The Amended Complaint in the instant case suffers from these same flaws.  The grouping of Defendants as "Peer Review Defendants" does not afford these Defendants fair notice of the basis for the claims against them, especially considering that as to some of these Defendants, no role in the peer review process is even generally described.

Although Plaintiff asserts that the Amended Complaint "alleges facts as to each Movant's role in the peer review process," (Doc. 138 at 4 n.4); "alleges the role each Movant played in the peer review at issue," (id. at 5); and "alleges facts showing how each Movant's role was instrumental and intertwined in the alleged conspiracy to abuse peer review," (id.), the Amended Complaint absolutely does not do this.  As to most of the Peer Review Defendants, no role is described at all beyond the bare labeling as a "Peer Review Defendant."  Because of the grouping together of these Defendants without differentiation or some sort of description of actions that could provide "fair notice" of the basis for the claims against them, the claims against the "Peer Review Defendants" are not sufficiently pled.  Any claim that is brought against these Defendants that otherwise survives the rulings in this Order must be repled.

The Court now turns to analysis of the motions to dismiss on a count-by-count basis.

B.  Sufficiency of the Pleading of Each Challenged Count

1.  Count I (Antitrust)

In Count I, which is brought against ORHS and the Peer Review Defendants, Plaintiff alleges "Combination and Conspiracy in Violation of Federal and State Law in Market for Orthopedic Services and in Market for Healthcare Services."  Plaintiff contends that these Defendants violated the Sherman Act, 15 U.S.C. § 1,[21] and the Florida Antitrust Act of 1980, Section 542.15, Florida Statutes, et seq.,[22] "by engaging in an unlawful combination and conspiracy to (1) blacklist and boycott [Plaintiff] and to exclude him from practicing medicine at ORHS facilities" and "(2) intentionally destroy and derail [Plaintiff's] development of The Physician Patient Alliance.™" (Am. Compl. ¶ 161).  Later in this same count, Plaintiff alleges that these Defendants "conspired with one another to monopolize or attempt to monopolize the orthopedic services in the relevant market in Central Florida in violation of 15 [U.S.C.] §§ 1 and 2 and/or Florida Antitrust Act of 1980."  (Am. Compl. ¶ 176).

This count is not sufficiently pled.  As an initial matter, Plaintiff seems to be attempting to allege two separate violations of the Sherman Act in one count.  Although Federal Rule of Civil Procedure 8(d)(2) allows for alternative statements of a claim "either in a single count or . . . in separate ones," Rule 8(d)(1) requires that "[e]ach allegation must be simple,

---

[21]"Sections 1 and 2 of the Sherman Act are actionable by private individuals only through sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26." Feldman v. Palmetto Gen. Hosp., 980 F. Supp. 467, 468 (S.D. Fla. 1997).

[22]"Federal and Florida antitrust laws are analyzed under the same rules and case law." All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc., 135 F.3d 740, 745 n.11 (11th Cir. 1998).

concise, and direct." Here, Plaintiff refers to both § 1 and § 2 of the Antitrust Act in Count I, but these sections proscribe very different conduct, and the combination of references to both sections renders this count confusingly pled. This claim is confusing both for the Court and for the Defendants and does not give fair notice to the Defendants of that against which they must defend.

For this reason alone—even without reaching the substantial arguments raised by Defendants in support of dismissal of Count I—this claim would have to be repled. However, as set forth below, no repleading will be necessary or permitted because whether brought under section 1 or section 2, Plaintiff lacks standing to bring an antitrust claim and has not set forth an actionable antitrust claim in any event.

Antitrust Standing

Antitrust suits are not novel in the medical peer review arena.[23] Indeed, among the statement of Congressional findings in the Health Care Quality Improvement Act

---

[23]As one court recently explained:

> Allegations of antitrust violations are a fairly common thread in cases where physicians challenge privilege decisions made by peer review committees. Because those decisions are made by fellow physicians—and hence, in some cases, competitors in the same practice area—a suspended or excluded physician attempts to introduce evidence showing the privilege decision was made out of an impermissible desire to restrain trade or shut the physician out of practice, rather than out of concerns for patient care or the efficient functioning of a hospital.

Stratienko v. Chattanooga-Hamilton County Hosp. Auth., No. 1:07-CV-258, 2009 WL 736007, at *22 (E.D. Tenn. Mar. 17, 2009).

("HCQIA")—a statute which Plaintiff challenges in several other counts of the Amended Complaint and which is discussed later in this Order—is that "[t]he threat of private money damage liability under Federal laws, including treble damage liability under Federal antitrust law, unreasonably discourages physicians from participating in effective professional peer review." 42 U.S.C. § 11101(4). However, a threshold requirement in any privately-brought[24] antitrust suit is that the plaintiff have standing to bring such a suit. Doctors have sometimes been found to have standing to bring antitrust claims against hospitals or competitors, but the factual scenario described by Plaintiff in the instant case does not support the requisite "antitrust standing."

"Standing in an antitrust case involves more than the 'case or controversy' requirement that drives constitutional standing." Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1448 (11th Cir. 1991). "[A]ntitrust standing is not simply a search for an injury in fact; it involves an analysis of prudential considerations aimed at preserving the effective enforcement of the antitrust laws. Antitrust standing is best understood in a general sense as a search for the proper plaintiff to enforce the antitrust laws." Id. (citations omitted).

As the Eleventh Circuit explained in Todorov, the Supreme Court has determined that "'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'" Id. (quoting Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 534 (1983)). "Thus, the

---

[24]The federal antitrust laws provide for both private enforcement and government enforcement. See generally 54 Am. Jur. 2d Monopolies and Restraints of Trade § 306 (describing enforcement scheme and listing respective statutory sections).

Court fashioned an approach for analyzing antitrust standing that requires [courts] to 'evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them.'" Id. at 1448-49 (quoting Associated Gen., 459 U.S. at 535).

Over time, a two-pronged approach to analyzing antitrust standing has developed in federal jurisprudence. See id. at 1449. Under this approach, "[f]irst, a court should determine whether the plaintiff suffered 'antitrust injury'; second, the court should determine whether the plaintiff is an efficient enforcer of the antitrust laws, which requires some analysis of the directness or remoteness of the plaintiff's injury." Id.

(1) Antitrust Injury

"Antitrust injury is defined as: 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations . . . would be likely to cause.'" Todorov, 921 F.2d at 1449 (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)); accord Davies v. Genesis Med. Ctr., 994 F. Supp. 1078, 1093 (S.D. Iowa 1998) ("A private plaintiff can recover on an antitrust claim only where the loss 'stems from a competition-reducing aspect or effect of the defendant's behavior.'" (quoting Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344 (1990))). "This limitation . . . 'requires the private antitrust plaintiff to show that his own injury coincides with the public detriment tending to result from the alleged violation . . . [,] increas[ing] the likelihood that public and private enforcement of the antitrust laws will further the same goal of increased competition.'" Todorov, 921 F.2d at 1449-50 (quoting Austin v.

-19-

Blue Cross & Blue Shield, 903 F.2d 1385, 1389-90 (11th Cir. 1990)) (all but first alteration in original).  The "antitrust injury" requirement derives from the fact that the antitrust laws "were enacted for 'the protection of competition[,] not competitors.'"  Brunswick Corp., 429 U.S. at 488 (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962)).

The Amended Complaint alleges many detriments to Plaintiff, but it does not allege "antitrust injury."  Plaintiff's generalized allegations of "diminished competition" and the "competitive significance" of his exclusion via increased patient load for competing orthopedists do not state the requisite injury.  The cases upon which Plaintiff relies for his assertion of antitrust standing are distinguishable.  In Angelico v. Lehigh Valley Hospital, 184 F.3d 268 (3d Cir. 1999), the court reversed the district court's finding of lack of antitrust standing, noting that the plaintiff had been completely shut out of competition; such is not the case here.  In Nilavar v. Mercy Health System-Western Ohio, 142 F. Supp. 2d 859 (S.D. Ohio 2000), a radiologist brought antitrust claims after a hospital awarded an exclusive contract for radiological services to a radiologist group of which the plaintiff was not a part. The plaintiff alleged, inter alia, that the defendant was one of only two hospital systems in the area; that he, as well as other physicians, had been limited in their ability to compete; that consumers had been deprived of free and open competition; that patient care had been harmed by lack of competition; and that consumers were forced to purchase services from the exclusive-provider radiologist group.  The Nilavar plaintiff also alleged that because of the exclusive contract, he had been completely foreclosed from the market and that prices

had risen due to the contract.[25]  These allegations are vastly different from those made by Plaintiff in the instant case.

Instead, the scenario presented in the case at bar is more akin to that in <u>Feldman v. Palmetto General Hospital, Inc.</u>, 980 F. Supp. 467 (S.D. Fla. 1997), upon which Defendants rely.  In <u>Feldman</u>, a podiatrist who was denied staff privileges at a hospital attempted to bring claims under sections 1 and 2 of the Sherman Act, alleging, respectively, that the Defendants conspired to boycott him in his privilege application and conspired to monopolize ER call referral of patients.  The court found no antitrust injury suffered by Dr. Feldman, noting that "[a] plaintiff 'simply looking to increase his profits, like any competitor[,]' does not have antitrust standing."  980 F. Supp. at 469; <u>see also</u> <u>Volm v. Legacy Health Sys., Inc.</u>, 237 F. Supp. 2d 1166, 1173-74 (D. Or. 2002) (finding that lactation consultant who was banned from providing services at any of defendant's facilities did not suffer antitrust injury, distinguishing <u>Angelico</u> and noting that the plaintiff was still able to work at other hospitals and thus had not been completely shut out of the market).

In the instant case, Plaintiff was not excluded from practicing in Central Florida or even at either of the two ORHS hospitals at issue here; his emergency and trauma call privileges were suspended, but he was still able to, and did, treat patients at ORMC and Sand Lake.  Although Plaintiff alleges in the Amended Complaint that ORHS and the Peer Review Defendants conspired to blacklist and boycott him and "to exclude him from

---

[25]As noted in <u>Nilavar</u>, some courts have found that exclusive contracts in the medical arena can be pro-competitive and beneficial rather than running afoul of antitrust laws.  <u>See</u> <u>Nilavar</u>, 142 F. Supp. 2d at 876 (citing <u>Balaklaw v. Lovell</u>, 14 F.3d 793, 799 n.13 (2d Cir. 1994)).

practicing medicine at ORHS facilities and in Central Florida by summarily suspending his privileges at both ORMC and Sand Lake without cause," (Am. Compl. ¶ 161), these allegations fall short of alleging antitrust injury.   Plaintiff does not allege that he was prevented from treating patients at any other hospitals in Central Florida, and there are several other hospitals in the vicinity of ORMC and Sand Lake.   Plaintiff also alleges that the suspension of his call privileges increased the patient load for other orthopedists; however, this would be true in any case and cannot be sufficient to confer antitrust standing.   In sum, Plaintiff does not have standing to bring an antitrust claim, and Count I will be dismissed.

