UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| RAYMOND H. PIERSON, III and JOANNE R. WERNTZ, | |
| Plaintiffs, | CASE NO.: 6:08-cv-466-ORL-28GJK |
| vs. | |
| ORLANDO HEALTH f.k.a.ORLANDO REGIONAL HEALTHCARE SYSTEMS, INC., ERIK LIEBERMAN, as personal representative of the Estate of Phillip G. Spiegel, ROGER MURBACH, STEVEN APPELBLATT, FRANK BONE, WILLIAM BOTT, THOMAS CSENCSITZ, J. DEAN COLE, JOHN HILLENMEYER, J. DAVID MOSER, N. DONALD DIEBEL, RORY EVANS, MANUEL J. GALCERAN, HEDRICK J. RIVERO, C. GORDON WOLFRAM, ROY W. SANDERS, GREGORY A. RIEF and LINDA G.T. PARKS as copersonal representatives of the Estate of John Connolly, MUSCULOSKELETAL INSTITUTE, CHARTERED, WOLVERINE ANESTHESIA CONSULTANTS, M.D., P.A., | |
| Defendants. | |

**PLAINTIFF'S SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

## I.     PARTIES

1.     Plaintiff Raymond H. Pierson, III, M.D. ("Plaintiff" or "Dr. Pierson"), is an individual who is licensed to practice medicine.  Presently, Dr. Pierson resides and practices medicine in Jackson, California.  At all times relevant to this Complaint, Dr. Pierson was licensed to practice medicine and was practicing medicine in the State of Florida. Dr. Pierson practiced

in Florida through a Professional Association ("P.A."), Raymond H. Pierson, III, M.D., P.A., that he alone owned and controlled.  That P.A., which suffered damages as a result of the wrongful events described herein, has since ceased to exist and is defunct.  Dr. Pierson succeeds to all rights of the P.A. Dr. Pierson sues to recover in his own right, individually, and on behalf of his former P.A.

2.      Defendant Orlando Health f.k.a. Orlando Regional Healthcare System, Inc. ("Defendant ORHS") is a private healthcare network serving Central Florida, with an address of 1414 Kuhl Avenue, MP 1, Orlando, FL 32806. Defendant ORHS is a non-profit corporation organized under the laws of the State of Florida.  Defendant ORHS is comprised of and does business through its seven healthcare facilities in Central Florida, including Orlando Regional Medical Center ("ORMC") and Dr. P. Phillips Hospital (formerly known as, and referred to herein as, "Sand Lake Hospital").  At all times relevant to this Complaint, Dr. Pierson had privileges at ORMC and Sand Lake.  Defendant ORHS's registered agent is John Hillenmeyer.

3.      Defendant Erik Lieberman is the personal representative of the Estate of Phillip G. Spiegel, M.D. ("Spiegel") deceased.  Prior to his death, Dr. Spiegel was a medical doctor licensed to practice in the State of Florida.  His principal place of business was 5802 North 30th St., Tampa, Florida.

4.      Defendant Roger Murbach, M.D. ("Defendant Murbach") is a medical doctor licensed to practice in the State of Florida.  Defendant Murbach's specialty is anesthesiology.  At all times and for all purposes relevant to this Complaint, Defendant Murbach was a member of the medical staff of ORHS and an agent of ORHS.  Defendant Murbach resides in

Windermere, Florida at 1449 Kelso Blvd., and his principal place of business is located in Orlando, Florida at 400 N. Mills Avenue.  At all times relevant to this Complaint, Defendant Murbach was associated with, employed by, and/or acted as an agent of Defendant Wolverine Anesthesia Consultants M.D., P.A. ("Defendant Wolverine") at 400 N. Mills Ave., Orlando, Florida.

5.      Defendant Steven Appleblatt, M.D. ("Defendant Appleblatt") is a medical doctor licensed to practice in the State of Florida.   Defendant Appleblatt's specialty is anesthesiology.  At all times and for all purposes relevant to this Complaint, Defendant Appleblatt was a member of the medical staff of Defendant ORHS and an agent of Defendant ORHS.  Defendant Appleblatt his principal place of business is 400 N. Mills Ave., Orlando, Florida.  At all times relevant to this Complaint, Defendant Appleblatt was associated with, employed by, and/or acted as an agent of Defendant Wolverine.

6.      Defendant Frank Bone, M.D. ("Defendant Bone") is a medical doctor licensed to practice in the State of Florida.  At all times relevant to this Complaint, Defendant Bone was a member of the medical staff of Defendant ORHS and an agent of Defendant ORHS. Defendant Bone resides in Orlando, FL at 113 Poinsettia Ave., and his principal place of business is 86 West Underwood St. in Orlando, Florida.

7.      Defendant William Bott, M.D. ("Defendant Bott") is a medical doctor licensed to practice in the State of Florida.  Defendant Bott's specialty is orthopedic surgery.  At all times relevant to this Complaint, Defendant Bott was a member of the medical staff, and an agent of Defendant ORHS, while maintaining an orthopedic practice offering orthopedic services at 506 Ocoee Commerce Parkway, Ocoee, Florida, which is in the same geographic

area and has the same referral base as does Dr. Pierson's practice.  Bott resides in Orlando, Florida 2605 Nela Ave. and his principal place of business is located in Jacksonville, Florida at 2080 Child Street.

8.      Defendant Thomas Csencsitz, M.D. ("Defendant Csencsitz") is a medical doctor licensed to practice in the State of Florida.  Defendant Csencsitz specializes in orthopedic surgery.  At all times relevant to this Complaint, Defendant Csencsitz was a member of the medical staff of Defendant ORHS and an agent of Defendant ORHS.  Defendant Csencsitz also maintained an orthopedic practice offering orthopedic services at 22 W. Underwood in Orlando, Florida, in the same geographic area and with the same referral base as Dr. Pierson's practice.  Defendant Csencsitz resides in Orlando, FL at 1660 Waterwitch Dr. and his principal place of business is located at 22 W. Underwood in Orlando, Florida.

9.      Defendant J. Dean Cole, M.D. ("Defendant Cole") is a medical doctor licensed to practice in the State of Florida.  Defendant Cole specializes in orthopedics.  Defendant Cole was at all times alleged herein a member of the medical staff of ORHS and an agent of ORHS while maintaining an orthopedic practice offering orthopedic services in Orlando, Florida, the same geographic area and with the same referral base as Dr. Pierson.  Defendant Cole resides at 2501 N. Orange Ave. No. 340, Orlando, FL and his principal place of business is in Orlando, Florida.

10.     Defendant John Hillenmeyer ("Defendant Hillenmeyer") is the President and Chief Executive Officer of Defendant ORHS.  At all times relevant to this Complaint, Defendant Hillenmeyer was the President and CEO, and an agent and employee, of Defendant ORHS.

Defendant Hillenmeyer's principal place of business is 1414 Kuhl Avenue, MP 1, located in Orlando, Florida.

11.     Defendant J. David Moser, M.D. ("Defendant Moser") is a medical doctor licensed to practice in the State of Florida.  At all times relevant to this Complaint, Defendant Moser was a member of the medical staff and an agent of Defendant ORHS.  Defendant Moser resides in Orlando, Florida at 9016 Great Heron Circle and his principal place of business is located at 1717 South Orange Avenue Orlando, Florida.

12.     Defendant N. Donald Diebel, M.D. ("Defendant Diebel") is a medical doctor licensed to practice in the State of Florida.  At all times relevant to this Complaint, Defendant Diebel was a member of the medical staff of Defendant ORHS and an agent of Defendant ORHS.  Defendant Diebel resides 1150 Via Lugano, Winter Park, Florida and his principal place of business is at 1551 Clay St. in Winter Park, Florida.

13.     Defendant Rory Evans, M.D. ("Defendant Evans") is a medical doctor licensed to practice in the State of Florida.  Defendant Evans specializes in orthopedics.  At all times relevant to this Complaint, Defendant Evans was a member of the medical staff of Defendant ORHS and an agent of ORHS.  Dr. Evans also maintained an orthopedic practice offering orthopedic services 200 West Gore St., Orlando, Florida, which is in the same geographic area and has the same referral base as Dr. Pierson's practice.  Defendant Evans resides at 621 Dunman Circle in Winter Springs, Florida.

14.     Defendant Manuel J. Galceran, M.D. ("Defendant Galceran") is a medical doctor licensed to practice in the State of Florida.  At all times relevant to this Complaint, Defendant Galceran was a member of the medical staff of ORHS and an agent of Defendant ORHS.

Defendant Galceran resides at 8593 Summerville Place, Orlando, Florida and his principal place of business is at 7051 Dr. Phillips Blvd. located in Orlando, Florida.

15.     Defendant Hedrick J. Rivero, M.D. ("Defendant Rivero") is a medical doctor licensed to practice in the State of Florida.  At all times relevant to this Complaint, Defendant Rivero was a member of the medical staff of Defendant ORHS and an agent of Defendant ORHS. Defendant Rivero resides at 8096 Desmond Drive, Boynton Beach, Florida, and his principal place of business is at 20 West Kaley St. located in Orlando, Florida.

16.      Defendant C. Gordon Wolfram, M.D. ("Defendant Wolfram") is a medical doctor licensed to practice in the State of Florida.  At all times relevant to this Complaint, Defendant Wolfram was a member of the medical staff of Defendant ORHS and an agent and employee of Defendant ORHS.   Defendant Wolfram resides at 1020 Campbell St., Orlando, Florida.

17.     Defendant Roy W. Sanders, M.D. ("Defendant Sanders") is a medical doctor licensed to practice in the State of Florida.  Defendant Sanders specializes in orthopedics.  At all times relevant to this Complaint, Defendant Sanders was a member of the medical staff of Defendant Musculoskeletal Institute, Chartered d/b/a Florida Orthopedic Institute ("Defendant FOI"), an officer and/or director of Defendant FOI, and an employee and/or agent of Defendant FOI.   Dr. Sanders also maintained an orthopedic practice offering orthopedic services at 13020 Telecom Parkway, which is in the same region as Dr. Pierson's practice and has an overlapping Level One orthopedic trauma referral base. Defendant Sanders resides at 3611 South Beach Drive in Tampa, Florida.

18.     Gregory A. Rief and Linda G.T. Parks are the Co-Personal Representatives of the Estate of John Connolly, M.D. ("Defendant Connolly"), deceased.   Prior to his death,

Defendant Connolly was a medical doctor licensed to practice in the State of Florida. Defendant Connolly specialized in orthopedic surgery.  At all times relevant to this Complaint, Defendant Connolly was a member of the medical staff of Defendant ORHS and an agent of Defendant ORHS.  Dr. Connolly also maintained an orthopedic practice offering orthopedic services in the same geographic area and with the same referral base as Dr. Pierson's practice.

19.     Defendant Wolverine Anesthesia Consultants M.D., P.A., is a professional association doing business in the State of Florida.  At all times relevant to this Complaint, Defendant Wolverine acted through its agents Defendant Murbach and Defendant Appleblatt, who, upon information and belief, are members and/or principals with ownership interests in Defendant Wolverine.  At all times relevant to this Complaint, Defendant Wolverine had an exclusive medical provider contract with Defendant ORHS to provide anesthesiology services to ORMC and Sand Lake.  Defendant Wolverine's principal place of business is at 400 North Mills Ave. in Orlando, Florida.

20.     Defendant Musculoskeletal Institute, Chartered d/b/a Florida Orthopedic Institute ("Defendant FOI"), is a corporation doing business in the State of Florida. On information and belief, at all times relevant to this Complaint, Defendant FOI acted through its agents and employees.  Defendant FOI's principal place of business is located 13020 Telecom Parkway in Temple Terrace, Florida.  Defendant FOI's registered agent is Joyce B. Anderson.

## II.      JURISDICTION AND VENUE

20.     This Court has jurisdiction over the case under 28 U.S.C. §1332(a).  Dr. Pierson is a California citizen.  All of the named defendants are Florida citizens or corporations. Accordingly, complete diversity exists.  *See* 28 U.S.C. §1332(a).  Further, the amount in controversy as alleged exceeds $75,000, excluding interest and costs.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (a) because defendants Spiegel, Sanders and FOI reside in this judicial district and all defendants reside in the State of Florida.  Moreover, a substantial part of the events giving rise to Dr. Pierson's claims occurred in this judicial district.

## III.      FACTS

22.     Dr. Pierson graduated from Temple University School of Medicine in May 1980. He then interned at the Harbor-UCLA Medical Center in Los Angeles, California. This internship was followed by one year as an emergency room physician at Phoenixville Hospital in suburban Philadelphia.  In July 1982, Dr. Pierson entered a four-year orthopedic surgery residency program in New York City at the Hospital for Special Surgery – Cornell University Medical Center, which he completed on June 30, 1986.  Dr. Pierson's residency program was followed by an Adult Reconstruction Fellowship (Total Joint Replacement Surgery Fellowship), and then a limited traveling fellowship in sports medicine at the Cincinnati Sports Medicine Center.

23.     Dr. Pierson then became a member of University Orthopedics and the academic teaching staff at Rush Medical College.  Dr. Pierson remained in this academic medical practice for six and a half years post-fellowship, achieving the rank of assistant professor.

24.     After serving as both an assistant professor of orthopedic medicine and a practicing orthopedic surgeon in Chicago, in November 1993, Dr. Pierson moved, to Orlando where his wife, Dr. Joanne Werntz, had a solo private practice.

25.     In early 1994, Dr. Pierson began the process of creating a management services organization/independent provider association ("MSO/IPA").  Establishing this organization, establishing a new practice, and spending time with his loving family were among his top priorities as he began his life in Orlando.

26.     On or about July 1994, Dr. Pierson put significant efforts into developing, marketing and growing the MSO/IPA, which would later be called The Physician Patient Alliance™ ("PPA").

27.      Dr. Pierson sought to join a hospital medical staff to use his talents to alleviate the suffering of injured patients in Central Florida.  Dr. Pierson also looked to gain revenue and to increase the number of patients in his practice by taking trauma and emergency orthopedic call in a hospital setting.

28.     After learning of ORHS and its trauma facilities which provided orthopedic surgeons the right to take trauma and emergency call as part of joining the medical staff, in early 1995 Dr. Pierson applied for and was granted privileges as a member of the ORHS medical staff. Dr. Pierson was bound by the Medical Staff Bylaws at that time and was included on the orthopedic trauma and emergency call schedules at both ORMC and Sand Lake.   Dr. Pierson's inclusion in the emergency and trauma call rotation was crucial to the development of his orthopedic surgery practice in Orlando.

29.     At that time, Dr. Pierson made approximately sixty (60) percent of his income by taking trauma and emergency call.

30.     Dr. Pierson retained professionals to compose a business plan.  He retained marketing firms to devise a name, settled upon The Physician Patient Alliance™ ("PPA"), and filed for a trademark on December 11, 1995.  He also retained an artist to devise a logo.  The name and logo were based upon his concept of the organization as one that provided the most cost effective advanced medical care to patients while simultaneously striving for the highest level of patient satisfaction. The PPA's mission would be effectuated in part by supporting physicians who were independent of hospital systems, and providing the infrastructure for creating a network of physicians who could contract their services as a group to insurance carriers covering the Central Florida region within an 80 mile radius of Orlando, as initially envisioned, with plans to expand as growth allowed.

31.     Dr. Pierson worked extensively to develop a group purchasing organization (GPO) for the PPA. Dr. Pierson retained Ms. Gail Lippit for one year during an initial phase of development.  In the development of the GPO, Dr. Pierson recruited Mr. Marc Westerman, the Corporate Director of Purchasing Operations at ORMC, and reached advanced stages of employment negotiations with Mr. Westerman to run the GPO.

32.      Dr. Pierson retained both a marketing organization Slaughter Hanson in Alabama, and later a private group of executives/employees with DDB Needham in Chicago who developed marketing plans and materials.  Dr. Pierson and Dr. Werntz then began advertising themselves as members of the PPA, marketed the organization extensively and met with doctors individually about the PPA, including Defendants Csencsitz, Evans, Wolfram, Bott,

and Cole.  Dr. Pierson and Dr. Werntz also purchased significant advertising space in the Yellowpages in the physician and orthopedics sections.

