RAYMOND H. PIERSON, III,

                  **Plaintiff,**

and

JOANNE R. WERNTZ,

                  **Intervenor-Plaintiff,**

-vs-                        **Case No.  6:08-cv-466-Orl-28GJK**

ORLANDO REGIONAL HEALTHCARE SYSTEMS,
INC.; ERIK LIEBERMAN, as personal
representative of the Estate of Phillip G. Spiegel;
ROGER MURBACH; STEVEN APPELBLATT;
FRANK BONE; WILLIAM BOTT; THOMAS
CSENCSITZ; J. DEAN COLE; JOHN
HILLENMEYER; J. DAVID MOSER; N. DONALD
DIEBEL; RORY EVANS; MANUEL J. GALCERAN;
HEDRICK J. RIVERO; C. GORDON WOLFRAM;
ROY W. SANDERS; GREGORY A. RIEF, as co-
personal representative of the Estate of John
Connolly; LINDA G.T. PARKS, as co-personal
representative of the Estate of John Connolly;
MUSCULOSKELETAL INSTITUTE, CHARTERED;
and WOLVERINE ANESTHESIA CONSULTANTS,
M.D., P.A.,

                  **Defendants.**

_____

# ORDER

      Plaintiff Raymond H. Pierson, an orthopedic surgeon, formerly practiced medicine in

Orlando, Florida, and served on the trauma and emergency call schedules at two hospitals

operated by Defendant Orlando Regional Healthcare System, Inc. ("ORHS").  In November

1996, Plaintiff was summarily suspended from emergency and trauma call—but was allowed

to otherwise continue to treat patents at the hospitals—while a review of his surgical practices was conducted; ultimately, Plaintiff was indefinitely suspended from emergency and trauma call via a resolution of the ORHS Board in January 2004. Four years later, Plaintiff filed this lawsuit.

In the Third Amended Complaint (Doc. 235, filed August 31, 2009), Plaintiff brings eleven counts, naming as Defendants ORHS, its President/CEO, the chief of staff of one of its hospitals, fourteen doctors, and two physician groups. Additionally, Plaintiff's ex-wife has intervened in this case to assert a claim for loss of consortium. (See Second Am. Compl. in Intervention, Doc. 230). Now before the Court are the several motions to dismiss and to strike filed by the Defendants. (Docs. 237, 238, 239, 241, 242, 244, & 248). Responses to these motions have been filed (Docs. 256 & 257) and, with leave of Court, Defendants have filed Reply Memoranda (Docs. 261 & 262). The Court heard oral argument on the motions on November 19, 2009, (see Mins., Doc. 265; Hr'g Tr., Doc. 279), and now issues the following rulings.

## I. Background[1]

According to the Third Amended Complaint ("TAC"), at times relevant hereto Defendant Wolverine Anesthesia Consultants, M.D., P.A. ("Wolverine") held an exclusive contract to provide 24-hour anesthesiology services at ORHS's hospitals. (TAC ¶ 42). Sometime prior to May 8, 1996, anesthesiologists, including Defendant Roger Murbach, who

---

[1]The factual allegations in the Background section are taken from the Third Amended Complaint (Doc. 235) and at this stage of the case, no finding has been made as to their accuracy.

was associated with Wolverine, "covertly contacted" the Chair and Vice-Chair of the orthopedic surgery department at ORHS—Defendant William Bott and Defendant Thomas Csencsitz, respectively—and complained that Plaintiff performed surgeries late at night and that Plaintiff's surgeries were lengthy. (Id. ¶¶ 4, 43). In letters dated May 8, 1996, Bott and Csencsitz wrote to Defendant N. Donald Diebel, the Chief of Staff at Orlando Regional Medical Center, expressing concerns regarding Plaintiff's late-night surgeries and length of surgeries as noted by the anesthesiologists. (Id. ¶ 44).

Defendant Diebel then asked Defendant J. David Moser, Chairman of the Credentials Committee ("CC"), to appoint an Investigation Committee ("IC") to investigate Plaintiff's practices. (Id. ¶¶ 46-47). Defendant Moser appointed Defendants Frank Bone, Manuel J. Galceran, and Hedrick J. Rivero as the IC,[2] and they, in turn, selected three orthopedic surgeons—Defendants Bott, John Connolly,[3] and Rory Evans—to review some of Plaintiff's charts. (Id. ¶ 47). Bott, Connolly, and Evans allegedly wrote reviews containing "many false statements and erroneous conclusions" about Plaintiff's "surgical technique, surgical judgment, methods and practice, operative durations, operating times, and surgical decisions." (Id. ¶ 54).

On October 21, 1996, summaries regarding Plaintiff's surgeries were presented at a

---

[2]Plaintiff does not provide the area of practice for these three doctors in the TAC. In the Amended Complaint (Doc. 3), however, he indicated that Bone is a gastroenterologist, that Galceran practices internal medicine, and that Rivero is a radiologist. (Id. ¶¶ 7, 15, & 16).

[3]John Connolly died prior to the filing of the TAC. The co-personal representatives of his estate, Gregory A. Rief and Linda G.T. Parks, have been named as Defendants in his stead, but the Court will refer to "Defendant Connolly" herein rather than to his estate.

meeting of the IC; as of that date, Plaintiff still had not been informed of the investigation, which had been initiated five months earlier. (Id. ¶ 57). The IC then issued a report to the CC in which the IC allegedly "adopted the reviewers' conclusions as [its] own with no effort to verify any significant facts." (Id. ¶ 58). The IC asked for an outside review of Plaintiff's cases and recommended that Plaintiff be indefinitely removed from the emergency and trauma call schedule during the investigation. (Id. ¶ 59).

More than one month later, on November 25, 1996, Plaintiff was informed by Defendants Bott and Moser in a meeting that an internal investigation had been completed and that he was summarily suspended from trauma and emergency call pending an outside review of his cases. (Id. ¶ 66). On December 3, 1996, the President and CEO of ORHS, Defendant John Hillenmeyer, wrote Plaintiff a letter informing him of the suspension. (Id. ¶ 67). Plaintiff requested a hearing under the Medical Staff Bylaws ("Bylaws"); however, ORHS maintained in a letter from its counsel that Plaintiff was not entitled to a hearing, and his request for a hearing at that time was denied. (Id. ¶¶ 70, 72).

Defendant Moser—allegedly on the suggestion of Defendant J. Dean Cole, another orthopedist at ORHS—then selected a Tampa orthopedist under whom Cole had trained, Defendant Phillip Spiegel,[4] to conduct an outside review of the same cases that had been assessed during the initial review. (Id. ¶¶ 3, 74-75). On February 6, 1997, Spiegel submitted a 91-page report ("the Spiegel Report") that allegedly "contained a multitude of

---

[4]Spiegel died in June 2008 and his estate, through its personal representative, Erik Lieberman, has been substituted as a Defendant herein. However, as with Defendant Connolly, in this Order the Court will refer to "Defendant Spiegel" rather than to his estate.

misrepresentations of fact concerning [Plaintiff's] patient charts as well as many false statements regarding [Plaintiff's] surgical technique, surgical judgment, methods and practice, the durations and timing of operations that he performed, and/or surgical decisions." (Id. ¶ 78). Between July 1997 and January 13, 1998, Plaintiff responded to the Spiegel Report by providing the IC with a detailed report of his own; in that report, Plaintiff explained his treatment approach and surgical technique and pointed out "the gross mischaracterizations and factual inaccuracies that were stated in the initial ORHS in-house review and the . . . Spiegel Report." (Id. ¶ 79).

The IC then requested a second review by an academic medical reviewer, but Defendant Moser again selected Spiegel to address the evidence and medical literature that Plaintiff had provided in response to the Spiegel Report. (Id. ¶¶ 80, 82). The 1100-page "Spiegel Rebuttal" was provided to Plaintiff on November 30, 1998. (Id. ¶¶ 83-84).

On December 3, 1998, Defendant C. Gordon Wolfram, another ORHS doctor,[5] requested a meeting with Plaintiff; during that meeting, Wolfram told Plaintiff "that he believed that [Plaintiff] had done nothing wrong in his treatment of patients," that Defendant Csencsitz had also opined that Plaintiff had done nothing wrong, and that Csencsitz felt that the conclusions in the Spiegel Report were in some areas incorrect or controversial and not consistent with the standard of care. (Id. ¶¶ 86-87). Wolfram also "told [Plaintiff] that the hospital was facing 16 million dollars in losses and did not want [Plaintiff] to perform surgery at late hours because of perceived increased costs." (Id. ¶ 88). Additionally, "Wolfram

_____

[5]Wolfram's specialty is not given in the TAC, but in the Amended Complaint it was indicated as cardiology. (See Doc. 3 ¶ 17).

attempted to persuade [Plaintiff] to stop performing surgery late in the evening or in the early morning hours and stated that there would be no need to report him to the National Practitioner's Data Bank if he voluntarily stopped performing nighttime surgery and permanently removed himself from the orthopedic trauma and emergency call roster." (Id.).

Two weeks later, in a letter dated December 18, 1998, Defendant Csencsitz, then Chairman of the CC, told Plaintiff that any comments he wished to provide regarding the Spiegel Rebuttal should be submitted by January 22, 1999. (Id. ¶ 90). Plaintiff asked for more time to respond, but Defendants Csencsitz and Galceran told Plaintiff that the IC was satisfied with the Spiegel Rebuttal and would proceed to a final recommendation. (Id. ¶ 91). On July 1, 1999, the IC affirmed its initial recommendation to the CC in a second report. (Id. ¶ 92). The IC recommended that Plaintiff's privileges remain suspended, and "[t]he CC rubber-stamped this recommendation in its report" to the Medical Executive Committee ("MEC"), "the top committee at the hospital." (Id. ¶¶ 94, 46).

On August 30, 1999, the MEC recommended that Plaintiff "should be excluded from trauma call and emergency department call, and that there should be ongoing monitoring instituted to assess surgical scheduling time, length of surgery, and prompt dictation of operative notes." (Id. ¶ 94). In a letter dated that day, Defendant Hillenmeyer informed Plaintiff that he was entitled to a hearing under the Bylaws, and Plaintiff requested a hearing immediately. (Id. ¶ 99). The Hearing Panel commenced a hearing on April 23, 2003—more than three and half years afer Plaintiff's request for a hearing.[6] (Id. ¶ 100).

---

[6]The TAC does not provide any indication of the reason for the passage of more than three and a half years between the hearing request and commencement of the hearing.

During the hearing, "the malicious, false statements made by Defendants Spiegel, Connolly, Evans[,] and Bott in their reviews and assessments of [Plaintiff's] cases were presented as support for the MEC's recommendation to exclude [Plaintiff] from trauma call and emergency department call." (Id. ¶ 107). However, the hearing panel found that although Plaintiff took longer to perform surgeries than did his peers, his surgical times were within standards, were not excessive, and demonstrated no harm to patients. (Id. ¶ 108). The hearing panel also determined that the processes used by ORHS were deficient and found it surprising that Plaintiff had not been counseled or informed of perceived problems before the peer review was initiated. (Id. ¶ 109). The hearing panel recommended that Plaintiff be given an opportunity to show his willingness and ability to correct deficiencies in scheduling, in completing medical records, and in his attitude. (Id. ¶ 110). Additionally, the panel recommended provisional restoration of Plaintiff's privileges with proctoring by an experienced trauma surgeon. (Id.).

Both Plaintiff and the MEC appealed the recommendation of the hearing panel. (Id. ¶ 111). On December 12, 2003, Plaintiff was informed that the appeal panel had recommended (1) that Plaintiff not be placed on emergency call until the MEC determined him ready, willing, and able to work within institutional guidelines, standards, protocols, resources, and systems; (2) that the MEC verify and analyze Plaintiff's surgical procedures and outcomes during the prior year; (3) that Plaintiff not be placed on emergency or trauma call unless the MEC determined he had clinical competency to handle emergency surgical procedures; and (4) that Plaintiff perform non-emergent elective cases before attempting emergent or trauma cases. (Id. ¶ 112).

