# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**RAYMOND H. PIERSON, III,**

                              **Plaintiff,**

**and**

**JOANNE R. WERNTZ,**

                         **Intervenor-Plaintiff,**

**-vs-**                                **Case No.  6:08-cv-466-Orl-28GJK**

**ORLANDO HEALTH f/k/a ORLANDO REGIONAL HEALTHCARE SYSTEMS, INC.; ERIK LIEBERMAN, as personal representative of the Estate of Phillip G. Spiegel; ROGER MURBACH; STEVEN APPELBLATT; FRANK BONE; WILLIAM BOTT; THOMAS CSENCSITZ; J. DEAN COLE; JOHN HILLENMEYER; J. DAVID MOSER; N. DONALD DIEBEL; RORY EVANS; MANUEL J. GALCERAN; HEDRICK J. RIVERO; C. GORDON WOLFRAM; ROY W. SANDERS; GREGORY A. RIEF, as co-personal representative of the Estate of John Connolly; LINDA G.T. PARKS, as co-personal representative of the Estate of John Connolly; MUSCULOSKELETAL INSTITUTE, CHARTERED; WOLVERINE ANESTHESIA CONSULTANTS, M.D., P.A.; UNITED STATES OF AMERICA; NATIONAL PRACTITIONER DATA BANK; MICHAEL O. LEAVITT, Secretary of the United States Department of Health & Human Services; REGION IV OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES; STATE OF FLORIDA; FLORIDA HEALTH DEPARTMENT; and FLORIDA BOARD OF MEDICINE;**

                         **Defendants.**

_____

# ORDER

In this breach of contract case, Plaintiff, Raymond H. Pierson, Jr., intends to present

at trial the expert testimony of a statistician, Dr. James T. McClave ("Dr. McClave"), in support of his claim for lost earnings.  Defendant Orlando Health has filed a Motion to Exclude (Doc. 303)[1] the testimony, arguing that Dr. McClave's opinions do not satisfy the standards for admissibility set forth in Federal Rule of Evidence 702.  After considering the parties' filings and oral argument, the Court finds that the motion has merit and must be granted.[2]

## I.  Background

Plaintiff is an orthopedic surgeon.  After graduating from medical school and completing his residency, he practiced medicine in Chicago for several years in the early 1990s.  While in Chicago, Plaintiff was a member of University Orthopedics, an established practice group at Rush Presbyterian-St. Luke's Hospital ("Rush"), a recognized trauma center affiliated with Rush Medical College.  During his employment at University Orthopedics, Plaintiff was sued for medical malpractice and a significant judgment was entered against him.  After entry of that judgment, Plaintiff was terminated from University Orthopedics and relocated to Orlando in late 1993.

―――――――――――――――――

[1]The motion was filed by Orlando Health and several other Defendants before an Order (Doc. 315) had been entered resolving all of the claims against those other Defendants.  Orlando Health is the only remaining Defendant.

[2]The Court heard oral argument on this motion and three other motions to exclude expert testimony on May 5, 2010.  (See Hr'g Mins., Doc. 329).  During the hearing, the Court granted two of the motions to exclude (Docs. 301 and 306), leaving the motion pertaining to Dr. McClave (Doc. 303) and the motion pertaining to Defendant's proposed expert (Doc. 309) pending.  This Order grants the motion pertaining to Dr. McClave and renders moot the motion pertaining to Defendant's purported expert, who was being offered only to rebut Dr. McClave's testimony.

Plaintiff did not practice medicine in 1994 but instead assisted his wife—also a physician—in establishing her practice in Orlando.  In 1995, he resumed work as an orthopedic surgeon as a solo practitioner in Orlando, and he applied for and was granted staff privileges at two hospitals operated by Orlando Health.  By obtaining staff privileges, Plaintiff became eligible for emergency and trauma call rotation and began participating in that rotation.

