### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
#### ORLANDO DIVISION

**RAYMOND H. PIERSON, III,**

                    **Plaintiff,**

**and**

**JOANNE R. WERNTZ,**

                    **Intervenor-Plaintiff,**

**-vs-**                               **Case No.  6:08-cv-466-Orl-28GJK**

**ORLANDO HEALTH f/k/a ORLANDO REGIONAL
HEALTHCARE SYSTEMS, INC., et al.,**

                    **Defendants.**
_____

### ORDER

This case arising from medical peer review proceedings is before the Court on the Motion for Summary Final Judgment (Doc. 330) filed by Defendant Orlando Regional Healthcare Systems, Inc. ("ORHS") and the Memorandum of Law in Opposition (Doc. 345) thereto filed by Plaintiff Raymond H. Pierson, III ("Plaintiff").[1]  ORHS seeks summary judgment in its favor on the two remaining counts of the Third Amended Complaint—the breach of contract count (Count I), in which Plaintiff contends that ORHS failed to comply with the Medical Staff Bylaws in conducting the peer review, and the count for declaratory relief (Count VII), in which Plaintiff asks that ORHS be required to rescind, correct, and expunge reports made about him to third parties.  As set forth below, ORHS's motion is

_____

[1]The claims of Intervenor-Plaintiff Joanne R. Werntz have been dismissed by prior Order (Doc. 315).

granted as to both counts.

## I.  Background

ORHS, a private, non-profit healthcare network, operates seven healthcare facilities in the Orlando area.  After relocating to Orlando from Chicago in the early 1990s, Plaintiff, an orthopedic surgeon, was granted membership and clinical privileges in "Orthopedics—CORE" by ORHS on January 24, 1995.  (Ameen Baker Aff., Ex. 2,[2] ¶ 3).  His application for reappointment was approved in January 1996.  (Id. ¶ 5).  By obtaining staff privileges, Plaintiff became eligible for emergency and trauma call rotation and began participating in that rotation at two of ORHS's hospitals—Orlando Regional Medical Center ("ORMC") and Sand Lake Hospital ("Sand Lake").

On May 8, 1996, the Chair and Vice Chair of the Department of Orthopedics—Dr. William Bott and Dr. Thomas Csencsitz, respectively—wrote separate letters to the Chief of Staff of ORHS, Dr. N. Donald Diebel, passing along concerns that had been reported to them by anesthesiologists and others about Plaintiff's surgical treatment of patients, particularly in trauma cases.  (Exs. 3-A and 3-B).  In his letter, Dr. Bott "requested that a focused review be implemented according to the hospital bylaws," (Ex. 3-A), and Dr. Csencsitz closed his letter by "respectfully request[ing] that [Dr. Diebel] consider looking into th[e] matter as soon as possible," (Ex. 3-B).

Five days later, on May 13, 1996, Dr. Diebel presented the issues raised in the letters

---

[2]Exhibit citations refer to the numbered exhibits submitted with ORHS's summary judgment motion (Doc. 330).  These fifteen exhibits—some with subparts—have been filed in the electronic court record at Documents 332 through 338.  Plaintiff did not submit any exhibits with his summary judgment response.

at a meeting of the Medical Executive Committee ("MEC"),[3] and the MEC referred the matter

to the Credentials Committee ("CC")[4] for immediate investigation.  (Diebel Dep., Ex. 8, at 90-

91; MEC Meeting Minutes May 13, 1996, Ex. 1-G at 2).  Dr. J. David Moser, the Chair of the

CC, then appointed an investigation committee consisting of Drs. Manuel Galceran, Hedrick

Rivero, and Frank Bone—none of whom is an orthopedist—"to investigate [Plaintiff's] clinical

competence."  (Investigation Committee Meeting Minutes May 21, 1996, Ex. 1-D at 1; Moser

Dep., Ex. 9, at 12, 77).

The investigation committee met on May 21, 1996, and "decided to request . . . a

focus study of [Plaintiff's] cases."  (Ex. 1-D at 1).  As part of that focus study, three

orthopedists—Dr. Bott, Dr. Rory Evans, and Dr. John Connolly—assessed charts from

Plaintiff's 1995 and 1996 cases with the assistance of the risk manager for the trauma

center, Lynn Burcham.  Burcham then compiled two summaries—one for each hospital—of

the orthopedists' comments on those cases.  (Exs. 3-C & 3-D; see also Burcham Dep., Ex.

11).

The investigation committee met again on July 2, 1996 and October 21, 1996, and

the committee was provided with Burcham's summaries of the three orthopedists'

_____

[3]As Chief of Staff, Dr. Diebel served as Chair of the MEC.  (See 1994 Bylaws, Ex. 1-A, at 17-18 ("The Chief of Staff shall be chairman of the Executive Committee.")).  The MEC is composed of the Chief of Staff, the Vice Chief of Staff, the immediate past Chief of Staff, the chairs of the hospital leadership committees, and the chairs of the clinical departments; departments with more than forty voting members also elect one additional representative to serve on the MEC.  (Id. at 17).

[4]The CC is composed of the Vice Chief of Staff, the immediate past Chief of Staff, and seven members of the Active Staff appointed by the Chief of Staff who are not the chairs of their departments.  (Id. at 19-20).

assessments of Plaintiff's cases.  The investigation committee "felt that the levels assigned by the reviewers in some cases were too varied," and the committee desired "to make sure there was no bias involved with the review."  (Ex. 1-D at 2).  Accordingly, after its October 21 meeting, the investigation committee recommended to the CC that an outside review of Plaintiff's cases be conducted and that "due to the increased number of trauma patients who have had an extended operating time," Plaintiff should be removed from the trauma call schedule while that outside review was conducted.  (Id.).

On November 25, 1996, Plaintiff was informed by Drs. Moser and Bott in a face-to-face meeting that he was being removed from trauma call and emergency department call pending completion of an investigation.  Prior to that meeting, Plaintiff was unaware that there were any concerns over his surgical practices and had not been informed of the appointment of an investigation committee.  In his meeting with Drs. Moser and Bott, Plaintiff was shown the summaries that Burcham had compiled; Plaintiff regarded the reviews as "grossly false" and told Drs. Moser and Bott that he believed the investigation was a maliciously motivated "witch hunt."  (Pl. Dep., Ex. 4, at 481-483).

In a letter dated December 3, 1996, John Hillenmeyer, the President of ORHS, formally confirmed to Plaintiff the information that Drs. Moser and Bott had given him a week earlier regarding the investigation and his removal from the call schedule.  (Ex. 3-E). Although Plaintiff was removed from the emergency and trauma call schedules and from consulting on trauma and emergency patients at that time, his ability to treat and admit patients at ORHS's hospitals was not otherwise curtailed in any way.  Plaintiff requested a hearing, but that request was rejected; Plaintiff was told that he was not entitled to a hearing

until the investigation committee completed its investigation.  (Joint Pretrial Statement, Doc. 358, at 15).

Meanwhile, Dr. Philip Spiegel, a Tampa orthopedist, was selected by Dr. Moser in early December 1996 to conduct the outside review of Plaintiff's cases that had been recommended by the investigation committee.  Dr. Spiegel examined seventy of Plaintiff's case charts at ORHS over a two-day period in January 1997 and compiled a 91-page Report (Ex. 3-F).  In his Report, Dr. Spiegel was complimentary of Plaintiff in some areas but critical of him in others.  For example, Plaintiff was noted to be thorough in his postoperative care, and Dr. Spiegel found that "[h]is radiological end results in trauma cases are generally satisfactory."  (Spiegel Report at 13).  However, Dr. Spiegel stated that he had "concerns and doubts re [Plaintiff's] technical ability and judgments to perform the procedures for which he is privileged."  (Id.).  Dr. Spiegel noted concerns regarding, inter alia, "[p]rolonged operating times," "[e]lective or semi-urgent surgery done in evenings/nights/early mornings," and "[d]elayed or tardy operative reports."  (Id. at 12).

Dr. Spiegel also opined in his Report that the protracted length of Plaintiff's procedures was placing his patients at increased risk, and Spiegel noted that "the time of day or night that the surgery is done also increases the chance of protracted surgery."  (Id. at 14).  Dr. Spiegel recommended that, with regard to orthopedic trauma cases from the emergency room, Plaintiff's privileges be redefined temporarily until there was sufficient time to judge Plaintiff's performance.  (Id. at 17).

The Spiegel Report was provided to Plaintiff in February or March 1997, and Plaintiff was afforded an opportunity to respond to it.  After seeking and being granted numerous

extensions of time to respond, Plaintiff ultimately presented eight volumes of clinical information to the investigation committee when he met with it on January 13, 1998. (See Ex. 1-D at 5). He later submitted an additional four volumes of clinical information. (See id.). Dr. Spiegel was then asked to review Plaintiff's response, and Dr. Spiegel prepared a Second Report (Exs. 3-I through 3-L) replying to Plaintiff's submissions; that Second Report was provided to Plaintiff on November 30, 1998. (Ex.1-D at 5; Joint Pretrial Statement at 16). Plaintiff was told that he could submit any comments he wished to make to Spiegel's second report by January 22, 1999. (Letter from Csencsitz to Pl. (Dec. 18, 1998), part of Ex. 3-M). Plaintiff did not submit any comments by that date but instead sent a letter on January 20, 1999 stating that he needed more time in which to do so. (Letter from Pl. to Csencsitz (Jan. 20, 1999), part of Ex. 3-M).