(2) Efficient Enforcer

The second prong of the antitrust standing analysis entails examination of factors other than antitrust injury "to determine whether a particular plaintiff is an efficient enforcer of the antitrust laws." Todorov, 921 F.2d at 1450.   These "factors include (1) the directness or indirectness of the asserted injury; (2) whether there exists an identifiable class of persons motivated to vindicate the public interest in antitrust enforcement; (3) the nature of the damages; (4) the importance of avoiding duplicate recoveries; and (5) whether the plaintiff can enforce an antitrust judgment." Feldman, 980 F. Supp. at 470 (citing Todorov).

"In the context of health care antitrust litigation, courts have observed that physicians may not be the most efficient enforcer of the antitrust laws.   Nevertheless, where a physician's interest coincides with the patient's interest, a physician may be a proper enforcer of the antitrust laws." N.Y. Medscan LLC v. N.Y. Univ. Sch. of Med., 430 F. Supp. 2d 140, 146-47 (S.D.N.Y. 2006) (citations omitted).   Here, Plaintiff's interest does not coincide with patients' interests. See Feldman, 980 F. Supp. at 470 (concluding that the

plaintiff was not an efficient enforcer because his "asserted interest is that he has been denied privileges; not that podiatrists generally have been denied privileges or that patients have been unable to obtain podiatric services at competitive prices," and "[t]here are others . . . who would be a more appropriate class of persons to vindicate the public interest in maintaining prices and services at competitive levels").  Thus, Plaintiff also lacks antitrust standing on the basis of not being an efficient enforcer.

<u>Failure to State a Sherman Act Violation</u>

Defendants contend that even if Plaintiff has antitrust standing, he has failed to allege a cause of action under Section 1 or Section 2 of the Sherman Act.  The Court agrees.

<u>Section 1 of the Sherman Act</u>

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal."  15 U.S.C. § 1.  Plaintiff contends that ORHS and the Peer Review Defendants violated this section "by engaging in an unlawful combination and conspiracy to (1) blacklist and boycott [him] and to exclude him from practicing medicine at ORHS facilities and in Central Florida by summarily suspending his privileges at both ORMC and Sand Lake without cause; and/or (2) intentionally destroy and derail [Plaintiff's] development of The Physician Patient Alliance.™" (Am. Compl. ¶ 161).

<u>Per Se Violations and the "Rule of Reason"</u>

Restraints of trade are characterized either as "per se" unreasonable restraints or as violations of the "rule of reason."  <u>Schering-Plough Corp. v. F.T.C.</u>, 402 F.3d 1056, 1064

(11th Cir. 2005).  "Generally, a *per se* analysis is applied only in limited circumstances, and after experience and pattern establish that a particular class of restraint is manifestly anticompetitive."  Schering-Plough, 402 F.3d at 1064 n.11.  During oral argument on the motions to dismiss, Plaintiff's counsel acknowledged that she was unable to cite a case setting forth that use of a "sham peer review" to knock out a competitor is a per se section 1 violation.  (Hr'g Tr., Doc. 155, at 45).[26]  Thus, Plaintiff must rely on the "rule of reason" to attempt to set forth a § 1 violation.

"The rule of reason tests 'whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.'"  Schering-Plough, 402 F.3d at 1064 (quoting FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 457 (1986) (further internal quotation and citation omitted)).  "Under Eleventh Circuit case law, alleged Section One agreements analyzed under the rule of reason require a plaintiff 'to prove (1) the anticompetitive effect of the defendant's conduct on the relevant market, and (2) that the defendant's conduct has no pro-competitive benefit or justification.'"  Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Comm'ns, Inc., 376 F.3d 1065, 1071 (11th Cir. 2004) (quoting Levine v. Cent. Fla. Med. Affiliates, Inc., 72 F.3d 1538, 1551 (11th Cir. 1996)) (footnote omitted).  "In alleging 'the anticompetitive effect of the defendant's conduct,' an antitrust plaintiff must show harm to competition rather than to

-------------------------

[26]Moreover, although Plaintiff has used the term "boycott" in the Amended Complaint, (Doc. 3 ¶ 161), the Eleventh Circuit has noted that its "jurisprudence [and that] of the Supreme Court . . . cautions against the haphazard expansion of the 'group boycott label' and the concomitant imposition of *per se* liability."  Retina Assocs. v. S. Baptist Hosp. of Fla., Inc., 105 F.3d 1376, 1381 (11th Cir. 1997).

competitors.  That is, the 'anticompetitive effects' are measured by their impact on the market rather than by their impact on competitors."  Id.

Plaintiff has not defined an appropriate market; while Plaintiff's description of the relevant market fluctuates, all of his proposed relevant markets must be rejected.  After variously describing the relevant market in the Amended Complaint,[27] at oral argument Plaintiff set forth two proposed relevant markets:  (1) "the market for specialized level one trauma services and emergency medicine in Central Florida," (Doc. 155 at 37), and (2) "the Physician Patient Alliance," (id. at 42).

Addressing the second proposed market first, the Court agrees with Defendants that Plaintiff's attempt to base an antitrust claim on The Physician Patient Alliance™ must fail. The Physician Patient Alliance is not described in detail in the Amended Complaint,[28] but it

---

[27]Plaintiff alleges that Defendants conspired "to exclude him from practicing medicine at ORHS facilities and in Central Florida."  (Am. Compl. ¶ 161).   Two paragraphs later, Plaintiff alleges that the Defendants' actions "diminish competition in (1) the field of specialized emergency and trauma orthopedic surgery in the ORMC and Sand Lake markets, and/or (2) the field of healthcare services to be provided by The Physician Patient Alliance™ in the Central Florida market." (Id. ¶ 163).  Plaintiff also refers to "the market for orthopedic services provided by ORHS at its facilities, including ORMC and Sand Lake and/or (2) . . . the market for healthcare services that the Physician Patient Alliance™ would have provided." (Id. ¶ 175).  A few paragraphs later he alleges restraint on competition "in the provision of high quality, efficient, cost-effective (1) orthopedic medicine and/or (2) healthcare services that The Physician Patient Alliance™ would provide the public." (Id. ¶ 179).

[28]The Physician Patient Alliance is mentioned in background paragraphs 45, 46, and 149 of the Amended Complaint, as well as in several paragraphs within Count I. Paragraphs 45 and 46 provide:

> 45.  Simultaneous with setting up private practice in Florida, [Plaintiff] began to implement plans for establishment of a physician-patient centered management services

appears to be some sort of entity that Plaintiff hoped to develop at some time.  However, it

had not come into existence by the time that Plaintiff's privileges were suspended.  Plaintiff's

contentions that the "market is the Physician Patient Alliance," (Doc. 155 at 42) and that

Defendants' actions "diminish competition in . . . the field of healthcare services to be

_____

> organization/independent provider association ("MSO/IPA")
> called The Physician Patient Alliance.™   [Plaintiff] invested
> significant time, effort and expense in The Physician Patient
> Alliance,™with the expectation that it would provide the best
> environment for physicians and the best healthcare alternative
> for patients.
>           46.  In the two[]years before the onset of the peer review
> at issue in this Complaint, [Plaintiff] extensively marketed The
> Physician Patient Alliance™ to physicians throughout Central
> Florida – including physicians who practiced at ORHS, and/or
> were effectively employed by ORHS, as well as those in senior
> leadership positions with ORHS.

(Am. Compl. ¶¶ 45-46).  Plaintiff later alleges that because of the peer review, "[a]ll efforts expended in the development of The Physician Patient Alliance™ were lost.  The entire project had to be abandoned once the peer review became known to [Plaintiff] in November 1996, due to the significant adverse financial effects of the peer review."  (Id. ¶ 149).

In Count I, Plaintiff alleges, with regard to The Physician Patient Alliance,™ that ORHS and the Peer Review Defendants engaged in an unlawful combination and conspiracy to "intentionally destroy and derail [Plaintiff]'s development of The Physician Patient Alliance.™" (Id. ¶ 161).  He further alleges that these Defendants' acts "diminish competition in . . . the field of healthcare services to be provided by The Physician Patient Alliance™ in the Central Florida market."  (Id. ¶ 163).  "Further, the restraint of [Plaintiff]'s ability to make high quality services readily and fully available to the public through The Physician Patient Alliance™ is detrimental to the public need for such healthcare services."  (Id. ¶ 165). Additionally, patients allegedly were denied "the opportunity to seek or benefit from [Plaintiff]'s services or from The Physician Patient Alliance.™" (Id. ¶ 166).  "[T]he summary suspension of [Plaintiff]'s privileges destroyed and derailed The Physician Patient Alliance.™" (Id. ¶ 173).  Plaintiff has expended resources "to overcome the illegal attempts by ORHS and the Peer Review Defendants to deny [Plaintiff] his right to develop and implement the Physician Patient Alliance.™" (Id. ¶ 177).  "By eliminating [Plaintiff] and The Physician Patient Alliance™ as competitors, the boycott successfully reduced competition for ORHS and the Peer Review Defendants."  (Id. ¶ 181).

provided by The Physician Patient Alliance in the Central Florida market" do not set forth a relevant market and make no sense.[29]  Plaintiff may be attempting to allege the failure of the development of The Physician Patient Alliance as a consequence of Defendants' actions, but this entity is not a market—there has been no diminution in competition within this entity, nor, seemingly, could there be.  In sum, The Physician Patient Alliance is not the relevant market for an antitrust claim.