33.     The PPA had plans to construct a multi-use medical office building.  Dr. Pierson signed a contract and provided earnest money for the purchase of the former Braun Cadillac location in Orlando that was to be the site of the PPA.   Negotiations with real estate attorneys, developers, and the bank that owned the property took place.

34.     The PPA's most significant asset was its access to advanced medical information technology platform – WinSquared (later known as Caretools).   Dr. Pierson invested substantial funds hiring a consultant to improve the software.  WinSquared and Dr. Pierson agreed that if Dr. Pierson, with the consultant's expertise to guide the development of an optimized practice management module of the software, WinSquared would provide Dr. Pierson exclusive, unrestricted access to the software for an 80 mile radius around Orlando (specified in an attachment to the agreement).  This software was to serve as the integrated information technology platform for the PPA, and be accessible to all PPA physicians.  This opportunity with WinSquared/Caretools began in August of 1995 and continued until late 1997/early 1998, during which time Dr. Pierson provided the consultant with multiple incremental payments of $10,000.00 for each payment.  Dr. Pierson and Dr. Werntz also purchased access to Pivitol, relationship management software, acting as a compliment to WinSquared.

35.     Dr. Pierson's growing, profitable practice, and investment in the PPA were threatened sometime before May of 1996, and ultimately thwarted.  Dr. Pierson's efforts to grow and implement the PPA were effectively stopped when his emergency and trauma call was

summarily suspended by Defendant Hillenmeyer, on behalf of ORHS, in November 1996.

From that point forward, all of Dr. Pierson's financial resources were directed to his efforts

to defend against the baseless actions and sham reviews being taken against him completely

unrelated to his clinical competency or quality of care. Financial resources that would

previously have been utilized by Dr. Pierson for development and growth of the PPA were

necessarily redirected to the payment of attorneys' fees and costs for legal representation

related to the above.

36.     Despite ORHS generated evidence of optimal outcomes in Dr. Pierson's patient care,

ORHS staff and anesthesiologists, including Defendants Murbach and Appleblatt, were

resistant to Dr. Pierson's treatment approach. Dr. Pierson provides early, humane surgical

intervention for acute surgical orthopedic cases using the most current techniques. Dr.

Pierson is a strong advocate for patients, and wanted to perform surgery at ORHS hospitals in

a manner that produced the best possible results for his patients.

37.     When patients presented with difficult or complicated surgeries, Dr. Pierson exercised

due care in taking the amount of time reasonable and necessary for the patient to have the

best possible recovery. Dr. Pierson also preferred to treat acutely injured orthopedic patients

with urgent and/or emergent orthopedic problems as quickly as possible at ORHS hospitals.

As a result, Dr. Pierson sometimes began surgery in the late evening or early morning hours

(so long as an operating room was available and no competing higher severity case that may

have required higher priority treatment was present, and the patient had no significant

medical or surgical contraindiciations), which did not violate any hospital rule or policy.

38.     Medical literature has established that early surgical treatment offers the best opportunity for a full recovery with a minimum risk for complications for acute orthopedic injuries in most patients.

39.     As a result of Dr. Pierson's conscientious care, his patients had better than average recovery time.  Specifically, a "Severity Adjusted Profile," produced by the hospital, for the year 1996 (the time period relevant to the patients reviewed as part of the sham review) demonstrated that Dr. Pierson's patient treatment represented the "best comparison" relative to all other orthopedic surgeons of ORHS.  The "best comparison" data showed that Dr. Pierson's patients went home a full one day earlier than did the patients of any other orthopedic surgeon then practicing at ORHS, and went home two days earlier than the average for all orthopedic surgeons practicing at ORHS, four days earlier than the state average of other treating orthopedic surgeons, with no evidence that Dr. Pierson's method of care significantly increased the cost structure for ORHS to provide this level of care.

40.     However, ORHS staff and anesthesiologists, including Defendants Murbach and Appleblatt, were resistant to surgeries being performed in the late evening or early morning hours because of issues of personal convenience.

41.     The anesthesiologists were resistant despite the fact that both ORMC, the only Level One Trauma Center in Central Florida, and Sand Lake were able to handle cases 24 hours a day, and fully able to treat acutely injured patients immediately.  However, at no point did any of the anesthesiologists, ORHS staff, or ORHS administration suggest to Dr. Pierson that the timing or length of his surgeries was inappropriate.

42.     Defendant Wolverine Anesthesiologists, including Defendants Murbach and

Appleblatt, have an exclusive contract to provide 24-hour anesthesiology services to ORHS hospitals.  Regardless of the time of day a surgery is performed, orthopedic surgeons must rely on using Wolverine Anesthesiology personel, who receive compensation for the procedures.

43.    Sometime before May 8, 1996, anesthesiologists, including Defendant Murbach, covertly contacted the Defendant Bott, Chair of Orthopedic Surgery Deptartment at ORMC, and Defendant Csencsitz Vice-Chair of Orthopedic Department of ORHS, complaing that Dr. Pierson performed surgeries late at night and early in the morning.  The anesthesiologists also complained about the duration of Dr. Pierson's operative cases.

44.    In May 1996, unbeknownst to Dr. Pierson, Defendant Diebel, Chief of Staff at ORMC, received two letters from Defendants Bott and Csencsitz respectively, dated May 8, 1996, falsely alleging concerns with Dr. Pierson's surgical management of trauma cases[1]. Both letters raised concerns about Dr. Pierson's treatment of emergency patients, specifically his late night/early morning surgery times and that Dr. Pierson's surgeries took too long. Defendants Bott and Csencsitz cited the anesthesiologists as a genesis of the letter.

45.    Without Dr. Pierson's knowledge, following receipt of the letter from Defendants Bott and Csencsitz, Defendant Diebel contacted Defendant Murbach to initiate an investigation into Dr. Pierson's practice.

46.    According to Article V, Part C, Section 2 (d) and (e) of the Medical Staff Bylaws, the Credentials Committee (CC) is supposed to review all information available regarding the professional and clinical competence of staff members, their care and treatment of patients,

_____

[1] See infra paragraph ___

and make a recommendation for granting, reducing, or withdrawing of privileges, reappointments, and changes in the assignment of staff members to the various departments. The CC also reviews reports from any hospital committee about the clinical privileges of medical staff members, and reports directly to the Medical Executive Committee (MEC), which is the top committee at the hospital.

47.     Defendant Moser, Chairman of the CC, was asked by Defendant Diebel to appoint an Investigation Committee.  On May 21, 1996, Defendant Moser, through his authority as the head of the CC, appointed an Investigation Committee (IC) consisting of Defendants Bone, Galceran, and Rivero to investigate Dr. Pierson.  At this time, Dr. Pierson was unaware of the investigation.   Defendants Bone, Galceran, and Rivero then selected orthopedic surgeons Defendants Bott, Connolly, and Evans to review certain of Dr. Pierson's patient charts.  The orthopedic physicians selected had inherent conflicts of interest because they were direct economic competitors with Dr. Pierson.

48.     Their status as economic competitors should have prevented their participation in the review in the first place.

49.     Dr. Moser later admitted that at the request of the IC direct competitors of Dr. Pierson were used to evaluate Dr. Pierson patient charts in a review at the request of the IC.

50.     Upon information and belief, Defendants Evans, Bott, and Connolly were biased and predisposed against Dr. Pierson for reasons in addition to economic competition.

51.     Upon information and belief, Defendant Evans was biased and predisposed against Dr. Pierson because Defendant Evans had a strong relationship with Defendant Cole and supported Defendant Cole's efforts to have a majority of the trauma cases at ORHS referred

to Cole.  This bias is demonstrated through Evan's resistance to Dr. Pierson's efforts to work out a shared call arrangement for referrals from Evans to Dr. Pierson and other non-aligned independent orthopedic surgeons.  Evans exhibited this resistance over the course of discussions beginning in the spring of 1994 between Dr. Pierson, Dr. Werntz, Defendant Evans, and Dr. Schroeder, Defendant Evans' practice partner.  Further, Defendant Evans was aware of Dr. Pierson's efforts to develop the PPA, which would directly compete with Evans' practice group as well as with Vitacare, Inc.   – a management services organization/independent provider association for which Defendant Evans was a member of the board of directors and with which Evans and his practice partner were participating physicians.

52.     Upon information and belief, Defendant Bott was biased and predisposed against Dr. Pierson because of Bott's misrepresentation of the surgical time for a case referenced in Bott's May 8, 1996 letter to Defendant Diebel in which Bott made complaints against Dr. Pierson.  Defendant Bott was biased against Dr. Pierson because Defendant Bott did not understand or was not familiar with the techniques or methods employed by Dr. Pierson in his cases and, rather than reviewing the medical literature or trying to understand those techniques or methods Bott falsified the real surgical times of Dr. Pierson's cases.

53.     Upon information and belief, Defendant Connolly was biased and predisposed against Dr. Pierson because of a past and ongoing adversarial relationship between Defendant Connolly and Dr. Pierson's wife, Dr. Werntz.  Because of bad personal relations, when Dr. Pierson first joined the medical staff, Defendant Connolly failed to appear for a meeting scheduled to take place at his office between himself and Dr. Pierson regarding Dr. Pierson's

assistance with the residency program.  Subsequently, Dr. Connelly made no attempt to reschedule the meeting and avoided any discussion with Dr. Pierson, an assistant professor from a highly rated Midwest orthopedic surgery program, about how Dr. Pierson could contribute to the residency program at ORHS.

54.     Defendants Bott, Connolly, and Evans reviewed a selection of Dr. Pierson's patient charts hand-picked by ORHS employees.  The three Defendants then wrote review forms of ratings and comments containing several false statements and erroneous conclusions regarding Dr. Pierson's surgical technique, surgical judgment, methods and practice, operative durations, operating times, and surgical decisions.[2]  ORHS administrative staff member Lynn Burcham assembled a summary of the ratings and comments, including false statements and erroneous conclusions contained therein, by "cutting and pasting" a random selection of comments from the reviews.  In many of the cases rated by the Defendant reviewers, there were significant disparities in the ratings given by the three reviewers who, due to their demonstrable lack of orthopedic trauma surgery experience, often misstated the procedure(s) being reviewed.

55.     The Defendant reviewers lacked knowledge about evolving concepts in modern orthopedic trauma management, and were unaware of the relevant standard of care documented in the orthopedic literature at the time of their scant reviews.  Defendant reviewers consistently misrepresented the applicable standard of care.

56.     Furthermore, at the time that Defendant Evans reviewed Dr. Pierson's cases, Evans was not participating in the ORMC trauma call rotation.  As a consequence of his limited

---

[2] See *infra* Defamation Count for statements.

trauma and emergency practice, Evans lacked exposure to the types of severely injured patients whose care by Dr. Pierson he was being asked to review.

57.     On October 21, 1996, the IC met for the third time, after already meeting twice in Dr. Pierson's absence and without his knowledge, and was presented with the summary about Dr. Pierson's treatment of patients.  Dr. Pierson was not afforded an opportunity to speak with the Defendant reviewers or the IC that appointed them; at this time he had still not been informed of the investigation.

58.     On October 21, 1996, following the meeting, the IC issued a report to the CC.  The IC noted the variance in ratings, but adopted the reviewers' conclusions as their own.  Notably, in spite of material ratings variance and the false misrepresentations of facts by the Defendant reviewers, Defendant Galceran, Chairman of the IC, admitted during the peer review proceeding that the IC did not significantly review any patient charts in connection with their investigation of Dr. Pierson.   The IC did not perform its assigned task to investigate Dr. Pierson's clinical competence.   Medical Staff Bylaws Article VII, Part E Section 1 (a).

59.     The IC asked for an outside review of the cases, and proceeded to recommended that Dr. Pierson be summarily suspended in the interim and removed from the emergency and trauma call schedule "due to the increased number of trauma patients who have had an extended operating time."

60.     However, the Defendant reviewers' statements about the length of Dr. Pierson's surgeries were false.

61.     The IC's recommendation to suspend Dr. Pierson's emergency and trauma call privileges did not include any statement of concern that Dr. Pierson somehow posed or could in the future pose, an immediate threat to patient care or safety in the hospital necessitating a summary suspension as required by the Medical Staff Bylaws Article VII, Part E Section 1 (a).

62.     The IC report and recommendation also did not state that a failure to suspend Dr. Pierson's emergency and trauma call would somehow impede the effective operation of the hospital.

63.     Dr. Pierson was not removed from emergency and trauma call and consulting for more than one month after the IC issued its recommendation on October 21, 1996, and continued treating patients while providing ER and trauma call during this time.

64.     This delay demonstrates that a summary suspension was absolutely unnecessary, unjustified, and unrelated to any alleged immediate threats to patient care or disruption of orderly hospital operations.

65.     Dr. Pierson was never notified during the five-month course of the initial investigation that Defendants had concerns about the length of his surgeries and the times at which they were scheduled, nor was he given any opportunity to be heard.  To the extent that anyone at Defendant ORHS was truly concerned about Dr. Pierson's "clinical competence," not one person at ORHS ever approached him with those concerns before he was removed from trauma and emergency call and consulting.

66.     On November 25, 1996, in a meeting with Defendants Moser and Bott, Defendants informed Dr. Pierson that he was under investigation, and that his trauma and emergency call would be summarily suspended pending the completion of the current investigation.

67.     On December 3, 1996, Defendant Hillenmeyer wrote to Dr. Pierson informing him of his suspension.  Defendant Moser, in his role as Chief of Staff, concurred with the letter and authorized Dr. Pierson's suspension.

68.     Defendant Hillenmeyer's letter did not address whether suspending Dr. Piersons' privileges and precluding him from consulting on trauma and emergency patients would serve or protect patient care or interests.

69.     Dr. Pierson then requested a hearing pursuant to the Bylaws.

70.     ORHS maintained, through a letter by its legal counsel, that Dr. Pierson was not entitled to a hearing. ORHS's denial of Dr. Pierson's request for a hearing violated the Bylaws, Article VIII Part B Section 2, which provide the right to a hearing upon the reduction of a staff member's privileges.

71.     The suspension of Dr. Pierson's ability to take trauma and emergency call reduced his income, harmed his reputation, and impaired his ability to develop an orthopedic practice in Central Florida.  The summary suspension of his emergency and trauma call also severely compromised Dr. Pierson's efforts to develop the PPA because it effectively eliminated Dr. Pierson's practice as a funding source for development of the PPA.

72.     Upon receiving notice of his suspension, Dr. Pierson immediately requested a hearing under the Bylaws due to the restriction of his continued ability to taking trauma and emergency call.  ORHS denied his request.

73.     Pursuant to the Bylaws Article VIII, Part B, Section 1, Dr. Pierson should have also been provided notice that he was entitled to a hearing.

74.     Upon information and belief, Defendant Cole suggested to Defendant Moser that Defendant Spiegel be retained by Defendant ORHS to provide the "outside" review of Dr. Pierson's cases.  Defendant Cole had trained in orthopedics under Defendant Spiegel and knew that Defendant Spiegel was biased toward Dr. Pierson would provide a review of Dr. Pierson's cases, if ORHS so desired, that was favorable to the hospital and that ORHS could use in its quest to permanently restrict Dr. Pierson's emergency and trauma call.

75.     Defendant Moser then retained Defendant Spiegel to perform a review of cases hand-picked by the hospital.  Defendant Moser admitted that one concern of his in selecting a peer reviewer was the need to select a doctor who was still doing surgery and was current with respect to a clinical practice – so the doctor would "have the ability to review current standards of care. . . ."  Despite Dr. Moser's concerns, at the time of his review, Dr. Spiegel had not performed surgery for over eight (8) years.