On January 26, 2004, the ORHS Board passed a resolution indefinitely maintaining suspension of Plaintiff's emergency and trauma call and consulting privileges. (Id. ¶ 113). ORHS then filed an Adverse Action Report with the National Practitioner Data Bank ("NPDB")—an entity to which it is obligated to report whenever it "'takes a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days.'" (Id. ¶¶ 116-17 (quoting 42 U.S.C. § 11133(a)(1)(A),(B))). In the Adverse Action Report, ORHS allegedly "provided a false, unflattering, misleading misstatement of the facts concerning Plaintiff's care of patients and suggested inappropriate conduct with respect to following hospital rules and regulations." (Id. ¶ 116).[7]

Four years later, on January 25, 2008, Plaintiff filed this lawsuit. (Doc. 1). He asserts that the peer review was a "sham" and identifies several alleged deficiencies in the peer

_____

[7]This NPDB report, which Plaintiff expressly incorporated by reference into the TAC, (see TAC at 33 n.6), states:

> Physician was removed from Hospital's orthopedic emergency/trauma call schedule. Physician's delineated clinical privileges have not been reduced or curtailed. Hospital does not consider participation on the emergency/trauma call schedule to be a clinical privilege; however, this report is submitted due to the expansive definition of "clinical privilege" under the Health Care Quality Improvement Act and the absence of a definitive determination in Florida as to whether participation on a hospital emergency/trauma call schedule is a clinical privilege. Physician was removed from the emergency/trauma call schedule because Physician routinely performed surgery during late night and early morning hours which did not need to performed at those times in the opinion of the peer reviewers. Physician's propensity for late night and early morning surgeries was determined to be inconsistent with Hospital's resources and staffing. Physician has also failed to comply with the rules and regulations of the medical staff, which further the risk management, quality assurance and other programs of Hospital, by delays in dictating operative reports.

(Adverse Action Report to NPDB, Ex. B to Doc. 238, at 3) (allcaps formatting removed).

review process, including that ORHS amended the Bylaws to change the burden of proof between August 1999 when he requested a hearing and April 2003 when the hearing began. (TAC ¶¶ 101-03). The TAC sets forth eleven counts: Breach of Contract against ORHS only (Count I); Defamation: Libel and Slander against ORHS and some of the individual Defendants (Count II); Fraud in the Inducement against ORHS only (Count III); Fraud against Defendants ORHS and Hillenmeyer only (Count IV); Intentional Infliction of Emotional Distress (Count V); Negligent Hiring and Supervision against ORHS only (Count VI); Request for Declaratory Relief—Compliance with Bylaws, Rescission, and Expungement against ORHS only (Count VII); Civil Conspiracy–Conspiracy to Defame against ORHS and some of the individual Defendants (Count VIII); Civil Conspiracy—Conspiracy to Breach the Medical Staff Bylaws against some of the individual Defendants (Count IX); Civil Conspiracy against some of the individual Defendants (Count X); and Civil Conspiracy—Conspiracy to Defraud against ORHS and some of the individual Defendants (Count XI). The motions to dismiss all but two of these counts are now before the Court.

## II. Motion to Dismiss Standards

Generally, "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "'[D]etailed factual allegations'" are not required, but "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting

<u>Twombly</u>, 550 U.S. at 570). In considering a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a court limits its "consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." <u>LaGrasta v. First Union Sec., Inc.</u>, 358 F.3d 840, 845 (11th Cir. 2004).

One caveat to the general pleading standard of Rule 8 is that "[i]n alleging fraud . . . , a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). As the Eleventh Circuit Court of Appeals has explained, "[p]articularity means that a plaintiff must plead facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendant['s] allegedly fraudulent acts, when they occurred, and who engaged in them." <u>United States ex rel. Atkins v. McInteer</u>, 470 F.3d 1350, 1357 (11th Cir. 2006) (citations and internal quotations omitted) (alteration in original).

Because a peer review proceeding is at issue in this case, Plaintiff also faces the hurdle of overcoming the qualified privilege provided by a Florida statute to peer review participants. Section 395.0193(2), Florida Statutes, requires, as a condition of licensure, that hospitals provide for peer review of physicians, and section 395.0193(5), Florida Statutes, states that "[t]here shall be no monetary liability on the part of, and no cause of action for damages against, any licensed facility, its governing board or governing board members, peer review panel, medical staff, or disciplinary body, or its agents, investigators, witnesses, or employees; a committee of a hospital; or any other person, for any action taken **without intentional fraud** in carrying out the provisions of this section." § 395.0193, Fla. Stat. (emphasis added). Because participants in peer review are immune from suit unless they acted with intentional fraud, "[t]o fall outside of the immunity provided by subsection

395.0193(5), [a plaintiff is] required to plead intentional fraud with particularity." <u>Cedars Healthcare Group, Ltd. v. Mehta</u>, 16 So. 3d 914, 917 (Fla. 3d DCA 2009).[8]  "The factual basis for a claim of fraud must be pled with particularity and must specifically identify misrepresentations or omissions of fact, as well as time, place or manner in which they were made." <u>Id.</u>

## III.  Discussion

As earlier noted, Plaintiff alleges eleven counts in the TAC (Doc. 235).  In the motions to dismiss now before the Court, all but Count I (breach of contract against ORHS only) and Count VII (request for declaratory relief against ORHS only) are challenged by the Defendants.  Additionally, while Plaintiff initially contested dismissal of Count III (fraud in the inducement against ORHS only), during oral argument Plaintiff's counsel conceded that Count III is barred by Florida's twelve-year statute of repose.[9]  (<u>See</u> Hr'g Tr., Doc. 279, at 42-43).  ORHS's motion (Doc. 238) is thus granted as to Count III based on the statute of repose and Plaintiff's concession.  Defendants make several arguments for dismissal of Counts II, IV-VI, and VIII-XI, and the Court now proceeds to address Defendants' motions as to those counts.

---

[8]The <u>Cedars</u> court quoted Florida Rule of Civil Procedure 1.120(b) immediately after the statement quoted in the text.  That rule is substantially identical to Federal Rule of Civil Procedure 9(b).

[9]Section 95.031(2)(a), Florida Statutes, provides in pertinent part that "an action for fraud . . . must be begun within 12 years after the date of the commission of the alleged fraud, regardless of the date the fraud was or should have been discovered."  Count III is based on fraud that allegedly occurred in 1994 and 1995, and this case was not filed until January 2008; Count III thus is, as now conceded by Plaintiff, barred by the absolute twelve-year limit of section 95.031(2)(a).

A.  Motion to Dismiss by Defendants Roy W. Sanders and Musculoskeletal Institute Chartered d/b/a Florida Orthopaedic Institute (Doc. 242)

Defendants Roy W. Sanders ("Sanders") and Musculoskeletal Institute Chartered d/b/a/ Florida Orthopaedic Institute ("FOI") have moved to dismiss the five counts that have been alleged against them—Counts II, V, VIII, X, and XI.  (See Doc. 242).  Sanders and FOI adopt the arguments made in ORHS's motion to dismiss (Doc. 238), and they also make arguments of their own, including that the counts against them do not state a cause of action for vicarious liability.

Plaintiff seeks to hold Sanders and FOI vicariously liable for the actions of Defendant Spiegel, the Tampa orthopedist who conducted the outside review of Plaintiff's surgical cases.  As alleged in the TAC, Sanders is a member of the staff of FOI, "an officer and/or director of FOI, and an employee and/or agent of FOI," (TAC ¶ 17); and Spiegel was formerly employed by FOI and supervised by Sanders, (id. ¶ 76).  Sanders and FOI argue in their motion to dismiss that they cannot be held vicariously liable for Spiegel's actions because Plaintiff has not alleged that Spiegel was acting in the scope of his employment with FOI when conducting the peer review-related acts described in the TAC.

As correctly noted by Sanders and FOI, "[u]nder Florida law, an employer may only be held liable for the intentional tort of its employee if the employee was acting within the scope of his employment at the time he committed the tort."  Carter v. Am. Online, Inc., 208 F. Supp. 2d 1271, 1278 (M.D. Fla. 2001).  "'Within the scope' means that the conduct must: 1) have been the kind he was employed to perform; 2) have occurred within the time and space limits of his employment; and 3) . . . have been activated at least in part by a desire

to serve the employer." Id. at 1278-79.

Sanders and FOI are correct that the Third Amended Complaint does not contain any allegations that Spiegel was acting within the scope of employment, and thus no basis for their vicarious liability for the torts of Spiegel has been set forth.  In response to the motion to dismiss filed by Sanders and FOI, Plaintiff merely asserts that he has stated a claim for vicarious liability and that "[t]he relevant facts in Paragraphs 75-78 put Defendants on sufficient notice of the claim."  (Pl.'s Consol. Resp., Doc. 257, at 39).  However, neither these paragraphs nor any other allegations of the TAC are sufficient to state a cause of action against Sanders or FOI based on vicarious liability for Spiegel's actions.  Paragraph 75 states that Defendant Moser retained Spiegel to conduct an outside review; it contains no allegations of agency, nor does it even mention Sanders or FOI.  Paragraphs 76 and 77 of the TAC provide:

> 76.  Spiegel was employed by Defendant FOI at least until 1994, before the investigation against [Plaintiff] began.  Following the end of his direct employment with Defendant FOI, Defendant Spiegel continued, on information and belief, a contractual relationship with FOI until 1999 (a time period relevant to his reviews provided in this peer review matter), participated in seminars and lectures sponsored by Defendant FOI[,] and maintained contact with FOI and its physicians.  Defendant Spiegel was directly supervised by Defendant Sanders in that capacity where he served as a supervising surgeon at a Tampa General Hospital affiliated clinic.  Defendant Spiegel also used FOI cases in his rebuttal report to criticize [Plaintiff's] care and treatment of patients.  Through his connections with Defendant FOI, Defendant Spiegel was aware of [Plaintiff's] open, unfavorable, and well-substantiated criticism of Defendant FOI's plans for a state-wide orthopedic surgery independent provider association, in February 1995, well before his involvement in this peer review matter.
>
> 77.  On information and belief, Defendants Cole, Sanders

and Spiegel were aware of the adverse impact [Plaintiff's] criticisms had on the failure of FOI's proposal to create a statewide orthopedic surgery independent provider association to be adopted by the Florida Orthopedic Society. Further, Cole and Sanders were present when [Plaintiff] spoke out against FOI's proposed independent provider association and were both noticeably impacted by the effect [Plaintiff's] legitimate criticisms had on the group of Florida Orthopedic Society representative[s] to whom FOI presented its proposal.

(TAC ¶¶ 76-77). Paragraph 78 pertains to the Spiegel Report of February 6, 1997 and makes no agency allegations or mention of FOI or Sanders. None of these paragraphs sets forth an allegation that, or a basis for concluding that, Spiegel was acting as an agent for Sanders or FOI when he performed actions in connection with Plaintiff's peer review.

The only other allegations that mention Sanders or FOI other than merely asserting that they are vicariously liable for the acts of Spiegel are: that Sanders was a member of the medical staff of FOI; "an officer and/or director of FOI, and an employee and/or agent of FOI," (id. ¶ 17); that FOI allegedly "acted through its agents and employees," (id. ¶ 20); and that "[i]n late November 1998, Defendant Spiegel, on information and belief, a contracted employee of FOI under the direction, at FOI, of Defendant Sanders, submitted a second, four volume report," (id. ¶ 261). The fact that Spiegel may have acted under Sanders's direction "at FOI" does not equate to Spiegel acting under Sanders's direction or on FOI's behalf in conducting the outside review of Plaintiff's cases. Sanders and FOI's motion is thus well-taken with regard to a lack basis for holding them vicariously liable for the acts of Spiegel.

Plaintiff also names Sanders as a Defendant in Count X of the TAC—one of the four civil conspiracy counts. However, Plaintiff does not provide any basis for inclusion of Sanders in that count. Sanders is merely listed, with others, as "lack[ing] the ability

individually to remove [Plaintiff] from emergency and trauma call." (TAC ¶ 348). Sanders is not otherwise mentioned in that count except in the caption and in paragraph 354, in which it is alleged that FOI and Sanders are liable for Spiegel's actions. The bare mention of Sanders in Count X is not sufficient to state a cause of action against him for civil conspiracy.

In sum, the motion to dismiss of Sanders and FOI will be granted, and all counts against these Defendants shall be dismissed because no basis for vicarious liability has been alleged in the TAC.

### B. The Other Defendants' Motions to Dismiss (Docs. 237, 238, and 244)

### 1. Sufficiency of Pleading In Light of Statutory Privilege

As earlier noted, a Florida statute provides for immunity from suit for peer review participants who act "without intentional fraud." § 395.0193(5), Fla. Stat. Thus, a plaintiff asserting claims based on events occurring in connection with peer review must "plead intentional fraud with particularity" in order to state claims that fall outside this statutory immunity. Cedars, 16 So. 3d at 917. Defendants contend that Plaintiff has not pleaded intentional fraud as required to overcome the qualified privilege[10] afforded by the statute. The Court agrees.

Plaintiff maintains in his response memorandum (Doc. 257) that he has satisfied the requirements for stating claims so as to overcome the statutory immunity, citing paragraphs

_____

[10]Defendants Sanders and FOI also argued in their motion (Doc. 242) that an absolute privilege for quasi-judicial proceedings applies. The other Defendants do not make this argument, and because the claims against Sanders and FOI have been dismissed on other grounds and because Defendants prevail on the issue of qualified privilege, the Court need not address the issue of absolute privilege.