In 1996, concerns arose regarding Plaintiff's surgical practices, and peer review proceedings were initiated.  Ultimately, after a peer review hearing and appeal, the hospital Board passed a resolution in January 2003 indefinitely suspending Plaintiff's emergency and trauma call and consulting privileges.  In September 2004, Plaintiff relocated to Jackson, California, where he entered into a contract with Sutter Amador Hospital ("Sutter") to provide orthopedic surgery services.  Plaintiff filed this lawsuit in January 2008, alleging improprieties in Orlando Health's peer review process and seeking to recover lost earnings for 1997 through 2005.

Plaintiff seeks to establish his lost earnings damages through the expert testimony of Dr. McClave.  Dr. McClave received a Ph.D. in statistics from the University of Florida in 1971.  Since then, he has taught and published in the field of statistics and econometrics.  He has frequently been deemed qualified to give expert opinions in state and federal courts.

In his Preliminary Expert Report ("Report"), Dr. McClave explains that he was asked by Plaintiff "to calculate the damages to [Plaintiff] resulting from the suspension of his trauma and emergency call and consulting privileges" at Orlando Health's two hospitals.  (Doc. 204-1 at 2 ¶ 2.0).  Dr. McClave states that he "utilized standard econometric methods" to

"'consider[] the difference between the plaintiff's economic position if the harmful event had not occurred and the plaintiff's actual economic position.'"  (<u>Id.</u> at 3 ¶ 4.0 (quoting Fed. Judicial Ctr., <u>Reference Manual on Scientific Evidence</u> 284 (2d ed. 2000)).  This so-called "'but-for' analysis" measures the "difference between the but-for value and the actual value" of earnings.  (<u>Id.</u> (quoting <u>Reference Manual</u> at 284)).  As explained by Dr. McClave, but for the suspension of Plaintiff's trauma and emergency call and consulting privileges in 1996, Plaintiff "would have had an opportunity to develop his practice in Orlando with the financial benefits that those privileges afforded."  (<u>Id.</u>).

In his Report, Dr. McClave calculated Plaintiff's alleged loss of earnings using three separate approaches or "scenarios," each yielding a different amount of lost earnings.  First, Dr. McClave used Plaintiff's 2006-2007 earnings in California—$716,569 in 2006 and $634,553 in 2007—as an "After" benchmark, "assum[ing] that after leaving Florida and relocating to California [Plaintiff] . . . was able to . . . establish his medical practice at his true non-encumbered earnings potential."  (<u>Id.</u> at 5).  Dr. McClave then applied Medical Care Services Consumer Price Index ("CPI") data to this "After" benchmark, creating a graph of Plaintiff's "After Indexed Potential Earnings" going back to 1991.  Under this scenario, Dr. McClave calculated Plaintiff's lost earnings as $4,132,055, and he notes in his Report that this analysis shows "excellent agreement" with Plaintiff's actual earnings in 1991 and 1992 in Chicago.  (<u>Id.</u> at 5-7).

In his second scenario, Dr. McClave used Plaintiff's 1991 and 1992 earnings in Chicago—$342,026 and $356,207, respectively—as a "Before" benchmark and applied the Medical Care Services CPI to project Plaintiff's earnings through 2007.  (<u>Id.</u> at 7).  Using this

"Before" scenario, Dr. McClave calculated Plaintiff's lost earnings to be $4,186,874, and Dr. McClave notes that the resulting graph line yielded results for 2006 and 2007 that were very close to Plaintiff's 2006 and 2007 actual earnings in California.  (Id.).

Finally, in his third scenario, Dr. McClave used the 2009 national median salary for orthopedic surgeons as reported on the website salary.com—$454,174—and then indexed that amount backward, again using the Medical Care Services CPI.  (Id. at 7).  Under this scenario, Dr. McClave calculated Plaintiff's lost earnings as $2,365,109, and he noted that using the national median income benchmark "significantly under-estimate[d] [Plaintiff's] actual income in both the 1991-92 '[B]efore' period and the 2006-07 '[A]fter' period."  (Id. at 8).  Dr. McClave concluded his report by stating that the first two scenarios "provide the best 'fit' to the actual earnings potential [Plaintiff] has demonstrated both before and after the 'Orlando experience.'"  (Id. at 9).