On July 1, 1999—having not received any additional information from Plaintiff—the investigation committee made its Report and Recommendation to the CC. (Ex. 1-D at 5-6). In the Report, the investigation committee noted four areas of concern: (1) excessive length of surgery time; (2) inappropriate scheduling of surgical time; (3) delay in dictating operative notes; and (4) elective cases being performed as urgent or semi-urgent. (Id. at 5). The committee also noted in its Report that it was "concerned that [Plaintiff's] response to this peer review proceeding demonstrates an attitude toward hospital, hospital staff, and peers which could interfere with collegial and professional relationships and the ability to work with peers and ancillary staff in a collegial and professional manner." (Id. at 6). The Report recommended (1) that Plaintiff continue to be excluded from trauma call; and (2) "[o]ngoing peer review or monitoring for surgical scheduling time, length of surgery, and prompt

-6-

dictation of operative notes." (Id.).

The investigation committee's Report and Recommendation made its way to the CC and the MEC, and on August 16, 1999, the MEC recommended "that [Plaintiff] be excluded from trauma call and regular emergency department call, and that ongoing peer review or monitoring be conducted for surgical scheduling time, length of surgery, and prompt dictation of operative notes."[5] (MEC Meeting Minutes Aug. 16, 1999, Ex. 1-G at 7). In a letter dated August 30, 1999, Hillenmeyer notified Plaintiff of the MEC's recommendations and advised him that he was entitled to request a hearing before the recommendation was acted upon by the ORHS Board and that he had thirty days to do so. (Letter from Hillenmeyer to Pl. (Aug. 30, 1999), Doc. 238-4). On September 28, 1999, Plaintiff requested a hearing.

The hearing was initially scheduled to begin on April 11, 2000, but Plaintiff requested additional time to prepare for it. (See Letter from Gabrielson to Romano (Mar. 24, 2000), part of Ex. 3-P). After many rescheduling attempts, the hearing finally commenced in April 2003 and was held in six sessions—on April 23, May 6, May 7, May 22, June 17, and July 1, 2003—before a three-member panel. At the hearing, Plaintiff was represented by counsel. Both Plaintiff's counsel and Plaintiff himself questioned witnesses and presented other evidence. (See Peer Review Hr'g Tr., Ex. 3-S).

On July 7, 2003, six days after conclusion of the hearing, the hearing panel issued a 17-page Report. (Ex. 1-E). The hearing panel's Findings of Fact included: (a) that "while [Plaintiff] is slower than his peers, his surgical time is not excessive and no harm to his

---

[5]Dr. Csencsitz, who was a member of the MEC at that time, abstained from voting. (MEC Meeting Minutes Aug. 16, 1999, Ex. 1-G at 7).

patients has been demonstrated," (id. at 12); (b) that Plaintiff had "good outcomes with patients" but "his election to perform surgery at [late evening and early morning] hours, in those instances where that scheduling was not necessary, put an undue burden on Hospital resources . . . and resulted in performance of surgery at a time that may not have been optimum for either the patient or Hospital personnel and at a time when skilled back-up physician and staff personnel were not available on site," (id. at 12-13); (c) that Plaintiff's "delay of twenty-five to thirty days in the dictation of an operative note was unacceptable regardless of his busy schedule," (id. at 13); (d) that Plaintiff's response to the Spiegel Report and some of Plaintiff's interrogation of witnesses at the hearing "did not reflect the collegial and professional attitude which should be the hallmark of the peer review process," (id. at 13-14); and (e) that "the peer review process was conducted without bias toward" Plaintiff but that the process was not perfect and the panel had difficulty understanding why Plaintiff "was not counseled by his peers and given an opportunity to cure those deficiencies identified by the Investigation Committee even before the Investigation Committee was appointed," (id. at 14-15).

The Hearing Panel Report concluded that Plaintiff "should have the opportunity to demonstrate that he is willing and able to cure those areas in which the Panel has found deficiencies i.e. inappropriate scheduling, untimely medical records, and attitude." (Id. at 16). The Hearing Panel recommendation states:

> Phillip Spiegel, M.D., the independent reviewer, recommended that [Plaintiff] be given temporary privileges so that his trauma call and emergency call practices could be analyzed.  The Panel endorses the recommendation that [Plaintiff] should be proctored by an experienced trauma surgeon

with a log maintained.  The peer review would be conducted to monitor whether [Plaintiff]'s scheduling and surgical time were appropriate.   [Plaintiff] would be required to explain to the proctor prospectively why he thought a procedure should be scheduled at the time selected and to provide retrospective justification for any prolonged surgery. The proctor would not be expected to be present for surgery but instead would be more of a mentor with a periodic reporting requirement.  The proctoring should continue for a period of twelve months.   In addition [Plaintiff] should provide the MEC, within thirty days of the date of the MEC's acceptance of these recommendations, if they are accepted, with a Corrective Action Plan for each area found deficient by the Panel with particular emphasis [on] relationship skills.  The Corrective Action Plan should include, at a minimum, appropriate continuing education courses and readings designed to sensitize [Plaintiff] to:  a) the attributes of a successful participant in a team setting, b) the institutional needs of the hospital and[] c) the needs of the peers and staff with whom he works.  At the hearing [Plaintiff] expressed willingness to work to improve the areas that the Panel has identified as deficient.  The Panel believes he should be given an opportunity to do so.

(Id. at 16-17).

Both Plaintiff and the MEC appealed the hearing panel's recommendation.  (Notices of Appeal, Ex. 3-V).  A three-member appeal panel heard oral presentations on November 18, 2003.  (See Ex. 1-H).  Shortly thereafter, the appeal panel issued a recommendation stating in part:

1.  The factual findings of the Hearing Panel disputed by [Plaintiff] are supported by the evidence.

2.   The Hearing Panel's observation that [Plaintiff] expressed a willingness to improve those deficiencies identified by the Hearing Panel is not supported by the evidence and is not supported by [Plaintiff's] written and verbal communications to this Panel.  The Appeal Panel asked [Plaintiff] regarding this subject, and his responses demonstrated that he has no willingness to improve in those areas or to modify his approach in any way.

3.  The Hearing Panel recommendation of a proctoring

arrangement is not workable, by [Plaintiff's] own admission.
    4.  The Appeal Panel's overriding concern is assuring patient safety and high patient care for *all* patients, including those treated by [Plaintiff] and those who present with emergency conditions at ORHS facilities.  The Appeal Panel is also concerned that the hospital be operated in an effective and efficient manner.

(Id.).  The appeal panel then recommended (1) "that the MEC make a determination as to whether [Plaintiff] is ready, willing, and able to work within the institutional guidelines, standards, protocols, resources, and systems that are generally applicable to orthopedic surgeons practicing in ORHS facilities" and that "[Plaintiff] should not be placed on emergency call unless and until it has been determined that he is ready, willing, and able to do so"; (2) "that the MEC verify and analyze [Plaintiff's] number of surgical procedures, type of procedures, and outcomes during the past 12 months," that Plaintiff "be required to provide written consent to Florida Hospital (or any other hospital where [Plaintiff] has been practicing) to release such information to ORHS," and that Plaintiff "not be placed on emergency call unless and until it has been determined by the MEC that he has current clinical competency to handle emergency surgical procedures"; and (3) that "the MEC's recommendation that [Plaintiff] do non-emergent elective cases at ORHS before attempting emergency or trauma cases is an appropriate recommendation, is in the best interest of patient care, and should be followed."  (Id.).  The Board of Directors met on January 26, 2004, and the appeal panel recommendation regarding Plaintiff was approved and affirmed in a Board Resolution.  (BOD Resolution, part of Ex. 1-I).

    Meanwhile, during the time that the peer review proceedings were ongoing, Plaintiff was reappointed to the Active Medical Staff in March 1998, March 2000, and May 2002.

(Baker Aff. ¶ 7).  In March 2004, Plaintiff requested to be reappointed to the Associate Staff, and that request was granted.  (Id.).  That appointment expired on March 31, 2006, and Plaintiff did not apply for further reappointment.  (Id.).  Plaintiff has resided in California since late 2004 and continues to practice orthopedic surgery there.

Plaintiff filed this lawsuit in January 1998, seeking damages and declaratory relief. (Compl., Doc. 1).  Initially, Plaintiff alleged twenty-two counts against more than twenty Defendants, asserting that he had been subjected to a "sham, malicious peer review" and raising claims of, inter alia, antitrust violations and civil conspiracy.  After several amendments to the initial complaint and rulings on numerous motions to dismiss, the only two remaining claims are Counts I and VII of the Third Amended Complaint ("TAC") (Doc. 235), in which Plaintiff seeks damages for breach of contract and declaratory relief against ORHS.  ORHS now seeks summary judgment in its favor on both of these counts.