Plaintiff's other alleged market—"the market for specialized level one trauma services and emergency medicine in Central Florida," (Doc. 155 at 37), is too narrow.  Plaintiff's counsel asserted at oral argument that this market is "not one hospital, it's not two hospitals, it is the Central Florida area."  (Id.).  However, she then said, "Now, the hospital here, Orlando Regional, is the only level one trauma center in the area." (Id.).  So, in essence, this proposed market is only a single hospital—ORMC—and does not even include Sand Lake, the other hospital discussed throughout the Amended Complaint; this narrowing obviously required some backpedaling by Plaintiff, who plainly alleged Sand Lake as part of the market in the Amended Complaint.[30]  Plaintiff's attempt to narrow the relevant market to one hospital as the sole "level one trauma center" is rejected.  There are many other hospitals in the Orlando area where orthopedic services—even urgent or emergency orthopedic

---

[29]To the extent that Plaintiff is alleging that he was unable to follow through with his plans for completion of development of The Physician Patient Alliance, at best this could potentially be an aspect of his damages in an otherwise actionable claim, though it is difficult to imagine that Plaintiff could overcome the hurdle that damages must be more than speculative.

[30](See, e.g., Am. Compl. ¶ 175 (referring to "the market for orthopedic services provided by ORHS at its facilities, including ORMC and Sand Lake")).

services—are provided.  The relevant market is either the market for orthopedic surgery services or the market for emergency orthopedic surgery services within a geographic area—here, Orlando or even "central Florida"—not the market for such services at one hospital because it is the only "level one trauma center."  Again, Plaintiff was not even excluded from that single hospital; instead, the hospital stopped referring him trauma and emergency cases.  In characterizing the relevant market, courts "cannot ignore commercial realities."  Davies v. Genesis Med. Ctr., 994 F. Supp. 1078, 1095 (S.D. Iowa 1988); see also Oksanen v. Page Mem'l Hosp., 945 F.2d 696, 709 (4th Cir. 1991) ("Although Page Memorial may be where Oksanen prefers to practice, this preference alone does not justify excluding other hospitals and other doctors from the relevant market definition.  Oksanen's narrow market definition violates a fundamental tenet of antitrust law that the relevant market definition must encompass the realities of competition.") (citations omitted).

Additionally, Plaintiff has not sufficiently alleged an anticompetitive effect; he has only alleged an adverse effect on himself and his profitability.  Plaintiff has alleged that he "was deprived of access to the care and treatment of emergency and trauma patients, which denied those patients . . . the opportunity to seek or benefit from [Plaintiff's] services or from The Physician Patient Alliance.™" (Am. Compl. ¶ 166).  He alleges that the suspension of privileges "is a black mark on [his] career," (id. ¶ 167), and that the emergency and trauma call consulting cases from which he was barred represented over 60% of his practice, "effectively put[ting] him out of business, (id. ¶ 172).  However, as noted in the discussion of "antitrust injury," Plaintiff was not excluded from either of the two hospitals at issue; instead, ORHS stopped referring emergency and trauma cases to him.  He could still treat

patients at these hospitals, and there is no allegation that he was prevented from competing at other hospitals in the Orlando area.  Plaintiff's § 1 claim fails.

Section 2 of the Sherman Act

Section 2 of the Sherman Act proscribes monopolization, attempted monopolization, and combinations and conspiracies "with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 2.  Plaintiff alleges that ORHS and the Peer Review Defendants conspired "to monopolize or attempt to monopolize the orthopedic services in the relevant market in Central Florida" (Am. Compl. ¶ 176), though this allegation seems somewhat halfhearted; as noted earlier, in this count Plaintiff combines allegations of violation of both section 1 and section 2, though most allegations seem geared toward a section one violation.  The Court agrees with the Defendants that no actionable claim under § 2 has been stated.

Plaintiff alleges that Defendants conspired "to monopolize" and "attempt[ed] to monopolize."[31]  (See id. ¶ 176).  The elements of a claim of "conspiracy to monopolize" under section 2 are "'(1) concerted action deliberately entered into with the specific intent of achieving a monopoly; and (2) the commission of at least one overt act in furtherance of the conspiracy.'"  Levine v. Cent. Fla. Med. Affiliates, Inc., 72 F.3d 1538, 1556 (11th Cir. 1996)

---

[31]Read literally, the Amended Complaint alleges that the Defendants"conspired to monopolize" and "conspired to attempt to monopolize."  (See Am. Compl. ¶ 176).  However, these assertions are equivalent—implicit within "conspiring to monopolize" is conspiring to attempt to do so.  In later filings, Plaintiff has argued conspiracy to monopolize and attempted monopolization.  (See Doc. 134 at 11-13; Hr'g Tr., Doc. 155, at 46 (plaintiff's counsel asserting, "I think that we've alleged attempted monopolization and I think we've alleged conspiracy of monopoly.")).  As noted in the text, Plaintiff's section 2 claim fails as a matter of law regardless of how it is characterized.

(quoting <u>Todorov</u>, 921 F.2d at 1460 n.35).  The elements of attempted monopolization are "'(1) an intent to bring about a monopoly and (2) a dangerous probability of success.'"  <u>Id.</u> at 1555 (quoting <u>Norton Tire Co. v. Tire Kingdom Co.</u>, 858 F.2d 1533, 1535 (11th Cir. 1988)).

Just as in a claim under § 1 of the Sherman Act, a § 2 claim requires definition of the relevant market.  <u>See, e.g.</u>, <u>Spectrum Sports, Inc. v. McQuillan</u>, 506 U.S. 447, 455-56 (1993).  As noted earlier, Plaintiff's market allegations are inadequate with regard to § 1; they are at least as deficient with regard to § 2.  Plaintiff alleges that Defendants conspired to monopolize or attempted to monopolize "the orthopedic services in the relevant market in Central Florida."  (Am. Compl. ¶ 176).  Plaintiff does not otherwise define the market in connection with his section 2 claim.  Regardless of what market definition is chosen, Plaintiff's claim fails.

The Court rejects out of hand the assertion that Defendants attempted to monopolize or conspired to monopolize the market for orthopedic services in Central Florida as a whole. There are numerous other hospitals in central Florida, as well as other outlets for the provision of such services.  For the reasons noted in the discussion of the § 1 claim, the Court also rejects a definition of market that includes "emergency orthopedic services" or "level one trauma center"; there are many other emergency rooms than the two at ORMC and Sand Lake.

In sum, Plaintiff has not alleged an appropriate relevant market, nor has he otherwise characterized the supposed monopoly that Defendants aspired to obtain by suspending some of his hospital privileges.  While ORHS may have the power to grant or deny staff privileges at its hospitals, it is not alleged to have—and as a practical matter cannot

have—the power to grant or deny privileges in the entire central Florida area.  Plaintiff's

attempt to raise a claim under § 2 of the Sherman Act fails.

    2.  Count III ("Judicial Review")

    In Count III, Plaintiff "requests that this court judicially review and determine the

validity, reasonableness[,] and fairness of ORHS's and the Peer Review Defendants'

actions." (Am. Compl. ¶ 193).  Plaintiff asserts in this count that the peer review "was

committed in bad faith, in violation and in breach of the Bylaws, and in violation of [his]

fundamental right to due process and fairness." (Id. ¶ 191).  He avers that these Defendants

"intentionally misapplied the Bylaws and/or intentionally conducted the peer review in

violation of the Bylaws." (Id. 192).  ORHS and the Peer Review Defendants have moved

to dismiss this claim.  (See Docs. 107, 108, 109, & 131).

    ORHS contends that Count III fails to state a cause of action and is redundant to the

breach-of-contract claim in Count II, characterizing Count III as merely a claim of "intentional

breach of contract."  Some of the Peer Review Defendants (see Doc. 109) argue, in urging

dismissal of this count, that Plaintiff does not allege that they had any control over how the

peer review was conducted or whether the bylaws were followed; thus, they contend that this

count should be directed at ORHS only.[32]

    It is far from obvious what the legal basis for Count III is—Plaintiff titles it "Judicial

---

[32]Defendant Sanders (Doc. 131) seeks dismissal on the basis that he did not take part in the peer review.  He has attached an affidavit to this effect, but the Court cannot consider such affidavits in ruling on a 12(b)(6) motion to dismiss without converting the motion into a motion for summary judgment.  See Fed. R. Civ. P. 12(d).  The Court therefore excludes this affidavit from consideration.

Review of Reasonableness and/or Fairness in Peer Review." In his response (Doc. 134) to ORHS's motion, Plaintiff asserts that "[t]here is no Florida rule, statute[,] or decision that prevents a physician from asking a court to review a hospital's decision to suspend or terminate existing privileges." (Doc. 134 at 33). However, it is not incumbent on a plaintiff to show that there is no bar to a claim, but instead to set forth a basis for one in the first instance.

Plaintiff contends that "Florida case law suggests a court may review a hospital's peer review process to determine whether rules or bylaws by which such a decision was reached are fair and/or were fairly applied." (Doc. 134 at 33). Plaintiff cites two Florida cases, but neither of them plainly stands for the proposition that a doctor may file a claim titled "judicial review" without an underlying basis for such a claim. In North Broward Hospital District v. Mizell, 148 So. 2d 1 (Fla. 1962), a hospital appealed a decree declaring a Florida statute that created a hospital district to be unconstitutional; it has no application here. It is difficult to discern how Dance v. North Broward Hospital District, 420 So. 2d 315 (Fla. 4th DCA 1982), arrived at the appellate court; it is described as an appeal of a physician's permanent suspension from the medical staff as a hospital, and the Fourth District Court of Appeal concluded "that there was adequate evidence upon which to base permanent suspension." Id. at 316. The Dance court noted that the administrative bodies who imposed the suspension were obligated to ensure quality patient care "in accordance with the by-laws" of the hospital district and that "[j]udicial intervention is only necessary or appropriate when suspension procedures are unfair or when the standards set by the hospital are unreasonable or applied arbitrarily or capriciously." Id. This suggests that the bylaws and

-32-

the procedures thereunder were reviewed; in the instant case, Plaintiff has not challenged the bylaws themselves, and his challenge to the manner in which the bylaws were applied has already been made in Count II.