76.     Spiegel was employed by Defendant FOI at least until 1994, before the investigation against Dr. Pierson began.  Following the end of his direct employment with Defendant FOI, Defendant Spiegel continued, on information and belief, a contractual relationship with FOI until 1999 (a time period relevant to his reviews provided in this peer review matter), participated in seminars and lectures sponsored by Defendant FOI and maintained contact with Defendant FOI and its physicians.  Defendant Spiegel was directly supervised by Defendant Sanders in that capacity.  Defendant Spiegel also used FOI cases in his rebuttal report to criticize Dr. Pierson's care and treatment of patients.  Through his connections with

Defendant FOI, Defendant Spiegel was aware of Dr. Pierson's open and legitimate criticism of Defendant FOI's plans for a state-wide orthopedic surgery independent provider association.

77.     On information and belief, Defendants Cole, Sanders and Spiegel were aware of the impact Dr. Pierson's comments had on FOI's attempts to create a state-wide orthopedic surgery independent provider association.  Further, Cole and Sanders were present when Dr. Pierson spoke out against FOI's proposed independent provider association and were both noticeably impacted by the effect Dr. Pierson's legitimate criticisms had on the group of orthopedists to whom FOI presented its proposal.

78.     On February 6, 1997, Spiegel submitted a 91 page report titled "ORHS Peer Review January 8/9, 1997" (the "Spiegel Report)."  The Spiegel report contained various misrepresentations of facts concerning Dr. Pierson's patient charts and false statements regarding Dr. Pierson's surgical technique, surgical judgment, methods and practice, the durations and timing of operations that he performed, and/or surgical decisions.[3]

79.     Between July 1997 and January 13, 1998, Dr. Pierson provided the IC with a detailed report, and review of the medical charts, focused on drawing out and explaining the gross mischaracterizations and factual inaccuracies that were stated in the initial ORHS in-house review and the Spiegel Report, and which formed the basis for the ORHS in-house reviewers' and Spiegel's false assertions that Dr. Pierson was not clinically competent to participate in emergency and trauma call and consulting.   Dr. Pierson's report provided detailed explanations for his treatment approach and surgical technique, which demonstrated that his

---

[3] See *infra* Defamation Count for specific statements.

care of orthopedic trauma patients was reasonable, fully supported, and well within the applicable standard of care.

80.     After Dr. Pierson provided the IC with his report and legitimate concerns about the Spiegel Report, the IC requested a second, "unbiased" review by an academic medical reviewer, noting that, while it could address administrative concerns, clinical areas of concern were outside its field of knowledge.

81.     Dr. Pierson immediately made a request to the IC that he be permitted to assist in choosing the second outside reviewer.  His request went unanswered.

82.     Unbeknownst to Dr. Pierson, Moser denied the IC's request for a second academic review by an "unbiased" medical school instructor and instead enlisted the biased and predisposed Spiegel to rebut the evidence and medical literature Dr. Pierson provided to the IC in support of his practice methods, surgical judgment, technique and management of trauma cases.

83.     In July 1998, ORHS's attorney finally informed Dr. Pierson and his counsel that Spiegel would be reviewing the materials submitted to the IC by Dr. Pierson.  Eleven months after receipt of Dr. Pierson's report, the Spiegel Rebuttal was provided to Dr. Pierson on November 30, 1998.

84.     The Spiegel Rebuttal (Spiegel's second report) was four volumes of hundreds of pages that further significantly misrepresented the facts as to Dr. Pierson's treatment of patients and misrepresented the applicable medical literature.[4]   The Spiegel Rebuttal was intended to overwhelm Dr. Pierson in his efforts to put before the IC the true facts of his

---

[4] See *infra* Defamation Count for specific statements.

patient care and treatment, facts which plainly showed Dr. Pierson to be competent as an orthopedic trauma surgeon, and the relevant medical literature.

85.     Upon receipt of the Spiegel Rebuttal, Dr. Pierson realized that a response to the Spiegel Rebuttal was necessary to address each of the factual inconsistencies and false assertions therein.   Dr. Pierson also realized that a response of that nature would be incredibly time consuming and would further exhaust his personal and financial resources.

86.     On December 3, 1998, Defendant Wolfram requested a meeting with Dr. Pierson in furtherance of the directive from the leadership committee.   During the meeting, Wolfram told Dr. Pierson that he had conducted his own review of materials and Wolfram told Dr. Pierson that he believed that Dr. Pierson had done nothing wrong in his treatment of patients, and that he believed no patient suffered adversely from Dr. Pierson's care.

87.     Wolfram further intimated that Defendant Csencsitz had expressed the opinion to the Credentials Committee that Dr. Pierson had done nothing wrong and was a good orthopedic surgeon.   Wolfram noted that Csencsitz opined that the conclusions presented in Spiegel's Report were incorrect in some areas and controversial in others.

88.     While Wolfram freely expressed to Dr. Pierson his opinions that the review was unfounded and that Dr. Pierson had done nothing wrong, Defendant Wolfram, a ORHS employee with the authority to represent the hospital system, told Dr. Pierson that the hospital was facing 16 million dollars in losses and did not want Dr. Pierson to perform surgery at late hours.   During that conversation, Defendant Wolfram attempted to persuade Dr. Pierson to stop performing surgery late in the evening or in the early morning hours and stated that there would be no need to report him to the National Practitioner's Data Bank if he voluntarily stopped

performing nighttime surgery and permanently removed himself from trauma and emergency call.

89.     After the meeting, Defendant Wolfram did nothing to call the sham review into question or raise with ORHS issues about the wrongful conclusions being drawn in the sham review, or relay to the reviewers or ORHS that Dr. Pierson had not adversely affected any patient and that Dr. Pierson was a good orthopedic surgeon.

90.     Approximately two weeks after the meeting, in a letter December 18, 1998, Defendant Csencsitz, then Chairman of the Credentials Committee, informed Dr. Pierson that the Investigation Committee would not provide Dr. Pierson with the time necessary to address the false statements in the Spiegel Rebuttal, and, in essence, the Investigation Committee was satisfied with having two Defendant Spiegel reports, to Dr. Pierson's one report.  Defendant Csencsitz then added that any "comments" Dr. Pierson wished to provide should be submitted no later than Friday, January 22, 1999.

91.     Dr. Pierson wrote Defendant Csencsitz asking for more time stating that there was no way possible to respond to the Spiegel Rebuttal by January 22, 1999.   In separate communications, Defendants Galceran and Csencsitz replied to Dr. Pierson's request by stating that Dr. Pierson could submit information if he desired, but that the IC was  satisfied with the information it had (the two Defendant Spiegel reports, to Dr. Pierson's one report), and the IC was going to proceed with a "final" report to the CC.

92.     On July 1, 1999, the IC made another report and recommendation to the CC.  While the medical literature Dr. Pierson cited clearly shows a difference in professional opinion as to case management and technique as well as support for Dr. Pierson's surgical judgment,

management and technique, the IC disregarded that literature in favor of adopting the ORHS

reviewers' disparate findings and Spiegel's Report and Rebuttal as the standard of care for Dr.

Pierson's cases.

93.    This misrepresented "standard of care" became the basis by which Dr. Pierson's

competence was judged and the foundation for the adverse actions taken by the Defendants.

94.    The IC recommended in its report that Dr. Pierson's privileges remain suspended.

The CC rubber-stamped this recommendation in its report to the MEC.  On August 30, 1999,

the MEC recommended that Dr. Pierson should be excluded from trauma call and emergency

department call, and also that peer review or monitoring for surgical scheduling time, length

of surgery, and prompt dictation of operative notes be conducted on an ongoing basis.

95.    The IC's report alleged deficiency in dictation of operative notes.  Dr. Pierson did not

receive any administrative suspensions for failing to complete patient medical records.

96.     The Physician Bylaws, Rules and Regulations govern the procedures for creating and

maintaining patient medical records.   According to the 1996 ORHS Bylaws, Article IX,

Section III, 1 (C) Medical Records and Procedure, physicians are to receive written warning

for any failure to complete medical records.  Upon written warning, physicians then have an

opportunity to remedy any delinquency.   The hospital takes disciplinary action only if a

physician fails to cure the defect after the written warning, which discipline includes a

temporary administrative suspension, but not a narrow, indefinite, restriction of trauma or

emergency call.

97.    The IC, CC, and MEC did not abide by the Bylaws when Dr. Pierson was

permanently removed from trauma and emergency call, in part, on the basis of an alleged

"delay in dictating operative notes" for which he should have first been provided with a warning and opportunity to cure.

98.     The MEC also noted an unsubstantiated "concern" that Dr. Pierson's response to the review proceeding demonstrated "an attitude toward the hospital, the hospital staff, and peers, which could interfere with collegial and professional relationships and the ability to work with peers and ancillary staff in a collegial and professional manner."  Notably, the MEC expressed its concerns only after Dr. Pierson responded to unfounded biased and predisposed Defendant reviewer criticisms of his abilities as an orthopedic surgeon.

99.      In a letter dated August 30, 1999, Defendant Hillenmeyer informed Dr. Pierson that he was entitled to a hearing pursuant to Article VIII, Part B, Section 2 of the Bylaws as a result of being taken off trauma and emergency room call. Pursuant to the cited section, the applicable ground for the hearing would be (g) "revocation of medical staff membership or reduction of privileges."  Defendant Hillenmeyer admitted that the ground for Dr. Pierson's hearing under the Bylaws was the revocation of his medical staff membership or reduction of his privileges.   In reliance on these representations that he would need to go through the hearing process in order to have his trauma and emergency room call privileges reinstated, Dr. Pierson requested a hearing immediately thereafter.

100.     On April 23, 2003, the Hearing Panel commenced a hearing – almost seven years after the commencement of the initial sham review action against Dr. Pierson.

101.      Between Defendant Hillenmeyer's letter of August 30, 1999, and the commencement of the hearing on April 23, 2003, the Bylaws were amended to change the

burden of proof and order of presentation in a hearing.   The new changes switched the burden and production from the MEC to the physician.

102.      Rather than utilize the 1996 Bylaws (in place when Dr. Pierson's review commenced), the Hearing Panel and Presiding Officer adopted and proceeded under ORHS's 2003 Fair Hearings and Appeals Policies and Procedures.

103.      The Presiding Officer of the Hearing rejected and overruled Dr. Pierson's objection to use of the revised procedure's order of presentation and the new burden of proof for the hearing.

104.      Dr. Pierson objection to one of the members of the Hearing Panel on the grounds that (1) Dr. Pierson had been critical of a model of medicine proposed by that doctor; and (2) that doctor was a former partner of one of the ORHS in-house reviewers (Defendant Evans) who participated in the initial investigation.

105.      During the course of the hearing, the Presiding Officer repeatedly rejected and overruled Dr. Pierson's standing objection to Spiegel's presence throughout the hearing to assist the MEC's counsel.   The Presiding Officer permitted Spiegel to remain at the hearing as a designated representative of ORHS and recognized that Spiegel was there to defend his criticism of Dr. Pierson and his related recommendations about Dr. Pierson's ability to take emergency and trauma call.

106.      As an outside reviewer, Spiegel was supposed to be neutral.   He was supposed to have an allegiance neither to Dr. Pierson nor to ORHS, and to give a completely objective, unbiased opinion about Dr. Pierson's clinical competence as an orthopedic surgeon.   Spiegel's

overt association with ORHS and his assistance in developing and presenting the MEC's case against Dr. Pierson undermined his neutrality.

107.     At the hearing, the malicious, false statements made by Defendants Spiegel, Connolly, Evans and Bott in their reviews and assessments of Dr. Pierson's cases were presented as support for the MEC's recommendation to exclude Dr. Pierson from trauma call and emergency department call.[5]   However, Evans and Bott would not appear at the hearing. Thus, Dr. Pierson was not afforded an opportunity to cross-examine them on their opinions or the erroneous judgments that were made about his clinical competence.

108.      Despite Defendants' efforts to have Dr. Pierson permanently removed from emergency and trauma call, the Hearing Panel found that, while Dr. Pierson was slower than his peers, his surgical time was not excessive and no harm to his patients was demonstrated.

109.      The Panel further noted that the processes employed by ORHS were deficient. The Panel expressed surprise that Dr. Pierson was not counseled by his peers or given an opportunity to correct perceived deficiencies before the IC was appointed.   The Panel also expressed difficulty understanding why an investigation was conducted without Dr. Pierson's involvement or knowledge – until the day before his trauma and emergency call were summarily suspended.   Importantly, the Panel noted that such conduct violated the spirit if not the letter of the Bylaws, and polarized the positions of Dr. Pierson and the MEC from the beginning making it impossible to conduct any legitimate peer review with professionalism and collegiality as otherwise required.

---

[5] See *infra* Defamation Count for specific statements.

110.    The Hearing Panel recommended that Dr. Pierson be given the opportunity to demonstrate his willingness and ability to correct deficiencies in scheduling, in completing medical records, and in his attitude toward fellow physicians and hospital personnel.  The Hearing Panel also recommended that Dr. Pierson's privileges be temporarily restored so that his trauma and emergency call practices could be reviewed through retrospective proctoring by an experienced trauma surgeon, who could evaluate whether Dr. Pierson's surgeries were appropriately scheduled and completed in a justifiable timeframe.

111.    Both Dr. Pierson and the MEC appealed the Hearing Panel's recommendation.

112.    On December 12, 2003, Dr. Pierson was notified of the Appeal Panel's recommendation that (1) Dr. Pierson not be placed on emergency call until the MEC determines he is ready, willing and able to work within institutional guidelines, standards, protocols, resources and systems; (2) the MEC verify and analyze Dr. Pierson's surgical procedures, type of procedures and outcomes of those procedures during the preceding 12 months; (3) Dr. Pierson not be placed on emergency or trauma call unless and until the MEC determines he has current clinical competency to handle emergency surgical procedures; and (4) Dr. Pierson perform non-emergent elective cases before attempting emergency or trauma cases as appropriate in the best interest of patient care.

113.    On January 26, 2004 – almost seven years after the sham review was initiated – the ORHS Board passed a resolution affirming the recommendation to indefinitely maintain a suspension of Dr. Pierson's emergency and trauma call and consulting privileges.

114.    The Board resolution stated that Dr. Pierson failed to comply with the rules and regulations of the Medical Staff, and that his practice of performing surgeries during late

night and early morning hours unnecessarily increased risk to his patients and to other patients who came to the hospital with what the hospital considered as "true emergencies."

115.     Following the Board's resolution, ORHS immediately filed a complaint with the Florida Department of Health, citing the disciplinary action taken against Dr. Pierson.  The Department of Health then initiated an investigation of Dr. Pierson's medical license.

116.     ORHS also immediately filed an Adverse Action Report with the National Practitioner Data Bank ("NPDB").  The report provided a false, unflattering, misleading misstatement of the facts of Dr. Pierson's review and the resulting decision.[6]

117.     According to 42 U.S.C. § 11133(a)(1)(A),(B) a health care entity must report a physician to the NPDB when the health care entity "takes a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days; or accepts the surrender of clinical privileges of a physician."

118.     ORHS maintains that Dr. Pierson's initial suspension and ultimate removal from emergency department and trauma call did not affect his clinical privileges.  Accordingly, ORHS falsely reported Dr. Pierson's removal from emergency and trauma call to the NPDB.

119.     Defendant Galceran admitted that a doctor should not be reported to the NPDB for a suspension of emergency and trauma call.  According to Defendant Galceran, Dr. Pierson should not have been reported to the NPDB.

120.     Dr. Pierson requested that ORHS correct the erroneous and false Adverse Action Report.  ORHS has refused, and continues to refuse, to make any such correction.

---

[6] NPDB Report is incorporated by reference.

121.     On information and belief, Defendants ORHS and Hillenmeyer, acting on behalf of ORHS, have made other similar reports to third parties. The reports made by Defendants ORHS and Hillenmeyer communicate that Dr. Pierson is incompetent, lacking in surgical judgment and skill, and a danger to patients. Those communications are false.

122.     The reported statements are outside the purview of the federal statute and based on the unfounded, unreasonable action taken against Dr. Pierson as a result of ORHS' sham, biased peer review. Defendant ORHS knew that the statements contained in its reports to the NPDB, the Florida Department of Health and the Florida Board of Medicine were erroneous and false at the time the reports were made, but ORHS made the reported statements anyway.

123.     Further, Defendant ORHS was aware that the charges against Dr. Pierson were not a basis to suspend Dr. Pierson's emergency and trauma call and that the decision to suspend his call was the result of a sham, biased, predisposed review.