171, 54, and 86-88 of the TAC.  (See Pl.'s Consol. Resp. at 26-27).  Paragraph 171 pertains

to one of the initial alleged defamatory statements—Murbach's statement to Bott that Plaintiff

took twelve hours to treat a tibia fracture when in fact the surgical time was only five hours

and thirty-five minutes.  Contrary to the assertion in Plaintiff's memorandum that, in

paragraphs including this one, he has "clearly alleged that the Defendants made

representations known by it [sic] to be actually false," (Doc. 257 at 26), he has not pleaded

intentional fraud with regard to Murbach's alleged statements; paragraph 171 does not aver

that the statement was knowingly or intentionally false rather than merely negligent.  Indeed,

just two paragraphs later, Plaintiff alleges that "Defendant Murbach was negligent with

regards to the falsity of the statements . . ., or alternatively acted with knowledge or reckless

disregard as [to] the falsity of the statements."  (TAC ¶ 173).

Plaintiff also relies on paragraph 54 of the TAC for his alleged satisfaction of the

"intentional fraud" pleading standard, but this paragraph does not meet that standard either.

He alleges that the initial reviews of Defendants Bott, Connolly, and Evans "contained many

false statements and erroneous conclusions" and that "[t]hey frequently falsely

misrepresented even the actual procedures performed on each patient." (Id. ¶ 54).  Falsity

and error are not, however, the equivalent of "intentional fraud."  Plaintiff also alleges in this

paragraph that Bott, Connolly, and Evans "allegedly wrote reviews," (id.), and in his

memorandum Plaintiff explains that he averred that they "allegedly" wrote reviews because

he believes they did not actually write the reviews.  (Doc. 257 at 26-27).  However, regardless

of Plaintiff's stated belief in his memorandum, no "intentional fraud" is pleaded in paragraph

54.

The final three paragraphs relied upon by Plaintiff in his response memorandum as support for satisfaction of the "intentional fraud" pleading standard are paragraphs 86-88. These paragraphs pertain to Plaintiff's meeting with Defendant Wolfram in December 1998 wherein Wolfram allegedly told Plaintiff that he did not believe that Plaintiff had done anything wrong and that the hospital did not want Plaintiff performing surgery late at night due to the cost. No "intentional fraud" is pleaded in these paragraphs as to Wolfram or any other Defendant; Plaintiff's contention that Wolfram's alleged statements support an assertion of "intentional fraud" is rejected.

At oral argument, Plaintiff's counsel cited additional paragraphs of the TAC—paragraphs 51-53, 55-58, 64-65, 82, and 101-102[11]—as purportedly pleading an intent to injure Plaintiff and satisfying the "intentional fraud" standard. (See Hr'g Tr., Doc. 279, at 58-61). However, these paragraphs plead, "upon information and belief," "bias" and "predisposition" as to several Defendants, (TAC ¶¶ 51-53); lack of knowledge of care standards or lack of experience, (id. ¶¶ 55 & 56); a meeting of the IC, (id. ¶ 57), that Plaintiff's counsel characterizes as an allegation of "collective involvement in [a] secret investigation," (Doc. 279 at 60); adoption by the IC—made up of non-orthopedists—of the conclusions of the initial reviewers, who were orthopedists, (TAC ¶ 58); a description of the summary suspension and Plaintiff's lack of notice of it, (id. ¶¶ 64-65); CC chairman Moser's selection of Spiegel—instead of an academic reviewer as requested by the IC—to conduct the second

---

[11]The hearing transcript refers to paragraph 108, but at this point in the hearing counsel appears to be describing paragraphs 101 and 102 of the TAC rather than paragraph 108. (See Doc. 279 at 61; TAC ¶¶ 101-02, 108).

review, (id. ¶ 82); and amendment to the Bylaws during the time between Plaintiff's request for a hearing and the time the hearing was commenced, (id. ¶¶ 101-02).

These paragraphs do not satisfy the "intentional fraud" standard as urged by Plaintiff.[12] Because Plaintiff has not pleaded "intentional fraud" with specificity as required by Florida statute and case law, he has not overcome the statutory qualified privilege that attaches to peer review. For this reason alone, his tort claims are due to be dismissed. Nevertheless, Defendants' alternative arguments for dismissal of Plaintiff's claims will be addressed.

## 2. Defamation (Count II)

In his defamation claim, Plaintiff alleges that "ORHS, Murbach, Bott, Csencsitz, Connolly, Evans, Galceran, Bone, Rivero, App[el]blatt, Spiegel, and Hillenmeyer made and published false and defamatory written and spoken statements about [Plaintiff] during and after the peer review." (TAC ¶ 170). Defendants assert that this claim fails because Plaintiff

---

[12]These paragraphs are the only paragraphs identified by Plaintiff as allegedly satisfying the "intentional fraud" standard required to overcome peer review immunity; Plaintiff does not argue on a count-by-count basis that he has met this standard, instead relying more generally on these cited paragraphs of the TAC.

Other paragraphs of the TAC also undercut Plaintiff's assertion of satisfying the intentional fraud standard. For example, throughout the defamation count, Plaintiff repeatedly alleges that the Defendants "were negligent with regards to the falsity of the statements, or alternatively acted with knowledge or reckless disregard as to the falsity of the statements." (See TAC ¶ 175 (discussing Bott, Csencsitz, and Diebel regarding letters); id. ¶ 210 (same as to Defendants Bott, Connolly, and Evans in their initial reviews); see also id. ¶ 264 (alleging that in making false statements in the Spiegel Report and Spiegel Rebuttal, Defendant Spiegel "acted in a negligent manner" or alternatively his statements "were knowingly false, malicious, or made with reckless disregard [as] to the truth or falsity of the statements"); id. ¶ 267 (same as to Defendant Appelblatt's state of mind); id. ¶ 270 (same as to ORHS and Hillenmeyer with regard to the NPDB report)). Plaintiff cannot satisfy the requirement of pleading intentional fraud with particularity by alleging negligence alternatively to recklessness and alternatively to malice and providing no facts to support intentional fraud.

has not made allegations sufficient to overcome—in addition to the statutory qualified peer review privilege just discussed—a common law qualified privilege.  Defendants also assert that Plaintiff's defamation claims are barred by the statute of limitations.

There are essentially seven sets of alleged defamatory statements set forth in this count, occurring at different times:  (1) statements made by Defendant Murbach "[s]ometime on or prior to May 8, 1996" to Defendant Bott regarding Plaintiff's surgeries, (id. ¶¶ 171-73); (2) republication of Murbach's statements on May 8, 1996 in letters by Defendants Bott and Csencsitz to Defendant Diebel, (id. ¶¶ 174-75); (3) statements made by the initial reviewers—Defendants Connolly, Evans, and Bott—"[s]ometime between May 21, 1996, and October 21, 1996" in their reviews regarding Plaintiff's competence, which were assembled into a report, and on which the Investigation Committee Report of Defendants Galceran, Bone, and Rivero was based, (id. ¶¶ 176-212); (4) the Spiegel Report of February 2, 2007, (id. ¶¶ 213-60); (5) the Spiegel Rebuttal of "late November 1998," (id. ¶¶ 261-64); (6) oral statements made by Defendant Appelblatt to Lisa Jones regarding Plaintiff "[s]ometime between June of 1999 and August of 2000," (id. ¶¶ 265-67); and (7) statements reported by ORHS and Hillenmeyer to the NPDB and other third parties on January 26, 2004 and thereafter, (id. ¶¶ 269-70, 113-16).

Defendants assert a common law qualified privilege[13] with regard to the defamation

_____

[13]Defendants are also correct that Plaintiff has not pleaded intentional fraud as to any of these alleged defamatory statements so as to overcome the statutory qualified peer review privilege.  Instead, as to each statement, he alleges negligence alternatively to recklessness (and sometimes also alternatively to malice) with respect to falsity.  See note 12 supra.

claim in Count II.  "'One who publishes defamatory matter concerning another is not liable for the publication if (a) the matter is published upon an occasion that makes it conditionally privileged and (b) the privilege is not abused.'" Nodar v. Galbreath, 462 So. 2d 803, 809 (Fla. 1984) (quoting Restatement (Second) of Torts § 593 (1976)).  "The law of Florida embraces a broad range of the privileged occasions that have come to be recognized under the common law." Id.  "'A communication made in good faith on any subject matter by one having an interest therein, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which would otherwise be actionable, and though the duty is not a legal one but only a moral or social obligation.'" Id. (quoting 19 Fla. Jur. 2d Defamation and Privacy § 58 (1980)).

This common law privilege has been recognized in communications between doctors at a hospital regarding another doctor and in statements concerning an employee's fitness. See Magre v. Charles, 729 So. 2d 440, 443 (Fla. 5th DCA 1999) ("Here the letter was distributed to fellow physicians who clearly had an interest in the substance of the communication.  Thus the defamatory statements were qualifiedly privileged."); Nodar, 462 So. 2d at 809 ("Under the common law of Florida, a communication to an employer regarding his employee's performance is conditionally privileged . . . .").  The privilege is overcome, however, by a showing of express malice.  See Nodar, 462 So. 2d at 810 ("If the statements were made without express malice . . . then there can be no recovery."); accord Magre, 729 So. 2d at 443.  In his response memorandum, Plaintiff acknowledges that the privilege has been recognized in such circumstances, but he argues that he has sufficiently alleged the "express malice" required to overcome the privilege.  (See Doc. 257 at 24).

However, Plaintiff has not alleged "express malice" in the defamation count. "Express malice" has been defined as "ill will, hostility, and evil intention to injure and defame." <u>Demby v. English</u>, 667 So. 2d 350, 353 (Fla. 1st DCA 1995). The factual allegations in this count state only that incorrect—i.e., untrue—statements were made, and Plaintiff alleges that each alleged defamer acted *either* with negligence *or* with reckless disregard, *or*, in a few instances, maliciously, (<u>see</u> TAC ¶¶ 173, 175, 210, 264, 267, & 270); in other words, malice is alleged only as to a few Defendants, and even as to those few it is alleged alternatively to negligence and recklessness. This alternative pleading does not equate to an allegation of "express malice." Thus, because of the common law qualified privilege, the defamation claims are not sufficiently pleaded and are due to be dismissed.

Defendants also argue that Count II is barred by Florida's two-year statute of limitations for defamation claims.[14] During oral argument, Plaintiff's counsel acknowledged that the statute of limitations bars this count except possibly with regard to statements made in the Adverse Action Report to the NPDB; although Plaintiff argues that the peer review process delayed the running of the statutes of limitations as to all of his damages claims, he concedes that even if that is true—an issue that will be addressed later in this Order—all but potentially the NPDB Adverse Action Report statements were published more than two years before this suit was filed. (<u>See</u> Hr'g Tr., Doc. 279, at 39-40; <u>see</u> also Pl.'s Mem., Doc. 257, at 15-20 (arguing that Plaintiff's defamation claims regarding republication of the NPDB report are timely but not urging timeliness of defamation claim based on other statements)). The

---

[14]<u>See</u> § 95.11(4)(g), Fla. Stat.

defamation count is indeed untimely insofar as it is based on the statements of Murbach, Bott, Csencsitz, Connolly, Evans, Bone, Galceran, Rivero, Spiegel, and Appelblatt—items one through six above. The motions to dismiss Count II as against these Defendants are therefore due to be granted on the basis of the statute of limitations as well as due to the qualified privileges already discussed.

To the extent Plaintiff's defamation claim is based on the statements made by ORHS and Hillenmeyer in the Adverse Action Report to the NPDB, however, the parties vigorously dispute whether this count is time-barred. Defendants argue that no defamation action will lie because they made the Report to the NPDB in 2004 and this suit was not brought until four years later—beyond the two years in which a defamation action must be brought. Plaintiff asserts, however, that each time the NPDB Report is republished, the two-year clock begins running anew. Plaintiff relies on some Florida case law for this proposition, but he also argues that California law should apply because he lives in California now and each time the NPDB Report has been republished he has suffered injury in California.

<u>Whether California or Florida Law Applies</u>

The Court rejects Plaintiff's contention that California law applies to the defamation claim with regard to publications occurring after Plaintiff relocated to California; indeed, there is no basis for applying the law of any state other than Florida to this or any other claim in this case. "A federal district court sitting in diversity applies the choice-of-law rules of the forum state." <u>Castellanos v. Pfizer, Inc.</u>, No. 07-60646-CIV, 2008 WL 2323876, at *3 (S.D. Fla. May 29, 2008) (citing <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941)). This court, as a federal court sitting in Florida, applies Florida's choice-of-law rules. <u>See</u> <u>id.</u> "Florida

resolves conflict-of-laws questions by applying the 'most significant relationship' test as set forth in the Restatement (Second) of Conflict of Laws." Id. This test "is comprised of the following four factors: 1) the place the injury occurred; 2) the place the conduct causing the injury occurred; 3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and 4) the place where the parties' relationship is centered." Id.