The graphs in Dr. McClave's Report representing each of these scenarios are reproduced below:

Scenario 1:



Scenario 2:



Scenario 3:



Orlando Health seeks to exclude Dr. McClave as an expert witness in this case, asserting several flaws in Dr. McClave's methodology.  As set forth below, the Court agrees that Dr. McClave's opinions do not meet the threshold requirement of reliability, and thus his testimony will not be allowed.

## II.  Discussion

### A.  Standards for Admissibility of Expert Opinion Testimony

Because disputes should be decided based upon facts admitted into evidence, witnesses are generally prohibited from testifying regarding opinions they may hold. However, Federal Rule of Evidence 702 provides an exception to this general prohibition. Pursuant to the rule, under certain circumstances a witness "qualified as an expert by knowledge, skill, experience, training, or education" may provide opinion testimony where "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  The circumstances that must exist before an expert opinion is admissible are that: "(1) the testimony [must be] based upon sufficient facts or data, (2) the testimony [must be] the product of reliable principles and methods, and (3) the witness [must have] applied the principles and methods reliably to the facts of the case."  Id.  Speculative and unreliable opinions are not admissible.  McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1237 (11th Cir. 2005).

As explained in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and its progeny, Rule 702 makes it the responsibility of the trial judge to serve as a "gatekeeper," screening expert testimony to ensure that it is relevant and reliable before it is presented to the trier of fact.  Trial judges are given substantial discretion in undertaking

this task.  In executing its gatekeeping responsibility, the court must determine whether each of the requisites of Rule 702 has been met, and the proponent of the opinion testimony has the burden of establishing each precondition to admissibility by a preponderance of the evidence.  <u>Rink v. Cheminova, Inc.</u>, 400 F.3d 1286, 1291-92 (11th Cir. 2005).

    <u>B.  Application</u>

    In sum, in order to be admissible under Rule 702, testimony must be from a qualified expert; reliable; and of assistance to the trier of fact.  As set forth below, although Dr. McClave is qualified to give lost earnings testimony based on econometric and statistical methodologies, the opinions that he has put forth in this case have not been established by Plaintiff to be reliable or of assistance to the jury.

    <u>1.  Qualifications</u>

    As noted earlier, Dr. McClave is certainly qualified by knowledge, skill, experience, training, and education to calculate lost earnings using statistical and econometric methods.  He has testified in many courts, including before the undersigned.  Orlando Health does not challenge Dr. McClave's credentials in the fields of statistics and econometrics; indeed, during oral argument, counsel conceded that they are impeccable.

    Orlando Health does, however, contest whether Dr. McClave's experience qualifies him "to testify about Orlando market factors."  (Doc. 303 at 5-6).  Plaintiff responds that he "is not calling Dr. McClave to testify about what a 'solo practitioner' in Orlando could reasonably expect to make," and Plaintiff asserts that "Defendant[] ha[s] not provided any alternative calculation of physician income in the Orlando market."  (Doc. 320 at 5).  Although one major problem with Dr. McClave's testimony is that he does not address the

-8-

fact that during most of the lost-earnings period Plaintiff was a solo practitioner in Orlando, the Court views this not as a shortcoming in Dr. McClave's qualifications but with his selection and application of data.[3]  Thus, the first aspect of Rule 702—qualifications—is satisfied here.

2.  Reliability

Rule 702 requires that in order to be admissible, expert testimony must first be shown to be reliable—it must be "based upon sufficient facts or data" and "the product of reliable principles or methods," and the expert must have "applied the principles and methods reliably to the facts of the case."  Dr. McClave's opinions fail as to this aspect of Rule 702. The methodology used by Dr. McClave in reaching his conclusions fails to take into account important facts and data directly bearing on Plaintiff's claim for lost earnings, and in each of the three scenarios presented in his expert report, Dr. McClave made assumptions and selectively chose data, rendering his opinions unreliable.