## II.  Summary Judgment Standards

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The moving party bears the burden of demonstrating that no genuine issues of material fact remain, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), but when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations," Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).

In ruling on a motion for summary judgment, the Court construes the facts and all

reasonable inferences therefrom in the light most favorable to the nonmoving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).   However, summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

"'In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.'   Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'"  Sawyer v. Sw. Airlines Co., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988), and Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)).

### III.  Analysis

#### A.  Count I—Breach of Contract

In Count I of the TAC, Plaintiff alleges that ORHS breached the Medical Staff Bylaws ("the Bylaws")—a legally enforceable contract under Florida law[6]—in several respects. ORHS seeks summary judgment on all aspects of this count, asserting that no material breach of the Bylaws occurred, that recovery for some of the alleged breaches is time-barred, and that it is immune from damages liability for any such breach under a federal

---

[6]See Lawler v. Eugene Wuesthoff Mem'l Hosp. Ass'n, 497 So. 2d 1261, 1264 (Fla. 5th DCA 1986) (noting that "[t]he majority view is that a Hospital's By-Laws, when approved and adopted by the governing board, become a binding and enforceable contract between the Hospital and the physicians comprising the medical staff").

statute as well as a Florida statute.  These contentions are addressed in turn.

1.  Alleged Breaches of the Bylaws

Plaintiff alleges breaches of the Bylaws[7] pertaining both to the investigation phase of the peer review (from 1996 to 1999) and to events occurring once he was informed of his right to a hearing (after 1999).  These alleged violations involve Article VII ("Actions Affecting Medical Staff Members") and Article VIII ("Hearing and Appeal Procedures") of the Bylaws.

a. Investigation Phase (1996-1999)

(1)  Article VII, Part C, Section (2)(b)

Plaintiff alleges two violations of Article VII, Part C, Section 2(b) of the Bylaws.  Part C is titled "Procedure for Actions Involving Clinical Competence, Patient Care or Treatment," and Section 2 provides the "Investigation or Review Procedure."  After providing for appointment of an investigation committee by the CC, Section 2(b) states:

> The . . . Investigation Committee (hereinafter known as "Committee") shall have available to them the full resources of the medical staff and the hospital to aid in their work, as well as the ability to use outside consultants as required.  **The individual with respect to whom an investigation has been requested shall have an opportunity to meet with the Committee before it makes its report.**  At this meeting (but not as a matter of right in advance of it), the staff member shall be informed of the general nature of the evidence supporting the investigation requested and shall be invited to discuss, explain or refute it.

> This interview shall not constitute a hearing, shall be preliminary

_____

[7]The Bylaws are amended periodically, and three versions of the Bylaws have been submitted into the record—the December 1994 Bylaws, the July 1996 Bylaws, and the March 1999 Bylaws.  (Exs. 1-A, 1-B, and 1-C).  In the TAC, Plaintiff cites to the July 1996 Bylaws, and citations in this Order are to the July 1996 Bylaws unless otherwise noted.

> in nature, and none of the procedural rules provided in these
> bylaws with respect to hearings shall apply.  A record of such
> interview shall be made by the Committee and included with its
> report to the Credentials Committee.  *The investigation shall be
> completed and the report submitted to the Credentials
> Committee within thirty (30) days.*  The Credentials Committee
> shall then make its report and recommendation to the [MEC].

(Emphasis added).  Plaintiff alleges that the investigation committee "ignored all time frames

placed on the investigation by the Bylaws," (TAC ¶ 157), and that Section 2(b) was violated

in two ways:  (1) the investigation committee did not meet with him prior to issuing its

October 21, 1996 recommendation of an outside review and removal of Plaintiff from call;

and (2) the investigation was not completed within thirty days of when it was initiated.

First, citing the portion of this section in boldface type above, Plaintiff contends that

he was not provided with an opportunity to meet with the investigation committee before it

issued its Report on October 21, 1996 recommending that an outside review of Plaintiff's

cases be conducted.  It is undisputed that Plaintiff did not meet with the investigation

committee before October 21, 1996; indeed, he did not even know about the investigation

at that time.  In its summary judgment motion, ORHS asserts that the October 21, 1996

"Report" cited by Plaintiff is not the "Report" contemplated by this provision.  ORHS argues

that "[t]he Bylaws envision a single report from the IC following its investigation," (Doc. 330

at 26), and that the investigation committee did not issue its "Report" until July 1, 1999, when

it wrote a Report that reached a conclusion after review of the Spiegel reports and Plaintiff's

responsive materials and recommended action to the CC.

The investigation committee titled the minutes of each of its meetings

"Reports"—even the minutes of its very first meeting on May 21, 1996.  That certainly was

-14-

not the "Report" to which this provision pertains, because the committee had not done anything but have an initial meeting at that point.  On the other hand, the October 21, 1996 "Report" is, unlike the other meeting minutes, directed to the CC.  Nevertheless, the October 21, 1996 "Report" was certainly a preliminary Report that contemplated further action by the investigation committee after the outside review, including submission of another Report at the conclusion of the investigation.  Thus, the Court agrees with ORHS as to the meaning of "Report" in this portion of the Bylaws and finds that the fact that Plaintiff did not meet with the investigation committee prior to October 21, 1996 does not amount to a breach of this provision.  Additionally, Plaintiff has not explained how he was damaged by failure to meet with the investigation committee at that time.

Second, Plaintiff asserts that the italicized portion of Section 2(b) quoted above was violated because the investigation was not completed within thirty days of its initiation in May 1996.  ORHS argues that the "thirty days" in this portion of Section 2(b) runs not from the date the investigation was initiated but from the date of the interview with the subject physician.  The Court agrees with this argument based on a reading of this provision in context.

This is not the end of this issue, however, because—as acknowledged by ORHS—the investigation was not completed within thirty days of Plaintiff's interview either.  It is undisputed that Plaintiff did not meet with the investigation committee until January 1998, when he presented his material in response to the Spiegel Report.  The investigation was not completed until July 1, 1999, when the investigation committee issued its final Report to the CC.  ORHS contends that this failure to complete the investigation within thirty days was

not a material breach of the Bylaws, noting that Plaintiff submitted additional supporting materials two months after the January 13, 1998 meeting with the investigation committee and urging that Plaintiff's own dilatory conduct and failure to object precludes a finding of a material breach of this provision.

Plaintiff has not explained how he was harmed by the failure of the investigation committee to complete its investigation within thirty days of its interview of him or within thirty days of any other time.  Plaintiff took nearly a year to respond to the Spiegel Report, and no evidence of any concern by Plaintiff over how long the process was taking has been presented.  In fact, Plaintiff repeatedly requested—and was granted—extensions of time to submit materials.  The Court does not find that a material breach of the Bylaws occurred based on noncompliance with the deadline in this provision.  See, e.g., Owens v. New Britain Gen. Hosp., 627 A.2d 1373, 1380 (Conn. App. Ct. 1993) ("[I]rregularities in procedural compliance will not constitute a breach of the bylaws unless the physician can establish that the hospital has failed to cure these lapses adequately or timely or that these lapses have been willfully made or have otherwise prejudiced the outcome of the process."); Terre Haute Reg'l Hosp., Inc., v. El-Issa, 470 N.E.2d 1371,1381-82  (Ind. Ct. App. 1984) (finding that hospital substantially complied with bylaws where any breaches that did occur were "merely technical in nature" and where no damages proximately caused by any breach were established).

### (2)  Article VII, Part E, Section 1(a)

Plaintiff also contends that ORHS violated Article VII, Part E, Section 1(a) of the Bylaws when it "summarily suspended" him in November 1996.  (TAC ¶ 154).  Part E is

entitled "Summary Suspension of Clinical Privileges," and Section 1 provides the "Grounds

for Summary Suspension."  Paragraph (a) states:

> The Chief of Staff, or chairman of a clinical department, or the
> Chairman of a Hospital Leadership Committee shall each have
> the authority **to summarily suspend all or any portion of the
> clinical privileges of an individual member of the medical
> staff** whenever such action must be taken immediately in the
> best interest of patient care or safety in the hospital, or for the
> continued effective operation of the hospital.  In addition, the
> President, or the President's designee, or the Chairman of the
> Board, with the concurrence of the Chief of Staff or the chairman
> of a clinical department, or in the absence of the Chairman of
> the Board, the Chairman's designee, shall have the authority **to
> summarily suspend all or any portion of the clinical
> privileges of an individual member of the medical staff**
> whenever such action must be taken immediately in the best
> interest of patient care or safety in the hospital, or for the
> continued effective operation of the hospital.  Such suspension
> shall be deemed an interim precautionary action and not a
> professional review action.  Such suspension shall not imply any
> final finding of responsibility for the situation that caused the
> suspension.

(Emphasis added).

Plaintiff alleges in the TAC that this provision was violated because his "summary

suspension" in November 1996 was "not warranted because there was no demonstration

that such action was required to be taken immediately in the best interest of patient care or

safety in the hospital, or for the continued effective operation of the hospital."  (TAC ¶ 154).