Plaintiff also cites three non-Florida cases in support of his asserted claim for "judicial review."  However, these cases cut against Plaintiff's position rather than supporting it.  In Brinton v. IHC Hospitals, Inc., 973 P.2d 956 (Utah 1998), a doctor brought nine discrete causes of action—none of which was for bald "judicial review"—and the appellate court, in affirming, noted that the trial court had "decided that each of [the plaintiff's] claims was ultimately grounded in the assertion that IHC had violated the contractual bylaws governing [the] staff privileges."  Id. at 959 & n.1; see also id. at 963 ("[T]he court held that all of Dr. Brinton's claims depended upon his ability to show that the Hospital had violated its contractual fair process obligations.").  The other two cases cited by Plaintiff also note that compliance with hospital bylaws was at the root of the claims.  See Mahmoodian v. United Hosp. Ctr., Inc., 404 S.E.2d 750, 755 (W. Va. 1991) ("Utilizing breach of contract principles, most courts explicitly addressing the issue presented here have held, and we hereby hold, that the decision of a private hospital to revoke, suspend, restrict or to refuse to renew the staff appointment or clinical privileges of a medical staff member is subject to limited judicial review to ensure that there was substantial compliance with the hospital's medical staff bylaws governing such a decision, as well as to ensure that the medical staff bylaws afford basic notice and fair hearing procedures, including an impartial tribunal."); Adkins v. Sarah Bush Lincoln Health Ctr., 544 N.E.2d 733, 737-38 (Ill. 1989) (noting that in most jurisdictions, generally "internal staffing decisions of private hospitals are not subject . . . to judicial review"

but that "when the decision involves a revocation, suspension or reduction of existing staff privileges . . . the hospital's action is subject to a limited judicial review to determine whether the decision made was in compliance with the hospital's bylaws").

This count must be dismissed.  Plaintiff has already brought a claim (Count II) based on failure to comply with the Bylaws.  Plaintiff does not allege that the Bylaws were unfair but only that they were not complied with during the peer review.   Plaintiff has not presented a basis for a claim of "judicial review" beyond the breach of contract claim.  The Court agrees with Defendants that the claim for "judicial review" in Count III is redundant to Count II.

### 3.  Count IV (Defamation)

Plaintiff brings a defamation claim in Count IV.  The allegations of this count are as follows:

> 195.  ORHS and the Peer Review Defendants made and published false and defamatory written and spoken statements about [Plaintiff] during and after the peer review, including statements that [Plaintiff] was justifiably summarily suspended.
> 196.   Further, Defendants ORHS and Hillenmeyer provided false, erroneous[,] and defamatory information about [Plaintiff] to the NPDB, to the Florida Department of Health and to other third parties.  These entities and third parties have published and republished these defamatory statements, which [Plaintiff] has also been required to self-publish.
> 197.  Throughout the peer review process, ORHS and the Peer Review Defendants made defamatory statements about [Plaintiff's] surgical technique, surgical judgment, methods and practice, operative durations, operating times[,] and surgical decisions.
> 198.   These defamatory statements, both written and spoken, were made with knowledge of their falsity or with reckless disregard of their truth or falsity.   Further, the defamatory statements are defamatory per se or per quod.
> 199.  As a direct and proximate result of ORHS's and the Peer Review Defendants' defamatory statements, both written

> and spoken, [Plaintiff] has suffered and continues to suffer actual and special damages, including but not limited to harm to his reputation, economic loss, extreme embarrassment, humiliation, outrage[,] and indignity.

(Am. Compl. at 45).

In Caster v. Hennessey, the Eleventh Circuit held, in addressing a Florida defamation claim, that "a federal court need not adhere to a state's strict pleading requirements but should instead follow Fed. R. Civ. P. 8(a). In contrast to Florida's strict pleading requirements, Fed. R. Civ. P. 8(a)(2)[] simply requires that a complaint must contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" 781 F.2d 1569, 1570 (11th Cir. 1986) (citation omitted); accord Leavitt v. Cole, 291 F. Supp. 2d 1338, 1341 (M.D. Fla. 2003) ("Although a forum state may apply a heightened pleading requirement, a federal court should, with limited exceptions, look instead to Federal Rule of Civil Procedure . . . 8(a)."); see also Greif v. Jupiter Med. Ctr., No. 08-80070-CIV, 2008 WL 2705436, at *5 (S.D. Fla. July 9, 2008) ("While pleading a defamation claim with a certain level of particularity may be required under Florida law, this requirement is procedural and not applicable in this Court.  Federal Rule of Civil Procedure 9(b) only requires specific pleading in limited circumstances, and a state law defamation claim is not one of those enumerated circumstances.  Thus, in federal court, a defamation claim can be pled generally, so long as it meets the requirements of Rule 8(a) and *Twombly*.") (citations omitted).

The Court cannot conclude at this point that there is no actionable defamation claim in this case.  And, as noted above, heightened pleading requirements do not apply to this

claim.  However, because of the problem with "group pleading" of the Peer Review Defendants as discussed previously, the count must be repled so that each Defendant is put on fair notice of the claim against him.  This count shall be dismissed without prejudice and with leave to amend.

### 4.  Counts V and VI (Interference)

Plaintiff brings two interference claims:  Intentional and Unjustifiable Interference with Existing Contractual Relations (Count V) and Interference with Advantageous Business Relationship (Count VI).  Defendants contend that these claims are not sufficiently pled because Plaintiff does not allege direct and intentional interference but only that his relationships were interfered with as an indirect consequence of the peer review.

Defendants rely on Lawler v. Eugene Wuesthoff Memorial Hospital Ass'n, 497 So. 2d 1261 (Fla. 5th DCA 1986), and Lake Hospital & Clinic, Inc. v. Silversmith, 551 So. 2d 538 (Fla. 4th DCA 1989).  In Lawler, the appellate court affirmed dismissal of a claim of intentional interference with an advantageous business relationship, noting that an essential element of such a claim "is that the interference be both direct and intentional."  497 So. 2d at 1263.  The "only act complained of as wrongfully taken by the [defendants in Lawler] was the termination of Dr. Lawler's staff privileges," and "[c]learly, the alleged interference with the[] relationships was only an indirect consequence of the termination of Dr. Lawler's staff privileges."  Id.  And, in Silversmith, the appellate court, citing Lawler, determined that the trial court erred in not directing a verdict for defendants on an interference claim where the plaintiff—a doctor whose privileges had been terminated—"did not present a case sufficient to suggest that appellants specifically interfered with particular relationships with his patients

and other physicians." 551 So. 2d at 544-45.

Plaintiff maintains that he has adequately alleged these counts, but the Court agrees with Defendants that Plaintiff has not stated claims for intentional interference. The Amended Complaint falls short of alleging direct and intentional interference as required under Florida law. Instead, as in Lawler, the allegations of the Amended Complaint allege interference as "only an indirect consequence of" the termination of Plaintiff's privileges.[33] Plaintiff does not seek leave to replead these claims, arguing instead that he has adequately stated them and that this case is distinguishable from Lawler and Silversmith. However, the Court finds this case—as pled by Plaintiff—to be indistinguishable from those Florida court decisions, and both interference counts will be dismissed with prejudice.

5.  Count VII (False Light)

In Count VII, Plaintiff brings a claim of false light. At the time of oral argument, the issue of whether false light is a viable cause of action in Florida was pending before the Supreme Court of Florida. (See Hr'g Tr., Doc. 155, at 15-16). That court has now expressly declined to recognize false light as a Florida cause of action distinct from defamation. Jews for Jesus, Inc. v. Rapp, 997 So. 2d 1098, 1113-14 (Fla. 2008), reh'g denied (Dec. 17, 2008). Thus, Count VII fails as a matter of law and must be dismissed with prejudice.

---

[33]As noted by Defendants in their motions, a different type of factual allegations was presented in Greenberg v. Mount Sinai Medical Center of Greater Miami, Inc., 629 So. 2d 252 (Fla. 3d DCA 1993), where the court found an interference claim sufficient pled. There, the doctor-plaintiffs alleged that the defendants influenced patients to see another doctor instead of them; offered inducements to other doctors to send patients to that other doctor; and told patients that the plaintiffs no longer practiced at the hospital. See id. at 255-56. Clearly, these allegations allege *direct* interference with relationships, whereas those in the Amended Complaint in the instant case do not.

### 6.  Count VIII (Intentional Infliction of Emotional Distress)

In Count VIII, Plaintiff brings a claim for intentional infliction of emotional distress against ORHS and the Peer Review Defendants.  Plaintiff contends that these Defendants "intentionally and recklessly labeled [him] 'incompetent' and a 'dangerous' doctor and excluded him from performing orthopedic trauma and emergency surgeries with the intended purpose of denying him the opportunity to perform the professional services for which he trained." (Am. Compl. ¶ 236).  Further, Plaintiff alleges that these Defendants "intentionally and recklessly harmed [him] through the use and abuse of the peer review process at ORHS." (Id. ¶ 237).  Defendants contend that Plaintiff has not stated a viable cause of action in this count because he has not alleged conduct sufficiently outrageous to support a claim for intentional infliction of emotional distress.[34]

To state a cause of action for intentional infliction of emotional distress, a plaintiff must plead "conduct 'so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Allen v. Walker, 810 So. 2d 1090, 1091 (Fla. 4th DCA 2002) (quoting Metro. Life Ins. Co. v. McCarson, 467 So. 2d 277, 278-79 (Fla. 1985)).  "Whether alleged conduct is outrageous enough to support a claim of intentional infliction of emotional distress is a

---

[34]"The elements of a cause of action for the intentional infliction of emotional distress are:  (1) the wrongdoer's conduct was intentional or reckless, i.e., he intended his behavior when he knew or should have known that emotional distress would likely result; (2) the conduct was outrageous, i.e., beyond all bounds of decency, atrocious[,] and utterly intolerable in a civilized community; (3) the conduct caused emotional distress; and (4) the emotional distress was severe." State Farm Mut. Auto. Ins. Co. v. Novotny, 657 So. 2d 1210, 1212 (Fla. 5th DCA 1995).  Defendants challenge only the second element.

matter of law, not a question of fact." <u>Gandy v. Trans World Computer Tech. Group</u>, 787 So. 2d 116, 119 (Fla. 2d DCA 2001). Defendants argue that even if the allegations in the Amended Complaint are true, they do not rise to the requisite level of outrageousness to support this claim.

The Court cannot conclude as a matter of law that, if established, Plaintiff's allegations do not rise to the requisite level of outrageousness. Plaintiff alleges that he was labeled "incompetent" and "dangerous" during a sham peer review. Though Plaintiff will likely have great difficulty establishing the requisite level of outrageousness—especially given his own description in the Amended Complaint of the review as entailing varying medical opinions about his technique—the character of the conduct alleged is not plainly unactionable. However, this count does suffer the shortcoming of the group pleading of the "Peer Review Defendants," and for this reason it must be repled.

### 7.  Count IX (Negligent Hiring and Supervision)

Plaintiff brings a claim of negligent hiring and supervision (Count IX) against Defendant ORHS only. ORHS seeks dismissal of this claim on the basis that it is barred by the economic loss rule because it is merely a restatement of the breach-of-contract claim in Count II.