124.     The statements reported by ORHS and Hillenmeyer impugn Dr. Pierson's competency as an orthopedic surgeon and disparage his abilities to discharge his duties as an orthopedic medicine practitioner. The reported statements would be understood to have such meaning by both the general public and by those within the medical community.

125.     For Dr. Pierson, a physician who has dedicated his life to the humane treatment of his patients in the most efficient manner and with the highest quality of care, no other accusation could be more heinous than to be labeled incompetent, lacking in surgical judgment and dangerous. The reported statements are unfounded, erroneous accusations that have caused Dr. Pierson to be ostracized from the medical community.

126.   When Defendants ORHS and Hillenmeyer made the reported statements at issue, they were aware that, from time to time, indefinitely into the future (and for as long as Dr. Pierson practices medicine), various persons and organizations would query NPDB and receive a copy of the reported statements, or otherwise discover the reported statements.  As a result, any entity that queries NPDB (be it a hospital, surgical center, other healthcare facility or provider, HMO or insurer) will view the false information published by Defendants.  This casts strong doubt on Dr. Pierson's professional credentials and severely impairs his ability to obtain or continue privileges at other hospitals or to establish relationships with other healthcare entities.

127.   When Defendants conducted and participated in the sham, biased review against Dr. Pierson, they were aware that Dr. Pierson would be required to self-report any adverse action taken against him in response to questions and queries posed by other hospitals, surgical centers, healthcare organizations, insurers, licensing bodies and other third parties, which in fact has happened.

128.   Further, Defendants were aware or should have known that any information reported to the NPDB would be reported to other hospitals, surgical centers, healthcare organizations, insurers, licensing bodies and other third parties, which in fact has happened.

129.   Defendants sham review was not kept secret nor did Defendants keep the sham review confidential as otherwise required under the Bylaws.  Details surrounding the sham review, including actions taken against Dr. Pierson's trauma and emergency call were intentionally disseminated to the medical communities at ORMC and Sand Lake. Immediately, Dr. Pierson lost patient referrals.

130.   Even before the sham review action was brought to Dr. Pierson's attention in November 1996, there was a progressive reduction in his on-call related patient work as well as physician referrals from the ORHS system due to the institution of the sham review.

131.   As soon as Dr. Pierson was taken off the trauma and emergency call at ORMC and Sand Lake, Dr. Pierson suffered immediate tremendous economic losses.  These included direct losses related to lost revenue from Dr. Pierson's inability to take call and treat patients in follow up, as well as the indirect losses related to the progressive loss of referrals from physicians practicing at ORHS, who lost confidence in Dr. Pierson's abilities because of the sham review.

132.   Additionally, the extreme amount of time and efforts by Dr. Pierson's employees to create the necessary responses to Defendant Spiegel's and Defendant Bott's, Connelly's and Evans' reviews resulted in significant further economic costs borne by Dr. Pierson and Dr. Werntz.

133.   There were also lost opportunities to see patients while Dr. Pierson was working on the reports and reviews required to counter all aspects of the Spiegel Report and Rebuttal as well as the ORMC in-house reviews.

134.   The sham review and actions severely compromised Dr. Pierson's personal financial condition, brought Dr. Pierson and Dr. Werntz to the brink of corporate and personal bankruptcy and saddled both with significant corporate and personal debt.

135.   Dr. Pierson had to quit practicing in Central Florida and re-establish himself in California in an underserved community that had no practicing orthopedic surgeon.

136.    All efforts expended in the development of the PPA were lost.  The entire project had to be abandoned because Dr. Pierson had no funds to further his investments in the PPA due to the significant adverse financial effects of the sham review.

137.    Dr. Pierson had limited opportunity to contribute to retirement plans from 1996 to the present.  Dr. Pierson's ability to make retirement contributions continues to be forestalled due to the costs of servicing and paying off loans taken out in Florida because of the effects of the sham review on his ability to earn income from his medical practice and in order to pay legal costs.

138.    A future increase option for Dr. Pierson's disability plan provided for automatic increases in coverage as long as income levels met appropriate thresholds.  Due to the decline in his income in Florida, resulting from the sham review, Dr. Pierson was never able to exercise this option.

139.    Dr. Pierson has patented a number of medical devices and techniques.  Dr. Pierson has not been able to further develop actual patents he holds, with respect to bringing actual products to market, due to lack of funding capital, which is a result of the requirement to satisfy accumulated debt that directly resulted from the sham review.  Further, Dr. Pierson was unable to pursue many other patentable ideas to completion during this time period due to the financial effects of the sham review action.

140.    Emotional and financial strains caused by the sham review destroyed Dr. Pierson's and Dr. Werntz's marriage and family life.  Dr. Pierson continues to incur significant divorce related costs that are a result of the marital dissolution that was brought about in large measure by the economic and emotional impact of the sham review.

141.    Dr. Pierson has incurred and continues to incur significant legal costs related to his efforts to preserve and restore his reputation as well as his ability to be able to continue to practice and earn a living in orthopedic surgery. Those costs are significant and ongoing from the time the sham review was initiated to the present, related to efforts to bring this matter before the courts in order to obtain relief from the damage that has been done.  These costs to date exceed $1.5 million

142.    Between 2002 and 2003, Dr. Pierson and Dr. Werntz were forced to sell or liquidate stocks from their joint brokerage account to pay legal fees and costs related to preparation for and then participation in the hearing process.

143.    Investment opportunities were lost as a direct result of the sham review action because all of Dr. Pierson's financial resources were committed to addressing the sham review.  The estimated loss in this regard exceeds $500,000.

135.    During the sham review time period, Dr. Pierson was absent from the family home for long periods related to preparations of his reports and preparations for the Hearing.  This resulted in loss of companionship with Dr. Werntz as well as the loss of valuable family time with Dr. Pierson's children.

136.    Also, while the peer review action was ongoing, Dr. Pierson did not leave the Orlando area even to visit extended family in the Northeast for period of over five years. This led to his inability to maintain the expected family relationships with close relatives such as his paternal grandmother with whom he had always been close and visited often prior to the peer review. Unfortunately, she became ill with cancer and died during this time.

137.   Further, Dr. Pierson harbored an intense sense of shame and experienced overwhelming frustration related to the nature of the comments and criticisms about his medical practice and judgment, which were untruthful and completely misrepresented in the in-house reviews by ORHS and the Spiegel Report and Rebuttal.  The Peer Review Defendants' comments and criticisms were personally devastating and never ending despite all Dr. Pierson's efforts to exonerate himself and to disprove this false information.

## COUNT 1 – BREACH OF CONTRACT (ORHS)

138.   The allegations contained in Paragraphs 22 – 137 are incorporated by reference.

139.   The Bylaws set out a series of rights afforded to members of the Medical Staff which constitute a contract between ORHS (including ORMC and Sand Lake) and the individual physicians, and are legally enforceable as a contract, pursuant to Florida Law.  Dr. Pierson, as a member of the Medical Staff, was a party to this contract and/or a third-party beneficiary of the contract.

140.   The Physician Bylaws, Rules and Regulations govern the procedures for creating and maintaining patient medical records.  According to the 1996 ORHS Bylaws, Article IX, Section III, 1 (C) Medical Records and Procedure, physicians are to receive written warning for any failure to complete medical records.  Upon written warning, physicians then have an opportunity to remedy any delinquency.  The hospital takes disciplinary action only if a physician fails to cure the defect after the written warning and the possible discipline does not include removal of physicians from trauma or emergency department call schedules.

141.    Dr. Pierson did not receive any administrative suspensions and responded, consistent with the Bylaws, to written warnings alleging that he failed to complete patient medical records.

142.    On July 1, 1999 in its report to the CC, the IC cited "delay in dictating operative notes" as reason to exclude Dr. Pierson from emergency and trauma call.  This report was adopted by the CC and the MEC who permanently removed Dr. Pierson from emergency and trauma call as a result of the recommendations of the IC.

143.    ORHS breached its contract with Dr. Pierson in failing to abide by the medical records procedure set out in the Medical Staff Bylaws, Rules, and Regulations.  Before Dr. Pierson was permanently removed from trauma and emergency call, in part, on the basis of an alleged "delay in dictating operative notes" he should have first been provided with a the remedies set forth in the Bylaws.  Even then, there was no basis under the Bylaws to take such actions against Dr. Pierson.

144.    Separately, and to the extent that ORHS claims the reduction of trauma or emergency call as a reduction or revocation of clinical privileges, ORHS breached the Medical Staff Bylaws in a number of ways:

145.    Summary suspension was not warranted because there was no demonstration that such action was required to be taken immediately in the best interest of patient care or safety in the hospital, or for the continued effective operation of the hospital. 1996 ORHS Bylaws, Article VII, Part E, Section 1(a) at p. 48.

146.    To the extent that the investigation and action taken was to investigate Dr.

Pierson's clinical competence, ORHS did not following the applicable Bylaws provisions for corrective action. Defendant Hillenmeyer denied Dr. Pierson's December 17, 1996 request for an immediate hearing on the summary suspension of his privileges.  The reduction of privileges was grounds for a hearing and a hearing should have been provided as requested by Dr. Pierson.  1996 ORHS Bylaws, Article VIII, Part B, Section 1 at p. 51.

147.    At the time of the reduction in privileges, December 3, 1996, Defendant Hillenmeyer should have provided Dr. Pierson with notice that he was entitled to a hearing. 1996 ORHS Bylaws, Article VIII, Part B, Section 1 at p. 51.

148.    The IC ignored all time frames placed on the investigation by the Bylaws.  The investigation began in May 1996, but Dr. Pierson was not notified of the investigation until February 1996.  The IC took 5 months for the initial phase of its investigation when the Bylaws provide that the investigation should be done in 30 days.  1996 ORHS Bylaws, Article VII, Part C, Section 2b, Paragraph 4 at p. 45.

149.    Dr. Pierson was not provided with an opportunity to meet with the IC before it issued its report of October 21, 1996. 1996 ORHS Bylaws, Article VII, Part C, Section 2b, Paragraph 3 at p. 45.

150.    The Investigation Committee's choice of direct economic competitors with known differences of opinions, bias towards, and disagreements with Dr. Pierson and/or Dr. Werntz violated the spirit of the Bylaws and was inconsistent with Bylaws provisions that economic competitors should not act as peer reviewers.  1996 ORHS Bylaws, Article VIII, Part B, Section 5 at p. 52.

151.   ORHS failed to employ any mechanisms to identify and avoid potential conflicts of interest on the part of the review participants and overall failed to provide Dr. Pierson with a fair review as otherwise required under its own Bylaws generally.

152.   Following the summary suspension, the IC's review was to have been completed in 30 days.  However, it was not.  A hearing on the summary suspension of privileges was required to have been given within 60 days of the request for such a hearing.  Dr. Pierson's initial request for a hearing, made in December 1996, was denied.  Dr. Pierson's second request for a hearing was made in September of 1999; a hearing should have been commenced within 60 days from that request.  1996 ORHS Bylaws, Article VIII, Part B, Section 3 at p. 52

153.   The hearing panel was not to include anyone in direct economic competition with Dr. Pierson.  However, panel members Smigielski and Shea were direct competitors of Dr. Pierson with orthopedic practices in the Central Florida area. Dr. Shea had close professional and/or business ties with Orlando Orthopedic Center, which he founded.  Harold was also a direct economic competitor of Dr. Pierson as it related to the use of hospital resources (operating room access).  1996 ORHS Bylaws, Article VIII, Part B, Section 5 at p. 52.

154.   ORHS applied the 1999 Bylaws, 2001 and/or 2003 Fair Hearing Policies and Procedures during Dr. Pierson's peer review rather than the 1996 Bylaws and procedures that were in place at the time of the investigation and summary suspension.

155.   In 1999, ORHS made changes to the Bylaws provisions regarding the burden of proof and order of presentation in a peer review hearing, which shifted the burden and order of

presentation to Dr. Pierson.  Further, Defendant Wolfram has specific knowledge that ORHS makes changes to the Bylaws in the interest of accomplishing what they need.

156.    Dr. Pierson, in accordance with the Bylaws, raised objections to panel members on the grounds that those members were biased and would not be fair and impartial peers.  Dr. Pierson also raised objections to those panel members who by their role with ORHS or as a competing orthopedic physician would have a conflict of interest in participating as a hearing panel member in his peer review.  His objections were overruled.

157.    Separately, and to the extent that ORHS claims the reduction of trauma or emergency call as a clinical privilege, the board breached its contract by taking action to reduce Dr. Pierson's privileges without a finding by the peer review hearing panel committee that grounds for discipline exist under Florida Statute § 395.0913 which ORHS is required to comply with pursuant to its own Bylaws and as a condition of its licensure.

158.    As to the only statutory provisions that might possibly relate - incompetence, medical negligence, or failure to comply with risk management - there was no finding by the hearing panel of any of these grounds, and the language to this effect incorporated into the board's resolution after the fact was just a sham.

159.    As a direct result of ORHS's actions that were in breach and violation of the Bylaws, Dr. Pierson has sustained substantial economic damages, including but not limited to (a) the loss of his emergency and trauma call and consulting privileges, resulting in substantial loss of past earnings; (b) the loss of referrals and patients as a result of being removed from the emergency and trauma call schedule, resulting in substantial loss of past earnings; (c) substantial economic losses in defending against Defendants' actions and the sham peer review, including payment of

reasonable attorneys' fees and costs; and (d) other consequential damages (such as those described throughout the complaint) resulting from ORHS's breach and violation of the Bylaws.

### COUNT 2 - DEFAMATION: LIBEL AND SLANDER

### (ORHS, MURBACH, BOTT, CSENCSITZ, CONNELLY, EVANS, GALCERAN, BONE, RIVERO, APPLEBLATT, SPIEGEL, AND HILLENMEYER)

160.    The allegations contained in Paragraphs 22 – 137 are incorporated by reference.

161.    ORHS, Murbach, Bott, Csencsitz, Connelly, Evans, Galceran, Bone, Rivero, Appleblatt, Spiegel, and Hillenmeyer   made and published false and defamatory written and spoken statements about Dr. Pierson during and after the peer review.

162.    Sometime on or prior to May 8, 1996, Defendant Murbach told Defendant Bott that Dr. Pierson took in excess of twelve (12) hours to treat a tibia fracture by intramedullary nailing with the implication that Dr. Pierson's performance of this case was below the standard of care or unacceptable. This statement was false and misleading because the total surgical time was nine (9) hours.  Further, the treatment was not simply an intramedullary nailing of the tibia, but included treating an open fracture of the tibia, the extensive irrigation and debridement of a severe open fracture, reamed intramedullary rodding of a severely communted segmental fracture of the ipsa lateral femur, reduction of a hindfoot dislocation, and four compartment faciotomies of the lower leg. Omitted from defendant's statement was any reference to the complexities of the procedure.

163.    Defendant Murbach also told Defendant Bott that Dr. Pierson treated a hip fracture during which there was damage to an artery which led to a transfusion of four or five units of blood.  This statement was false and misleading because the bleeding occurred while Jeff

Richards, M.D. was drilling a screw placement. Omitted from defendant's statement was any reference to factors which could have contributing to bleeding:  patient's regular preoperative use of aspirin, and her pre-existing mild coagulopathy as evidenced by the admission prothrombin time of 14.2.  Also omitted from the statement was the fact that Defendant Murbach admitted that this case represented an opportunity for improvement of the anesthesia care provided.  The omitted statements compounded Defendant Murbach's prevarication to make the communication to Defendant Bott more misleading.

164.    Defendant Murbach was negligent with regards to the falsity of the statements in paragraphs 143 and 144, or alternatively acted with knowledge or reckless disregard as the falsity of the statements.  Defendant Murbach admitted that he had not seen the patient charts prior to speaking with Defendant Bott, and admitted in the 2003 hearing that there was nothing wrong with the orthopedic care provided to the patient with the hip fracture, and that the anesthesia could have been improved.