Applying these factors, while California may be the place where Plaintiff was injured when the NPDB report was republished after Plaintiff moved to California, the other three factors strongly point toward Florida as the state with the "most significant relationship" to the tort of defamation. Defendants' injury-causing conduct occurred in Florida; all of the Defendants reside and do business in Florida, and Plaintiff formerly did so; and the parties' relationship plainly arose, existed, and is centered in Florida. Indeed, there is no assertion or indication that the Defendants have any connection whatsoever to California other than Plaintiff, who unilaterally chose to move there. There is no allegation that any of the Defendants has ever even been to California. Under these circumstances, it would not be proper to apply California law to Defendants in any event, but the significant relationship test points to Florida anyway.

Florida Law

The determination that Florida law governs the defamation claim does not end the inquiry, however. The question remains whether an actionable, timely publication has occurred under Florida law.

Defendants assert that ORHS and Hillenmeyer made only one publication of the adverse action report to the NPDB–in February 2004, just after the ORHS Board passed the

-23-

resolution suspending Plaintiff's emergency and trauma call privileges. They correctly note that in Florida, the statute of limitations for defamation claims begins to run at the time of publication, not from the time the defamation is discovered or reasonably should have been discovered. See Wagner, Nugent, Johnson, Roth, Romano, Erikson & Kupper, P.A. v. Flanagan, 629 So. 2d 113, 113-15 (Fla. 1993).

Plaintiff, however, relies on Musto v. Bell South Telecommunications Corp., 748 So. 2d 296 (Fla. 4th DCA 1999), in which the Fourth District Court of Appeal held that the statute of limitations on a credit slander claim "begins anew and a new cause of action accrues each time a credit report is disseminated to a potential creditor." Id. at 298. The Musto court analogized the case before it to cases under the Fair Credit Reporting Act, in which the statute of limitations begins to run 'when an inaccurate credit report is issued.'" Id. The court noted that other jurisdictions have adopted such a rule in the credit report context, and it joined those jurisdictions. Id. at 299. The Musto court emphasized that "[w]hen a credit report is issued in confidence to only those people processing the appropriate credentials to gain access to such reports, the plaintiff may not learn of the dissemination of the inaccurate reports until well after the initial inaccurate report issues." Id. at 298.

Plaintiff asserts that the NPDB report is analogous to a credit report and that therefore under Musto, the two-year statute of limitations should begin anew each time the report is issued, even if the report is issued at Plaintiff's request and even though Plaintiff knew of the contents of the report at the time it was first made in February 2004. Although Plaintiff's

assertion is not without some support,[15] this Court must act as it thinks a Florida court would on this matter of Florida law—apparently one of first impression. Having considered <u>Musto</u> and the policy concerns noted therein, this Court declines to extend <u>Musto</u> beyond the credit report context. Here, Plaintiff knew of the contents of the Adverse Action Report at the time it was issued to the NPDB; thus, the potential pitfall of credit report subjects not knowing of a defamatory credit statement until the statute of limitations has run is not present. Under Plaintiff's argument, Plaintiff could apply for employment over and over again and create a new defamation claim based on reissuances of the NPDB report at his whim. This Court does not believe that the <u>Musto</u> court or other Florida courts would endorse such a rule.[16] Thus, the Court finds that any defamation claim premised on the Adverse Action Report to the NPDB accrued in 2004 when the report was made by ORHS to the NPDB. Accordingly, the two-year statute of limitations expired in 2006, well before this suit was filed in January 2008. Plaintiff's defamation claim based on the Adverse Action report is, like the rest of this

---

[15]<u>See, e.g.</u>, <u>Stephan v. Baylor Med. Ctr. at Garland</u>, 20 S.W.3d 880, 889 (Tex. App. 2000) (adopting credit report rule for NPDB context and holding that because "[a] physician may suffer a new and distinct injury with each republication of an allegedly defamatory report by the NPDB . . . each transmission of the report is a new publication and a possible separate tort").

[16]In addition to arguing for the extension of <u>Musto</u> beyond the credit report context, Plaintiff also argues that the law of Florida is that a defendant can be liable for defamation based on third-party republication if that republication was "reasonably foreseeable." However, the only authority cited by Plaintiff on this point is dicta in a footnote in a 1986 Florida appellate court case and citation of that dicta by a federal district court in New Jersey. <u>See</u> <u>Granda-Centeno v. Lara</u>, 489 So. 2d 142, 143 n.3 (Fla. 3d DCA 1986); <u>Pelullo v. Patterson</u>, 788 F. Supp. 234, 238 (D.N.J. 1992). This Court does not find the <u>Lara</u> dicta sufficient to establish the law of Florida on this point, and thus this portion of Plaintiff's argument is rejected.

count, time-barred.

### 3. Statutes of Limitations and the Peer Review Process

With regard to the rest of Plaintiff's claims, the parties dispute the impact of the peer review process on the running of the statutes of limitations. While the statute of limitations for defamation claims is, as noted earlier, two years, the statute of limitations for all of Plaintiff's other claims—fraud (Count IV), intentional infliction of emotional distress (Count V), negligent hiring and supervision (Count VI), and civil conspiracy (Counts VIII-XI)—is four years. See § 95.11(3)(a), Fla. Stat. (negligence); id. § 95.11(3)(j) (fraud); id. § 95.11(3)(p) ("[a]ny action not specifically provided for"); accord Olson v. Johnson, 961 So. 2d 356, 359 (Fla. 2d DCA 2007) (citing the residual four-year statute of limitations in section 95.11(3)(p) with regard to civil conspiracy claim); Ross v. Twenty-Four Collection, Inc., 617 So. 2d 428, 428 (Fla. 3d DCA 1993) (same as to intentional infliction of emotional distress). "[T]he time within which an action shall be begun under any statute of limitations runs from the time the cause of action accrues." § 95.031, Fla. Stat. Generally, "[a] cause of action accrues when the last element constituting the cause of action occurs." § 95.031(1), Fla. Stat. However, with regard to fraud claims, the statute begins to run at "the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence." § 95.031(2)(a), Fla. Stat.

Defendants argue that Plaintiff's tort claims are time-barred because they were not filed within four years of accrual. They note that Plaintiff is seeking damages for emotional pain and lost income beginning in November 1996—when he was first removed from trauma call and emergency call—and that the last act of any individual Plaintiff occurred, at the latest,

by the summer of 2003 when the peer review hearing was held.  Thus, they assert that the four-year statute of limitations for each tort claim expired well before this case was filed in January 2008.  Plaintiff, however, contends that because the peer review process did not conclude until the passage of the ORHS Board resolution on January 26, 2004, his claims were timely filed when this lawsuit was initiated on January 25, 2008—within four years of the Board resolution.  Plaintiff argues several doctrines in support of this contention, and these doctrines are addressed in turn.

a.  Primary jurisdiction

Plaintiff avers that the "doctrine of primary jurisdiction" renders his claims timely.  However, this doctrine does not assist Plaintiff.  As noted in the only case cited by Plaintiff on this point, "[t]he doctrine of primary jurisdiction dictates that when a party seeks to invoke the original jurisdiction of a trial court by asserting an issue which is beyond the ordinary experience of judges and juries, but within an administrative agency's special competence, the court should refrain from exercising its jurisdiction over that issue until such time as the issue has been ruled upon by the agency."  Flo-Sun, Inc. v. Kirk, 783 So. 2d 1029, 1036-37 (Fla. 2001).  Application of the doctrine "enables a court to have the benefit of an agency's experience and expertise in matters with which the court is not as familiar, protects the integrity of the regulatory scheme administered by the agency, and promotes consistency and uniformity in areas of public policy."  Id. at 1037.

The doctrine of "primary jurisdiction" has no application in the instant case.  First, the doctrine, when employed, is applied by the judicial branch in deference to the administrative branch of government, and the peer review body at issue here is not an administrative

agency or a governmental entity of any kind.  Plaintiff has identified no case that has applied

the doctrine in a peer review proceeding or where a nongovernmental review body is

involved.[17]  Second, this is not a situation where a court needs "the benefit of an agency's

experience and expertise in matters with which the court is not as familiar."  Flo-Sun, 783 So.

2d at 1037; see also Hill Top Developers v. Holiday Pines Serv. Corp., 478 So. 2d 368, 370

(Fla. 2d DCA 1985) (noting that where the doctrine applies, the judiciary "stays its hand and

defers to the administrative agency in order to maintain uniformity at that level or to bring

specialized expertise to bear upon the disputed issues").  Tort claims for damages are not

something with which courts are unfamiliar or for which courts need agency expertise to

resolve.  Third, the doctrine can be applied where an agency and a court have "'concurrent

jurisdiction over the same matter,'" Hill Top, 478 So. 2d at 370 (quoting Mercury Motor

Express, Inc. v. Brinke, 475 F.2d 1086, 1091 (5th Cir. 1973)); however, the peer review

proceeding could not possibly have afforded Plaintiff what he seeks here—an award of

money damages.  Finally, even if the doctrine could be invoked in deference to a peer review

body, Plaintiff has identified no case where the doctrine was employed for the purpose of

_____

[17]The Court's own research reveals that at least one court has denied a request to stay a medical peer review proceeding based on the doctrine primary jurisdiction.  In Wahi v. Charleston Area Medical Center,  No. Civ. A. 2:04-CV-0019, 2004 WL 2418316, at *2-4 (S.D.W. Va. Oct. 27, 2004), the court found the doctrine inapplicable, noting that a peer review body is not an administrative agency and that factual issues did not need to be resolved by that body before the court could consider the merits of the case.  The doctrine *has* been applied in a case brought in New York by a doctor whose privileges were suspended; however, the decision to dismiss that case based on the doctrine of primary jurisdiction was grounded in the fact that New York law requires that a doctor seek administrative review by the State Public Health Council before filing suit in court.  See Bauman v. Mt. Sinai Hosp., 452 F. Supp. 2d 490, 499-501 (S.D.N.Y. 2006).

rendering otherwise untimely claims timely. The Court rejects Plaintiff's primary jurisdiction argument.

b.  Equitable estoppel

Plaintiff also argues that equitable estoppel should apply here and preclude Defendants from asserting the bar of the statute of limitations. This doctrine "'is applicable in all cases where one, by word, act or conduct, willfully caused another to believe in the existence of a certain state of things, and thereby induces him to act on this belief injuriously to himself, or to alter his own previous condition to his injury.'" Major League Baseball v. Morsani, 790 So. 2d 1071, 1076 (Fla. 2001) (quoting State ex rel. Watson v. Gray, 48 So. 2d 84, 87-88 (Fla. 1950)). As Plaintiff himself recognizes, "[e]quitable estoppel presupposes a legal shortcoming in a party's case that is directly attributable to the opposing party's misconduct." Id. at 1077.

Plaintiff relies on Hillenmeyer's August 1999 letter advising of entitlement to a hearing as the purported "misconduct" by ORHS that allegedly renders equitable estoppel applicable here. However, that letter does not amount to "misconduct" supporting invocation of the doctrine. Plaintiff claims that the letter "lulled" him into the belief that he was entitled to a hearing, but Plaintiff was indeed given a hearing, and the letter did not inform Plaintiff that the statute of limitations on damages claims was not running, nor did it otherwise misrepresent anything pertaining to the statute of limitations for any such claims. In short, Plaintiff has not identified any misconduct by ORHS or any other Defendant that could support equitable estoppel with respect to the statute of limitations.

c.  Equitable Tolling

Plaintiff also argues that the Court should apply the doctrine of equitable tolling to render his tort claims timely.  "Equitable tolling, which involves no misconduct on the part of the defendant, may delay the running of the limitations period based on the plaintiff's blameless ignorance and the lack of prejudice to the defendant."  Major League Baseball, 790 So. 2d at 1076 n.11.  Plaintiff contends that he "should not be faulted for diligently pursuing every aspect of federal and state-mandated peer review afforded to him by ORHS" and that he "exerted a herculean effort" defending himself in the peer review.  (Doc. 257 at 12).