First, Dr. McClave's Report is devoid of any consideration or comparison of the geographic markets involved—Orlando, Chicago, and northern California.  In the "After" scenario, Dr. McClave assumed that Plaintiff would likely have done as well—absent the peer review proceedings over which he has brought this suit—in Orlando as he did once he moved to California.  Similarly, Dr. McClave assumed in the "Before" scenario that Plaintiff would likely earn as much in Orlando as he did in Chicago.  And, in the "median earnings"

---

[3]Moreover, it is certainly not Orlando Health's burden to prove up Plaintiff's damages for him.  Plaintiff's criticism of Orlando Health's failure to provide an alternative calculation misses the mark.

scenario, Dr. McClave made no attempt to relate the national median income of orthopedic surgeons to the earnings of orthopedic surgeons in central Florida.  There is no data offered to support an assumption that such market-to-market comparisons can properly be made.[4]

Not only did Dr. McClave fail to account for geography, but he also neglected to consider the different employment circumstances in which Plaintiff found himself in each city.  In Chicago, Plaintiff was a member of large, exclusive group practice associated with a medical school and hospital.  In his deposition, Plaintiff described the arrangement as "essentially a monopoly in terms of orthopedic practice at Rush," and it was "a very successful large orthopedic practice."  (Pl. Dep. at 1609, 1611).  It is undisputed that Plaintiff's practice in Chicago was not at all similar to his practice in Orlando, where he worked as a sole practitioner without the benefit of being associated with a medical school.  Furthermore, he had no reported source of referrals.  For all practical purposes, he was starting over again in a new city.

Similarly, Dr. McClave's "After" scenario fails to account for the fact that Plaintiff's

_____

[4]Indeed, Dr. McClave notes in his third scenario that his projected national median incomes were less than Plaintiff's actual earnings in Chicago and northern California.  A likely explanation for this is that those markets are above-median markets—precisely the problem with Dr. McClave's comparison of Orlando to those markets.

Incidentally, the Court is particularly perplexed as to Dr. McClave's methodology in the "national median income" scenario.  Dr. McClave used the May 2009 national median income figure from a website and then "indexed this median income benchmark back in time using the Medical Care Services CPI."  (Doc. 204-1 at 7).  While the Court understands a need to create projections when no data is available, seemingly there would be national median income data for all of the years at issue, rendering a definite trend line without the need for any type of indexing or regression analysis.  The Court by no means endorses the use of any such line—which certainly would not require any expert technique—but the indexing of a single median figure is puzzling.

employment arrangement in California is distinctly different from his practice in Orlando. Plaintiff testified in his deposition that Sutter guaranteed him a $50,000 or $55,000 monthly gross revenue guarantee for the first eighteen months, and the next-closest referral location for an orthopedic surgeon at the beginning of his tenure there was forty-five minutes away. (Pl. Dep. at  2110, 2112).   Hence, in California, Plaintiff enjoyed a lucrative guaranteed contract and a near monopoly—not comparable to his solo practice in Orlando.  The national median income comparison fares no better; it merely employs a bare average income amount, without regard to any practice circumstances.  Dr. McClave acknowledged in his deposition that "competition in any business matters," (McClave Dep. at 85), but he has not explained why he did not take into account the different practice circumstances or geographic locations in conducting his analysis.

Dr. McClave's data selections are troubling for other reasons as well.  First, as noted earlier, Plaintiff was sued for medical malpractice in Chicago and was terminated from his job there just before he moved to Orlando.   However, Dr. McClave did not take this circumstance into account.  Additionally, even though Plaintiff's income for the three years immediately preceding his December 1996 call suspension is known, in making his projections Dr. McClave used the higher, 1991-1992 Chicago income amounts instead.[5] This selective methodology is simply not sound or reliable.

---

[5]Dr. McClave does state in his Report that during 1995 and 1996 Plaintiff "made considerable investments" in developing a managed care organization and that "[t]hese investments during the 1995-96 start-up period absorbed nearly all of the revenue generated by [Plaintiff]'s practice." (Doc. 204-1 at 5-6).  However, the fact that Plaintiff made financial investments that consumed his revenue does not explain why the amount of revenue earned in those years is not significant in determining a pre-event benchmark.