This argument fails for several reasons, however, and Article VII, Part E, Section 1(a) was

not violated.[8]

_____

[8]It is not clear why Plaintiff alleges that his "summary suspension" occurred under
Article VII, Part E, Section 2(b) rather than Article VII, Part C, Section 2(b).  Part C, Section
2(b)—discussed in part earlier—addresses investigation procedure and provides in part:

First, this provision applies only to a summary suspension of "clinical privileges."  No part of Plaintiff's "clinical privileges" was suspended in November 1996—he was merely removed from the trauma and emergency call list at that time.  Plaintiff was still able to treat patients at ORHS's hospitals as a member of the Active Staff, but ORHS was no longer referring patients to him via call.  Plaintiff was removed from trauma call and emergency department call pending an investigation, and the evidence establishes that such call was not a "clinical privilege" within this provision.  ORHS has submitted the affidavit of its Operations Manager, Ameen Baker, on this point.  In that affidavit, Baker lists the clinical privileges in "Orthopedics—CORE," which were the only clinical privileges for which Plaintiff ever applied and the only clinical privileges that he was ever granted, and participation in trauma call or emergency department call is not among them.  (Baker Aff. ¶¶ 6, 8).  Baker attests that "[p]articipation on emergency and trauma call rotation was not and is not granted as a clinical privilege."  (Id. ¶ 8).

Other testimony overwhelmingly reinforces this conclusion as well.  The Medical Staff

_____

At any time during the investigation or review, the [MEC] may suspend all or any part of the clinical privileges of the member of the medical staff being investigated.  This suspension shall be deemed to be administrative in nature, for the protection of hospital patients.  It shall remain in effect during the investigation or review only, shall not indicate the validity of the charges, and shall remain in force, without appeal, during the course of the investigation or period of review.

It appears that the suspension of privileges during an investigation is covered in Part C, while "summary suspension" where there is not an ongoing investigation is covered in Part E.  In any event, the result is the same under either provision.  As discussed in the text, none of Plaintiff's "clinical privileges" were suspended in November 1996, and even if they had been, such suspension was in the interest of protection of hospital patients and was, as stated by Plaintiff's own witnesses, an appropriate action while the investigation proceeded.

Bylaws state in part that a member of the Active Staff "agrees to assume all the functions and responsibilities of membership on the Active Medical Staff, including, **when required by the Chairman of the department to which the member is appointed or the Chief of Staff**, . . . emergency service care." (1996 Bylaws Article II, Part A).  Participation on emergency call and trauma call is thus not a "clinical privilege"[9] but an obligation that an active staff physician must agree to undertake if asked to do so.  As is clear from the record evidence, some physicians do not like being on call, while others do.  The fact that Plaintiff wanted to take call and hoped to build his solo practice from it did not elevate his responsibility to take call when asked to do so to a "clinical privilege."  At one point in his own testimony, Plaintiff referred to call as a "requirement" to which he was subject because he enjoyed staff privileges.  (Peer Review Hr'g Tr., Ex. 3-S, at 273 (Test. of Pl.)).  Moreover, one of Plaintiff's own expert witnesses at the peer review hearing—the chair of the orthopedic surgery department at a hospital in New York City—testified that it is the prerogative of the department chair to decide who is on or off the call schedule.  (Id. at 1284, 1290 (Test. of Charles Cornell)).  This notion is not consistent with call being a clinical privilege.

Additionally, even assuming arguendo that trauma call and emergency call participation was a "clinical privilege," the Court rejects Plaintiff's assertion that the "summary

---

[9]The Court recognizes that at times throughout the peer review process, the term "privilege" was used by some to describe service on emergency call and trauma call. (See, e.g., Hearing Panel Report, Ex. 1-E at 6).  However, the sometimes loose use of the word "privilege" in these and other contexts does not elevate service on trauma and emergency call to the level of a "clinical privilege" in the face of overwhelming evidence that it is not considered such.

suspension" of his participation in that call was not "[i]n the best interest of patient care or safety in the hospital, or for the continued effective operation of the hospital." ORHS was reasonably concerned about Plaintiff's late-night trauma call and emergency call surgeries affecting patient care, safety, and the effective operation of the hospital.  Moreover, there is evidence from several witnesses that it is certainly appropriate to remove a physician from call pending an investigation.  Indeed, one of Plaintiff's expert witnesses testified at the peer review hearing that he has taken such action himself.  (Id. at 1290 (Test. of Charles Cornell)).

    (3)  Article VII, Part E, Section 2(b)

    Plaintiff also asserts that ORHS violated the Bylaws because the investigation was not completed within thirty days of his "summary suspension."  (TAC ¶ 161).  In this regard, Article VII, Part E, Section 2(b), states in part:  "A review of the matter that required the [summary] suspension shall be completed within a reasonable time not to exceed thirty (30) days or reasons for the delay shall be transmitted to the Board so that the Board may consider whether the suspension should be lifted."[10]  Again, Plaintiff was not subjected to a

---

[10]Plaintiff's response memorandum asserts that the investigation was to have been completed within thirty days of Plaintiff's summary suspension, citing Article VIII, Part B, Section 3 of the Bylaws.  (See Doc. 345 at 9).  That section, however, pertains to time and place of hearing and does not provide a right to a hearing within thirty days of a summary suspension.  The text discusses Article VII, Part E, Section 2(b), which does contain a thirty-day provision, because that is the section cited by ORHS in its motion, (see Doc. 330 at 24).

    As noted earlier, however, Part C, Section 2(b)—rather than Part E, Section 2(b)—seems more readily applicable if a "suspension of privileges" occurred at all.  Part C, Section 2(b) contains language similar to Part E, Section 2(b) with regard to completion of review within thirty days, and thus the result is the same under either provision.  None of Plaintiff's "clinical privileges" were suspended, and even if they had been, the reason that the review took more than thirty days was communicated to the Board.

"summary suspension."  In any event, the Board was advised of Plaintiff's removal from call and that an outside review of Plaintiff's cases was going to be conducted; thus, even if removal from call were regarded as a "summary suspension," this provision was complied with because the reasons for the time that the investigation was taking were conveyed to the Board.

(4)  Article VIII, Part B, Section 1

Plaintiff alleges two violations of Article VIII, Part B, Section 1 of the Bylaws.  This section provides in part:  "When a recommendation is made which, according to these bylaws, entitles an individual to a formal hearing prior to a final decision of the Board on that recommendation, the . . . medical staff member . . . shall promptly be given notice."  Plaintiff alleges that ORHS breached this provision by not providing him with a hearing and notice that he was entitled to a hearing when there was a "summary suspension of his privileges" in November 1996.  (TAC ¶¶ 155-56).

ORHS does not dispute that Plaintiff requested a hearing in December 1996—shortly after he received Hillenmeyer's letter advising him that he was being removed from emergency and trauma call pending an investigation—or that that request was denied. However, the Bylaws specifically list the grounds for a hearing in Article VIII, Part B, Section 2, and removal from call rotation pending an investigation is not one of those grounds.  As discussed earlier, participation in call was not regarded as a "clinical privilege" but as an obligation that **could be** imposed on an Active Staff Member by ORHS.  And again, removal from call was, according to the testimony of even Plaintiff's expert witnesses, an appropriate interim action. Plaintiff has not established that he was entitled to a hearing at the time that

he was removed from trauma and emergency call in November 1996, nor was he entitled to notice of any right to such a hearing.

### (5)  Article VIII, Part B, Section 5

The final investigation phase violation that Plaintiff asserts is an alleged violation of Article VIII, Part B, Section 5 of the Bylaws.  This section, entitled "Hearing Panel," provides for appointment of a three-member hearing panel and that "[n]o person who is in direct economic competition with the person requesting the hearing shall be appointed to the Hearing Panel."  Plaintiff argues that this section was violated because "direct economic competitors"—Drs. Bott, Evans, and Connolly—were permitted to conduct the initial internal review of his charts.  However, this Bylaw provision was not violated by the participation of these orthopedists in the internal review.  This section pertains to the composition of the hearing panel, and these doctors did not serve on the hearing panel.[11]  Plaintiff's assertion that their participation in the internal review violated Article VIII, Part B, Section 5 of the Bylaws misses the mark.

### (6)  Statute of Limitations

ORHS asserts that all of the alleged investigation-phase Bylaws breaches are time-barred, noting that these alleged breaches occurred no later than 1999 and Plaintiff did not file suit until January 2008—beyond the five-year limit for breach of contract actions in section 95.11(2), Florida Statutes.  Plaintiff responds that he could not file suit because he was required to exhaust administrative remedies before filing suit, and he emphasizes that

---

[11]Plaintiff also asserts that this section was violated because the hearing panel members were direct competitors.  That contention is addressed later in this Order.

the Board resolution was not passed until January 2004 after the hearing and appeal process at the hospital was concluded.