However, the Court need not reach the issue of the applicability of the economic loss rule in addressing this claim because more fundamentally, a prima facie case of negligent hiring in Florida ultimately "requires that a plaintiff demonstrate that: '(1) the employer was required to make an appropriate investigation of the employee and failed to do so; (2) an appropriate investigation would have revealed the unsuitability of the employee for the

particular duty to be performed or for employment in general; and (3) it was unreasonable for the employer to hire the employee in light of the information he knew or should have known.'" Pycsa Panama, S.A. v. Tensar Earth Techs., Inc., No. 06-20624-CIV, 2008 WL 1775409, at *47 (S.D. Fla. Apr. 16, 2008) (quoting Malicki v. Doe, 814 So. 2d 347, 361-62 (Fla. 2002)).  "A necessary predicate for a claim of negligent hiring is the existence of an employment relationship." Id. (citing Behrman v. Allstate Life Ins. Co., 388 F. Supp. 2d 1346, 1350 (S.D. Fla. 2005)).

The Amended Complaint falls short of alleging an employment relationship between ORHS and those whom it allegedly negligently hired and supervised.  Plaintiff alleges that the latter "were each agents **and/or** employees of ORHS," (Am. Compl. ¶ 247) (emphasis added), but in Behrman the court held, and this Court agrees, that allegations of an agency relationship are not enough; **employment** is required.  See 388 F. Supp. 2d at 1350-51.  If Plaintiff has a good-faith basis for alleging that an employment relationship existed between ORHS and the persons whom ORHS allegedly negligently hired and supervised, he may replead this claim; otherwise, there is no viable cause of action for negligent hiring or supervision under Florida law.  This claim thus will be dismissed without prejudice.

### 8.  Count X (Fraud)

In Count X, Plaintiff brings a claim of fraud against ORHS and the Peer Review Defendants.  Defendants seek dismissal of this claim, noting that Federal Rule of Civil Procedure 9(b) requires that "a party must state with particularity the circumstances constituting fraud."  As the Eleventh Circuit Court of Appeals has explained, "[p]articularity means that a plaintiff must plead facts as to time, place, and substance of the defendant's

alleged fraud, specifically the details of the defendant['s] allegedly fraudulent acts, when they occurred, and who engaged in them." <u>United States ex rel. Atkins v. McInteer</u>, 470 F.3d 1350, 1357 (11th Cir. 2006) (citations and internal quotations omitted) (alteration in original). Defendants are correct that Count X of the Amended Complaint does not meet the Rule 9(b) standard.

As noted during oral argument, Defendants initially read Count X as attempting to set forth a fraud-in-the-inducement claim, but upon receiving Plaintiff's response to ORHS's motion to dismiss Defendants realized that Plaintiff was attempting to allege fraud occurring *during* the peer review process and not prior to the time Plaintiff began working at ORHS. (<u>See</u> Doc. 155 at 17-18). It is understandable that Defendants construed this claim as a fraudulent inducement claim, because as pled, it certainly reads as such. The allegations of this Count include that "material representations were made by ORHS and the Peer Review Defendants with the intention that the medical staff, including [Plaintiff], rely on [them] in reaching a decision to become a member of the medical staff," (Am. Compl. ¶ 258), and that "[i]n deciding to join the ORHS medical staff, [Plaintiff] relied on these false representations to his severe and continuing detriment," (<u>id.</u> ¶ 259).

Although Plaintiff is now arguing that he is alleging fraud in connection with the peer review itself[35] (<u>see</u> Doc. 134 at 32-33), the fraud count alleged in the Amended Complaint

---

[35]As Plaintiff notes in his response memorandum, the elements of fraud are "(1) a false statement concerning a specific material fact; (2) the maker's knowledge that the representation is false; (3) an intention that the representation induces another's reliance, and (4) consequent injury by the other party acting in reliance on the representation." (Doc. 134 at 32 n.18 (citing <u>Ward v. Atl. Sec. Bank</u>, 777 So. 2d 1144, 1146 (Fla. 3d DCA 2001))). If the fraud allegedly occurred in the process of the peer review, it is unclear where the

does not state such a claim.  Moreover, this count particularly suffers the flaw of the grouping of allegations against the "Peer Review Defendants."  "[I]n a case involving multiple defendants . . . the complaint should inform each defendant of the nature of his alleged participation in . . . fraud," and "[p]leadings are insufficient where they simply lump together all defendants and are 'devoid of specific allegations with respect to the separate Defendants."  <u>Prime Mgmt. Consulting & Inv. Servs., LLC v. Certain Underwriters at Lloyd's London</u>, No. 1:07-cv-1578-WSD, 2007 WL 4592099, at *6 (N.D. Ga. Dec. 28, 2007) (first alteration in original).

The fraud count will be dismissed without prejudice.  Plaintiff may replead this claim if he can do so with the requisite particularity and if he can state a cause of action for fraud that does not run afoul of the economic loss rule.

### 9.  Count XI (Request for Permanent Injunction)

In Count XI, Plaintiff requests a permanent injunction, stating in the title of the count that this relief is sought as against "All Defendants."  (<u>See</u> Am. Compl. at 56).  Plaintiff contends in this count that pursuant to the Bylaws, Plaintiff "has a legal right to have ORHS comply with the Bylaws by rescinding and vacating the wrongful suspension of his privileges and expunging these events from his record at ORHS."  (<u>Id.</u> ¶ 264).  Plaintiff further alleges that he "has a legal right to have ORHS rescind, correct, and expunge the reports made to the NPDB, the Florida Department of Health[,] and any other third parties to whom a false

---

reliance by Plaintiff would inhere in such a claim.  Plaintiff is, of course, free to attempt to plead his claim as chooses, so long as his pleading apprises the Defendants of the basis for it.

or wrongful report concerning [Plaintiff] was made." (Id. ¶ 265).  And, "[i]n addition, to the extent that any other Defendant has made or published these reports, [Plaintiff] has the legal right to have those parties rescind, correct, and expunge such reports." (Id. ¶ 266).  Plaintiff "seeks injunctive relief ordering ORHS to comply in all respects with the Bylaws by lifting and vacating his wrongful suspension of privileges, rescinding and vacating his wrongful suspension of privileges, and expunging these events from [his] record at ORHS and to expunge the reports made to the National Practitioners' Data Bank, the Florida Department of Health, Consumer Unit, and any other third parties to whom a false or wrongful report concerning [Plaintiff] was made." (Id. ¶ 268).

ORHS does not challenge the sufficiency of the pleading of this count.  (See Doc. 107 at 2 (noting that Count 11 appropriately states a cause of action)).  However, some of the other Defendants do.[36]  The Peer Review Defendants argue that "[t]here is no allegation as to how . . . any of the . . . individual Defendants[] would have it in his power to make any of [the requested injunctive] events occur" and that this count is properly alleged against ORHS but not them individually.  (Doc. 108 at 8-9).  The Florida Department of Health and the Florida Board of Medicine argue in their motion (Doc. 121)[37] that this count fails to allege a

---

[36]The federal Defendants—United States of America, National Practitioner Data Bank, Region IV of the Department of Health and Human Services, and Michael O. Leavitt—do not address Count XI in their motion to dismiss (Doc. 142).

[37]The Florida Department of Health and the Florida Board of Medicine also argue in their motion that they are not proper Defendants in this case because they enjoy the benefit of sovereign immunity under the Eleventh Amendment.  Because all of the claims against these Defendants—Counts XI, XIV, XV, XVI, XVII, and XVIII—are dismissed in this Order for failure to state a claim, the Court need not address the sovereign immunity argument.

factual basis for the issuance of injunctive relief against them, noting that the only facts alleged regarding them are that reports were made to them and an investigation was initiated.

This count fails for a more fundamental reason:  an injunction is not a cause of action but a remedy.  See, e.g., Rodriguez v. City of Laredo, No. 5:06-cv-175, 2007 WL 2329860, at *1 n.1  (S.D. Tex. Aug. 13, 2007); Abboub v. Int'l Bus. Machs. Corp., No. C 04-00017 JW, 2006 WL 905319, at *9 (N.D. Cal. Apr. 7, 2006); Minn. Indus. Ventures, L.L.C. v. City of Roseville, No. Civ. 052488RHKJSM, 2006 WL 763208, at *5 n.4 (D. Minn. Mar. 24, 2006); Booth v. Quantum3D, Inc., No. C-04-5376 EMC, 2005 WL 1512138, at *4 (N.D. Cal. June 15, 2005).  In this count, Plaintiff seems to seek this injunctive relief as a remedy for ORHS's alleged breach of its bylaws.[38]  (See Am. Compl. ¶ 264 ("Pursuant to the Bylaws, [Plaintiff] has a legal right to have ORHS comply with the Bylaws by rescinding and vacating the wrongful suspension . . . ."); id. ¶ 268 ("[Plaintiff] seeks injunctive relief ordering ORHS to comply in all respects with the Bylaws . . . .")).  While Plaintiff may certainly request injunctive relief as a remedy where appropriate, there must be an underlying claim upon which to base the request.  Count XI cannot stand on its own and must be dismissed.

---

[38]As noted earlier, in Count II Plaintiff brings a breach of contract claim against ORHS based on failure to comply with the Bylaws.  ORHS has not challenged that claim at this stage of the case.

### 10.  Count XII (Declaratory Relief–ByLaws, Rescission, and Expungement)

In Count XII, Plaintiff makes a request for declaratory relief against ORHS and the Peer Review Defendants.  ORHS has not challenged the sufficiency of the pleading of this claim,[39] but the Peer Review Defendants do.  Plaintiff contends in this count that "he has a legal right to have ORHS and the Peer Review Defendants comply with the Bylaws by rescinding and vacating his wrongful suspension of privileges and expunging these events from his record at ORHS" and "a legal right to have these Defendants rescind, correct, and expunge the reports made to any third party."  (Am. Compl. ¶¶ 270-71).  Plaintiff "seeks a declaration . . . that he is entitled to the above-stated rights."  (Id. ¶ 273).

This count cannot survive against the Peer Review Defendants.  As these Defendants note, (see Doc. 109), they are not alleged to have the power to rescind the reports or expunge his ORHS records.  Thus, even if Plaintiff is entitled to a declaration regarding a right to rescission, correction, or expungement, such a declaration cannot be directed at parties who have no power to affect those rights on their own.[40]   Count XII must be dismissed as against the Peer Review Defendants.