165.    On May 8, 1996, Defendant Murbach's defamatory statements in paragraphs 143 and 144, deeming Dr. Pierson to be professionally incompetent, were republished in a letter composed by Defendant Bott to Defendant Diebel requesting a "focused review" of Dr. Pierson. The letter contained Defendant Murbach's statements, and specifically cited the statements as a basis for the requested review.  Defendant Bott then mailed the letter to Defendant Diebel, which Defendant Diebel read upon receipt.  Defendant Diebel subsequently told Defendant Moser the comments, and requested that Defendant Moser form a committee to investigate Dr. Pierson.  Per Defendant Moser's statement, Defendant Moser

also saw Defendant Bott's letter in contemplation of setting up the investigation committee. The IC members, Defendants Galceran, Bone, and Rivero also saw the letter.

166.     Neither Defendant Bott nor Defendant Diebel made an attempt to verify Defendant Murbach's defamatory statements in paragraphs143 and 144 by looking at the relevant patient charts, and instead were negligent with regards to the falsity of the statements, or alternatively acted with knowledge or reckless disregard as the falsity of the statements.

167.     Sometime between May 21, 1996, and October 21, 1996, Defendants Connolly, Evans and Bott made false and defamatory statements about Dr. Pierson's professional competence, implying that Dr. Pierson was professionally incompetent and was performing below the acceptable standard of care, in the form of written reviews of Dr. Pierson's patients from ORMC and Sandlake Hospitals.  The written reviews were assembled into a report by ORHS administrative assistant Lynn Burcham and consisted of a series of "abstracts" regarding the patients reviewed.  The review, as a whole, is defamatory.   Among the false statements in the report are the following:

168.     In ORMC patient abstract No. 42 the reviewers significantly overstated the time of the operation, stating that it was 4 hours in duration.  A "4 hour operation is twice normal maximum for IM rodding – max time is usually 2 hours for open tibial nailing." (ORMC Abstract #42).  The actual operative time was 2 hours and 40 minutes.

169.     In ORMC patient abstract No. 4 a reviewer stated, "An 11 hour operation for this type of injury is inexplicable by anything except surgical deficiencies." The statement was false because the operative session lasted from 05:50 until 15:15 for a total of 9 hours, 25 minutes.

During this interval, there were two 15 minute intervals required to take and develop x-rays before the procedure could proceed.  The actual surgery time was 8 hours 55 minutes.

170.     Additionally, in ORMC patient abstract No. 4 a reviewer stated "[p]rolonged surgery may have led to compartment syndrome of hand since this is unusual after isolated ulna fracture." (ORMC #4).  This statement is false and without any factual basis, because there is no reasonable evidence to implicate the duration or type of operative procedure with the development of hand compartment syndrome that occurred.

171.     In ORMC patient abstract No. 26 a reviewer stated that the surgery time was one (1) hour (ORMC #26). The surgery time was actually either 10 or 15 minutes.  Start time was either 01:45 or 01:50 with an end time of 02:00.  Thus, this represents a significant overstatement of the actual time required for the surgical debridement.

172.     In ORMC patient abstract No.  29 a reviewer stated that the surgery time was "1 hr. 45 min." (ORMC# 29). The actual surgery time was from 16:48 to 18:00, which is a total surgery time of 1 hour and 12 minutes.

173.     In Sand Lake patient abstract No. 17 one reviewer stated that the surgery time was 3 hours and 50 minutes and stated that the procedure was two (2) times the normal for the procedure.  Another reviewer stated that the surgery was four (4) hours in duration and that it was "2-3 times normal for ORIF forearm fx [sic]" (SL# 17).  The statements regarding duration of surgery were false because the tourniquet went up at 20:01 and the patient was extubated at 23:40, for a total surgery time of 3 hours and 39 minutes. The general statement regarding normal length for an ORIF forearm fixation is false and misleading because it does not express an understanding of the complexity of the fracture fragment due to delayed

treatment.  It also does not indicate a clear understanding of the difficulty and meticulous care necessary for insertion of a radial plate of the type utilized in this case.

174.    In ORMC patient abstract No. 36 a reviewer stated that surgery time was 5 hours and 55 minutes.  Another reviewer stated that the surgery was six (6) hours and that a "6 hour operation for IM nailing of open femur [is] difficult to explain."  The statements were both false and misleading because the orthopedic surgical time was significantly less than 6 hours. Several non-orthopedic surgical phases occurred during this time, including repair of a significant lip laceration.

175.    In ORMC patient abstract No. 2 a reviewer stated that surgery time was four (4) hours and 35 minutes.  This statement is false and misleading because the initial phase of the operative session was from the exploratory laporotomy.  The beginning of the surgical procedure (tourniquet up) did not occur until 02:35 for a total operative time of 3 hours, 25 minutes.

176.    In ORMC patient abstract No. 6 a reviewer stated that the patient lost 10 units of blood, which "is deviation from the standard of care and resulted in potential threat to the life of a 92 year old."  This statement is false and misleading because the bleed represented at most eight (8) units, and not all of those eight (8) units of blood loss occurred at the time of this acute hemorrhage. One (1) unit was transfused to correct pre-existing anemia.  Two (2) units were infused to replace acute blood loss pre-operatively.

177.    Additional false statements include the following: "Surgery time: 3 hrs 30 min." (ORMC #37) This statement is false because the actual surgical time was 3 hours and 25 minutes.

178.    "(p.o. Hgb down 2 gms)" (SL# 7) This suggestion, that a 2 gram reduction was significant, is false and misrepresents this information, confusing the non-surgical physician reviewers on the investigation committee."

179.    "Arthroscopy not indicated …" This statement is incorrect and inconsistent with the modern treatment of should capsular instability. "4 hr. 30 min. operation well beyond normal time (2 hrs) for this operation." (ORMC# 39) This statement is false because the surgery began at 01:43 and was extubated at 06:15, for a total surgery time of 4 hours and 22 min. Statement that 2 hours is normal fails to consider several important factors associated with this surgery including the severe nature of the open injury, the lavage required, and the need to repair the tibial tubercle fragment.

180.    "Surgery time: 4 hrs." (ORMC #13) This statement is false because the actual surgery time was 2 hours and 48 minutes.  "Excessive blood loss …" (SL# 20) This statement is false because the peri-operative blood loss that occurred in this case was well within the accepted range for bleeding related to hip hemi-arthoplasty. Such an opinion is not supported by the literature.

181.    One reviewer stated, "Surgery time: 5 hrs. 30 min." (ORMC# 49) Another  reviewer stated,"6 ½ hr operation is twice normal …" (ORMC #49) Both statements are false because the actual surgery time was 4 hours 55 minutes at most (for an overstatement of 35 minutes).

182.    "Five hour and thirty minute operation for patella fracture and medial malleolar fracture is excessive" (ORMC #38) This statement is false because the actual surgical time was only 3 hours and 9 minutes for completion of the multiple procedures indicated, as was

indicated by the start and stop times of the intraoperative nurse's note and the anesthesia record.

183.     "Isolated lateral malleous fracture is not an indication for surgery." (SL #15) This statement is false because the ankle injury was not an isolated lateral malleolar fracture. Alternative treatment of a long leg cast was offered to the patient and his mother, and they chose the surgical alternative.

184.     "Procedure apparently uncomplicated but time for anesthesia (8:50 to start of surgery (10:25) unexplainable." (ORMC #40) This statement is false because it was at this time that the catheter placement formally began, but the patient was not placed in the operating room nor the epidural injected at this time. The epidural was not started until the patient was placed in the OR.

185.     "Surgery time: 2 hours, 15 minutes" (ORMC #21) This statement is false because the incision was made at 22:55, with a surgery end time of 00:35, for a total surgery time of 1 hour and 40 minutes.

186.     "Surgery time: 1) 1 hr. 40 min. 2) 25 min 3) 50 min." (ORMC #12) This statement is false because the first operative time was 1 hour and twenty minutes.  There third operative time was either 45 or 48 minutes.

187.     "Transfusion of 1-unit considered inappropriate in most patients." (SL# 23) This statement is false because it was the accepted approach to use a minimum of 2 units, this is now thought to be illogical.  A single unit was sufficient in this situation.

188.     "Surgery time: 3 hours 45 minutes." This statement is false because the surgery time began at 13:35 and ended at 17:10 for a total surgical time of 3 hours and 35 minutes.

189.     "Surgery time: 4 hrs 30 min." (Sand Lake# 14) This statement is false because, though the noted surgery occurred from 15:15 until 19:45, the patient was actually extubated at 19:25, which is a more appropriate end time for surgery.  Thus the total surgical time was 4 hours and 10 minutes.

190.     "Prolonged operating time (twice normal) consistent with questionable technical skills." (Sand Lake# 14) The statement ignores factors which easily explained the issue of the additional time requirement.

191.     "Arthroscopy not indicated if open repair of dislocation is planned." (ORMC #25) This statement is false because, in addition to the obvious benefits in the evaluation and treatment of this patient, there is extensive published orthopedic literature that defines a significant role for arthroscopy in the evaluation and treatment of should instability conditions.

192.     "Surgery time: 5 hrs. 32 min." (Sand Lake# 5) This statement is false because, due to intra-operative x-rays, the total surgery time was 4 hours and 47 minutes.

193.     "Failure of operative technique, loss of graft attachment to femur complicated procedures and indicates lack of experience and technical skill." (ORMC #9) This statement is false because this complication is a well recognized complication that has occurred to many experienced sports orthopedic surgeons.

194.     "7 hour operation far in excess of norm." (ORMC #9). This statement is false because the maximum surgery time was 6 hours 37 minutes because the patient was extubated at 20:07.

195.    "Surgery time: 3 hrs. 35 min." (SL# 1) This statement is false because the surgery

time was exactly 3 hours and 20 minutes.

196.    "Also 5 intraoperative x-rays for this procedure (soft tissue repair) are not within the

standard and opens questions regarding surgeons understanding of the problems." (ORMC

#5) This statement is false because the intra-operative x-rays in this case were obtained for

the purpose, specifically, of reconstructing the knee mechanics to exactly that which existed

pre-injury utilizing the contralateral, uninjured knee as the reference to determine what these

relationships were."

197.    One reviewer stated, "Surgery time" 5 hrs." (ORMC #5) Another reviewer state, "7

hour operation for tendon rupture is in excess of standard of care." (ORMC #5). Both

statements are false because the actual operative session was 4 hours and 15 minutes, which

included 55 minutes of non-surgical time for the x-rays.  If this phase is subtracted, the

operative time is actually 3 hours and 20 minutes.

198.    "10 hr operation for acetabular fx started at 6:45pm and ended at 4 am is

inappropriate for elective case. This raises serious questions about surgeon's technical ability

to perform this operation." (ORMC #47) This statement is false because the actual surgical

time was only 7 hours and 10 minutes, with a beginning time of 20:00 and an end time of

04:00, with a non-surgical 50 minute phase in during this period. Further the surgery on the

acetabular fracture was only 5 hours and 10 minutes of the total.  Also, the procedures were

not elective, they were orthopedic urgencies because the patient was immobilized by the

injury.  The patient was already 3-4 days post-injury without any definitive stabilization of

the fracture – this was bordering on the upper limit of any acceptable delay. Further, due to

the weekend and the plastic surgery scheduled, any delay would have significantly extended the time prior to surgery.

199.    The reviewer stated, "4 hrs for bimalleolar ankle fx fixation is twice normal for procedure and raises questions regarding competence." (SL #19) This statement is false because the procedure was more than just a treatment of a bimalleolar ankle fracture.  It also involved the irrigation and debridement of three distinct open fracture components. The other two reviewers clearly demonstrated that they believed this to be a good outcome.

200.    "Surgery time: 12 hours." (ORMC #8) This statement is false because there were 11 operative phases, the maximum amount of time that they could have compromise was approximately 9 hours.

201.    Defendant Bott, Connelly, and Evans were negligent with regards to the falsity of the statements in paragraphs 151 and 159, or alternatively acted with knowledge or reckless disregard as the falsity of the statements.  All three Defendants had access to the charts, and reviewed said charts.  As such, Defendants had direct access to the correct information regarding Dr. Pierson's surgical technique, surgical judgment, methods and practice, operative durations, operating times, and/or surgical decisions.

202.    The written report of Defendant Bott, Connelly, and Evans was read by Defendants Galceran, Bone and Rivero, among others, who based their October 21, 1996 "Investigation Committee Report" on the written report by Defendants Connolly, Evans, and Bott.

203.    Dr. Pierson was then suspended from emergency and trauma call on the basis of the false and defamatory statements of Defendant Bott, Connelly, and Evans. Dr. Pierson suffered economic loss and continues to suffer actual and special damages, including but not

limited to harm to his reputation, economic loss, extreme embarrassment, humiliation, outrage, and indignity.

204.    On February 2, 1997, Defendant Spiegel transmitted a document to Defendant Moser entitled "ORHS Peer Review January 8/9 1997" that was itself defamatory, containing false and defamatory written statements about Dr. Pierson's professional competence, implying that Dr. Pierson was professionally incompetent and was performing below the acceptable standard of care.

205.    The report by Defendant Spiegel contained statements that were false and misleading and omitted facts which tended to make the statements more false and misleading. Included in the report were false misrepresentations regarding Dr. Pierson's surgical technique, surgical judgment, methods and practice, operative durations, operating times, and/or surgical decisions, such as the following:

206.    Defendant Spiegel falsely stated that the patient referenced on p. 41 had an operating time from "00:15 to 01:30, one hour and thirty minutes."  The surgery was from 00:17 to 01:15, for an actual operative time of 58 minutes.

207.    Defendant Spiegel falsely stated that the patient referenced on p. 61 underwent surgery starting "at 10:15 in the morning and last[ing] until 16:10, approximately a 6 hour surgery."  Defendant Spiegel also indicated that the procedure had a "prolonged operative time" because it lasted longer than "3-4 hours." However, the surgery started at 10:15 was by the plastic surgeon on a lip laceration.  The surgical procedure on the right thigh did not begin until around 11:00am.  Also, 1 ½ hours were required for extensive irrigation and debridement of the open femoral fracture and 2 ½ hours required for the placement of the

statistically locked femoral reconstruction.  Thus the total operative time was actually within

the 3-4 hour range that Defendant Spiegel indicated were appropriate for this procedure.

208.    Defendant Spiegel also made false statements about Dr. Pierson's dictation of

operative notes.  Defendant Spiegel indicates that the patient discussed on p. 73 had an

operation on September 25, 1995, but that the operative dictation was on September 26,

1995.  In truth, the surgery lasted until after midnight, so the dictation was done on the same

day the surgery was completed.

209.    On p. 50 Defendant Spiegel states, 'The operative note is dictated by Dr. Pierson on

11/18/95.  The surgery was done on 10/29/95.  That is 19-20 days late."  In truth, the case

had a written operative note placed in the chart immediately following the procedure with

specific information relative to the important intra-operative events.

210.    Additional statements include the following: "Estimated blood loss was 200cc" (p.

58) This statement is false because Spiegel relied on the nurse anesthetist's note, instead of

the surgical resident's note which indicated an estimated blood loss of 150cc.  Surgical

resident note is the more reliable source.

211.    "Surgery time … 3 hours and 30 minutes" (p. 58) This is false because there was a

total operating time of 2 hours, 40 minutes or 2 hours, 50 minutes (depending on the surgery

end time selected as a reference).

212.    "Surgery started at 5:50 and ended at 15:15, approximately 9 hours and 25 minutes."

(p. 82) This statement is false because, the "surgery time" included two non-surgical phases

which amounted to a total of 30 minutes.  Actual surgery time, with these phases excluded is

8 hours 55 minutes.

213.    "The operative time was somewhat prolonged as well…" (p. 91) This statement is false because, once the time is corrected to the actual surgery time of 3 hours and 10 minutes, it would fall within Spiegel's conception of "reasonable time" for this procedure.

214.    "Blood loss was estimated at 400cc's." (p. 91) This statement is false because the more reliable resident physician's note which estimated blood loss at 250cc.