Equitable tolling, however, is not available in civil actions in Florida.  Section 95.051(1), Florida Statutes, sets forth a list of events that toll a statute of limitations, and equitable tolling is not among them.  The next subsection provides that "[n]o disability or other reason shall toll the running of any statute of limitations except those specified."  Id. § 95.051(2).  Florida's Second District Court of Appeal has held that pursuant to this statute, equitable tolling is not available outside of the administrative context.  HCA Health Servs. of Fla., Inc. v. Hillman, 906 So. 2d 1094, 1098 (Fla. 2d DCA 2004) (declining to apply equitable tolling outside of administrative actions, noting that "the legislature has made clear its intent to exclude all tolling exceptions not listed in the statute").[18]

_____

[18]In Machules v. Department of Administration, 523 So. 2d 1132 (Fla. 1988), the Supreme Court of Florida applied the doctrine of equitable tolling to afford relief to an employee who missed a twenty-day administrative appeal deadline where the employee's union representative filed a grievance instead of an appeal.  The Second District Court of Appeal acknowledged Machules in HCA Hillman before holding that equitable tolling does not apply outside the administrative setting.  See 906 So. 2d at 1098 ("Machules laid the

This Court, as a federal court situated in Florida, "must follow the decisions of the Florida Supreme Court and Florida's intermediate appellate courts." Prime Ins. Syndicate, Inc. v. Soil Tech Distribs., Inc., 270 F. App'x 962, 964 (11th Cir. 2008). "[A]bsent a decision from the state supreme court on an issue of state law, [federal courts in Florida] are bound to follow decisions of the state's intermediate appellate courts unless there is some persuasive indication that the highest court of the state would decide the issue differently." McMahan v. Toto, 311 F.3d 1077, 1080 (11th Cir. 2002). Thus, this Court is bound by the holding of the Second District Court of Appeal in HCA Health that equitable tolling does not apply outside of administrative actions,[19] and the doctrine is not available to Plaintiff in this case.[20]

### d. Exhaustion of Administrative Remedies

Finally, Plaintiff contends that his claims were timely filed because he was required

_____

predicate for applying the doctrine of equitable tolling in administrative law cases. However, it did not address application of the doctrine to toll a statute of limitation governed by the provisions of chapter 95, Florida Statutes." (footnote omitted)).

[19]Plaintiff relies on Sacred Heart Health System, Inc. v. Humana Military Healthcare Services, Inc., No. 3:07cv62/MCR, 2008 WL 2385506 (N.D. Fla. June 9, 2008), in which a federal court in the Northern District of Florida found equitable tolling appropriate. However, Sacred Heart was a class action, and the court acknowledged HCA Health in a footnote but distinguished it, in part by stating that "HCA Health Services is not, however, a class action case, and . . . class actions are treated differently under Florida law." 2008 WL 2385506, at *2 n.7.

[20]Even in the absence of controlling Florida case law disallowing application of the equitable tolling doctrine in nonadministrative cases, the Court would not find it appropriate to equitably toll the statutes of limitations in this case. As noted in the text, the doctrine focuses in part on "lack of prejudice to the defendant," and it cannot be said that the Defendants have not been prejudiced by Plaintiff's extensive delay—as to some, a more than eleven-year delay—in filing his damages claims.

to exhaust his administrative remedies in the hospital's peer review process before he could file tort claims in court. Defendants respond that administrative exhaustion is not required where the administrative remedy—here, the peer review process—could not afford Plaintiff the relief he seeks in court—an award of damages. None of the cases cited by either side speaks to the issue of the running of the statute of limitations in a situation such as that in the instant case, but Defendants' argument is persuasive.

Generally, judicial power should not be invoked or exercised until administrative remedies are exhausted. See, e.g., Gamma Phi Chapter of Sigma Chi Fraternity v. Univ. of Miami, 718 So. 2d 910, 911 (Fla. 3d DCA 1998). Here, however, the relief being sought in court—money damages—is different from the relief sought through the peer review process. Money damages were not even available through the administrative process; the only remedy Plaintiff sought in that process was restoration to call. The parties are, with the exception of ORHS, different as well.

The cases relied upon by Plaintiff do not, for the most part, involve damages claims. In Gamma Phi, a trial court's denial of a requested injunction against a university's scheduled hearing pursuant to a procedure in a student handbook was affirmed due to lack of administrative exhaustion. 718 So. 2d at 911. Similarly, in Baptist Health Systems of South Florida, Inc. v. Rae, 753 So. 2d 752 (Fla. 3d DCA 2000), a doctor whose clinical privileges were summarily suspended filed suit two weeks after learning of the suspension and obtained a temporary injunction against the summary suspension; that injunction was reversed on appeal on the basis that administrative remedies had not been exhausted and therefore the trial court lacked jurisdiction to enter the injunction. Again, damages claims were apparently

not at issue in either of these decisions.

In Zakharia v. Cedars Healthcare Group, Ltd., 15 Fla. L. Weekly Supp. 148a (Fla. Cir. Ct. 2007), also cited by Plaintiff, a doctor was notified of suspension of his privileges and requested a hearing. When the hearing was not initiated within several months, the doctor filed suit.[21] The doctor brought claims for breach of contract and violation of the peer review statute, and he also sought to enjoin the peer review process so that he could pursue claims for money damages against the hospital and because he felt the process was not worth resuming. The court refused to stay the peer review, citing Gamma Phi for the proposition that it is not appropriate to exercise judicial power where there has not been administrative exhaustion. The court also found that the complaint did not plead fraud as required to overcome immunity and therefore granted the motion to dismiss with leave to amend. On a motion for clarification, the court stated that plaintiff had twenty days from the exhaustion of the hospital's administrative process to amend his complaint. While Zakharia is somewhat supportive of Plaintiff's position, it did not address a situation where the statute of limitations has long since passed.[22]

_____

[21]A hearing was commenced after the suit was filed but before the court ruled on the hospital's motion to dismiss.

[22]In addition to the Florida cases discussed in the text, Plaintiff cites cases from other jurisdictions regarding administrative exhaustion. Most of these, however, are distinguishable. In Nemazee v. Mt. Sinai Medical Center, 564 N.E.2d 477 (Ohio 1990), a medical resident's employment was terminated and the court held that he did have to exhaust administrative remedies; however, the court noted that the doctor sought back pay and reinstatement, which the hospital hearing panel *did* have the power to award. The doctor also sought punitive damages, which the hospital could not award, but the Ohio Supreme Court held, "[W]e cannot allow appellee to circumvent the internal review procedures of the hospital simply by adding a claim for punitive damages." Id. at 483. The

Defendants rely on several cases holding that administrative remedies need not be exhausted where the remedy is not adequate. In <u>Greenberg v. Mount Sinai Medical Center</u>

---

Seventh Circuit's decision in <u>Qasem v. Kozarek</u>, 716 F.2d 1172, 1175 (7th Cir. 1983), actually stands for the opposite of what Plaintiff asserts; the appellate court found that the trial court did not err in failing to require exhaustion, stating: "[W]e are persuaded that exhaustion should not be considered mandatory in this case because the only remedy Qasem seeks in this lawsuit is an award of damages . . . . Since the Hospital reviewing body is not empowered to award Qasem damages, it would be unnecessary for Qasem to pursue his administrative remedies."

Plaintiff also cites <u>Shulman v. Washington Hospital Center</u>, 348 F.2d 70 (D.C. Cir. 1965), in which the appellate court remanded with instructions to dismiss without prejudice pending exhaustion of remedies, but it does not appear that that case involved damages claims rather than just a request by a doctor for reinstatement to staff. The same appears to be true of <u>Yarnell v. Sisters of St. Francis Health Services Inc.</u>, 446 N.E.2d 359 (Ind. Ct. App. 1983). In <u>Crow v. Penrose-St. Francis Healthcare System</u>, 169 P.3d 158 (Colo. 2007), a doctor sued a hospital, seeking injunctive relief and bringing contract and common law tort claims after summary suspension. Relying on a provision in the Colorado peer review statute, the court held that exhaustion of all peer review administrative remedies was required before the doctor could seek relief in court, rejecting the plaintiff's argument that the statute does not require exhaustion if money damages for common law claims are sought. However, no such provision in the Florida peer review statute has been brought to this Court's attention.

The final two out-of-state cases cited by Plaintiff are somewhat more supportive of his position. In <u>Bartschi v. Chico Community Memorial Hospital</u>, 137 Cal. App. 3d 502 (1982), a doctor sued three hospitals for wrongful removal of him from their staffs. The trial court granted one hospital's summary judgment motion because of plaintiff's failure to exhaust administrative remedies, and the appellate court affirmed, citing a 1976 case in which the California Supreme Court had "held that the exhaustion doctrine applies in just this kind of case, where a doctor sues a private hospital for damages or seeks an order compelling reinstatement or admission." <u>Id.</u> at 508. The <u>Bartschi</u> court noted that exhaustion is not required where the administrative remedy is unavailable or inadequate, but the plaintiff had shown neither. In <u>Eidelson v. Archer</u>, 645 P.2d 171 (Alaska 1982), a doctor sued two other doctors and a union one month after his hospital staff privileges were summarily suspended, alleging conspiracy and defamation claims. The trial court denied a defense summary judgment motion that was based on failure to exhaust, and the case proceeded to a jury trial that resulted in a significant damages award for the plaintiff. On appeal, the Alaska Supreme Court agreed with the defense argument that the suit should be dismissed due to plaintiff's failure to exhaust administrative remedies, and the denial of summary judgment was reversed.

-34-

of Greater Miami, Inc., 629 So. 2d 252 (Fla. 3d DCA 1993), the trial court dismissed breach

of contract and breach of covenant claims against a hospital—in which money damages were

sought—for failure to exhaust administrative remedies, but the Third District Court of Appeal

found error in the dismissal, noting that "[a] plaintiff will not be required to pursue and exhaust

administrative remedies where they are not adequate" and emphasizing that the plaintiffs

sought money damages. Id. at 257. The Court held that "[s]ince the remedy provided by the

bylaws does not allow for money damages, the trial court acted improperly in dismissing both

[of these counts] on exhaustion grounds." Id. Like Plaintiff's cases, however, this case is not

squarely on point because it does not address a statute-of-limitations situation. The other

cases cited by Defendant are of a similar vein.[23]

Again, neither side's cited case law is directly on point, but this Court is persuaded that

because Plaintiff could not receive an award of damages from the peer review process, that

process did not delay accrual of his tort claims or toll the statute of limitations for such claims,

and he was required to file his suit for damages prior to January 2008. There are compelling

policy reasons for the existence and enforcement of statutes of limitations. These statutes

_____

[23]See S. Bell Tel. & Tel. Co. v. Mobile Am. Corp., Inc., 291 So. 2d 199 (Fla. 1974) (affirming reversal of dismissal of complaint based on lack of jurisdiction and finding that trial court did have jurisdiction over damages claims because Public Service Commission could not adjudicate damages claim against telephone company); Berkowitz v. City of Tamarac, 654 So. 2d 982, 983 (Fla. 4th DCA 1995) (reversing dismissal of complaint based on failure to exhaust where plaintiff sought money damages that administrative body lacked power to award); Winter Springs Dev. Corp. v. Fla. Power Corp., 402 So. 2d 1225, 1228 (Fla. 5th DCA 1981) ("[A] plaintiff is not required to pursue administrative remedies where they are not available and adequate. Therefore, where, as here, a plaintiff seeks money damages for breach of contract, which an administrative body is not empowered to award, the administrative remedy is not considered adequate and the plaintiff is not bound to exhaust it before seeking relief in court." (citation omitted)).

"are designed to prevent undue delay in bringing suit on claims and to suppress fraudulent and stale claims from being asserted, to the surprise of parties or their representatives, when all the proper vouchers and evidence are lost, or the facts have become obscure from the lapse of time or the defective memory or death or removal of witness[es]." Foremost Props., Inc. v. Gladman, 100 So. 2d 669, 672 (Fla. 1st DCA 1958). "While the courts will not strain either the facts or the law in aid of a statute of limitations, nevertheless such enactments will receive a liberal construction in furtherance of their manifest object and are entitled to the same respect as other statutes, and ought not to be explained away." Id.

In the instant case, the actions of some of the Defendants are alleged to have occurred, and Plaintiff is alleged to have been aware of those actions, in 1996—nearly twelve years prior to the filing of this lawsuit. The latest act of any of the individual Defendants was nearly five years prior to the filing of the suit. Two of the doctors against whom claims have been brought have died and are represented in this suit by their estates. The Defendants should not be forced to defend stale claims that have become stale through no fault of their own; Plaintiff has not alleged fault of any Defendant with regard to the delay between Plaintiff's 1999 hearing request and the start of the hearing in 2003. If he had, he might have been able to prevail on his equitable estoppel argument. However, this Court cannot conclude that a Florida court would hold that the peer review proceeding in this case excuses Plaintiff's filing of tort claims at such a late date.