In each of Dr. McClave's scenarios, "potential earnings" are represented as a steady ascent from 1991 to 2007, even though it is known that Plaintiff's income dropped significantly after 1992 when the malpractice judgment was entered and he left Chicago and his income had not rebounded by 1996 when the allegedly causative events at issue occurred.  The "potential earnings" for the years between Plaintiff's departure from Chicago and late 1996 make absolutely no sense—perhaps they represent potential earnings if Plaintiff had remained at his large group practice Chicago without a malpractice suit, but they clearly do not represent what actually happened.  Although the court recognizes that Dr. McClave did not calculate damages using this portion of the "potential earnings" line, the fact that those "potential earnings" are so far from the known reality renders the portion of the earnings calculation from which damages were calculated unreliable.  In other words, a line of this slope running back to 1991 does not fit with the evidence.

As the Supreme Court has explained, "conclusions and methodology are not entirely distinct from one another.  Trained experts commonly extrapolate from existing data.  But nothing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997).  Such is the case here.

Although Plaintiff argues that Orlando Health's concerns about Dr. McClave's analysis go to the weight to be given to his opinions rather than to their admissibility, the Court disagrees.  Dr. McClave did not consider sufficient facts or data, ignored available

data, and did not apply principles and methods reliably to the facts.  Instead, his opinions are based on unsupported assumptions that, inter alia, geographic markets and practice environments are comparable.  His failure to account for the differences in the relevant orthopedic markets, Plaintiff's professional situations in each of those markets, the circumstances under which Plaintiff left Chicago, and Plaintiff's actual income just before the events at issue renders Dr. McClave's opinions regarding Plaintiff's lost earnings unreliable under Rule 702, and therefore they must be excluded.

 3.  Helpfulness to the Jury

  Finally, to be admissible, specialized knowledge must be of assistance to the trier of fact in "understand[ing] the evidence or . . . determin[ing] a fact in issue."  Fed. R. Evid. 702.  "This condition goes primarily to relevance."  Daubert, 509 U.S. at 591.  While evidence tending to prove lost earnings would certainly be relevant evidence in this case, because Dr. McClave's conclusions are, as discussed above, not reliable, they also are not relevant.  In other words, the lack of reliability renders the evidence unhelpful; his opinions could only assist a jury in reaching an unsustainable verdict.  Cf. In re Air Crash Disaster at New Orleans, 795 F.2d 1230, 1235 (5th Cir. 1986) (finding "the assumptions of plaintiffs' economist so abusive of the known facts, and so removed from any area of demonstrated expertise, as to provide no reasonable basis for calculating" lost inheritance damages and reversing award because such an award "'cannot stand when the only evidence to support it is speculative or purely conjectural'" (quoting Marks v. Pan Am. Airways, Inc., 785 F.2d 539, 542 (5th Cir. 1986))).  The problem with Dr. McClave's testimony is that it does not pass muster under the reliability analysis; if it did, it may well have been of assistance.

III.  Conclusion

The opinions of Dr. McClave simply are not logically supported by the facts, rendering those opinions unreliable and therefore inadmissible.  By not considering or accounting for differences in geographic markets, differences in Plaintiff's employment circumstances, and the disruption in Plaintiff's career when he left Chicago, Dr. McClave created an analytical gap between the known data and his proffered opinion.  This gap is simply too great to satisfy the reliability requirement of Federal Rule of Evidence 702.

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1.  The Motion to Exclude Opinion Testimony of James T. McClave (Doc. 303) is **GRANTED**.

2.  As acknowledged by counsel during oral argument, the granting of the motion pertaining to Dr. McClave renders moot Plaintiff's motion to exclude the testimony of Defendant's rebuttal damages expert.  Accordingly, Plaintiff's Motion to Exclude the Testimony of J. Clay Singleton (Doc. 309) is **DENIED as moot**.

**DONE** and **ORDERED** in Orlando, Florida this 30th day of August, 2010.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record

-14-