As to the first four of the five investigation-phase breaches, the Court agrees with ORHS. Those alleged breaches involved failure to comply with deadlines and failure to grant a timely hearing and interview. "Administrative exhaustion" would not have afforded Plaintiff a remedy for these deficiencies, and Plaintiff could have filed a suit seeking to compel compliance with deadlines or to seek the hearing to which he felt entitled in November 1996. Thus, these four alleged breaches are time-barred.

With regard to the participation of Drs. Connolly, Evans, and Bott in the initial internal review, however, the Court reaches a different conclusion. The involvement of these doctors in the process is not the same type of alleged violation as the untimely hearing and noncompliance with deadlines. Moreover, it is not clear when Plaintiff learned the identity of these reviewers; there is some evidence that it was late in the peer review process. Although as noted earlier the Court finds no merit to the alleged Bylaw violation with regard to the involvement of these doctors, the Court does not find this asserted breach time-barred.

b.  Hearing Phase (1999-2004)

In addition to alleging Bylaw violations during the investigation phase, Plaintiff also alleges several violations of the Bylaws in connection with the hearing that he was provided in 2003. These alleged violations are addressed in turn.

(1)  Article VIII, Part B, Section 3

Plaintiff contends that ORHS violated Article VIII, Part B, Section 3 of the Bylaws

because he was not provided with a hearing within sixty days of when he requested one on September 28, 1999.  (TAC ¶ 161).  However, this provision does not state that a hearing must be provided within sixty days.  It states:

> The President shall schedule the hearing.  The President shall give notice to the person who requested the hearing of the time, place and date of the hearing.  The hearing shall commence within sixty (60) days of the notice of the hearing or as soon as practicable, but shall in no event occur sooner than thirty (30) days after the date of the notice of hearing.  In the event the hearing cannot commence within ninety (90) days following the receipt of the hearing request, the person shall be advised in writing of the reason for the delay.

The only reference to "sixty days" in this provision is to "within sixty (60) days of the **notice** of the hearing"—not within sixty days of the **request** for the hearing.  The provision certainly suggests that the hearing will start within ninety days of the hearing request, but no violation of this provision has been shown.

Although Plaintiff requested a hearing on September 28, 1999 and the hearing did not commence until April 2003, there is no evidence that the delay was attributable to ORHS rather than to Plaintiff.  On December 2, 1999—plainly within ninety days of Plaintiff's hearing request—ORHS's counsel sent Plaintiff's counsel a letter attempting to establish dates for the hearing.  (Letter from Gabrielson to Romano (Dec. 2, 1999), part of Ex. 3-N). The hearing was initially scheduled to begin in April 2000, but Plaintiff requested that it be delayed because he did not have enough time to prepare.  Numerous scheduling conflicts prevented the hearing from commencing until April 2003, but the evidence in the record reflects that it was Plaintiff or his counsel—not ORHS—who requested or necessitated the

delays.[12]   Plaintiff has not submitted any evidence to establish that the delay in the commencement of the hearing was caused by ORHS.

> ### (2)  Article VIII, Part B, Section 5

Plaintiff contends that Article VIII, Part B, Section 5 of the Bylaws was violated.  As noted earlier, this section provides in part that "[n]o person who is in direct economic competition with the person requesting the hearing shall be appointed to the Hearing Panel."

The three members of Plaintiff's hearing panel were Dr. Lou Harold, Dr. J. Darrell Shea, and Dr. Michael Smigielski, and the presiding officer at the hearing was an attorney, William J. Stewart.  Plaintiff alleges in the TAC that "Smigielski was a direct competitor . . .

---

[12]As noted in the text, the attempts to schedule the hearing began at least by December 2, 1999, when counsel for ORHS sent a letter to Plaintiff's counsel proposing dates and times for the hearing—in four-hour increments from January 11, 2000 to May 6, 2000—and asking that counsel advise when he and Plaintiff were unavailable.  (Letter from Gabrielson to Romano (Dec. 2, 1999), part of Ex. 3-N).  On January 28, 2000, Plaintiff's counsel's office responded that due to Plaintiff's counsel's trial schedule, only four of the 109 proposed four-hour blocks were available.  (Letter from Plunkett to Gabrielson (Jan. 28, 2000), part of Ex. 3-N).  ORHS responded, noting that the hearing would be scheduled for three of the four dates that were acceptable to Plaintiff.  (Letter from Edenfield to Romano (Feb. 4, 2000), part of Ex. 3-N).

The hearing was initially set to be held on April 11, 12, and 18, 2000.  (Letter from Hillenmeyer to Romano (Mar. 8, 2000) part of Ex. 3-O).  Shortly after those dates were set, however, Plaintiff advised that he did not have enough time to prepare for a hearing commencing on April 11, 2000.  (See Letter from Gabrielson to Romano (Mar. 24, 2000), part of Ex. 3-P).  On March 24, 2000, counsel for the hospital submitted to Plaintiff's counsel a list of 137 four-hour increments of time so that the hearing could be rescheduled; the new proposed dates ranged from July 5, 2000 to November 24, 2000.  (Id.).  On June 8, 2000, Plaintiff's counsel responded by requesting that four of the November 2000 dates be set aside for the hearing.  (Letter from Romano to Gabrielson (June 8, 2000), part of Ex. 3-P).  The hearing was not held then either, and after the parties later agreed to set the hearing for October 23 and 30, 2002, Plaintiff's counsel advised on October 9, 2002 of a scheduling conflict, and the hearing again had to be postponed.  (See Letter from Gabrielson to Romano (Sept. 23, 2002), part of Ex. 3-P; Letter from Romano to Gabrielson (Oct. 9, 2002), part of Ex. 3-P).  The hearing  commenced in April 2003.

with an orthopedic practice in the Central Florida area"; that Dr. Shea "had been a direct competitor for the initial years of the peer review[] and had ties with Orlando Orthopedic Center, which he founded, which continued to be in competition with [Plaintiff] until 2004," and that Dr. Harold was a direct economic competitor "as it related to the use of hospital resources (operating room access)."  (TAC ¶ 162).

In advance of the hearing, Plaintiff's counsel sent a letter asking several questions regarding Dr. Shea.  (See Ex. 3-R).  Counsel for ORHS responded that Dr. Shea had retired from active practice in 1997 and had briefly been a partner of Dr. Rory Evans—one of the three orthopedists who conducted the initial internal review of Plaintiff's charts—in the late 1970s or early 1980s.  (Letter from Gabrielson to Romano (Apr. 3, 2003), part of Ex. 3-R). Plaintiff's counsel then objected to Dr. Shea serving on the panel based on Dr. Shea's "close business relationship" with Dr. Evans and on Plaintiff's previous "very vocal and very open" criticism of Dr. Shea's "'model' of medicine that allowed HMOs and other 'managed care' organizations to take a strong foothold in the Central Florida area."  (E-mail from Romano to Gabrielson (Apr. 8, 2003), part of Ex. 3-R; Letter from Romano to Stewart (Apr. 11, 2003), part of Ex. 3-R).

ORHS would not agree to remove Dr. Shea from the hearing panel but stated that "it may be appropriate to have some limited voir dire of the Hearing Panel members if either party believes it necessary."  (Letter from Gabrielson to Stewart (Mar. 20, 2003), part of Ex. 3-R).  The presiding officer, William J. Stewart, then wrote to both parties regarding Dr. Shea's service on the hearing panel:

> The law applicable to the subject provides that no hearing

panel member should be in direct competition with the individual subject to peer review.  The law also provides that the panel member should be free of conflicts of interest. Further, no panel member should be influenced by a bias or hostility toward the person subject to the peer review proceeding which would affect the outcome of the hearing.

It appears from the materials presented that Dr. Shea is neither in direct competition with [Plaintiff] nor does he have a conflict of interest.  The question that has been raised is whether he might have a bias or hostility toward [Plaintiff] which may affect the result of the hearing.  There is nothing that has been submitted to me which would enable me to determine the answer to that question.  The only solution appears to be a voir dire at the commencement of the hearing.  We can discuss the matter of conducting that voir dire if you wish.

At the conclusion of voir dire, I will decide whether Dr. Shea is qualified to sit on the hearing panel.  I would suggest that the hospital have an alternate in the event that he is disqualified.

(Letter from Stewart to Romano and Gabrielson (Apr. 7, 2003), part of Ex. 3-R).  At the beginning of the peer review hearing, Plaintiff's counsel conducted voir dire of the hearing panel members.  (Peer Review Hr'g Tr., Ex. 3-S, at 8-18).  After the voir dire, Plaintiff's counsel had no objections other than those previously made but stated that Plaintiff wanted to preserve the previous objections.  (Id. at 20).

Plaintiff did not object to Dr. Smigielski or Dr. Harold prior to the hearing, and thus any objection to those panel members has been, as noted by ORHS, waived.  Cf. Moore v. Williamsburg Reg'l Hosp., 560 F.3d 166, 176 (4th Cir. 2009) ("[P]laintiff waived any right to object . . . because he did not object to the final composition of the Hearing Panel when it was convened.").  Even if Plaintiff had preserved his objection to them, however, there is no evidence that they were "in direct competition" with him at the time of the hearing.  And, although Plaintiff did object to Dr. Shea, he has not presented evidence that Dr. Shea was

in direct competition with Plaintiff at the time of the hearing either.  No violation of Article VIII, Part B, Section 5 has been established.