### 11.  Counts XIV, XV, XVII, and XVIII (Constitutional Claims)

Plaintiff's constitutional claims challenge the provisions of the Health Care Quality

---

[39](See Doc. 107 at 2 (acknowledging that Count 12 appropriately states a cause of action)).

[40]In his response to the motion to dismiss this count, Plaintiff does not address the Peer Review Defendants' argument that they lack the power to rescind or expunge, instead arguing that these Defendants "knew or should have known" the reports were false and that they made the reports.  (See Doc. 138 at 18-19).

Improvement Act of 1986[41] ("HCQIA"), 42 U.S.C. § 11101 et seq.  HCQIA consists of a

statement of Congressional findings[42] followed by three subchapters—the first titled

"Promotion of Professional Review Activities," the second, "Reporting of Information," and

the third, "Definitions and Reports."   The first subchapter contains provisions regarding

professional review activities, including a section providing that if a professional review action

meets certain standards, the participants in the professional review action "shall not be liable

in damages under any law of the United States or of any State (or political subdivision

---

[41]Plaintiff also challenges the state statutes—sections 766.101, 766.1015, and 395.0193, Florida Statutes—that confer immunity in connection with medical peer review. The parties have addressed the federal and state statutes collectively in their pleadings and arguments, and the Court does so as well; in other words, the rulings regarding HCQIA apply with equal force to the Florida statutory provisions.

[42]These Congressional findings are that:

> (1) The increasing occurrence of medical malpractice and the need to improve the quality of medical care have become nationwide problems that warrant greater efforts than those that can be undertaken by any individual State.
> (2) There is a national need to restrict the ability of incompetent physicians to move from State to State without disclosure of the physician's previous damaging or incompetent performance.
> (3) This nationwide problem can be remedied through effective professional peer review.
> (4) The threat of private money damage liability under Federal laws, including treble damages liability under Federal antitrust law, unreasonably discourages physicians from participating in effective professional peer review.
> (5) There is an overriding national need to provide incentive and protection for physicians engaging in effective professional peer review.

42 U.S.C. § 11101.

thereof) with respect to the action." 42 U.S.C. § 11111(a)(1).[43]   In order for damages liability to be barred, the "professional review action must be taken—(1) in the reasonable belief that the action was in the furtherance of quality health care, (2) after a reasonable effort to obtain the facts of the matter, (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).   42 U.S.C. § 11112(a).   The review action is presumed to have met the standards necessary for the barring of damages liability "unless the presumption is rebutted by a preponderance of the evidence."   Id.   HCQIA specifically provides that it does not "chang[e] the liabilities or immunities under law" or "preempt[] or overrid[e] any State law which provides incentives, immunities, or protection for those engaged in a professional review action that is in addition to or greater than that provided by this subchapter."   42 U.S.C. § 11115(a).

Subchapter II of HCQIA contains mandatory reporting requirements regarding professional review actions.   Health care entities "which . . . take[] a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days" must report "(A) the name of the physician or practitioner involved, (B) a description

---

[43]Additionally, "no person (whether a witness or otherwise) providing information to a professional review body regarding the competence or professional conduct of a physician shall be held, by reason of having provided such information, to be liable in damages under any law of the United States or of any State (or political subdivision thereof) unless such information is false and the person providing it knew that such information was false."   42 U.S.C. § 11111(a)(2).

of the acts or omissions or other reasons for the action or, if known, for the surrender, and (C) such other information respecting the circumstances of the action . . . as the Secretary [of Health and Human Services] deems appropriate" to the state Board of Medical Examiners. 42 U.S.C. § 11133(a)(1), (3). The Board of Medical Examiners, in turn, must report that information to the Secretary of Health and Human Services or the Secretary's designee. 42 U.S.C. §§ 11133(b), 11134(b). If a state Board of Medical Examiners revokes or suspends a physician's medical license, the Board must also make a report to the Secretary. 42 U.S.C. § 11132(a).

In addition to requiring reporting of information, HCQIA also requires hospitals to *obtain* information; any time a physician applies for clinical privileges at a hospital or to be on the hospital's medical staff, and once every 2 years with regard to physicians who are on staff or have privileges, a hospital has a duty to request reported information from the Secretary. 42 U.S.C. § 11135(a). Hospitals are also permitted to request information at other times. Id.[44]

Plaintiff contends that the peer review process was a sham and that because of the

---

[44]The statute also directs the Secretary to "by regulation, provide for—(1) disclosure of the information, upon request, to the physician or practitioner, and (2) procedures in the case of disputed accuracy of the information." 42 U.S.C. § 11136. HCQIA further provides that "[t]he Secretary . . . shall, upon request, provide information reported under this subchapter with respect to a physician or other licensed health care practitioner to State licensing boards, to hospitals, and to other health care entities (including health maintenance organizations) that have entered (or may be entering) into an employment or affiliation relationship with the physician or practitioner or to which the physician or practitioner has applied for clinical privileges or appointment to the medical staff." 42 U.S.C. § 11137(a). Reported information is declared to be considered confidential and its disclosure is limited; penalties are provided for violations of the confidentiality and nondisclosure provisions. 42 U.S.C. § 11137(b)(1)-(2).

reporting of his suspension to state and federal entities he "is labeled incompetent and a 'dangerous' doctor for the rest of his career." (Am. Compl. ¶ 1). He seeks relief for these alleged wrongs in part by challenging the constitutionality of HCQIA on various grounds in Counts XIV, XV, XVII, and XVIII.[45]

### a.  Count XIV

In Count XIV, Plaintiff alleges that he "has a fundamental liberty and due process right in his livelihood, work and reputation under both the United States and Florida Constitutions" and that in conducting the peer review proceedings ORHS and the Peer Review Defendants "acted as state actors, with all of the constitutional limitations that apply to the state and federal government." (Am. Compl. ¶ 282). He then alleges that "acting under color of state law, [these Defendants] conducted and participated in a peer review process that failed to meet ordinary standards of due process." (Id. ¶ 283). Plaintiff alleges that the review process "suffered from numerous procedural flaws." (Id.). Additionally, he contends that these Defendants, "[a]cting as peer reviewers at the direction of the federal and state governments, . . . administered HCQIA and similar Florida peer review statutes, which . . . purport[] to insulate" them from federal and state causes of action. (Id. ¶ 286). Plaintiff avers that this "administration of HCQIA and the Florida peer review statutes" deprives him of due process "because it interferes with [his] ability to secure redress of his rights in a court of law." (Id. ¶ 287). He then requests "a declaratory judgment that the HCQIA and the Florida immunity statutes . . . violate the Due Process protections provided by the United

---

[45]As noted earlier in this Order, Plaintiff's claim in Count XVI that HCQIA is not a valid exercise of Congress's power under the Commerce Clause has been abandoned.

States Constitution and the Florida Constitution" and an award of damages.  (Id. ¶ 288).[46]
The named Defendants in this count are the United States, the NPDB, the Department of
Health and Human Services, Region IV, the State of Florida, the Florida Health Department,
and the Florida Board of Medicine.

The Court has struggled to decipher the precise nature of the claim that is being
asserted here.  The count is titled "Request for Declaratory Relief" and seemingly seeks a
broad declaration that HCQIA and the Florida immunity statutes violate the Due Process
provisions of the U.S. and Florida Constitutions.  In these aspects, it appears to be a facial
challenge to the federal and Florida statutes listed.  However, as described in the foregoing
paragraph, this count also complains at length about the way in which ORHS and the Peer
Review Defendants conducted the peer review proceedings, asserting that these Defendants
"acted as state actors" with attendant constitutional limitations on their actions, and that the
peer review did not afford due process.  During oral argument, Plaintiff's counsel appeared
to argue this count as a facial challenge,[47] but when questioned by the Court he insisted
Plaintiff is raising only an "as applied" challenge to the level of process Plaintiff was
afforded.[48]

In any event, whether facial or as-applied, Plaintiff's due process challenge to HCQIA
fails as a matter of law.  First, Plaintiff relies on the actions of private parties—ORHS and the

---

[46]Plaintiff does not identify which specific provisions of HCQIA he claims are
unconstitutional, though there are many sections within the statute.

[47](See Hr'g Tr. 08/05/2008, Doc. 199, at 33-34).

[48](See Hr'g Tr. 08/05/2008, Doc. 199, at 36).

Peer Review Defendants—to ostensibly support his as-applied constitutional violation. "'Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action.'" <u>Cranley v. Nat'l Life Ins. Co. of Vt.</u>, 318 F.3d 105, 111 (2d Cir. 2003) (quoting <u>United States v. Int'l Bhd. of Teamsters</u>, 941 F.2d 1292, 1295 (2d Cir. 1991)).  "'[S]tate action requires both an alleged constitutional deprivation caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible, and that the party charged with the deprivation must be a person who may fairly be said to be a state actor.'" <u>Id.</u> (quoting <u>Am. Mfrs. Mut. Ins. Co. v. Sullivan</u>, 526 U.S. 40, 50 (1999) (alterations in original) (further internal quotation and citation omitted)).

"[C]onduct by a private entity is not fairly attributable to the state merely because the private entity is a business subject to extensive state regulation or 'affected with the public interest.'" <u>Id.</u> at 112.  And, although "coercive power" by the state or "significant encouragement" provided by the state to the private actor can result in challenged activity by a private entity being deemed state action, <u>id.</u> at 112, Plaintiff's contention that the peer review immunity provisions constitute such a level of encouragement or coercion is rejected, and his assertions are insufficient to allege state action.

In <u>Freilich v. Board of Directors of Upper Chesapeake Health, Inc.</u>, 142 F. Supp. 2d 679 (D. Md. 2001), <u>aff'd</u>, 313 F.3d 205 (4th Cir. 2002), the court rejected facial and as-applied due process challenges to HCQIA, and this Court agrees with that court's conclusions and reasoning.  The court noted that the claim could not stand against the

private hospital defendants "because the Fifth Amendment restricts only actions of the federal government, and not actions of private parties." Id. at 691.  With regard to the hospital defendants, the court concluded that "the fact that [the doctor-plaintiff's] peer reviewers may seek immunity through a state or federally enacted statute does not turn a purely private decision into that of the state or federal government." Id. at 691.  Although Plaintiff in the instant case has not named ORHS and the Peer Review Defendants in this count, the conduct that is described in this count is that of these Defendants, and thus any "as-applied" challenge must be based on their actions.