215.    "The hemoglobin went from 13.1 to 9.2 on 10/23/95 and the hemocrit from 37.8 to 25.8, again indicating significant bleeding." (p. 91) This statement is false because there was significant peri-fracture bleeding prior to surgery, as well as other significant factors contributing to the post-operative anemia. Such information presented in this manner could greatly confuse the non-surgical members of the investigation committee and cause them to have an adverse opinion that is based on this misrepresented information.

216.    "[T]he op note for 10/25/95 …" (p. 91) This date is incorrect.  To the extent Spiegel is suggesting that the operative note was dictated for the wrong date, Spiegel misreferenced the date (neither the operative date nor note occurred on the 25th).

217.    "[T]he operative time was 23:25 to 01:30, a two hour and five minute operation." (p. 29) This statement is false because the more reliable intra-operative nurse's note indicated a stop time of 01:25.  Thus the surgery time was actually 2 hours.

218.    "This development could be considered a complication of previous surgery, that is, a delayed union at the fracture site." (p. 29) This statement is false because there is no manner in which this situation could be related as a complication of the previous surgery.

219.    "[T]he length of the operation was … three hours and twenty-nine minutes." (p. 47) This statement is false because  the actual operative time was three hours and eighteen minutes – from initial incision to extubation after wound closure.

220.    "[T]he surgery started at 20:00 hours and ended at 23:50 for 3 hours and 50 minutes." (p. 23) This statement is false because the surgery actually started at 20:01 and the patient was extubated at 23:40, for a total surgery time of 3 hours and 39 minutes.

221.    "The second surgery was done on 11/24/95 … that surgery only lasted about an hour." (p. 61). This statement is false because the second surgery was actually a sterile dressing change performed on 11/22/95.  The third surgery was either 42 or 47 minutes, not 60 minutes.

222.    "Surgery time was from 0125 to 0600 for a total of four hours 35 minutes." (p. 80). This statement is false because the initial phase of the operative session was from the exploratory laporotomy.  The beginning of the surgical procedure (tourniquet up) did not occur until 02:35 for a total operative time of 3 hours, 25 minutes.

223.    "[T]he dictation was done almost a month later on 4/23/96." (p. 80). This statement is false because the dictation was actually completed on 4/2/96, however, the medical records chart completion unit indicated that they did not have the dictation.  Dr. Pierson was forced to do a second dictation, which did not occur until 4/23/96.

224.    "The operative time for this procedure was from 12:15 to 15:30, 3 hours and 15 minutes." (p. 62). This statement is false because the surgery actually began at 12:50, according to the anesthesia record of when the incision occurred – for a total surgery time of 2 hours and 40 minutes.

225.     "The operative note was dictated on 02/07/96 for an operation done on 02/04/96." (p. 78).  This statement is false because the operative procedure was completed on 02/05/96. Thus, the operative dictation was less delayed than indicated.

226.     "The operative consent has a capsular stabilization as part of what is being consented to; which in my mind means an open procedure." (p. 81).  Spiegel is incorrect to the extent he is is suggesting the patient was not appropriately consented for the arthroscopic examination. The short stay record indicates it would be done.

227.     "Progress notes start on 12/21/95" (p. 46).  This statement is false because there is a note for 12/20/95.

228.     "Surgery time … was four hours and twenty-seven minutes." (p. 31). Surgery time is misstated.  Surgery started at 01:53 and the patient was extubated at 06:15, for a total surgery time of 4 hours and 22 minutes.

229.     "A consult was called 6/21/96 but the actual consult was not done until 6/24 and the ileus was managed by the orthopedist." (p. 24).  This statement is meant to suggest that it is inappropriate for an orthopedic surgeon to treat such a condition.  Dr. Pierson treated the ileus while waiting for the consulting physician to respond.

230.     "This operative time was somewhat long for a hemi-arthroplasty." (p. 24).  Such a statement is inconsistent with the orthopedic literature.

231.     "Surgery time was from 1805 to 2310 which is five hours and five minutes." (p. 56). "I believe this is another case where there is an excess of operative time." (p. 56).  This statement is false because surgery actually began at 1820, and extubation occurred at 2300.

Plus there were two intraoperative sets of x-rays.  Total time was actually 4 hours 40 minutes or 4 hours 10 minutes when the x-ray time is excluded.

232.     "[T]he total operative time for all these procedures was from 02:53 to 08:30, five hours and thirty-seven minutes.  This is a somewhat long operating time, the many procedures had to be done." (p. 32).  "[T]he trend is a long operative time." (p. 32).  This is an overstatement of the actual surgery time by at least 42 minutes and additionally, a significant amount of non-surgical time.

233.     "A second series of surgeries were on 6/29/96 … these procedures took approximately two hours." (p. 32).  This statement is false because the operative procedure began at 11:40 and ended at 13:10 for a total operative time of 1 hour and 30 minutes.

234.     "Inappropriate use of a wrist arthroscopy in the treatment of this wrist fracture." (p. 45).  This statement is false because the literature indicates that arthroscopy and fluoroscopy used in these types of fractures is occurring more frequently with success.

235.     "The operative time is from 03:33 to 07:00, which is three hours and twenty-seven minutes …" (p. 33).  The stated surgery time is overstated by 15 minutes. And for practical purposes, the actual surgery time was overstated by 30 minutes (due to the bulky dressings and splintings that were done).

236.      "I would rate these first two surgeries as 5 in light of a subsequent malleolar mal-reduction." (p. 33).  This statement is false and is inconsistent with Spiegel's own review.  He previously stated that the operative reduction and alignment of all fractures is "satisfactory" post-operatively on the x-rays.

237.    "The patient had nine units of RBCs ..." (p. 57). This statement is false because the patient actually had 4 packed units of RBCs.

238.    "[T]he operation lasted from 1255 to 1700 which is four hours and five minutes and long for this procedure." (p. 57).  This statement is false because the operative time is actually 3 hours and 58 minutes.  For the magnitude of the work required and the difficulty of the reduction, this operative time is quite respectable.

239.    "This time the surgery time was between 10:25 and 11:35, an hour an ten minutes." (p. 53) This statement is false because the surgery start time according to the intraoperative nurse's note was 10:37, for a total surgery time of 58 minutes.

240.    "The operation started 22:25 and lasted until 00:34, 2 hours and 9 minutes." (p. 77) This statement is false because the actual surgery start time was 22:55, with an end time of 00:35, for a total time of 1 hour and 40 minutes, which was evident from the records in the chart.

241.    "Again, this procedure was done early in the morning on 04:05 until 06:55, two hours and fifty minutes surgery time." (p. 49) This statement is false because the surgical time is estimated to have actually started no earlier than 04:30.  With the starting time of 04:30, the operative time would be two hours and twenty-five minutes, which represents an excellent total surgery time for this case.

242.    "The history and physical examination are done by someone else other than Dr. Pierson." (p. 19) This statement is false because Dr. Pierson did perform the history and physical.

243.    "… [A]n operation that started at 13:10 and ended at 17:00 for three hours and fifty minute total surgical time." (p. 19) This statement is false because, due to the time the Marcaine was infiltrated, the surgery end time should be 16:45 pr before.  Using that time, as reference, the total surgical time was at most three hours and thirty minutes.

244.    "The operative procedure of three hours and one minute this time is somewhat long …" (p. 19) This statement has no basis in the reality of orthopaedic surgical practice with regard to should stabilization surgery. The time is appropriate and consistent with the procedures performed.

245.    "Anesthesia time was from 2049 to 2340 which is two hours and 51 minutes." (p. 42) Surgery had to have ended prior to 2340 (discharge time from the operating room) in order to apply the bulky dressings, which probably took ten minutes.  Also, intraoperative x-rays were taken.  Thus the surgical time is overestimated by 10 minutes, or even 20 minutes.

246.    "Surgery was from 13:30 to 20:18, 6 hours and 48 minutes." (p. 28) This statement is false because the patient was extubated at 20:07, for a surgery time of 6 hours 37 minutes.

247.    "Cases in which something happens out of the norm at surgery should be dictated in a timely fashion." (p. 30) This statement is false because there was no intraoperative complication, as suggested.  The additional finding of more significant meniscal involvement is not "out of the norm."

248.    "The operation took from 09:31 to 14:35 and that would be five hours of surgery." (p. 64) "This case was excessive in time (5 hours)." (p. 64) This statement is false because 45 minutes was lost in between two phases of surgery, due to the need to reposition the patient.

Thus the actual operative time was a max of 4 hours and 19 minutes, which is well within acceptable limits.

249.     "The operation lasted one hour with 350cc orthopaedic blood loss." (p. 87) This statement is false because the surgery actually last 1 hour 10 minutes, with a blood loss of 300cc (there is no reference anywhere to a blood loss of 350cc).

250.     "All these operations apparently took from 1120 to 1555 which is 4 hours and 35 minutes." (p. 87) The indicated operative time by Dr. Spiegel represents an overstatement of the required surgical time by 1 hour and 30 minutes.  "The surgery lasted from 10:25 to 14:55 which is four hours and 30 minutes."  (p. 55) This statement is false because the surgery started at 10:25.  The procedure ended at 14:40, according to the intraoperative nurse's note.  This represents a total surgery time of 4 hours 15 minutes.

251.     "Surgery apparently started at 04:25 ending at 16:15 which is eleven hours and fifty minutes." (p. 25) "… the absence of prioritization of the surgeries is bothersome…" (p. 26) Spiegel said that a closed injury should have been prioritized.  His recommendation to ignore the open injuries initially is an approach that represents medical malpractice.

252.     In late November 1998, Defendant Spiegel, on information and belief, a contracted employee of FOI under the direction, at FOI, of Defendant Sanders, submitted a second report to Defendant Moser containing false and defamatory written statements about Dr. Pierson's professional competence, implying that Dr. Pierson was professionally incompetent and was performing below the acceptable standard of care.

253.     The second report by Defendant Spiegel was itself defamatory and contained statements that were false and misleading and omitted facts that tending to make the

statements more false and misleading. Included in the report were false misrepresentations regarding Dr. Pierson's surgical technique, surgical judgment, methods and practice, operative durations, operating times, medical records and/or surgical decisions.  Statements include:

254.    Defendant Spiegel falsely stated that the patient referred to on p. 70 was subjected to a prolonged operative time.  In truth, the operative time of 4 hours and 22 minutes is well within the accepted range as confirmed by the literature.  Defendant Spiegel also falsely stated that the patient referred to on p. 30 was subjected to a prolonged operative time.  In actuality, this patient was operated on the 24th day following injury.  At that late stage significant soft tissue contracture had occurred and early fracture union had taken place. This resulted in a difficult procedure.

255.    In making the false statements above, Defendant Spiegel acted in a negligent manner. Alternatively, Defendant's statements were knowingly false, malicious, or made with reckless disregard to the truth or falsity of the statements.

256.    Sometime between June of 1999 and August of 2000, Defendant Appleblatt had a series of conversations with Ms. Lisa Jones during which he made false and defamatory statements about Dr. Pierson to Ms. Jones.

257.    During one conversation, Defendant Appleblatt made statements that were false and misleading and omitted facts which tended to make the statements more false and misleading. Defendant Appleblatt told Ms. Jones that Dr. Pierson was taken off trauma call at ORMC because he wasn't a good surgeon, and he was not a good surgeon because he was very slow.  Defendant Appleblatt also stated that Dr. Pierson's surgeries were excessive in

duration and that he would tie up the trauma staff all night.  He stated that a "committee" at ORHS agreed with him that Dr. Pierson was talking too much time for his surgeries.

258.     In making these false statements, Defendants Appleblatt acted in a negligent manner. Alternatively, Defendants' statements were knowingly false, malicious, or made with reckless disregard to the truth or falsity of the statements.

259.     Defendants ORHS and Hillenmeyer, provided false, erroneous, and defamatory information about Dr. Pierson to the National Practitioners Data Bank, to the Florida Department of Health and to other third parties.  The statements concerned Dr. Pierson's surgical technique, surgical judgment, methods and practice, operative durations, operating times, and/or surgical decisions.  The report, in and of itself, taken as a whole, is defamatory. These entities and third parties have published and republished these defamatory statements, which Dr. Pierson has also been required to self-publish.

260.     The statements in Defendants' report to the National Practitioners Data Bank defamed Dr. Pierson by stating that Dr. Pierson was not a competent surgeon; that Dr. Pierson was not a surgeon who should perform emergency and trauma procedures; and that Dr. Pierson is a dangerous surgeon, all of which statements are provably false.  Moreover, to the extent ORHS claims the removal of Dr. Pierson's emergency department and trauma call was not a reduction or revocation of clinical privileges, then the Adverse Action Report is per se false and defamatory for claiming exactly the opposite.

261.     In making these false statements, Defendants ORHS and Hillenmeyer acted in a negligent manner.  Alternatively, Defendants' statements were knowingly false, malicious, or made with reckless disregard to the truth or falsity of the statements.

262.    Defendants' statements have harmed Dr. Pierson's reputation or lowered his esteem in the community.

263.    Because of Defendants' statements, Dr. Pierson has suffered and continues to suffer actual and special damages, including but not limited to harm to his reputation, economic loss, extreme embarrassment, humiliation, outrage, and indignity.

264.    Defendants' statements were not privileged.  The defamatory statements republished by Defendants were not privileged.

265.    Defendants Murbach and Appleblatt were associated with, employed by and/or acted as an agent of Defendant Wolverine, thus, Defendant Wolverine is liable for his actions. Similarly, ORHS is liable for the actions of its employees and/or agents, including Defendants Bott, Diebel, Moser, Hillenmeyer, Connolly, Evans, Galceran, Bone, and Rivero. FOI and Sanders are similarly liable for the actions of their agent Spiegel.

## COUNT 3 – FRAUD (ORHS)

266.    The allegations contained in Paragraphs 25 – 113 are incorporated by reference.

*Fraud in the Inducement*

267.    At all times prior to plaintiff obtaining privileges at ORHS, Defendant ORHS knew that plaintiff was an orthopedic surgeon with an interest in trauma care, with prior practice and experience through residency.

268.    At all times during late 1993 and 1994, when Dr. Pierson was applying for privileges at ORHS, ORMC, an ORHS hospital, held itself out to be a Level One Trauma Center, specializing in orthopedic trauma services, willing and able to provide 24 hour patient care.

That ORMC was a Level One Trauma Center, able to provide around-the-clock patient care, and afford orthopedic surgeons the right to take trauma and emergency department call, were material inducements to Dr. Pierson seeking privileges at ORHS.

269.    Dr. Pierson was reasonable in relying on ORHS's representation because ORMC had the facilities to provide such care.  Also, at that time, it was well within the standard of care for orthopedic surgeons to perform surgery, regardless of the hour, when clinically indicated.

270.    After Dr. Pierson began taking trauma and emergency call, he discovered that ORMC's staff was unwilling to provide 24 hour patient care. Specifically, Dr. Pierson was made aware of strong opposition by Defendant Wolverine Anesthesiologists, and Defendants Murbach and Appleblatt, and other of Defendant ORHS's employees and staff to providing patient care during the late evening and early morning hours.  Because of their opposition to providing care outside of normal business hours, Defendant Murbach and Defendant Wolverine Anesthesiologists' employees reported alleged concerns to management at ORMC.  These reports initiated the secret sham investigation against Dr. Pierson which led to the wrongful suspension of his emergency and trauma call.

271.    Defendant ORHS was resistant to Dr. Pierson's method of care and did not want Dr. Pierson to perform late night or early morning surgeries because it believed that such surgeries increased its costs of operation.  In a December 3, 1998 meeting between Defendant Wolfram, a hospital employee[7], and Dr. Pierson, Defendant Wolfram told Dr. Pierson that the hospital faced 16 million dollars in losses and did not want him to perform surgery during late night and early morning hours, and did not want him to be on emergency and trauma call, period.  During that

conversation, Defendant Wolfram attempted to persuade Dr. Pierson to stop performing surgery at that time and stated that there would be no need to report him to the National Practitioner's Data Bank if he voluntarily stopped.