During oral argument, Plaintiff's counsel repeatedly argued that the delay in the filing of this lawsuit should be excused because Plaintiff "initially believed that he could be fully vindicated through the [peer review] process." (Hr'g Tr., Doc. 279, at 37). Counsel then

stated that Plaintiff "engaged in the peer review process not for monetary compensation. He never initially had that notion in mind. He wanted to be placed back on call. . . . [H]e felt that he could resolve his issues without having to seek monetary damages." (<u>Id.</u>). Counsel argued that "if [Plaintiff] could have a successful result at the end of the peer review proceeding and not feel the need to move forward with any claims, then that would avoid the issue of having to bring any of these issues forward in court." (<u>Id.</u> at 38).

Regardless of what Plaintiff "felt," his damages claims existed as early as 1996; what he is seeking to recover in this case are damages that, according to his own allegations, he began to suffer "[a]s soon as [he] was taken off the trauma and emergency call." (TAC ¶ 131; <u>see also</u> <u>id.</u> ¶ 71 (alleging that the November 1996 suspension "reduced [Plaintiff's] income, harmed his reputation, and impaired his ability to develop an orthopedic practice")). Even if Plaintiff had been "vindicated" in the peer review, the damages that he allegedly suffered from 1996 to 2004 would still have been suffered; he might have been restored to trauma and emergency call as a result of a favorable peer review outcome, but he could not have been awarded damages. The fact that Plaintiff changed his mind about whether to seek damages upon not being "vindicated" does not provide a basis for deeming his claims timely filed in this Court.

At least one other court has reached this conclusion in the peer review setting, declining to find that pursuit of administrative remedies saved tort claims from being time-barred. In <u>Long v. Houston Northwest Medical Center, Inc.</u>, No. 01-90-00284-CV, 1991 WL 19837 (Tex. App. Feb. 14, 1991), the court explained:

> [T]he appellant could have sought judicial redress for intentional

> infliction of emotional distress and tortious interference with business relations when his surgical privileges were suspended, on April 13, 1983. The later review of the suspension of his privileges and subsequent denial of reinstatement of his privileges did not affect the accrual of the causes of action. Thus, in order to avoid the bar of the statute of limitations, the appellant was required to file suit . . . within two years of April 13, 1983. . . . Therefore, as a matter of law, the appellant's [claims] . . . are barred by the statute of limitations.

Id. at *10. This Court agrees with the conclusion of Long. The accrual of Plaintiff's tort claims was not delayed by the peer review proceeding.

### 4. Fraud (Count IV) and Negligent Hiring and Supervision (Count VI)

In Count IV, Plaintiff brings a claim of "Fraud—Sham Hearing and Appeal Process" against Defendants Hillenmeyer and ORHS only, and in Count VI Plaintiff brings a claim of negligent hiring and supervision against ORHS only. ORHS raises several arguments supporting dismissal of these counts.

ORHS contends that both of these counts are barred by the economic loss rule because they do not allege commission of any act beyond a breach of the Bylaws—a contract between ORHS and Plaintiff. ORHS is correct on this point. Where a contract exists between parties, tort claims may still be alleged if the claims "involve alleged acts . . . that are 'independent of any contractual breach.'" Ramos v. Fla. Power & Light Co., 21 So. 3d 91, 94-95 (Fla. 3d DCA 2009) (quoting Am. Express Travel Related Servs. Co. v. Symbiont Software Group, Inc., 837 So. 2d 434, 435 (Fla. 3d DCA 2002)); accord Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc., 891 So. 2d 532, 537 (Fla. 2004) (noting that claims that can permissibly be brought where contractual relationship exists include "torts committed independently of the contract breach, such as fraud in the inducement" and that "'[w]here a

-38-

contract exists, a tort action will lie for either intentional or negligent acts considered to be independent from the acts that breached the contract'" (quoting <u>HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.</u>, 685 So. 2d 1238, 1239 (Fla. 1996))).  However, the fraud claim in Count IV and the negligent supervision claim in Count VI do not allege acts independent of a contractual breach.

Plaintiff alleges in the fraud count that "to the extent that ORHS claims the reduction of trauma or emergency call is not a reduction or revocation of clinical privileges, Defendant ORHS falsely stated to [Plaintiff] that reducing [his] emergency and trauma call constituted a reduction in his clinical privileges and that to be reinstated on the call list, [Plaintiff] would have to go through the hearing and appeal process." (TAC ¶ 292).  Plaintiff contends that he "relied on Defendant ORHS's statements, requested a hearing and appeal, and spent extraordinary personal, marital, and corporate . . . resources to go through the process enumerated by the Bylaws." (<u>Id.</u> ¶ 295).  Moreover, "[h]ad these Defendants not made such false statements and misrepresentations, Plaintiff would have not gone through the hearing and appeal procedures to reinstate his call," and Plaintiff "mistakenly believed that he had to request a hearing to pursue his available administrative remedies." (<u>Id.</u>).

The fraud count is based on the letter that Hillenmeyer, on ORHS's behalf, sent to Plaintiff on August 30, 1999.  The letter stated in part: "Following an investigation pursuant to Article VII, Part C of the Medical Staff Bylaws, the Medical Executive Committee (MEC) has recommended that you be excluded from trauma call and emergency department call. . . . Pursuant to Article VIII, Part B, Section 2 of the Medical Staff Bylaws, you are entitled to request a hearing before this recommendation is finally acted upon by the Board." (Letter

from Hillenmeyer to Pl., August 30, 1999, Ex. D to Doc. 238).[24]

In this claim, Plaintiff asserts a misrepresentation by ORHS during the performance of the contract between Plaintiff and ORHS. As noted by ORHS, "[t]he issues of whether participation [in trauma and emergency call] is a 'privilege' and whether [Plaintiff] was 'entitled to request a hearing' are determined by the terms of the contract." (Doc. 238 at 17). Thus, the alleged misrepresentation[25] relates to ORHS's performance of the contract and is barred by the economic loss rule. See Samuels v. King Motor Co., 782 So. 2d 489, 498 (Fla. 4th DCA 2001) ("[B]ecause fraud in the performance cases involve misrepresentations related to the breaching party's performance of a contract and thus fraud in the performance is inextricably linked to breach of contract, the economic loss rule bars the Plaintiffs' cause of action for fraud in the performance.").

In Count VI, Plaintiff alleges negligent hiring and supervision against ORHS on the basis that Defendants Murbach, Csencsitz, Bone, Spiegel, Moser, Diebel, Bott, Evans, Connolly, Galceran, Rivero, and Wolfram "were agents and/or employees of ORHS" and that "Defendant ORHS could reasonably foresee Defendants' wrongful, illegal and malicious actions against [Plaintiff]." (TAC ¶¶ 313-14). ORHS allegedly "negligently failed to investigate these Defendant physicians' propensities for wrongful, illegal, destructive, vengeful and malicious action, bias, or wrongful motive before placing them in positions at

---

[24]This letter is referenced in the TAC and central thereto; thus, it is properly considered at the motion-to-dismiss stage.

[25]As pointed out by ORHS in a footnote in its motion, the letter as characterized by Plaintiff is quite different from the letter on its face. (See Doc. 238 at 11 n.9). The letter states that Plaintiff is "entitled" to a hearing, not that he was required to pursue a hearing.

ORHS from which these Defendants were able to orchestrate and perpetrate malicious acts and the sham review proceeding against [Plaintiff]." (Id. ¶ 315).

ORHS is correct that the negligent hiring and supervision count is barred by the economic loss rule because Plaintiff is seeking to recover for some of the same acts upon which he bases his breach of contract claim in Count I. (See, e.g., id. ¶¶ 159-60 (alleging, as part of breach of contract claim, that the "choice of direct economic competitors with known differences of opinions, bias towards, and disagreements with [Plaintiff] . . . violated the spirit of the Bylaws" and that "ORHS failed to employ any mechanisms to identify and avoid potential conflicts of interest on the part of the review participants")). Plaintiff has brought a claim for breach of the Bylaws based in part on ORHS's selection of peer reviewers, and a separate negligent supervision claim will not lie.

ORHS also argues that the fraud and negligence claims are barred by the four-year statute of limitations for these claims. As to the fraud count, ORHS contends that assuming there was a false misrepresentation in the letter, Plaintiff should have known of the falsity immediately because he claims to have read and understood the Bylaws. (See Doc. 238 at 11 ( citing TAC ¶ 287)). ORHS thus contends that the latest Plaintiff could have filed this fraud claim was August or September of 2003. This argument is well-taken. As discussed earlier, the peer review process did not toll the running of the statute of limitations or delay accrual of tort claims. The Court agrees with ORHS that Defendant knew or should have known of any fraud upon receipt of the letter in August or September 1999, and a fraud claim based on that letter must have been brought by August or September 2003. Similarly, the negligent hiring and supervision claim is barred by the four-year statute of limitations because

the last acts of the doctors whom ORHS allegedly did not sufficiently supervise occurred in 2003, more than four years prior to the filing of this lawsuit in January 2008.

ORHS additionally argues that the fraud count fails to state a cause of action because the statements in Hillenmeyer's August 30, 1999 letter are not actionable as fraud in any event. ORHS contends that the statements are legal conclusions as to construction of the Bylaws and cannot form the basis of a fraud claim. The Court agrees. Cf. Nicholson v. Ariko, 539 So. 2d 1141, 1142 (Fla. 5th DCA 1989) (finding that statement was "not a proper basis for a fraud or misrepresentation remedy" because "[a] person's interpretation of a complex formula in a document is not a misrepresentation of fact" but "is essentially a legal conclusion, which is capable of being interpreted in different ways").

Plaintiff's negligence claim also fails for other reasons. In this Court's Order (Doc. 201) on the motions to dismiss Plaintiff's Amended Complaint, the negligent supervision claim was dismissed because Plaintiff alleged that the peer review participants were "agents and/or employees" of ORHS, but an employment relationship—not mere agency—is required for a negligent supervision claim to lie. (See Doc. 201 at 40). The Court granted leave to amend so that Plaintiff could replead this claim **if** Plaintiff could allege an employment relationship. (See id.). However, Plaintiff has again brought this claim based on allegations that those who were negligently supervised were "agents and/or employees of ORHS." (See TAC ¶ 313).[26] Because Plaintiff has yet again failed to affirmatively allege an employment

_____

[26]Earlier in the TAC, those who were allegedly negligently supervised—Murbach, Csencsitz, Bone, Spiegel, Moser, Diebel, Bott, Evans, Connolly, Galceran, Rivero, and Wolfram—are, with the exception of Wolfram—alleged to be agents of ORHS rather than its employees; Wolfram is alleged to be an "agent and employee," (TAC ¶ 16), and in Count III

relationship between ORHS and those whom it allegedly negligently supervised, Count VI fails to state a claim.

Count VI is deficient on yet another basis. "In order to state a cause of action for the tort of negligent hiring or retention recognized in Florida, a plaintiff must allege facts showing that the employer was put on notice of the harmful propensities of the employee." Willis v. Dade County Sch. Bd., 411 So. 2d 245, 246 n.1 (Fla. 3d DCA 1982) (citations omitted). Compare Brantly v. Dade County Sch. Bd., 493 So. 2d 471, 472 (Fla. 3d DCA 1986) (finding negligent hiring claim sufficiently stated where plaintiff alleged supporting facts), with Garcia v. Duffy, 492 So. 2d 435, 441-43 (Fla. 2d DCA 1986) (affirming grant of motion to dismiss negligent hiring and retention claim where allegations of complaint were not sufficient to show legal duty or breach of any such duty by employer). Plaintiff has not alleged any facts to support notice or a duty. Instead, he has merely alleged that "ORHS was or became aware, or should have become aware of these Defendants' problems, biases and wrongful motives," (TAC ¶ 314), and that "ORHS negligently failed to investigate these Defendant physicians' propensities for wrongful, illegal, destructive, vengeful and malicious action," (id. ¶ 315). Plaintiff does not provide a factual basis for ORHS's knowledge or duty to investigate these Defendants. For this reason as well, Count VI fails.[27]

_____

to be an "employee," (id. ¶ 280). However, it is not clear to the Court what role or position Wolfram was allegedly placed in by ORHS in any event. Earlier in the TAC, Wolfram was alleged to have told Plaintiff in a meeting in December 2008 that he and Csencsitz did not believe that Plaintiff had done anything wrong, (see TAC ¶¶ 86-89), and no role or participation in the peer review by Wolfram is described in Count VI.

[27]There may be yet another problem with this claim. Arguably, a claim for negligence will not lie in connection with peer review proceedings. As noted earlier in the text of this

In sum, Count IV for fraud and Count VI for negligent hiring and supervision are due to be dismissed on several bases. They are barred by the economic loss rule, by the four-year statute of limitations, and otherwise for failure to state a cause of action as set forth above.