(3)  Applicable Version of the Bylaws

Plaintiff also contends that "ORHS applied the 1999 Bylaws, 2001 and/or 2003 Fair Hearing Policies and Procedures during [Plaintiff's] peer review rather than the 1996 Bylaws and procedures that were in place at the time of the investigation and summary suspension." (TAC ¶ 163).  Plaintiff asserts that in 1999, ORHS changed the Bylaw provisions regarding burden of proof and order of presentation at peer review hearings, thereby shifting the burden of proof and presentation to him.  (Id. ¶ 164).  Plaintiff argues that the 1996 procedures should have been employed.  ORHS asserts that the burden of proof did not change and that the later version of the procedural rules was the appropriate version in any event.

The "Burden of Proof" provisions of the Bylaws are contained in Article VIII, Part C, Section 10 of the 1996 Bylaws and in Article VIII, Part C, Section 9 of the 1999 Bylaws.  Both versions provide that "[a]fter all the evidence has been submitted by both sides, the Hearing Panel shall recommend against the person who requested the hearing unless it finds that said person has proved that the recommendation of the Executive Committee was unreasonable, not sustained by evidence, or otherwise unfounded."  (1996 Bylaws Article VIII, Part C, Section 10(c); 1999 Bylaws, Article VIII, Part C, Section 9(b)).  Thus, the burden of proof did not change and was on Plaintiff under either version of the Bylaws.

As acknowledged by ORHS, there **is** a difference in these Bylaws as to the order of presentation—under the 1996 Bylaws, the Executive Committee had the burden "initially to

come forward with evidence in support of its recommendation" and then the burden "shift[ed] to the person who requested the hearing to come forward with evidence in his or her support." (1996 Bylaws Article VIII, Part C, Section 10(b)).  Under the 1999 Bylaws, however, it was "incumbent on the person who requested the hearing initially to come forward with evidence in support of his or her position." (1999 Bylaws, Article VIII, Part C, Section 9(a)).

ORHS correctly argues that the order of presentation is a matter of procedure rather than of substance and that procedural rules in effect at the time of a proceeding—rather than those in effect at the time the claim arose—were properly applied here. Cf. Alamo Rent-A-Car, Inc. v. Mancusi, 632 So. 2d 1352, 1358 (Fla. 1994) (noting that "[p]rocedural or remedial statutes . . . are to be applied retrospectively and are to be applied to pending cases"); Ginsberg v. Lennar Fla. Holdings, Inc., 645 So. 2d 490, 497 (Fla. 3d DCA 1994) ("Statutes which do not change the substantive rights of the parties and which are merely procedural in nature may be applied retroactively."). Although the order of presentation changed in the 1999 Bylaws, the burden of proof was on Plaintiff under either the 1996 Bylaws or the 1999 Bylaws. Arguably, Plaintiff actually benefited from this changed order of presentation; he was able to call witnesses of his choice through five hearing sessions before the MEC was permitted to call its witnesses at the end of the final scheduled session. (See Peer Review Hr'g Tr., Ex. 3-S).

Plaintiff has presented no argument on this issue in his response memorandum, and ORHS's assertions are legally correct. The Court finds no error here. No breach of the Bylaws occurred when the 1999 order of presentation rules were used instead of the 1996

order of presentation rules.

### (4)  Section III(1)(c) of the Medical Staff Rules and Regulations

Plaintiff alleges that ORHS breached Section III(1)(C) of the Rules and Regulations of the Medical Staff.  (TAC ¶ 149).  This paragraph provides:

> A medical record shall be considered complete when the required contents are assembled and signed following discharge of the patient.  Failure of the medical staff member to complete medical records within thirty (30) days of discharge and after written warning of such delinquency shall result in the automatic relinquishment of the staff member's elective admitting and surgical privileges.

Plaintiff asserts that he provided written operative notes and that failure to comply with this provision should not have been part of his peer review.

ORHS correctly responds that this provision is not involved here because it pertains to completion of medical records within thirty days of discharge of a patient from the hospital; it does not involve the timeliness of operative reports after surgery, which is what part of ORHS's concern was regarding Plaintiff.  Moreover, Plaintiff's "elective admitting and surgical privileges" were not relinquished without written warning; Section III(1)(C) is simply not applicable here.

ORHS points out that the section at issue is not Section III(1)(C) of the Regulations but Section III(5)(A).  This section, entitled "Operative Reports," requires that operative reports be "dictated or written immediately following a surgical procedure" and that "[c]ompleted operative reports shall be signed by the surgeon and filed in the medical records as soon as possible after surgery."  ORHS asserts that Plaintiff routinely was delayed in completing his operative notes and that this was cause for concern.  Although

there is evidence that Plaintiff did promptly provide handwritten notes after surgery, there is also evidence that he sometimes did not finish his dictated notes for almost a month.

Plaintiff asserts that delay in dictating operative notes is not a basis for "summary suspension." However, again, Plaintiff was not "summarily suspended," and his delay in dictating notes was not the basis for ORHS's investigation; it was something that came to light during the investigation and was noted in the recommendations. No breach of Section III(1)(C) or Section III(5)(A) of the Staff Rules and Regulations has been shown.

(5)  Violation of section 395.0193, Florida Statutes

Plaintiff also alleges in the TAC that ORHS took action to "reduce his privileges" without a finding that grounds for discipline existed under section 395.0193, Florida Statutes—a provision that ORHS must comply with under the Bylaws and as a condition of its licensure. (TAC ¶ 166). ORHS argues that no breach of this section occurred, and Plaintiff has not responded to this contention. The Court finds no breach of this statutory section; the statute obligates hospitals to conduct peer reviews, but the Court sees no basis for a cause of action for breach of contract by Plaintiff under this provision.

c.  Conclusion as to Merits of Count I

In sum, there is no genuine issue of material fact as to any of the alleged breaches of the Bylaws. Although there may have been some technical violations of the time deadlines during the investigation phase, Plaintiff has not presented evidence of how any such violation was material. ORHS is thus entitled to summary judgment on Count I of the TAC.

2.  HCQIA Immunity

ORHS also claims that, regardless of the merits of the breach of contract claim, it is immune from damages liability under a federal statute, the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. §§ 11101-11152.  As the Eleventh Circuit has explained, "HCQIA provides that, if a 'professional review action' (as defined by the statute) meets certain due process and fairness requirements, then those participating in such a review process shall not be liable under any state or federal law for damages for the results."  <u>Bryan v. James E. Holmes Reg'l Med. Ctr.</u>, 33 F.3d 1318, 1321-22 (11th Cir. 1994).  "Thus, '[d]octors and hospitals who have acted in accordance with the . . . requirements of [HCQIA] are protected from damages sought by a disciplined doctor.'"  <u>Id.</u> at 1322 (bracketed alterations in original) (quoting H.R. Rep. 903, at 3, *reprinted in* 1986 U.S.C.C.A.N. at 6385).

In order for peer review participants to be protected from damages liability, the professional review action must have been taken:

> (1) in the reasonable belief that the action was in the furtherance of quality health care;
> (2) after a reasonable effort to obtain the facts of the matter,
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a).  HCQIA "creates a rebuttable presumption of immunity," <u>Bryan</u>, 33 F.3d at 1323; the statute provides that "[a] professional review action shall be presumed to have met [these] . . . standards necessary for [damages protection] . . . unless the presumption is rebutted by a preponderance of the evidence."  42 U.S.C. § 11112(a).

As acknowledged by Plaintiff,[13] "the rebuttable presumption of HCQIA section 11112(a) creates an unusual summary judgment standard that can best be expressed as follows: 'Might a reasonable jury, viewing the facts in the best light for [the plaintiff], conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)?'" Bryan, 33 F.3d at 1333 (alteration in original) (quoting Austin v. McNamara, 979 F.2d 728, 734 (9th Cir. 1992)).  "If not, the court should grant the defendant's motion.  In a sense, [this] presumption language in HCQIA means that the *plaintiff* bears the burden of proving that the peer review process was *not* reasonable."  Id. (emphasis in original).  The presumption language does not, however, actually alter the usual summary judgment burdens; Plaintiff's "burden is no different than that of the nonmovant who must demonstrate the existence of a genuine issue as to any material fact on all of the elements of the claim alleged once a movant for summary judgment files a properly supported motion."  Singh v. Blue Cross/Blue Shield of Mass., Inc., 308 F.3d 25, 32-33 (1st Cir. 2002).

ORHS asserts that it has satisfied all four of the HCQIA requisites for damages immunity, but Plaintiff disagrees.  The four requirements are addressed in turn.

a.  Furtherance of Quality Health Care

The first requirement that must be met in order for HCQIA immunity to apply is that the professional review action must have been taken "in the reasonable belief that the action was in the furtherance of quality health care."  42 U.S.C. § 11112(a)(1).  In assessing

---

[13](See Pl.'s Mem., Doc. 345, at 11-13).

reasonableness, an objective standard is applied, and this first element is satisfied "if 'the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients.'" Bryan, 33 F.3d at 1334-35 (quoting H.R. Rep. No. 903, at 10, reprinted in 1986 U.S.C.C.A.N. at 6393).