Moreover, Plaintiff complains about the "process" he received during his peer review, but HCQIA was not—or has not yet become—part of that process.[49]  "[T]he provisions of the HCQIA are not enforcement standards which are required to be used against physicians. The statute merely sets standards for health care professionals who engage in peer review

_____

[49]The Freilich court further noted:

> [The plaintiff's] claim raises standing and ripeness concerns. Specifically, it is questionable whether [her] injury—the termination of her hospital privileges—is traceable to the provisions of the HCQIA, as [she] has not demonstrated how the HCQIA has been applied to her, if at all.  Further, the HCQIA has yet to be applied to provide or deny immunity to the individuals against whom she has brought this case.

142 F. Supp. 2d at 692.  At oral argument in the instant case, Plaintiff's counsel conceded that because the issue of entitlement to HCQIA immunity has not yet been determined in this case, "it is possible to say that [Plaintiff] has not been harmed in terms of equal protection or due process by the federal statute." (Hr'g Tr., Doc. 199, at 38).  Counsel asked that the Court hold Counts XIV and XV in abeyance until the issue of immunity is determined. (Id.). However, because the Court finds that these claims fail as a matter of law, there is no need to hold them in abeyance.

and who seek immunity." Id. at 693; see also Bok v. Mut. Assurance, Inc., 119 F.3d 927, 928 (11th Cir. 1997) ("The HCQIA thus provides that, if the peer review action 'meets certain due process and fairness requirements, then those participating in such a review process shall not be liable under any state or federal law for damages for the results.'" (quoting Bryan v. James E. Holmes Reg'l Med. Ctr., 33 F.3d 1318, 1321-22 (11th Cir. 1994))).  No immunity has yet been sought or granted in this case.

This claim is flawed for yet another reason.  The right that Plaintiff claims at the beginning of this count is a right "in his livelihood, work[,] and reputation."  (Am. Compl. ¶ 282).  However, he claims later that ORHS and the Peer Review Defendants' "administration of HCQIA" deprived him "of due process because it interferes with plaintiff's ability to secure redress of his rights in a court of law."  (Id. ¶ 287).  Plaintiff has not identified how these statutory provisions interfere with the securing of redress of whatever right Plaintiff possesses "in his livelihood, work[,] and reputation"—the right he claims.  The statutes merely insulate certain defendants from *liability for damages*, and Plaintiff has not alleged—nor could he—a constitutional right to seek damages from those participating in his peer review.  Nothing in HCQIA prevents him from obtaining redress of a deprivation of the right he asserts in his livelihood.  Even if the Defendants are determined to have immunity under these statutes, the statutes do not bar actions for injunctive relief or correction of error in a peer review determination.

For all of the foregoing reasons, Count XIV fails to state a cause of action and shall be dismissed with prejudice.

b. Count XV

In Count XV, Plaintiff makes another "Request for Declaratory Relief" regarding the constitutionality of HCQIA and the Florida Immunity Statutes, again alleging that in conducting the peer review ORHS and the Peer Review Defendants "acted under color of state law." (Am. Compl. ¶ 291). Plaintiff contends in this count that HCQIA and the Florida peer review statutes violate Equal Protection because "doctors from small practice groups and solo-practitioners such as [Plaintiff] are treated differently from those in large practice groups, and doctors in some specialties are treated differently than those in others." (Id. ¶ 293). Further, Plaintiff alleges that these statutes "create arbitrary classifications that deprive physicians of their traditional state-based common law and statutory causes of action including breach of contract, interference with contractual relations and defamation as well as statutory clauses [sic] under anti-trust laws, while not denying all healthcare providers and all non-health care professionals their rights to bring such claims." (Id. ¶ 295).

As was initially the case with Count XIV, the character of the constitutional challenge being brought in this claim is unclear. Plaintiff again refers to ORHS and the Peer Review Defendants as acting under color of state law in conducting the peer review—suggesting that he is attempting to bring an as-applied challenge based on conduct of alleged state actors—but he also seeks a broad declaration of unconstitutionality. And, as in Count XIV, the Defendants named in this count are the United States, the NPDB, the Department of Health and Human Services, Region IV, the State of Florida, the Florida Health Department, and the Florida Board of Medicine.

Like Count XIV, Count XV fails to state a cause of action. As in the due process

count, the Court rejects Plaintiff's assertions of state action, so any as-applied challenge—which is the only challenge Plaintiff now claims to be bringing in this count—fails.[50]  Moreover, the challenged statutes do not on their face violate the Equal Protection Clause.  Plaintiff only vaguely asserts that the statutes "treat similarly situated doctors in different ways."  (Id. ¶ 293).  He does not explain how the statutes do so, and the Court cannot discern any equal protection violation in the statutes on their face.  Accord Freilich, 142 F. Supp. 2d at 692 (rejecting equal protection challenge to HCQIA, noting that it "does not make any classifications base on any suspect class (or any other basis for that matter)" and survives rational basis scrutiny).  This claim shall be dismissed with prejudice.

c.  Count XVII

In Count XVII, Plaintiff claims that the reporting requirements of HCQIA violate the Tenth Amendment to the U.S. Constitution, which provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. amend. X.  Plaintiff contends that the reporting amounts to "commandeering [of] state processes" and violates the Constitutional proscription on the federal government requiring officials of the states to take certain actions. (Am. Compl. ¶ 309).  Plaintiff brings this count against all of the Defendants.

Although the Court has strong doubts about Plaintiff's standing to raise a Tenth Amendment challenge, case law in this Circuit precludes the Court from disposing of this

---

[50]Plaintiff's counsel asked that this claim, like the due process claim, be held in abeyance until the issue of immunity is determined.  (See Doc. 199 at 38).  However, the claim fails on the merits.

count wholesale on this basis.[51]   In any event, the Court agrees with Defendants that HCQIA

does not violate the Tenth Amendment.

The parties argue in their papers over the correct application of three Tenth

_____

[51]The Eleventh Circuit has held that private parties have standing to raise Tenth Amendment arguments, though concerns have been expressed in panel opinions about that precedent.  See Seniors Civil Liberties Ass'n, Inc. v. Kemp, 965 F.2d 1030, 1034 n.6 (11th Cir. 1992) ("Because this court has said before that, if injury or threatened injury exists, private parties have standing to assert Tenth Amendment challenges, Atlanta Gas Light Co. v. United States Dep't of Energy, 666 F.2d 1359, 1368 n.16 (11th Cir. 1982), we conclude, with admitted doubts, that the [plaintiffs] have standing to advance this Tenth Amendment claim."); Dillard v. Baldwin County Comm'rs, 225 F.3d 1271, 1283 (11th Cir. 2000) (Barkett, J., concurring specially) ("Based on the precedent of this Circuit, I concur in the majority's conclusion that this case be remanded for further proceedings.  While I have reservations about whether Atlanta Gas & Light Co. . . . and Seniors Civil Liberties Ass'n . . . were correct in saying that private plaintiffs have standing to assert Tenth Amendment claims, I agree that they foreclose Appellees['] arguments in this regard.") (citing Tenn. Elec. Power Co. v. T.V.A., 306 U.S. 118 (1939)), abrogated on other grounds by Dillard v. Chilton County Comm'n, 495 F.3d 1324 (11th Cir. 2007).
In Tennessee Electric Power Co. v. T.V.A., 306 U.S. 118, 144 (1939), the Supreme Court stated that "absent the states of their officers, [the appellants] have no standing in this suit to raise any question under the [Tenth A]mendment," and other circuits have relied on this statement in holding that private parties lack standing.  See Medeiros v. Vincent, 431 F.3d 25, 35 (1st Cir. 2005) (affirming holding that private parties lack standing, relying on TVA and noting that "the Eleventh Circuit's [contrary] precedent commenced without any reference to TVA, and subsequent panels have expressed concern as to whether the omission has resulted in the perpetuation of a circuit precedent inconsistent with TVA."); Oregon v. Legal Servs. Corp., 552 F.3d 965, 972 (9th Cir. 2009) ("Only states have standing to pursue claims alleging violations of the Tenth Amendment by the federal government.") (citing TVA).  But see Gillespie v. City of Indianapolis, 185 F.3d 693, 703 (7th Cir. 1999). In Pierce County v. Guillen, 537 U.S. 129, 148 n.10 (2003), the Supreme Court noted that in light of resolution of case on a different basis, it "need not address the second question on which [it] granted certiorari:  whether private plaintiffs have standing to assert 'states' rights' under the Tenth Amendment where their States' legislative and executive branches expressly approve and accept the benefits and terms of the federal statute in question."

Amendment Supreme Court cases—New York v. United States,[52] Printz v. United States,[53] and Reno v. Condon[54]—to the resolution of this issue.  Additionally, Defendants rely heavily on the determination by the Fourth Circuit Court of Appeals in Freilich—the only circuit court decision on the issue—that HCQIA does not violate the Tenth Amendment.  313 F.3d 205 (4th Cir. 2002).  Plaintiff does not argue that Freilich is distinguishable, but maintains, as he must, that it was wrongly decided.  However, this Court agrees with the Fourth Circuit's analysis and application of the Tenth Amendment case law and accordingly finds no Tenth Amendment violation.  As the Fourth Circuit explained:

> The HCQIA does not commandeer the state legislature or executive.  "It does not require . . . [the Maryland legislature] to enact any laws or regulations, and it does not require state officials to assist in the enforcement of federal statutes regulating private individuals."  The HCQIA does not compel states to implement a federal regulatory program either.  Under the HCQIA, health care providers are required to collect and report information to the State Board of Medical Examiners.  The State Board of Medical Examiners then forwards that information to a federal data bank.   But more is required than the expenditure of time and effort on the part of state officials in order to offend the Tenth Amendment.  "Any federal regulation demands compliance.  That a state wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect."
>
> All that the HCQIA requires of states is the forwarding of information. . . .  In sum, the HCQIA does not come close to offending the Tenth Amendment.

---

[52]505 U.S. 144 (1992).

[53]521 U.S. 898 (1997).

[54]528 U.S. 141 (2000).

313 F.3d at 213-14 (citations omitted) (first alteration in original).  Count XVII fails to state a cause of action.

d.  Count XVIII

Plaintiff alleges in Count XVIII that HCQIA constitutes an impermissible delegation of a governmental function to a private body because it "deprives [him] of his ability to have his case heard in a neutral court" and "[i]nstead . . . provides him . . . with a peer review that can be woefully deficient, fraudulent, malicious, wanton, and oppressive, and without effective ability to remedy that deficient, wrongful process in court."  (Am. Compl. ¶ 313).  He asserts that "HCQIA essentially displaces the public function of adjudication—transferring what was previously a judicial decision to a private enclave in the peer review process."  (Id. ¶ 315). He brings this count against all of the Defendants.  Defendants seek dismissal of this count on the basis that HCQIA does not delegate a governmental function.  The Court agrees with Defendants' position.