272. Defendant ORHS knew or should have known that its representations to Dr. Pierson were false and misleading because Defendant ORHS omitted crucial details regarding its willingness and amenability to provide 24 hour patient care to Dr. Pierson during his recruitment. Defendant ORHS was aware of budgetary concerns when Dr. Pierson was applying for privileges, but declined to disclose those concerns to Dr. Pierson. Moreover, when discussing staff privileges with Dr. Pierson, Defendant ORHS knew or should have known that budgetary restrictions would impact the services that surgeons could provide for patients.

273. Defendant ORHS never informed Dr. Pierson that the hospital and anesthesiologists opposed the type of care that Dr. Pierson provided, and operated under the assumption that if the patient was not suffering from a life-threatening injury and could be given palliative care, surgery should be delayed until normal business hours. The hospital was aware or should have been aware that it was well within the standard of care at the time Dr. Pierson applied for privileges to provide early surgical intervention to immediately alleviate patient suffering.

274. ORHS stood to gain by concealing the fact that it discouraged the performance of late night and early morning surgery on seriously injured patients. Dr. Pierson would not have applied for privileges at ORHS. Further, ORHS patients and other healthcare consumers might be less inclined to seek treatment at ORHS hospitals if they were aware that ORHS discouraged its surgeons from performing late night and early morning surgery on seriously

---

[7] At that time, Dr. Wolfram was a hospital employee who on December 3, 1998 called Dr. Pierson requesting a

injured patients despite the surgeon's determination that early surgical intervention was proper and could immediately alleviate patient suffering.

275.    As a result, Dr. Pierson experienced mental anguish and financial strain.  The economic effects included direct losses related to lost revenue from Dr. Pierson's inability to take call as well as the indirect losses related to the progressive loss of referrals from physicians practicing at ORHS, who lost confidence in Dr. Pierson's abilities because of the peer review.

276.    Additionally, and to the extent that ORHS claims the reduction of trauma or emergency call is not a clinical privilege, at all times prior to plaintiff obtaining privileges at ORHS, Defendant ORHS concealed that emergency and trauma call was not a clinical privilege, or part of clinical privileges, but rather an opportunity that could be given or taken away solely at Defendant's discretion.

277.    At all times prior to plaintiff obtaining privileges at ORHS, Defendant ORHS knew that plaintiff was an orthopedic surgeon with a subspecialty in trauma care.  Defendant held itself out as a hospital providing orthopedic trauma services.

278.    Article II, Part A and D of the Medical Staff Bylaws mention emergency service care as a function and responsibility of membership on the active staff and provisional staff.  Dr. Pierson read the Bylaws and understood that the Bylaws comprised his obligation to the hospital, and the hospital's obligation to him with regard to his clinical privileges.

279.    Defendant concealed that emergency and trauma call was not a clinical

_____

meeting with Dr. Pierson, and stated to him specifically that in the meeting he would be representing, in part,

privilege, but rather an opportunity that could be given or taken away solely within the

discretion of the hospital.  Defendants knew or should have known that a primary purpose of

orthopedic trauma surgeons obtaining hospital privileges is to provide emergency and trauma

call in order to establish physician referral relationships, both through the treatment of

patients and through associating with physicians on consultations.

280.     But for Defendant's representations and material omissions, Dr. Pierson would

not have applied for clinical privileges and medical staff membership.

281.     As a direct result of these Defendants' actions, Dr. Pierson has been damaged.

Damages include a loss of past earnings as the result of Dr. Pierson's exclusion from trauma

and emergency call; loss of income derived from patient referrals;  attorneys' fees to defend his

emergency and trauma call; and other consequential damages (such as those described

throughout the complaint) resulting from ORHS's fraudulent inducement.

## COUNT 4 – FRAUD (ORHS, HILLENMEYER)

282.     The allegations contained in Paragraphs 25 – 113 are incorporated by reference.

*Fraud - Sham Hearing and Appeal Process*

283.     Separately, and to the extent that ORHS claims the reduction of trauma or

emergency call is not a reduction or revocation of clinical privileges, Defendant ORHS

falsely stated to Dr. Pierson that reducing Dr. Pierson's emergency and trauma call

constituted a reduction in his clinical privileges and that to be reinstated on the call list, Dr.

Pierson would have to go through the hearing and appeal process.   ORHS CEO Defendant

---

the interests of the hospital.

Hillenmeyer wrote to Dr. Pierson on August 30, 1999: "Pursuant to Article VIII, Part B, Section 2 of the Medical Staff Bylaws, you are entitled to request a hearing before this recommendation is finally acted upon by the board." Pursuant to the cited section, the applicable ground for the hearing would be (g) "revocation of medical staff membership or reduction of privileges." Defendant Hillenmeyer stated that the ground for Dr. Pierson's hearing was the revocation of his medical staff membership or reduction of his privileges.

284.    Defendant Hillenmeyer, making the statement on behalf of ORHS, knew or was in reckless disregard of the fact that, under Defendant ORHS's interpretation and/or construction of the Bylaws, taking away emergency room and trauma call did not affect Dr. Pierson's clinical privileges, and that none of the grounds under Article VIII, Part B, Section 2 afforded Dr. Pierson hearing or appeal.

285.    Defendant ORHS stated that Dr. Pierson was entitled to a hearing with the intent that after the proceedings were completed, Defendant ORHS would falsely report Dr. Pierson to the Databank under the auspices of a professional review activity adversely affecting clinical privileges for more than 30 days.

286.    Dr. Pierson relied on Defendant ORHS's statements, requested a hearing and appeal, and spent extraordinary sums of money to go through the process enumerated by the Bylaws. Dr. Pierson was injured and damaged by these Defendants' false statements and misrepresentations. Had these Defendants not made such false statements and misrepresentations, Plaintiff would have not gone through the hearing and appeal procedures to reinstate his call. Also, by misrepresenting to Dr. Pierson that he was entitled to a hearing, Dr. Pierson mistakenly believed that he had to request a hearing to pursue his available

administrative remedies.  Dr. Pierson would not have delayed in seeking a remedy in court, as he did, had he not believed that he was required to exhaust his administrative remedies.

287.    As a result of Defendant ORHS's false and fraudulent statements and misrepresentations, Dr. Pierson experienced mental anguish and significant financial losses.

288.    Dr. Pierson suffered a substantial loss of his income as the result of being excluded by Defendant from trauma and emergency call, and being reported to the Databank and Department of Health as a result of these actions.  Dr. Pierson has suffered a significant loss of income because of his lack of resulting patient referrals.  Dr. Pierson has incurred significant attorneys' fees in seeking to regain what he believed to be his staff privileges – his placement on the emergency and trauma call schedule.  Dr. Pierson also has suffered other damages, as described elsewhere in this Complaint, from relying to his detriment on Defendant ORHS's misstatements and misrepresentations.

## COUNT 4 – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (MURBACH, APPLEBLATT, MOSER, CSENCSITZ, BOTT, CONNELLY, EVANS, RIVERO, GALCERAN, BONE, SPIEGEL, WOLFRAM, HILLENMEYER, AND DIEBEL)

289.    The allegations contained in Paragraphs 25 – 113 are incorporated by reference.

290.    The suspension and termination of Dr. Pierson from emergency and trauma call at ORHS caused by the actions of  Defendants and the publications of such incidents as set forth above constitute the tort of intentional infliction of emotional distress.

291.    By their conduct, Defendants Murbach, Appleblatt, Moser, Csencsitz, Bott, Connelly, Evans, Rivero, Galceran, Bone, Spiegel, Wolfram, Hillenmeyer, and Diebel intentionally and

recklessly labeled Dr. Pierson "incompetent" and a "dangerous" doctor and excluded him from performing orthopedic trauma and emergency surgeries with the intended purpose of denying him the opportunity to perform the professional services for which he trained.

292.    Defendants also intentionally and recklessly harmed Dr. Pierson through the use and abuse of the peer review process at ORHS.

293.    Defendants subjected Dr. Pierson to an investigation, review, hearing, and appeals process that spanned from 1996 – 2004.  Dr. Pierson takes substantial pride in his work, and to be labeled as an "incompetent" and a "dangerous" doctor, for what amounts to eight consecutive years, broke him down physically and mentally to the point of chronic sleeplessness and depression.

294.    In addition to the eight-year-attack on Dr. Pierson's self-worth,   it was outrageous for Defendants to have Dr. Pierson go through a hearing and appeal process under the auspices that this was the only way for Dr. Pierson to have his emergency and trauma call restored; to then report Dr. Pierson to the NPDB as if emergency and trauma call were in fact clinical privileges; and then claim that emergency and trauma call were not clinical privileges, or part of clinical privileges, in an attempt to claim that Dr. Pierson was not damaged.

295.    Defendants' conduct was not privileged, legally justified, or excused.  Further, their conduct was so extreme, unreasonable and outrageous in character and degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

296.    By engaging in such conduct, these Defendants intentionally and recklessly ignored and/or disregarded the foreseeable risk that Dr. Pierson would suffer extreme emotional distress as a result of Defendants' conduct.

297.    These Defendants' conduct proximately caused Dr. Pierson emotional distress. As a result of their conduct, Dr. Pierson was required to defend his surgical techniques in a sham peer review proceeding that utterly ignored the applicable medical standards of care at issue in Dr. Pierson's reviewed cases, Dr. Pierson was required to dispute an erroneous, false characterization of his practices filed by ORHS with the National Practitioner's Data Bank, Dr. Pierson was also required to defend his medical license in response to a complaint filed by ORHS with the Florida Department of Health, which complaint was based on the sham peer review conducted against Dr. Pierson, and he has been subjected to other investigations at other hospitals and healthcare organizations.

298.    Due to Defendants' conduct, Dr. Pierson has been labeled an "incompetent" and "dangerous" doctor, which is the most heinous label a physician can bear.  Dr. Pierson was ostracized from the Central Florida medical community and his ability to earn a livelihood for himself and his family was jeopardized and then destroyed.  Dr. Pierson suffered the dissolution of his marriage as a result of the tensions in familial and marital relationships that resulted from these Defendants' intentional and reckless abuse of the peer review procedures at ORHS.

299.    Defendants are either a part of the medical community in Central Florida or have knowledge of the healthcare industry and knew the serious and permanent ramifications to a physician and to his practice if the physician were labeled an "incompetent" and "dangerous" doctor.  These Defendants knew that their abuse of the peer review proceedings (and subsequent

reporting) at ORHS would devastate Dr. Pierson personally and professionally.  ORHS and the

Peer Review Defendants intended that their actions inflict emotional distress on Dr. Pierson or

knew there was at least a high probability that their actions would cause the severe emotional

distress that he has suffered.

300.    As a direct and proximate result of Defendants' conduct, Dr. Pierson has suffered and

continues to suffer actual damages as described herein including damages for lost profits and

loss of past and future earnings and/or earning capacity, in an amount to be determined by a

jury.  In addition, he has suffered non-economic damages (e.g., past and future mental anguish,

emotional distress, injury to reputation and physical pain) described herein to his detriment, in

an amount to be determined by a jury.

301.    Further, the acts, statements, determinations and recommendations made and acts

reported by Defendants as more fully set forth above, were made with malice, without good

faith, and with specific intent to cause injury to Dr. Pierson.

302.    Defendants Murbach and Appleblatt were associated with, employed by and/or acted

as an agent of Defendant Wolverine, thus, Defendant Wolverine is liable for his actions.

Similarly, ORHS is liable for the actions of its employees and/or agents, including

Defendants Bott, Diebel, Moser, Hillenmeyer, Connolly, Evans, Galceran, Bone, and Rivero.

FOI and Sanders are similarly liable for the actions of their agent Spiegel.


**COUNT 5 – NEGLIGENT HIRING AND SUPERVISION OF THOSE CONDUCTING
THE SHAM REVIEW**


303.    The allegations contained in Paragraphs 25 – 113 are incorporated by reference.

304.   Defendants Murbach, Csencsitz, Bone, Spiegel, Moser, Diebel, Bott, Evans, Connolly, Galceran, Rivero, and Wolfram, who are or were agents and/or employees of ORHS, acted maliciously with intent to harm Dr. Pierson.

305.   Defendant ORHS could reasonably foresee Defendants' wrongful, illegal and malicious actions against Dr. Pierson because Defendant ORHS was or became aware, or should have become aware of these Defendants' problems, biases and wrongful motives, which  indicated their unfitness to participate in the review proceeding at any level.  Defendant ORHS failed to take any action to investigate, discharge or reassign these Defendants in relation to their participation in Dr. Pierson's peer review.  Such action would have revealed that each of these Defendants were unsuited to participate in Dr. Pierson's review.

306.   Defendant ORHS is liable to Dr. Pierson for the negligent hiring and supervision of these Defendants.   Defendant ORHS negligently failed to investigate these Defendant physicians' propensities for wrongful, illegal, destructive, vengeful and malicious action, bias, or wrongful motive before placing them in positions at ORHS from which these Defendants were able to orchestrate and perpetrate malicious acts and the sham review proceeding against Dr. Pierson.  Had Defendant ORHS investigated the Defendant physicians, such investigation would have revealed their unsuitability to participate in Dr. Pierson's review.

307.   Defendant ORHS negligently failed to supervise these Defendants to prevent them from maliciously conducting a sham review against Dr. Pierson and from acting wrongfully and illegally in the manner described to Dr. Pierson.

308.     Defendant ORHS negligently placed Drs. Shea and Neder on the peer review hearing and appeals panels, and failed to remove them from those panels after Dr. Pierson objected to their participation.

309.     As a direct and proximate result of Defendant ORHS's negligence, Dr. Pierson suffered and continues to suffer actual damages.

310.     In addition, Dr. Pierson has suffered non-economic damages, including past and future mental anguish, emotional distress, injury to reputation and physical pain.


### COUNT 6 – REQUEST FOR DECLARATORY RELIEF – COMPLIANCE WITH BYLAWS, RESCISSION, AND EXPUNGEMENT

311.     The allegations contained in Paragraphs 25-113 are incorporated by reference.

312.     ORHS claims that emergency and trauma call was not a clinical privilege, or part of clinical privileges, therefore the report ORHS made to the NPDB is false.

313.     An actual controversy has arisen between Dr. Pierson and Defendant ORHS.  Dr. Pierson contends that he has a legal right to have Defendant ORHS comply with its Bylaws, and that, accordingly, ORHS should rescind and vacate their erroneous suspension of Dr. Pierson's emergency room and trauma call. ORHS should expunge these events from his record at ORHS so that such events may not be used against him in the future at ORHS Defendant ORHS contends that Dr. Pierson lacks such a right.

314.     An actual controversy also has arisen between Dr. Pierson and the Defendant ORHS with regards to Dr. Pierson's contention that he has a legal right to have Defendant ORHS

rescind, correct, and expunge the reports made to any third party, including the National
Practitioner Data Bank and the Florida Department of Health.

315.    Dr. Pierson brings this complaint for declaratory relief to settle and resolve his
uncertainty with respect to rights, status and other legal relations.  Dr. Pierson's claim that a
bona fide, actual, present practical need exists for such declaration is sufficient to invoke the
Court's jurisdiction to enter the declaratory relief requested.

316.    Dr. Pierson seeks a declaration of his rights that he is entitled to have Defendant ORHS
comply with its Bylaws and rescind, correct and expunge any reports made to any third party
about Dr. Pierson.  Dr. Pierson also seeks his court costs and interest as allowed by law.  The
relief sought by Dr. Pierson is not advisory.


## COUNT 7 – CIVIL CONSPIRACY – CONSPIRACY TO DEFAME

### (ORHS MURBACH, APPLEBLATT, BOTT, EVANS, CONNOLLY, SPIEGEL, BONE, CSENCSITZ, COLE, HILLENMEYER, MOSER, DIEBEL, EVANS, GALCERAN, RIVERO, AND WOLFRAM)

317.    The allegations contained in Paragraphs 22-137, and 161 - 197 are incorporated by
reference.

318.    Defendants Murbach, Appleblatt, Bott, Evans, Connolly, Spiegel, Bone, Csencsitz,
Cole, Hillenmeyer, Moser, Diebel, Evans, Galceran, Rivero, and Wolfram through letters,
meetings, and conversations agreed to defame Dr. Pierson to accomplish their respective
personal, professional, political and economic agendas.  This concerted action to defame Dr.
Pierson directly and proximately resulted in harm to Dr. Pierson's reputation, his feelings of
mental anguish, and economic loss.