### 5. Intentional Infliction of Emotional Distress (Count V)

In Count V, Plaintiff brings a claim of Intentional Infliction of Emotional Distress ("IIED") against Defendants Appelblatt, Bone, Bott, Connolly, Csencsitz, Diebel, Evans, Galceran, Hillenmeyer, Moser, Murbach, Rivero, Spiegel, and Wolfram—all of the individual Defendants except Cole and Sanders—and he argues that ORHS and Wolverine are vicariously liable on this count. Plaintiff alleges that "[t]he suspension and termination of [Plaintiff] from emergency and trauma call at ORHS caused by the actions of Defendants and the publication of such incidents as set forth above constitute the tort of intentional infliction of emotional distress." (TAC ¶ 299). Further, these Defendants allegedly "intentionally and recklessly labeled [Plaintiff] an incompetent and dangerous doctor and excluded him from performing orthopedic trauma and emergency surgeries with the intended purpose of denying him the opportunity to perform the orthopedic surgical services which he was qualified to provide." (Id. ¶ 300).

In this count, Plaintiff lumps all of these Defendants together without differentiating

---

Order, under section 395.0193(5), Florida Statutes, there can be no cause of action against ORHS—a "licensed facility"—"for any action taken without intentional fraud" in carrying out peer review. Thus, seemingly ORHS cannot be held liable for negligent hiring or supervision of those involved in the peer review absent "intentionally fraudulent" negligent hiring or supervision, if such an act is possible.

among them or their alleged actions.  This Court dismissed many of the counts in Plaintiff's prior Amended Complaint—including the IIED claim—with leave to replead so that Plaintiff could remedy the lumping together of Defendants, yet in this count Plaintiff has done so again.  Plaintiff merely relies on allegations "as set forth above"—incorporating by reference the background facts in paragraphs 22-146 of the TAC and generally referring to "their [Defendants'] conduct."  These allegations are not sufficient to support a claim for IIED.

This count fails for other reasons as well.  The IIED claim is based on two categories of conduct—(1) "[t]he suspension and termination" of Plaintiff from emergency and trauma call; and (2) "the publication of such incidents as set forth above."  (TAC ¶ 299).  As persuasively argued by Defendants, to the extent the IIED claim is based on publication of statements, the count fails because it is merely a recasting of Plaintiff's insufficiently-pleaded and time-barred defamation claims.  Attempts by plaintiffs in other cases to pursue claims sounding in defamation by calling them by the name of another tort have been repeatedly rejected by courts in this state.  See Fridovich v. Fridovich, 598 So. 2d 65, 69-70 (Fla. 1992) ("It is clear that a plaintiff is not permitted to make an end-run around a successfully invoked defamation privilege by simply renaming the cause of action and repleading the same facts.  Obviously, if the sole basis of a complaint for emotional distress is a privileged defamatory statement, then no separate cause of action exists.  In short, *regardless of privilege*, a plaintiff cannot transform a defamation action into a claim for intentional infliction of emotional distress simply by characterizing the alleged defamatory statements as 'outrageous.'" (emphasis in original) (citations omitted)); MYD Marine Distribs., Inc. v. Donovan Marine, Inc., No. 07-61624-CIV, 2009 WL 701003, at *2 (S.D. Fla. Mar. 16, 2009) ("A cause of action

sounding in tort is limited to the two year statute of limitations for defamation if it is premised on the defamatory remark."); <u>Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.</u>, 831 So. 2d 204, 207-08 (Fla. 4th DCA 2002).

Similarly, the "suspension and termination" of Plaintiff from emergency and trauma call does not support a claim of IIED. Plaintiff may certainly claim that he has suffered emotional distress as a consequence of the suspension and termination of his privileges, but the fact that his call privileges were suspended and ultimately terminated does not in and of itself "constitute" IIED as asserted in paragraph 299 of the TAC. The tort of IIED requires "outrageous" conduct by a defendant—conduct that is "beyond all bounds of decency, atrocious[,] and utterly intolerable in a civilized community." <u>State Farm Mut. Auto. Ins. Co. v. Novotny</u>, 657 So. 2d 1210, 1212 (Fla. 5th DCA 1995). Plaintiff complains largely of the consequences of the peer review process. He does allege that it was "outrageous" for "Defendants"—without differentiation among them—to have Plaintiff "go through a hearing and appeal process" during an "eight-year attack." (TAC ¶ 303). However, the Court cannot conclude that the provision of a hearing process after such process was requested by Plaintiff—and as to which most of the Defendants named in this count are not alleged to have control—amounts to "outrageous" conduct. Again, Plaintiff may well have suffered emotional distress, but emotional distress is an element of damages on many types of claims. The facts alleged here do not support an independent, actionable tort of IIED.[28]

_____

[28]In ruling on the prior motions to dismiss, the Court granted leave to replead the IIED claim to remedy the "group pleading" problem that permeated the Amended Complaint. The Court declined to dismiss the count on the basis of lack of outrageousness because Plaintiff had alleged that he had been falsely labeled "incompetent" and "dangerous." Plaintiff again

Defendants are also correct that the IIED claim is barred by the four-year statute of limitations.  As noted earlier, the peer review proceeding did not affect the running of the statute of limitations on Plaintiff's tort claims; Plaintiff alleges that he first suffered injury when he was removed from trauma call in November 1996 and the latest act by any of the individual Defendants is alleged to have occurred in July 2003.

6.  Civil Conspiracy (Counts VIII through XI)

Plaintiff brings four civil conspiracy claims in Counts VIII, IX, X, and XI.  Defendants seek dismissal of all of these counts on the basis that they fail to state a cause of action and are time-barred.  Defendants' arguments are well-taken.

"'A civil conspiracy requires:  (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under

_____

alleges that he has been labeled "incompetent," and "dangerous" by Defendants, but Plaintiff now acknowledges that these labels are his characterization of what the Adverse Action Report to the NPDB means; the report does not use any such language or anything close to this language.  Defendants now correctly argue, as noted in the text, that even if Plaintiff had been labeled with these words by Defendants, such a count would sound in defamation, not in IIED.

Plaintiff continues in the TAC to use these labels in quotation marks even though they appear in no statement of any Defendant, including the NPDB Report.  (See TAC ¶ 302).  Plaintiff denies attempting to give the impression that these labels are actual quotations from a document or statement of a Defendant.  (See Pl.'s Consol. Resp., Doc. 257, at 35 n.11 ("[T]he Plaintiff apologizes to the Court for any confusion that the use of quotations may have evoked.  By using quotations, and not specifically citing the report at the end of the sentence wherein the words in quotation were used, Plaintiff intended to set forth the practical implications of reporting a doctor to the NPDB or Florida [Department] of Health—that when a doctor is reported, he is forever labeled in the medical community as an incompetent and dangerous doctor.")).  However, such an impression was certainly created during the Court's review of the prior motions to dismiss, and frankly, the Court can discern no reason for the use of quotation marks around these words.

the conspiracy.'" Charles v. Fla. Foreclosure Placement Ctr., LLC, 988 So. 2d 1157, 1159-60 (Fla. 3d DCA 2008) (quoting Raimi v. Furlong, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997)). Whereas in the context of criminal law a conspiracy charge targets "[a]greements to engage in criminal activity," which are "considered dangerous to society in and of themselves," "the purpose of a [civil] conspiracy claim is to impute liability—to make X jointly liable with D for what D did to P." Beck v. Prupis, 162 F.3d 1090, 1099 n.18 (11th Cir. 1998). In other words, "[t]he gist of a civil action for conspiracy is not the conspiracy itself, but the civil wrong which is done pursuant to the conspiracy and which results in damage to the plaintiff." Liappas v. Augoustis, 47 So. 2d 582, 582 (Fla. 1950). "Thus, a civil conspiracy plaintiff must [ultimately] prove that someone in the conspiracy committed a tortious act that proximately caused his injury; the plaintiff can then hold other members of the conspiracy liable for that injury." Beck, 162 F.3d at 1099 n.18.

"A cause of action for civil conspiracy should allege the scope of the conspiracy, its participants, and when the agreement was entered into." In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig., Nos. 08-01916-MD & 08-20641-CIV-KAM, 2010 WL 432426, at *12 (S.D. Fla. Feb. 4, 2010). Conclusory allegations of an agreement are not sufficient to state a cause of action for conspiracy. See, e.g., MedTech Prods. Inc. v. Ranir, LLC, 596 F. Supp. 2d 778, 795 (S.D.N.Y. 2008) (finding civil conspiracy claim insufficiently pleaded under Rule 8 standard where the complaint "merely concludes that an agreement [among the defendants] existed without any factual basis to make the allegation *plausible*" (citing Twombly, 550 U.S. at 560-61) (emphasis in original)). "A complaint may justifiably be dismissed because of the conclusory, vague and general nature of the

allegations of conspiracy." In re Chiquita, 2010 WL 432426, at *12.

Defendants contend that the conspiracy claims are based on allegations of independent acts, that no agreement is plausibly suggested, that underlying torts, where required, have not been pled, and that the pleading standards of Twombly are not satisfied. This Court agrees. See Twombly, 550 U.S. at 566 ("We think that nothing contained in the complaint invests either the action or inaction alleged with a plausible suggestion of conspiracy.").

### a. Count VIII (Conspiracy to Defame)

In Count VIII, Plaintiff alleges "on information and belief" that all of the Defendants named in that count—Murbach, Appelblatt, Bott, Evans, Connolly, Spiegel, Bone, Csencsitz, Cole, Hillenmeyer, Moser, Diebel, Galceran, Rivero, and Wolfram—"through letters, meetings, and conversations agreed to defame [Plaintiff] to accomplish their respective personal, professional, political and economic agendas." (TAC ¶ 327). In the next sentence, he refers to "[t]his concerted action" to defame Plaintiff. (Id.). Plaintiff then alleges that "[o]n information and belief" Murbach, Appelblatt, and other Wolverine employees "came to an agreement to defame" Plaintiff sometime prior to May 8, 1996 in "meetings and/or conversations." (Id. ¶ 329). The rest of the count describes the chain of events that culminated in the peer review, including Murbach's complaints to Csencsitz and Bott; the initial reviews by Connolly, Evans, and Bott; "agreement" by the IC members (Galceran, Bone, and Rivero) to adopt the initial reviews; Spiegel's alleged false statements in his reports; "agreement" by members of the CC and IC to adopt Spiegel's conclusions; and "collective action" of all of the Defendants named in this count leading to the NPDB report

being made.

A cause of action for conspiracy to defame is not stated in this count. First, as noted above, in order for an actionable civil conspiracy claim to be made, there must be an actionable underlying tort against at least one of the alleged conspirators. See Beck, 162 F.3d at 1099 n.18. The underlying tort on which this count is based is defamation, and, as concluded earlier in this Order, no actionable defamation claim has been stated; Plaintiff has not pled defamation so as to overcome the qualified privileges asserted by the Defendants, and the defamation claims are time-barred. Plaintiff may not resurrect his defeated defamation claims by relabeling them "conspiracy to defame." See Fridovich, 756 So. 2d at 140 ("The conspiracy to defame claim cannot stand where, as here, the defamation action fails. There being no defamation, the gist of the defamation conspiracy, there can be no conspiracy claim."); accord Palm Beach County Health Care Dist. v. Prof'l Med. Educ., Inc., 13 So. 3d 1090, 1096 (Fla. 4th DCA 2009) ("Since the counts regarding the goals of the conspiracy—defamation and tortious interference—fail, so too the conspiracy count must fail."). Additionally, the description of events and the general allegation of an agreement among these many Defendants do not sufficiently state a plausible claim of civil conspiracy in any event.

b. Count IX (Conspiracy to Breach the Medical Staff Bylaws)

In Count IX, Plaintiff brings a claim of "conspiracy to breach the medical staff bylaws" against seven of the individual Defendants—the three orthopedists (Bott, Connolly, and Evans) who were selected by the IC to conduct the initial reviews; those who comprised the

IC (Bone, Galceran, and Rivero), as chosen by Moser; and Moser, who chaired the CC.[29]

Plaintiff alleges that these Defendants agreed not to tell Plaintiff about the investigation into his surgeries; agreed not to give him the opportunity to meet with the IC before it issued its report; and agreed to extend the investigation past thirty days. (Id. ¶¶ 341-43). He also alleges that the IC "agreed to recommend" that Plaintiff be suspended from trauma and emergency call. (Id. ¶ 344). Plaintiff then generally alleges, "on information and belief," that "Defendants had a meeting of the minds" and that their "concerted action" assisted ORHS in breaching the Bylaws. (Id. ¶ 345).