Plaintiff argues that "the record evidence taken as a whole rebuts the presumption that ORHS acted to restrict incompetent behavior or protect patients." (Doc. 345 at 16). Plaintiff asserts that no adverse patient outcomes or harm to patients was identified in any of his cases and that he met or exceeded the standard of orthopedic care in his treatment of patients. He further asserts that at best, the evidence showed only that "some of Plaintiff's surgical decisions were different than those his reviewers would have made" and that his surgeries were sometimes longer than those of other surgeons but were not excessively long. (Id. at 19).

However, no reasonable jury could find that the professional review action was not taken based on an objectively reasonable belief that the action was in the furtherance of quality health care. The record is replete with evidence that Plaintiff's performance of surgeries in the late night and early morning hours while he was on trauma and emergency call was a strain on hospital resources and placed his patients and other patients at some risk. Thus, action to limit Plaintiff's performance of such surgeries is reasonably viewed as action "to protect patients."

Plaintiff's narrow focus on only the actual outcomes of his own patients is misplaced. The fact that Plaintiff achieved good patient outcomes does not mean that he was not

creating unnecessary risks for those patients or for other patients.  See Singh, 308 F.3d at 38 (noting that "HCQIA was designed to prevent patient harm, not to assure an adequate response after it occurred" and rejecting physician's argument that hospital's actions were not in furtherance of quality health care); cf. Leal v. Sec'y, U.S. Dep't of Health and Human Servs., No. 09-15727, 2010 WL 3667020, at *5 (11th Cir. Sept. 22, 2010) (noting, in reviewing determination of HCQIA reportability of physician's outburst, that physician's behavior, "although not resulting in any known harm to a patient, is conduct that 'could affect adversely' patient health or welfare").  There is abundant record evidence that the resources of ORHS's hospitals—especially Sand Lake Hospital—were strained by unnecessary nighttime procedures and that patients would benefit from surgery being performed—where feasible—at times when experienced orthopedic surgical teams were available and when other specialists would already be on site in the event complications emerged.

Moreover, when performing surgery at night, Plaintiff sometimes occupied the only available operating room and on-call team at Sand Lake, meaning that when truly urgent cases came in, emergency procedures could not be performed until Plaintiff's procedure was finished.  On one occasion, a man with appendicitis and a woman with an ectopic pregnancy came in to the emergency room on a night when Plaintiff chose to perform an orthopedic procedure.  Although there is no evidence of any adverse consequences on that night, the danger was certainly there; the circumstances surely created risks to those patients, if not to Plaintiff's own patients.[14]  And, as to Plaintiff's own patients, many witnesses, including

---

[14]Plaintiff argues in his memorandum that "[t]he only 'risk' to patients Defendant could articulate was the potential risk to a potential patient who potentially needed immediate

Plaintiff's own expert witnesses, testified that humans are "not nocturnal creatures"[15] and that for that reason alone, daytime surgery generally is preferable to nighttime surgery where feasible.   Plaintiff professed to being able to function well at night, but he showed little concern for the possibility of support staff's decreased functioning at nighttime and also stated that one of the reasons he did not always dictate his operative notes right away was because he was too tired from being up all night in surgery.  Clearly, ORHS's concerns over Plaintiff's nocturnal practices were objectively reasonable.

In light of this abundant evidence, the Court rejects Plaintiff's assertion that a reasonable jury could conclude that the action against him was not undertaken in the reasonable belief that it "was in furtherance of quality health care."  The first requirement for the application of HCQIA immunity is satisfied here.

### b.  Reasonable Effort to Obtain Facts

The second requisite for HCQIA immunity is that the professional review action must have been taken "after a reasonable effort to obtain the facts of the matter."  42 U.S.C. § 11112(a)(2).  Plaintiff asserts that this "reasonable effort" must be "geared toward obtaining *objective* facts, not those facts which best support the action the peer reviewers wish to take." (Doc. 345 at 23 (emphasis in original)).  Plaintiff contends that when the investigation

_____

emergency surgery when the [operating room] was potentially occupied because Plaintiff sometimes made the standard default decision to treat semi-urgent surgical cases acutely." (Doc. 345 at 31).   However, all risks involve "potential" events, and ORHS's attempt to minimize risks to patients where such minimization is possible is certainly in the interest of quality health care and patient safety.

[15](See, e.g., Peer Review Hr'g Tr., Ex. 3-S, at 532 (Test. of Mark Baumgaertner)).

committee received disparate reviews from the three orthopedists who initially assessed Plaintiff's charts, it should have—instead of seeking an outside review—"accept[ed] that this disparity merely evidenced an acceptable range of legitimate professional surgical approaches and end[e]d the inquisition there." (Id.). Plaintiff also criticizes Dr. Spiegel's outside review as "dramatically incorrect." (Id. at 24).

Although Plaintiff finds fault with the actions of the investigation committee, the committee's actions do indeed evidence "reasonable effort to obtain the facts" rather than a failure to do so. The three physicians who served on the investigation committee were not orthopedists, and thus when they were unable to determine initially whether the concerns that had been raised to Dr. Diebel in May 1996 were borne out by the internal review of Plaintiff's charts, they sought more information by requesting an outside review. Plaintiff criticizes them for doing so, but their actions certainly do not amount to a failure to undertake "a reasonable effort to obtain the facts of the matter." And, as noted by ORHS, this reasonable effort did not end there. After the outside reviewer, Dr. Spiegel, submitted his report, Plaintiff was permitted the opportunity to respond to it. Plaintiff's response was then reviewed by Dr. Spiegel, and the investigation committee then submitted its report to the CC. Ultimately, a formal peer review hearing was held, followed by an appeal. The Court agrees with ORHS that "[t]he effort to obtain facts went far beyond a 'reasonable effort.'" (Doc. 330 at 36). The second HCQIA immunity element is met.

c. Adequate Notice and Hearing Procedures

Third, in order for HCQIA damages immunity to apply, the professional review action must have been taken "after adequate notice and hearing procedures are afforded to the

physician involved or after such other procedures as are fair to the physician under the circumstances." 42 U.S.C. § 11112(a)(3). Plaintiff recites this element in his memorandum but does not argue that it was not satisfied. (See Doc. 345 at 24). For this reason alone, ORHS is entitled to prevail on this point.

Moreover, as argued by ORHS in its memorandum, Plaintiff was provided with adequate notice and hearing procedures. Plaintiff was given notice of the professional review action, notice of the hearing that he requested, and a hearing before a panel of individuals who were not in direct economic competition with him. He was represented at the hearing by an attorney of his choice; a record was made of the proceedings; he called, examined, and cross-examined seventeen witnesses; he introduced evidence; and he received the written recommendation of the hearing panel. He also was given an appeal and the written recommendation of the appeal panel, as well as the written decision of the Board of Directors. No reasonable jury could conclude that Plaintiff was not afforded adequate procedures,[16] and thus the third requisite of HCQIA immunity is satisfied.

---

[16]HCQIA provides that the requirements of § 11112(a)(3) are satisfied if the conditions set forth in § 11112(b) are met; satisfaction of the conditions in § 11112(b) is sufficient but not necessary to establish compliance with § 11112(a)(3). See § 11112(b) ("A professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3) of this section.")

It appears that the only element listed in § 11112(b) that Plaintiff may not have been afforded was the right "to submit a written statement at the close of the hearing." See 42 U.S.C. § 11112(b)(3)(C)(v). Plaintiff did provide the panel members with written evidence during the hearing, but the attorneys argued orally at the close of the hearing instead of submitting written closing statements. Plaintiff's counsel readily agreed to this procedure, however. (See Peer Review Hr'g Tr., Ex. 3-S, at 1383, 1432). Again, the § 11112(b) elements are sufficient but not necessary conditions. Nearly all of them were met here, and Plaintiff clearly was provided adequate notice and hearing procedures so as to satisfy the third element for HCQIA damages immunity as a matter of law.

d.  Action Warranted By the Facts

The fourth and final requirement that must be met in order for HCQIA damages immunity to apply is that the professional review action must have been taken "in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3)."  42 U.S.C. § 11112(a)(4).  Plaintiff argues that "the record evidence here does not support a reasonable belief that the summary and continued suspension of Plaintiff's privileges would restrict incompetent behavior or protect patients" because "there was no evidence of any incompetent behavior and there was no evidence of any endangered patients."  (Doc. 345 at 25).