Although Plaintiff asserts that "HCQIA turns peer review into a judicial process," (Doc. 134 at 40) and amounts to "wholesale delegation of judicial power to a private body," (Am. Compl. ¶ 314) the statute does no such thing.  As noted earlier in the discussion of Count XIV, the statute does not create peer review or any kind of adjudicative function at all; it merely provides that if a peer review is conducted and if it is conducted in a certain way, those who participate in that review receive a limited immunity—from damages liability only.

Plaintiff argues that HCQIA denies access to courts.  Again, the statute does not do that, and courts have noted that the statute preserves claims for declaratory and injunctive relief while precluding only damages liability where immunity is found to apply.  See, e.g.,

Bryan v. James E. Holmes Reg'l Med. Ctr., 33 F.3d 1318, 1322 (11th Cir. 1994) (noting that HCQIA "attempts to balance the chilling effect of litigation on peer review with concerns for protecting physicians improperly subjected to disciplinary action; accordingly, Congress granted immunity from monetary damages to participants in properly conducted peer review proceedings while preserving causes of action for injunctive or declaratory relief for aggrieved physicians"); cf. Singh v. Blue Cross/Blue Shield of Mass., Inc., 308 F.3d 25, 32-33 (1st Cir. 2002) (rejecting doctor's claim that HCQIA's "statutory presumption of immunity effectively denies him his Seventh Amendment right to a jury trial"). Indeed, Plaintiff has not been denied access to this Court because of HCQIA. He has filed a nineteen-count Amended Complaint, and the deficiencies noted in this Order regarding his asserted claims are not due to HCQIA, nor have any counts been deemed barred by HCQIA. While it is true that if certain facts are ultimately proved, recovery of damages from immune defendants may be barred by HCQIA's conferral of immunity, this result is far from a denial of access to courts that would run afoul of the Constitution. This claim shall be dismissed with prejudice.

### 12.  Count XIX (Civil Conspiracy)

In Count XIX, Plaintiff brings a common law civil conspiracy claim against ORHS and the Peer Review Defendants, contending that these Defendants "conspired against [Plaintiff] in his peer review in order to accomplish their respective personal, professional, political[,] and economic agendas and to assure the current power structure of ORHS." (Am. Compl. ¶ 318). Plaintiff contends that "[t]he object of the conspiracy was to accomplish an unlawful purpose or a lawful purpose by unlawful means, i.e. the removal of [Plaintiff's] privileges at ORMC and Sand Lake through a sham, malicious peer review, the placement of a

permanent stigma on his reputation, and the destruction of his career through various false reports to third parties."  (Id. ¶ 319).

Defendants seek dismissal of this count on several bases, including that ORHS cannot conspire with its own agents and that no underlying tort to support the conspiracy has been pled.[55]  These contentions are addressed in turn.

a.  Hospital Conspiring With Its Own Agents

ORHS relies on Lawler v. Eugene Wuesthoff Memorial Hospital Ass'n, 497 So. 2d 1261 (Fla. 5th DCA 1986), for its argument that a hospital cannot conspire with members of its own staff, just as a corporation cannot conspire with its own directors, officers, and employees.  The Lawler court found conspiracy allegations insufficient where "all of the alleged conspirators were, in one form or another, the agents or actors for the Hospital," and "[t]ermination of Dr. Lawler's staff privileges was an act which had to be done by the defendants as a group, acting for the Hospital."  Id. at 1263.  "Therefore, there was no additional separate individual with whom the Hospital could have conspired."  Id.

Plaintiff acknowledges this rule but points out that an exception has been recognized where "the individual has an independent personal stake, apart from that of the corporation, in achieving the object of the conspiracy."  Greenberg v. Mount Sinai Med. Ctr. of Greater Miami, Inc., 629 So. 2d 252, 256 (Fla. 3d DCA 1993).  Plaintiff contends that his conspiracy claim is within the exception because he has alleged that the Peer Review Defendants "had

---

[55]Defendants also argue that this claim is barred by the economic loss rule.  As noted in the text, Plaintiff will be permitted to replead this claim, and the Court finds it unnecessary to address the economic loss rule argument at this time.

an independent personal stake, apart from that of ORHS, in achieving the object of the conspiracy." (Doc. 134 at 26 (citing Am. Compl. ¶¶ 318-19)).  Plaintiff has alleged that "each of the Peer Review Defendants also acted pursuant to their respective individual interests." (Am. Compl. ¶ 41).

The Court concludes that Plaintiff has—but for the general problem with lumping the "Peer Review Defendants" together—sufficiently alleged that the Peer Review Defendants had independent interests so that they could conspire with ORHS.  Thus, dismissal of this claim is not warranted on the basis of the Defendants being unable to conspire with one another.

### b.  Independent Tort

"A civil conspiracy requires:  (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." Raimi v. Furlong, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997).  "Additionally, an actionable conspiracy requires an actionable underlying tort or wrong."  Id.

As noted by Defendants during oral argument, Plaintiff has not alleged an underlying tort to support the civil conspiracy claim, leaving the defendants "in the position of trying to divine which tort they . . . allegedly conspire[d] to commit."  (Hr'g Tr., Doc. 155, at 26).  Defendants acknowledge that an exception to the independent tort requirement has been recognized where "'the plaintiff can show some peculiar power of coercion possessed by the conspirators by virtue of their combination, which power an individual would not possess.'" (Doc. 107 at 34 n.17 (quoting Churruca v. Miami Jai-Alai, Inc., 353 So. 2d 547, 550 (Fla.

1977)); see also Walters v. Blankenship, 931 So. 2d 137 (Fla. 5th DCA 2006) (noting the exception to the independent tort requirement and reversing dismissal of civil conspiracy count).    However, Defendants correctly note that Plaintiff has not alleged these circumstances in the Amended Complaint.

Plaintiff argues in his response (Doc. 134) that he has alleged facts supporting underlying torts, but Plaintiff has not specified the underlying tort in pleading the civil conspiracy count.  Plaintiff also argues that he has pled facts supporting the "peculiar power" exception to the independent tort requirement, but Plaintiff has not pled this theory in Count XIX.  This count will be dismissed without prejudice and with leave to amend so that Plaintiff can attempt to set forth an actionable civil conspiracy claim that apprises Defendants of the basis of the claim, either by specifying the underlying tort or by alleging an exception to the requirement of an underlying tort, or both.  And, as with all of the claims against the Peer Review Defendants, Plaintiff shall, on repleading, apprise each Defendant of the basis for the claim against him instead of relying solely on collective references.

### III.  Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1.  ORHS's Motion to Dismiss Counts 1, 3-10, and 17-19 of Plaintiff's First Amended Complaint (Doc. 107), which Defendant Bott joins (see Doc. 124), is **GRANTED with prejudice in part and GRANTED without prejudice in part** as set forth herein.

2.  The Motion to Dismiss Counts 1, 3-8, 10-12, and 17-19, or for More Definite Statement (Doc. 108) filed by Defendants Wolfram, Lieberman, Rief, Parks, Csencsitz, and

Hillenmeyer and in which Defendant Bott joins (<u>see</u> Doc. 124) is **GRANTED with prejudice in part and GRANTED without prejudice in part** as set forth herein.

3.   The Motion to Dismiss or, Alternatively, for More Definite Statement (Doc. 109) filed by Defendants Murbach, Appleblatt, Bone, Cole, Moser, Diebel, Evans, Galceran, Rivero, and Wolverine and in which Defendant Bott joins (<u>see</u> Doc. 124) is **GRANTED with prejudice in part and GRANTED without prejudice in part** as set forth herein insofar as it seeks dismissal and is **DENIED as moot** insofar as it seeks a more definite statement.

4.   The Motion to Dismiss by Defendant Florida Department of Health and Defendant Florida Board of Medicine (Doc. 121) is **GRANTED**.  All claims against these Defendants shall be dismissed with prejudice.

5.   The Motion to Dismiss Counts 1, 3-8, 10-12, and 17-19, or in the Alternative to Strike or for More Definite Statement (Doc. 131) filed by Defendants Sanders and Musculoskeletal Institute, Chartered, is **GRANTED with prejudice in part and GRANTED without prejudice in part** as set forth herein insofar as it seeks dismissal and is **DENIED as moot** insofar as it seeks to strike and for more definite statement.

6.   The Motion to Dismiss (Doc. 142) filed by Defendants United States of America, National Practitioner Data Bank, Region IV of the Department of Health and Human Services, and Leavitt is **GRANTED**.  All claims against these Defendants shall be dismissed with prejudice.

7.   Counts I, III, V, VI, VII, XI, XIV, XV, XVI, XVII, and XVIII of the Amended Complaint (Doc. 3) are **DISMISSED with prejudice as to all Defendants**.

8. Counts XII of the Amended Complaint (Doc. 3) is **DISMISSED with prejudice** as against Defendants Appleblatt, Bone, Bott, Cole, Csencsitz, Diebel, Evans, Galceran, Hillenmeyer, Lieberman, Moser, Murbach, Parks, Rief, Rivero, Sanders, Wolfram, Musculoskeletal Institute, Chartered, and Wolverine Anesthesia Consultants, M.D.  This count was not challenged by Defendant ORHS and remains pending against ORHS.

9. Counts IV, VIII, IX, X, and XIX of the Amended Complaint are **DISMISSED without prejudice and with leave to amend**.  Plaintiff may file a second amended complaint realleging these claims **on or before Friday, May 29, 2009**.  If Plaintiff elects to file a second amended complaint Plaintiff shall include in that document the claims from the Amended Complaint (Doc. 3) that were not challenged or addressed in this Order—i.e., Counts II and XIII, as well as Count XII as against ORHS only—so that all claims are contained in one operative complaint.  **If Plaintiff does not file an a second Amended Complaint by the deadline set earlier in this paragraph, the claims as to which leave to amend was granted will be deemed abandoned and will be dismissed with prejudice without further notice**, and the case will proceed on only Counts II and XIII, as well as on Count XII insofar as it pertains to ORHS.

**DONE** and **ORDERED** in Orlando, Florida this 28th day of April, 2009.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record

-64-