319.     Defendants' agreement to defame Dr. Pierson directly resulted in harm to his reputation, and caused him feelings of mental anguish and direct economic loss.

320.     On information and belief, Defendants Murbach, Appleblatt, and other employees of Defendant Wolverine Anesthesiologists, through meetings and/or conversations prior to May 8, 1996, came to an agreement to defame Dr. Pierson to accomplish their respective personal, professional, and political goals.  The anesthesiologists, opposed to Dr. Pierson's method of patient care, circulated false statements about Dr. Pierson's competence and approached Dr. Bott for the purpose of providing false statement s about Dr. Pierson's patient care and competence to incite an investigation of Dr. Pierson.   Defendant Murbach knew that any false statements about Dr. Pierson's competence as a surgeon to doctors in positions of authority at ORHS would result in an investigation of Dr. Pierson, and the publication of defamatory statements about Dr. Pierson.

321.     Defendants Csencsitz and Bott, after speaking with Defendant Murbach and other anesthesiologists, initiated an investigation of Dr. Pierson based on the false statements regarding Dr. Pierson's competency.

322.     The multiple false statements in Defendants Connolly's, Evans', and Bott's reviews about Dr. Pierson's surgical technique, surgical judgment, methods and practice, operative durations, operating times, and/or surgical decisions defamed Dr. Pierson by communicating to others that Dr. Pierson was not a competent surgeon; that Dr. Pierson is not a surgeon who should perform emergency and trauma procedures; and that Dr. Pierson is a dangerous surgeon.  Specifically, Defendants misstated operating times, by stating that the procedures were longer than they actually were, or by oversimplifying the nature of the procedure such

that the duration of the procedure seemed excessive in light of the stated procedure.  Had

Defendants not made defamatory statements concerning Dr. Pierson's surgical practices and

procedures, members of the IC and MEC would not have been able to conclude that Dr.

Pierson's surgeries were excessively long.

323.    Defendants Galceran, Bone, and Rivero, as members of the Investigation Committee,

were specifically tasked by the Credentials Committee to investigate Dr. Pierson's

competency as a surgeon.  Defendant Galceran, the head of the Investigation Committee,

stated in the peer review hearing that he did not review a single one of Dr. Pierson's charts.

Nevertheless, in the October 21, 1996 meeting Defendants Galceran, Bone, and Rivero agreed

with and adopted the peer reviews of Defendants Connolly, Evans, and Bott, and represented, in

writing to Defendant Moser, the head of the Credentials Committee, that Dr. Pierson had

excessive operating times and that he should be removed from trauma call.

324.    On information and belief, Defendant Moser, looking for an "outside" peer reviewer

who would confirm that Dr. Pierson's trauma and emergency call should remain suspended, and

should ultimately be terminated, spoke with Defendant Cole who acknowledged that Defendant

Spiegel would provide the type of sham review that Defendant Moser was looking for.

325.    Defendant Spiegel, in the course of two separate reports reviewing Dr. Pierson's

patients, defamed Dr. Pierson by publishing false statements regarding Dr. Pierson to Defendant

Moser, and others, with the knowledge that the statements were false, or with a reckless

disregard for the truth or falsity of the statements.

326.    On information and belief, Defendant members of the Credentials Committee and the

Investigation Committee, agreed, in a meeting or meetings, to adopt the conclusions and false

statements promulgated by Dr. Spiegel in his reports, disregarding the medical literature and Dr. Pierson's vigorous defense of his professional abilities, to defame Dr. Pierson through false and erroneous conclusions about his competency as a surgeon.  Defendant members of the Credentials Committee and the Investigation Committee knew that such conclusions and statements would lead to the removal of Dr. Pierson from emergency and trauma call and would result in reporting him to the National Practitioner Data Bank.

327.    The collective action of Defendants Murbach, Appleblatt, Bott, Evans, Connolly, Spiegel, Bone, Csencsitz, Cole, Hillenmeyer, Moser, Diebel, Evans, Galceran, Rivero, and Wolfram resulted in Dr. Pierson being reported by ORHS to the National Practitioners Data Bank.  The statements in Defendants' report to the National Practitioners Data Bank defamed Dr. Pierson by stating that Dr. Pierson was not a competent surgeon; that Dr. Pierson was not a surgeon who should perform emergency and trauma procedures; and that Dr. Pierson is a dangerous surgeon, all of which statements are provably false.  Moreover, to the extent ORHS claims the removal of Dr. Pierson's emergency department and trauma call was not a reduction or revocation of clinical privileges, then the Adverse Action Report is per se false and defamatory for claiming exactly the opposite.

328.    Defendant employees of ORHS, including Defendants Hillenmeyer, Moser, Diebel, and Wolfram, committed an overt act to further the object or course of action of the conspiracy.  On December 3, 1998, at a meeting called by Defendant Wolfram with Dr. Pierson, Defendant Wolfram attempted to persuade Dr. Pierson to stop performing surgery during the evening and early morning hours and stated that there would be no need to report him to the National Practitioner Data Bank if he voluntarily stopped.

329.    In engaging in the above actions, at least two Defendants of Defendants Murbach, Appleblatt, Bott, Evans, Connolly, Spiegel, Bone, Csencsitz, Cole, Hillenmeyer, Moser, Diebel, Evans, Galceran, Rivero, and Wolfram agreed to defame Dr. Pierson.  Their action culminated in the issuance of a false, defamatory report to the National Practitioner Data Bank. They also performed some overt act in the pursuance of the conspiracy resulting in Dr. Pierson's feelings of mental anguish and humiliation, damage to Dr. Pierson's reputation, and damage to Dr. Pierson's medical practice.  As asserted above, the anesthesiologists, competing orthopedists, and other named Defendants who had a personal bias towards Dr. Pierson had a personal stake in the activities separate and distinct from ORHS' monetary interest, so as to conspire with agents and employees of Defendant ORHS.

330.    Defendants Murbach and Appleblatt were associated with, employed by and/or acted as an agent of Defendant Wolverine, thus, Defendant Wolverine is liable for his actions. FOI and Sanders are similarly liable for the actions of their agent Spiegel.

## COUNT 8 - CIVIL CONSPIRACY – CONSPIRACY TO BREACH THE MEDICAL STAFF BYLAWS

### (DEFENDANTS MOSER, GALCERAN, BONE, RIVERO, BOTT, CONNELLY, AND EVANS)

331.    The allegations contained in Paragraphs 22 – 137, 139 - 159 are incorporated by reference.

332.    If removing Dr. Pierson from emergency and trauma call constitutes a reduction of his clinical privileges, and, thus, is governed by the ORHS Bylaws, Defendants Moser, Galceran, Bone, Rivero, Bott, Connelly, and Evans, through meetings and/or conversations agreed not to tell Dr. Pierson about the investigation into Dr. Pierson's surgeries, and agreed

that Dr. Pierson would not be afforded an opportunity to meet with the Investigation Committee before it issued its report of October 21, 1996, which the Investigation Committee, on behalf of ORHS, was required to do under the Bylaws.

333.    As competing orthopedists, Defendants Bott, Connelly, and Evans had an economic, political, and/or personal stake in Defendant ORHS' breach of the Medical Staff Bylaws.

334.    The above Defendants also agreed, by extending the investigation past 30 days, to breach the Bylaws. The Investigation Committee, on behalf of ORHS, took 5 months for the initial phase of its investigation when the Bylaws provide that the investigation should be done in 30 days.

335.    The Investigation Committee, on behalf of ORHS, then agreed to recommend that Dr. Pierson's trauma and emergency call be suspended in direct contravention of the bylaws which state that a summary suspension should only occur in the best interest of patient care or safety in the hospital, or for the continued effective operation of the hospital, neither of which was specified by the Investigation Committee in its October 21, 1996 report.

336.    Defendants had a meeting of the minds on the object or course of action of the conspiracy and at least one of these Defendants committed an overt act to further the object or course of action of the conspiracy.  Defendants' concerted action to enable, assist in, and affect Defendant ORHS' breach of the Medical Staff Bylaws directly and proximately resulted in damages to Dr. Pierson.

337.     Dr. Pierson has sustained substantial economic damages, including but not limited to (a) the loss of his emergency and trauma call and consulting privileges, resulting in substantial loss of earnings; (b) the loss of referrals and patients as a result of being removed from the

emergency and trauma call schedule, resulting in substantial loss of earnings; (c) substantial

economic losses in defending against ORHS's and the Peer Review Defendants' actions and the

sham peer review, including payment of reasonable attorneys' fees and costs; and (d) other

consequential damages (such as those described throughout the complaint) resulting from

conspiracy, breach , and violation of the Bylaws.

### COUNT 9 - CIVIL CONSPIRACY

### (DEFENDANTS MURBACH, APPLEBLATT, BOTT, EVANS, CONNOLLY, SPIEGEL, BONE, CSENCSITZ, COLE, HILLENMEYER, MOSER, DIEBEL, EVANS, GALCERAN, RIVERO, WOLFRAM, AND SANDERS)

338.    The allegations contained in Paragraphs 22 - 137 are incorporated by reference.

339.    Individually, Defendants Murbach, Appleblatt, Bott, Evans, Connolly, Spiegel, Bone,

Csencsitz, Cole, Hillenmeyer, Moser, Diebel, Evans, Galceran, Rivero, Wolfram, and

Sanders lacked the ability to remove Dr. Pierson from emergency and trauma call.

340.    To remove Dr. Pierson from emergency and trauma call, it was necessary for the

Defendants to work in concert.  The Defendants together had the power to accomplish what

one Defendant could not accomplish individually.  The Defendants collectively opposed Dr.

Pierson in all proceedings aimed at removing him from trauma and emergency call.

341.    Specifically, it would have been impossible for one, or even two defendants to,

among other things, lodge complaints and make false statements regarding Dr. Pierson's

practice; investigate said complaints; suspend Dr. Pierson's emergency and trauma call; pick

a reviewer who would review Dr. Pierson's patient charts in a false and misleading manner;

proceed to review the charts in a false and misleading manner; change the Medical Staff

Bylaws to reflect a burden of proof favorable to the hospital before the hearing regarding Dr. Pierson's removal from trauma and emergency call; and make a report to the NPDB.

342.     Competing orthopedic surgeons including Defendants Bott, Evans, and Connolly stood to gain economically by eliminating competition through harming Dr. Pierson's relationship, and removing him from practice.  The anesthesiologists including Defendants Murbach and Appleblatt had personal motivations, including preserving a lifestyle with regular business hours, to remove Dr. Pierson from emergency and trauma call.  According to Defendant Wolfram, the ORHS had financial motivations to remove Dr. Pierson from emergency and trauma call.

343.     The above defendants agreed to remove Dr. Pierson from trauma and emergency call to accomplish their respective personal, professional, economic and political goals and the economic goals of the hospital.  Defendants had a meeting of the minds on the object or course of action of the conspiracy and at least one of these Defendants committed an overt act to further the object or course of action of the conspiracy.

344.     This concerted action to remove Dr. Pierson from trauma and emergency call directly and proximately caused Dr. Pierson mental anguish and economic loss, and other damages.

345.     Defendants Murbach and Appleblatt were associated with, employed by and/or acted as an agent of Defendant Wolverine, thus, Defendant Wolverine is liable for his actions. FOI and Sanders are similarly liable for the actions of their agent Spiegel.


**COUNT 10 - CIVIL CONSPIRACY – CONSPIRACY TO DEFRAUD**

**(DEFENDANTS MURBACH, APPLEBLATT, BOTT, EVANS, CONNELLY, GALCERAN, BONE, RIVERO, SPIEGEL, ORHS, HILLENMEYER AND MOSER)**

346.    The allegations contained in Paragraphs 22 – 137 are incorporated by reference.

347.    If removing Dr. Pierson from emergency and trauma call does not constitute a

reduction of clinical privileges, and is, therefore, not a right or obligation governed under by

the Medical Staff Bylaws (the contract between Dr. Pierson and the ORHS), Defendant

ORHS committed fraud and Defendants Murbach, Appleblatt, Bott, Evans, Connelly,

Galceran, Bone, Rivero, and Spiegel came to an agreement with ORHS, and its agents and

employees, Defendants Hillenmeyer and Moser, to commit fraud.

348.    Defendants' agreement was made in the interest of accomplishing Defendants'

respective personal, professional, political and economic agendas, and the economic agenda

of the hospital.

349.    The allegations contained in Paragraphs 199 - 220 are incorporated by reference.

350.    Defendants individually took action leading up to and enabling Defendant

Hillenmeyer, acting on behalf of ORHS, to defraud Dr. Pierson.  Through providing the

initial false comments on Dr. Pierson's competence; participating on the Investigation

Committee or Credentials Committee; or through providing a review of Dr. Pierson's patient

charts, Defendants Murbach, Appleblatt, Bott, Evans, Connelly, Galceran, Bone, Rivero,

Moser and Spiegel took overt action in furtherance of the conspiracy.

351.    Furthermore, Defendants Galceran, Hillenmeyer, Murbach, Moser, Connolly,

Spiegel, Csencsitz, Bott, Wolfram and Diebel assisted Defendant ORHS in the hearing by

providing live testimony or testimony via Affidavit.

352.    Dr. Pierson spent extraordinary sums to participate in the hearing and appeals

process, and as a result was injured and damaged by the false statements regarding the nature

of trauma and emergency call, and his entitlement to a hearing.  But for the false statements, Plaintiff would not have participated in the hearing and appeal procedures in an attempt to reinstate his call and, instead, would have promptly pursued other avenues including but not limited to litigation to have his emergency and trauma call reinstated.

353.    Dr. Pierson was injured as a result of Defendants' conduct and suffered financial and personal losses.

## IV.    CONDITIONS PRECEDENT

354.    All conditions precedent have been performed or have occurred.

## V.    DEMAND FOR JURY

355.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury.

## VI.    PRAYER FOR RELIEF

Wherefore, premises considered, Dr. Pierson prays that Defendants be cited to appear and answer herein, and that upon final trial or hearing, Dr. Pierson recover judgment against the Defendants, jointly and severally, ordering as follows:

A.    That the Court award Dr. Pierson his actual damages as proved at trial;

B.    That the court award Dr. Pierson statutory damages as allowed by law;

C.    That ORHS and the Peer Review Defendants and their respective officers, directors, agents and employees, and all other persons acting or planning to act on behalf thereof, or in concert therewith, be perpetually enjoined and restrained from in any manner, directly or indirectly, continuing, maintaining or renewing the aforesaid

conspiracy, and from adopting or following any practice, plan, program or design, having a similar purpose or effect;

E.    That the Court award punitive damages as allowed by law;

F.    That the Court award pre-judgment and post-judgment interest as provided by law;

G.    That the Court award Dr. Pierson reasonable and necessary attorneys' fees as pleaded;

H.    That the Court award Dr. Pierson his taxable costs of Court; and

I.    That the Court grant such other and further relief to which Dr. Pierson has pleaded and/or shown himself justly entitled.

## **VERIFICATION**

**STATE OF CALIFORNIA §**
                                        **§**
**COUNTY OF _____ §**

On this day, Raymond H. Pierson, III, M.D., appeared before me, the undersigned notary public.  After I administered an oath to him, upon his oath, he said that he read the foregoing Plaintiff's First Amended Original Complaint and Demand for Jury Trial – Injunctive Relief Sought and that the facts stated in it are within his personal knowledge and are true and correct.

Respectfully submitted:


_____ s/ John Romano
John Romano
Florida Bar No. 175700
Romano Law Group
PO Box 21349
West Palm Beach, Florida 33416
Telephone:     561.533.6700
Facsimile:     561.533.1285



__s/Raymond H. Pierson_____
Raymond H. Pierson, III, M.D.


SWORN TO AND SUBSCRIBED before me by Raymond H. Pierson, III, M.D., on this ___ day of _____ 2009.


_____
Notary Public in and for the State of California
Printed Name: _____
My Commission Expires: _____