Count IX does not state a cause of action for civil conspiracy. This count is essentially an attempt to allege a tortious interference with contract claim, but it is not pled as such. Rather than alleging an actionable conspiracy, the count describes a few decisions that were made by committees or individuals during the peer review process and then alleges that these decisions amount to an "agreement to breach the Bylaws." Count IX merely rehashes some of the allegations in the chain of events of the peer review and generally and conclusorily alleges an agreement. This is not sufficient to state a civil conspiracy claim.[30] Plaintiff has already brought a claim for breach of contract against ORHS based on failure to comply with the Bylaws, and he may not recast that claim here by parsing out portions of

---

[29]Defendant Diebel is listed in the heading of this count, but he is not mentioned in the body of the count. Thus, the Court construes this count as not being brought against Defendant Diebel.

[30]The Court finds it unnecessary to address Defendants' contention that there is no such cause of action as "conspiracy to breach a contract." Assuming arguendo that such a claim exists, the claim as pleaded here fails.

the process and calling it a "conspiracy" among those who participated in the process. Additionally, this claim is clearly time-barred; the events described in this count allegedly occurred in 1996 and culminated in Plaintiff's summary suspension in November 1996—more than eleven years before this suit was filed in January 2008.

### c.  Count X (Civil Conspiracy)

In Count X, Plaintiff brings a civil conspiracy claim against all of the individual Defendants.  Plaintiff in this count pleads the type of conspiracy endorsed in <u>Walters v. Blankenship</u>, 931 So. 2d 137 (Fla. 5th DCA 2006), wherein the court explained that while "[g]enerally an actionable conspiracy requires an actionable underlying tort or wrong, . . . an alternative basis for a civil conspiracy claim exists where the plaintiff can show some 'peculiar power of coercion' possessed by the conspirators by virtue of their combination, which an individual acting alone does not possess." <u>Id.</u> at 140; <u>accord</u> <u>Palm Beach</u>, 13 So. 3d at 1096 n.3 (noting that when this "'force of numbers'" type of conspiracy is involved, "the conspiracy itself becomes the gist of the action'" (quoting <u>Liappas</u>, 47 So. 2d at 583)).

Plaintiff alleges in this count that "[t]he Defendants together had the power to accomplish what one Defendant could not accomplish individually" and "[o]n information and belief, the Defendants collectively opposed [Plaintiff] in all proceedings aimed at removing him from trauma and emergency call." (TAC ¶ 349).  Moreover, "[o]n information and belief, [these] Defendants agreed to remove [Plaintiff] from trauma and emergency call to accomplish their respective personal, professional, economic and political goals and the economic goals of the hospital." (<u>Id.</u> ¶ 352).

The allegations in this count do not meet the standards of <u>Twombly</u>; the contentions

are entirely conclusory and do not plausibly present a conspiracy claim.  Plaintiff merely incorporates by reference all of the background facts of the TAC, states that it was necessary for the Defendants to work in concert, and states reasons why some of the named Defendants stood to gain by eliminating competition.  Plaintiff does not allege when any agreement was entered into—a significant shortcoming, especially considering that some of the Defendants, e.g., Murbach, are alleged (elsewhere in the TAC rather than in this count specifically) to have completed their actions before other allegedly conspiring Defendants had even been selected to serve on committees or otherwise to participate in the peer review. The allegations of agreement are wholly speculative.  Additionally, although no dates are given in this count, this claim is plainly time-barred because elsewhere in the TAC these Defendants are alleged to have acted only, at best, as late as the summer of 2003.

### d.  Count XI (Conspiracy to Defraud)

In Count XI, Plaintiff brings a claim of "conspiracy to defraud" against Defendants ORHS, Appelblatt, Bone, Bott, Connolly, Diebel, Evans, Galceran, Hillenmeyer, Moser, Murbach, Rivero, and Spiegel.  He alleges that "[i]f removing Plaintiff from emergency and trauma call does not constitute a reduction of clinical privileges, and is, therefore, not a right or obligation governed . . . by the Medical Staff Bylaws . . . , Defendant ORHS committed fraud and Defendants Murbach, App[el]blatt, Bott, Evans, Conn[o]lly, Galceran, Bone, Rivero, and Spiegel came to an agreement with ORHS, and its agents and employees, Defendants Hillenmeyer and Moser, to commit fraud."  (TAC ¶ 356).  Moreover, "Defendants individually took action leading up to and enabling Defendant Hillenmeyer, acting on behalf of ORHS, to defraud [Plaintiff]."  (Id. ¶ 359).  "Through providing the initial false comments on [Plaintiff's]

competence; participating on the Investigation Committee or Credentials Committee; or through providing a review of [Plaintiff's] patient charts, Defendants Murbach, Appelblatt, Bott, Evans, Conn[o]lly, Galceran, Bone, Rivero, Moser and Spiegel took overt action in furtherance of the conspiracy," (id.), and "Defendants Galceran, Hillenmeyer, Murbach, Moser, Connolly, Spiegel, Csencsitz,[31] Bott, Wolfram and Diebel assisted Defendant ORHS in the hearing by providing live testimony or testimony via Affidavit," (id. ¶ 360).

The allegations of agreement in this count are wholly conclusory and insufficient to state a cause of action for conspiracy. Plaintiff merely describes discrete actions of individual Defendants and baldly asserts that "if ORHS committed fraud," then these Defendants agreed with ORHS to do so. Moreover, as noted earlier, Plaintiff's allegations as to fraud are not sufficient, and because the underlying tort fails, the conspiracy to defraud count fails as well. See, e.g., Palm Beach, 13 So. 3d at 1096.

In sum, none of the civil conspiracy counts meets the pleading standards of Twombly. Plaintiffs' rehashing of allegations of individual actions and general allegations of agreement are not sufficient. These counts therefore shall be dismissed. Moreover, these counts are barred by the four-year statute of limitations for conspiracy claims in any event.

C.  ORHS's Amended Motion to Strike Certain Claims for Damages (Doc. 248)

ORHS has also moved, pursuant to Federal Rule of Civil Procedure 12(f), to strike

_____

[31]Though Csencsitz is mentioned in this paragraph, he is not named in the heading of this count or alleged to have been a conspirator—only to have "assisted" with the hearing. Thus, the Court does not construe this count as being brought against Csencsitz. Even if it were, it would fail as against him for the same reasons that it fails as against the other Defendants.

certain of Plaintiff's claims for damages in Count I of the TAC—the breach of contract claim against ORHS that was not part of ORHS's motion to dismiss. (Am. Mot. to Strike, Doc. 248). ORHS notes that in Count I Plaintiff seeks damages stemming from the allegedly improper summary suspension of his call privileges in November 1996 and also seeks damages stemming from the passage of the Board resolution in January 2004 in which the decision not to restore him to call was effectuated. ORHS does not dispute that Plaintiff may seek damages for breach of contract with regard to the Board resolution, but ORHS asserts that damages stemming from the November 1996 summary suspension may not be recovered because they were incurred too long before the filing of this lawsuit. Plaintiff responds that it would be improper to strike the portions of Count I that ORHS seeks to strike, essentially arguing that the material sought to be stricken pertains to Plaintiff's theory of recovery and is not the proper subject of a motion to strike. (See Doc. 257 at 20-21).

The issue implicated by ORHS in this motion is that in Count I, Plaintiff essentially alleges more than one breach of contract, and while claims for some breaches of the Bylaws may have been timely filed in 2008, claims for others are time-barred because those breaches occurred as early as 1996. The Court will not strike any portion of Count I at this time. However, at later stages of the case ORHS may raise the issue of timeliness and recoverability of damages with regard to the multiple breaches of the Bylaws that are alleged in Count I. Thus, this motion (Doc. 248) shall be denied without prejudice.

### D. Motions to Dismiss/Strike Second Amended Complaint in Intervention

Also pending before the Court are the Motion to Dismiss Second Amended Complaint in Intervention and to Strike Claim for Damages (Doc. 239) filed by Defendants ORHS,

Wolverine, Hillenmeyer, Csencsitz, Wolfram, Connolly, Spiegel, Murbach, Appelblatt, Bone, Cole, Diebel, Evans, Galceran, Rivero, Moser, and Bott[32] and the Motion to Dismiss Second Amended Complaint in Intervention and to Strike Certain Claims for Damages (Doc. 241) filed by Defendants Sanders and FOI and in which Sanders and FOI adopt the arguments made in the first motion.

Defendants move to dismiss the Second Amended Complaint in Intervention (Doc. 230) ("SACI") filed by Plaintiff's former wife, Joanne Werntz, on the basis that her claim for loss of consortium is derivative of—as alleged in the SACI[33]—Counts II, III, IV, V, VI, VIII, and XI of the TAC, which they have urged must be dismissed. Defendants also argue that the allegation in the SACI seeking to recover for "an increase in stress" should be stricken because it is a claim for direct injury rather than a proper component of a derivative loss of consortium claim.

As noted in the Minutes (Doc. 265), during oral argument the Court granted these motions to the extent they sought to strike the portion of the SACI seeking damages for an increase in stress, and ruling was reserved on the motions to the extent they sought dismissal of the SACI. (See Hr'g, Tr., Doc. 279, at 68). Because the Court has found that all of the counts of the TAC on which the SACI is based are due to be dismissed, Defendants are correct that the SACI must also be dismissed. Accordingly, these motions (Docs. 239

---

[32]Bott is not listed among the Defendants upon whose behalf this motion is brought. (See Doc. 239 at 1 n.1). However, he is listed as a movant in the docket entry made by counsel when the motion was filed, and the Court attributes the failure to include him in the footnote on page one of the document to clerical error.

[33](See Doc. 230 ¶ 26).

& 241) are now granted *in toto*.

## IV.  Conclusion

The contentions in Defendants' motions to dismiss are well-taken.  All of Plaintiff's tort claims are insufficiently pleaded and time-barred.   Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1.  The Motion to Dismiss Third Amended Complaint as to Drs. Murbach, Appelblatt, Bone, Bott, Cole, Moser, Diebel, Evans, Galceran, and Rivero and Wolverine Anesthesia Consultants, M.D., P.A. (Doc. 237), in which Defendants Hillenmeyer, Csencsitz, Wolfram, Connolly, and Spiegel joined, (see Doc. 244), is **GRANTED.**

2.  Defendant ORHS's Motion to Dismiss Counts 2, 3, 4, 5, 6, 8, 9, 10, and 11 of Plaintiff's Third Amended Complaint (Doc. 238), in which Defendants Hillenmeyer, Csencsitz, Wolfram, Connolly, and Spiegel joined, (see Doc. 244), is **GRANTED**.

3.  The Motion to Dismiss Counts 2, 5, 8, 10, and 11 of Plaintiff's Third Amended Complaint filed by Defendants Roy W. Sanders, M.D. and Musculoskeletal Institute Chartered d/b/a Florida Orthopaedic Institute (Doc. 242) is **GRANTED.**

4.  Defendant ORHS's Amended Motion to Strike Certain Claims for Damages (Doc. 248)[34] is **DENIED without prejudice.**

5.  The Motion to Dismiss Second Amended Complaint in Intervention and to Strike Claim for Damages filed by Defendants ORHS, Wolverine, Hillenmeyer, Csencsitz, Wolfram,

---

[34]Defendants Hillenmeyer, Csencsitz, Wolfram, Connolly, and Spiegel joined in a prior version of motion (Doc. 240), (see Doc. 244), but ORHS's motion to strike pertains only to Count I, which is brought only against ORHS and not against Defendants Hillenmeyer, Csencsitz, Wolfram, Connolly, or Spiegel.

Connolly, Spiegel, Murbach, Appelblatt, Bone, Cole, Diebel, Evans, Galceran, Rivero, Moser, and Bott (Doc. 239) and the Motion to Dismiss Second Amended Complaint in Intervention and to Strike Certain Claims for Damages filed by Defendants Sanders and FOI (Doc. 241) are **GRANTED** in all respects.

      6. Counts II, III, IV, V, VI, VIII, IX, X, and XI of the Third Amended Complaint (Doc. 235) are **DISMISSED with prejudice** as to all Defendants, and the Second Amended Complaint in Intervention (Doc. 230) is **DISMISSED with prejudice** as to all Defendants. This ruling disposes of all claims against each Defendant except ORHS. Counts I and VII remain pending against ORHS, and the case will proceed as to those two counts only.

      7. By prior Order, the summary judgment deadline was suspended. (See Doc. 298). The new deadline for the filing of summary judgment motions is **Friday, May 7, 2010.**

      **DONE** and **ORDERED** in Orlando, Florida this 6th day of April, 2010.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record