Although Plaintiff is correct that ORHS does not regard him as "incompetent," he again—as in the discussion of the first element—focuses only on actual outcomes of his own patients in addressing the question of whether his removal from trauma and emergency call was warranted for the protection of patients.  Plaintiff asserts that ORHS "admits baldly" that its decision was not based on bad outcomes, (id. (citing Doc. 330 at 37)), but Plaintiff ignores ORHS's objectively legitimate concern that Plaintiff's trauma call practices could lead to a bad outcome and also ignores the objective reasonableness of the proposition that "the MEC should not wait for a patient to be injured before taking action," (Doc. 330 at 337).  Plaintiff argues that "the evidence demonstrates that the peer review here was a pretext to force a physician with excellent trauma patient outcomes and a legitimate professional opinion as to how his trauma cases should be addressed to modify his surgical approach to suit the desires of some disgruntled colleagues and the priorities of hospital administrators."  (Doc.

345 at 26).  He further asserts that "[t]he evidence shows that the goal of the peer review at issue was not to address quality concerns or any concerns regarding patient safety, but instead to establish that Plaintiff's practices were different from those of his peers[] and punish him for nonconformance."  (Id.).

As discussed with regard to the first element, however, the facts presented at the peer review support the reasonableness of the actions of ORHS.  ORHS made a reasonable effort to obtain the facts, and abundant testimony supports a reasonable belief that ORHS's actions were warranted by the facts.

e.  Conclusion as to HCQIA Immunity

In sum, all four of the elements necessary for the application of HCQIA immunity are satisfied here.  A reasonable jury could not conclude that ORHS's actions are outside the scope of 42 U.S.C. § 11112(a), and thus ORHS is entitled to summary judgment on this issue.  Thus, even if the evidence supported a finding of a material breach of the Bylaws, ORHS would be immune from damages liability under this federal statute.

3.  Immunity Under Florida Law

ORHS also asserts that it is entitled to immunity under section 395.0193, Florida Statutes.  This statute provides in part:

> There shall be no monetary liability on the part of, and no cause of action for damages against, any licensed facility, its governing board or governing board members, peer review panel, medical staff, or disciplinary body, or its agents, investigators, witnesses, or employees; a committee of a hospital; or any other person, **for any action taken without intentional fraud** in carrying out the provisions of [section 395.0193].

§ 395.0193(5), Fla. Stat. (emphasis added).  ORHS contends that Plaintiff did not adequately

plead "intentional fraud" in the breach of contract count and that in any event there is no evidence supporting a finding that ORHS engaged in "intentional fraud" in conducting the peer review process.

In his response memorandum (Doc. 345), Plaintiff does not specifically address ORHS's assertion of immunity under section 395.0193, though he does generally assert in an introductory paragraph that it is too late at the summary judgment stage of a case to assert the inadequacy of pleadings. (See Doc. 345 at 2-3). Plaintiff is correct that inadequacy of pleading should have been raised earlier.[17] However, Plaintiff has not identified any evidence of "intentional fraud"; again, he has not made a specific response to this portion of ORHS's summary judgment motion at all. Thus, ORHS is entitled to immunity under this Florida statute as well as under HCQIA.

### B. Count VII—Declaratory Relief

In Count VII of the TAC, Plaintiff alleges that "ORHS claims that emergency and trauma call was not a clinical privilege" and that "therefore the report ORHS made to the [National Practitioner Data Bank] is false." (TAC ¶ 321). Plaintiff further alleges "that he has a legal right to have Defendant ORHS rescind, correct, and expunge the reports made to any third party, including the National Practitioner Data Bank and the Florida Department of Health." (Id. ¶ 323). Plaintiff asserts that "'clinical privileges' are the only actions with which the NPDB is concerned" and that therefore "the report ORHS filed with the NPDB is

---

[17]In its motion to dismiss (Doc. 238), ORHS did assert failure to plead intentional fraud as to other of Plaintiff's claims, and the Court agreed that intentional fraud had not been adequately pled as to those claims. (See Order, Doc. 315). In that motion, however, ORHS did not seek dismissal of the breach of contract claim on this basis or on any other ground.

misleading and prejudicial at best." (Doc. 345 at 31).

The Report that ORHS filed with the NPDB explained that Plaintiff's "delineated clinical privileges have not been reduced or curtailed" and that ORHS "does not consider participation on the emergency/trauma call schedule to be a clinical privilege." (Ex. B to Doc. 238, at 3). The Report then states: "[H]owever, this report is submitted due to the expansive definition of 'clinical privilege' under the Health Care Quality Improvement Act and the absence of a definitive determination in Florida as to whether participation on a hospital emergency/trauma call schedule is a clinical privilege."[18] (Id.).

ORHS seeks summary judgment on this count, arguing that there was no breach of the Bylaws leading to the NPDB Report, that the Report that was made to the NPDB accurately describes what occurred, and that the Report was prepared in accordance with instructions given by the NPDB. ORHS's arguments are well-taken.

HCQIA requires that if a professional review action is taken that "adversely affects the clinical privileges of a physician for a period longer than 30 days," a report must be made describing the action. 42 U.S.C. § 11133(a). The term "clinical privileges" is defined in HCQIA, for the purposes of HCQIA, as including "privileges, membership on the medical staff, and the other circumstances pertaining to the furnishing of medical care under which a physician or other licensed health care practitioner is permitted to furnish such care by a health care entity." Id. § 11151(3).

_____

[18]As earlier noted, the only evidence before this Court is that participation in emergency and trauma call was not a "clinical privilege" in "Orthopedics—CORE" at ORHS but instead was an obligation that could be imposed on Active Staff members, some of whom desired it and others of whom did not.

Plaintiff argues that ORHS cannot both claim that emergency and trauma call is not a "clinical privilege" and also report the removal of him from such call to the NPDB because HCQIA is only concerned with actions affecting "clinical privileges."  However, Congress can—and does—define terms in statutes in whatever manner it chooses.  There is no inconsistency between a statute employing one definition of a term and a hospital delineating the scope of that same term in a different, narrower way in an arrangement with a physician. ORHS has presented evidence of what constituted "clinical privileges" in its orthopedics department, and participation on emergency and trauma call was not among them.  This does not render the Report that ORHS made to the NPDB "false."

Indeed, the record reflects that ORHS went to great lengths to ensure that it did **not** make a false or otherwise improper report to the NPDB.  Carol Paris, ORHS's director of risk management, explained in her deposition that as was typical, in February 2004 her department was notified of and provided with the ORHS Board resolution regarding Plaintiff being kept off of the trauma and emergency call schedule.  (Paris Dep., Ex. 14, at 4, 39). Paris was concerned about whether the resolution involved an event that was reportable to the NPDB because she did not think that Plaintiff's clinical privileges were being affected, so she made inquiry to the NPDB about it.  (Id. at 41, 54-56).  The Report was filed because Paris was advised by the NPDB that a report needed to be filed, and Paris followed the NPDB's instructions as to what the report should include.  (Id. at 162-63).

Plaintiff has not established entitlement to declaratory relief.  The evidence before this Court reflects that the Report that was made to the NPDB accurately states what occurred and therefore is not "false."  Moreover, ORHS has presented unrebutted evidence that the

-43-

Report was made to the NPDB at the direction of NPDB after a call was made to the NPDB hotline to ensure that the results of the peer review were indeed reportable.[19]  ORHS is entitled to summary judgment on Count VII.

## IV.  Conclusion

No genuine issue of material fact remains as to whether a material breach of the Bylaws occurred or whether ORHS is entitled to immunity from Plaintiff's claims for damages.  Additionally, no basis for declaratory relief has been presented.  Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1.  The Motion for Summary Final Judgment (Doc. 330) filed by Defendant Orlando Regional Healthcare Systems, Inc. is **GRANTED** as to both of Plaintiff's remaining claims —Count I (breach of contract) and Count VII (declaratory relief) of the Third Amended Complaint (Doc. 235).

2.  ORHS's Request for Oral Argument (Doc. 331) is **DENIED**.

---

[19]The regulations promulgated pursuant to HCQIA provide a mechanism for disputing the accuracy of information at the NPDB.  Section 60.16 of Title 45 of the Code of Federal Regulations states that a physician may challenge the accuracy of a report by informing the Secretary of the Department of Health and Human Services of the basis for disagreement. Decisions of the Secretary regarding reportability and accuracy can then be reviewed by federal courts.  See, e.g., Leal v. Sec'y, U.S. Dep't of Health & Human Servs., No. 09-15727, 2010 WL 3667020 (11th Cir. Sept. 22, 2010) (affirming district court's ruling that Secretary's determination that physician's suspension was reportable was not arbitrary and capricious).

This Court has no information as to whether Plaintiff has sought to avail himself of the process provided for in the regulations.  The Court here determines only that he has not established an entitlement to declaratory relief in this lawsuit because he has not established that the report that ORHS provided was incorrect or that any breach of the Bylaws occurred that could necessitate correction or amendment of the report.  In other words, even assuming that this Court has the power to grant the relief that Plaintiff seeks, Plaintiff has not established entitlement to that relief.

3.  All other pending motions are **DENIED as moot**.

4.  In accordance with this Order and the Court's prior Orders (Docs. 201 and 315), the Clerk is directed to enter a judgment providing that Plaintiffs shall take nothing on any of their claims against any of the Defendants in this case.  Thereafter, the Clerk shall close this file.

**DONE** and **ORDERED** in Orlando, Florida this 27th day of October, 2010.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record